Nick Suciu III (pro hac vice)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Rachel Soffin (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
First Horizon Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
rsoffin@milberg.com

Trenton Kashima (CA SBN No. 291405)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

*Attorneys for Plaintiffs*
*and the Proposed Classes*

[Additional Counsel Listed On Signature Page]

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA SUNDERLAND and BENJAMIN BINDER individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PHARMACARE U.S., INC., a Delaware Corporation, and PHARMACARE LABORATORIES PTY LTD., an Australian company,<br><br>Defendant. | Case No: 3:23-cv-01318-JES-AHG<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**<br><br>Date:    January 15, 2025<br>Time:    10:00 a.m.<br>Judge:  Hon. James E. Simmons, Jr.<br>Ctrm:   Courtroom 4B |

## *** REDACTED FOR PUBLIC FILING ***

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS...................................................................i

TABLE OF AUTHORITIES ..........................................................iii

I.  INTRODUCTION .................................................................1

II.  FACTS RELEVANT TO CLASS CERTIFICATION ...............2

    A.  The Sambucol Elderberry Supplements.................................2

    B.  The Elderberry Juice in the Sambucol Products is Not Dr. Mumcuoglu's Patented Formula ........................................................4

    C.  Each of the Products Includes Uniform Misrepresentations that they were Developed by a Virologist ........................................8

    D.  Common Evidence Demonstrates that Defendant's Labels are False .....10

    E.  Defendant's Distribution of the Products ...........................12

III.  ARGUMENT.......................................................................13

    A.  Plaintiffs Meet the Requirements of Rule 23(a) ....................13

        1.  The Class Is Sufficiently Numerous and Ascertainable ...............13

        2.  Common Questions of Fact and Law Exist...................14

        3.  Plaintiffs' Claims Are Typical of the Class.....................15

        4.  Plaintiffs and their Counsel Will Fairly and Adequately Protect the Interests of the Class ..........................................16

    B.  Plaintiffs Meet the Requirements of Rule 23(b) ....................19

        1.  Common Issues of Law and Fact Predominate ..............19

            a.  Plaintiffs' state law claims do not require any individualized analysis ............................................20

            b.  Breach of warranty claims under the UCC do not require any individualized analysis ..................................24

            c.  Plaintiffs' claims can be determined by common evidence 25

            d.  Plaintiffs May Assert Claims for Each of the Products ......28

            e.  The Class's restitution, damages, and other relief may be determined on a class-wide basis ........................................29

        2.  A Class Action Is a Superior Method of Adjudication..................34

IV.    CONCLUSION .................................................................................34

MOTION FOR CLASS CERTIFICATION                    Case No. 3:23-cv-01318-JES-AHG

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013) ........................................................................14

*Aho v. AmeriCredit Fin. Servs., Inc.*,
  277 F.R.D. 609 (S.D. Cal. 2011) ...................................................................14

*Ainger v. Michigan Gen. Corp.*,
  476 F. Supp. 1209 (S.D.N.Y. 1979), *aff'd*, 632 F.2d 1025 (2d Cir. 1980) ...............24

*Allen v. Similasan Corp.*,
  306 F.R.D. 635 (S.D. Cal. 2015) ...................................................................29

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .....................................................................................19

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013) ..................................................................................13

*Anderson v. Jamba Juice Co.*,
  888 F. Supp. 2d 10006 (N.D. Cal. 2012) .......................................................28

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013) ............................................................13, 14

*Bailey v. Rite Aid Corp.*,
  338 F.R.D. 390 (N.D. Cal. 2021) ...........................................................13, 19

*Bank of the West v. Sup. Ct.*,
  2 Cal.4th 1254 (1992) ...................................................................................21

*Bradach v. Pharmavite, LLC*,
  735 Fed. Appx. 251 (9th Cir. May 17, 2018) ................................................19

*Brazil v. Dole Packaged Foods, LLC*,
  No. 12-CV-01831-LHK, 2014 WL 2466559 (N.D. Cal. May 30, 2014) ...............15

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) .......................................................................14

*Brockey v. Moore*,
  107 Cal. App. 4th 86 (2003) .........................................................................25

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004 ..........................................................................29

*CBS Inc. v. Ziff-Davis Pub. Co.*,
  75 N.Y.2d 496, 503 (1990) ...........................................................................24

*Chacanaca v. Quaker Oats Co.*,
  752 F. Supp. 2d 1111 (N.D. Cal. 2010) ........................................................21

- iii -

*Chapman v. Skype Inc.*,
   220 Cal.App.4th 217 (2013)..................................................................21

*Chavez v. Blue Sky Natural Beverage Co.*.
   268 F.R.D. 365 (N.D. Cal. June 18, 2020)............................................29

*Coffey v. WCW & Air, Inc.*,
   No. 3:17CV90-TKW-HTC, 2020 WL 4519023 (N.D. Fla. Mar. 25, 2020)............33

*Cohen v. JP Morgan Chase & Co.*,
   498 F.3d 111 (2d Cir. 2007).................................................................22

*Colgan v. Leatherman Tool Group*,
   135 Cal. App. 4th 663 (2006)...............................................................30

*Colpitts v. Blue Diamond Growers*,
   527 F. Supp. 3d 562 (S.D.N.Y. 2021)...................................................24

*Corbett v. PharmaCare U.S., Inc.*,
   No. 21CV137-JES (AHG), 2024 WL 1356220 (S.D. Cal. Mar. 29, 2024) 1, 2, 18, 32

*Corbett v. PharmaCare U.S., Inc. ("Corbett II")*,
   567 F. Supp. 3d 1172 (S.D. Cal. 2021)................................................24

*Corbett v. Pharmacare U.S., Inc. ("Corbett III")*,
   544 F. Supp. 3d 996 (S.D. Cal. 2021)..................................................28

*DeCoursey v. Murad, LLC*,
   673 F. Supp. 3d 194 (N.D.N.Y. 2023)...................................................23

*Dilts v. Penske Logistics, LLC*,
   267 F.R.D. 625 (S.D. Cal. 2010)...........................................................20

*Dzielak v. Whirlpool Corp.*,
   No. 2:12-0089 (KM)(JBC), 2017 WL 1034197 (D.N.J. Mar. 17, 2017)................32

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   131 S. Ct. 2179 (2011) .......................................................................20

*Fendler v. Westgate-Cal. Corp.*,
   527 F.2d 1168 (9th Cir. 1975)...............................................................17

*Fink v. Time Warner Cable*,
   714 F.3d 739 (2d Cir. 2013)............................................................23, 25

*Friedman v. AARP, Inc.*,
   855 F.3d 1047 (9th Cir. 2017)...............................................................21

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
   8 F. Supp. 3d 467 (S.D.N.Y. 2014)........................................................24

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc. ("Goldemberg II")*,
   317 F.R.D. 374 (S.D.N.Y. 2016)............................................................30

- iv -

*Gregory v. Albertsons, Inc.,*
  104 Cal. App. 4th 845 (2002)..................................................................................21

*Guido v. L'Oreal USA, Inc.,*
  No. 2:11-cv-01067-CAS (JCx), 2014 WL 6603730 (C.D. Cal. July 24, 2014) .......32

*Hadley v. Kellogg Sales Co.,*
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) ............................................................26, 32

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998).............................................................14, 15, 16, 19

*Hartless v. Clorox Co.,*
  273 F.R.D. 630 (S.D. Cal 2011) .............................................................................16

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender &*
  *Co., Inc.,*
  37 N.Y.3d 169 (2021) .............................................................................................22

*Holman v. Ali Indus., LLC,*
  No. 4:22-CV-4133-NKL, 2023 WL 1438752 (W.D. Mo. Feb. 1, 2023).................28

*In re ConAgra Foods, Inc.,*
  90 F. Supp. 3d 919 (C.D. Cal. 2015)......................................................................32

*Izquierdo v. Mondelez Int'l, Inc.,*
  No. 16-cv-04697, 2016 WL 6459832 (S.D.N.Y. Oct. 26, 2016)...........................23

*Jimenez v. Allstate Ins. Co.,*
  No. CV-10-08486, 2019 WL 13088814 (C.D. Cal. May 13, 2019) ........................33

*Johns v. Bayer Corp.,*
  \1280 F.R.D. 551 (S.D. Cal. 2012)....................................................................16, 20

*Johnson v. Nissan N. Am.. Inc.,*
  No. 3:17-CV-00517-WHO, 2022 WL 2869528 (N.D. Cal. July 21, 2022) .............33

*Keegan v. Am. Honda Motor Co.,*
  284 F.R.D. 504 (C.D. Cal. 2012) ...........................................................................29

*Koenig v. Boulder Brands, Inc.,*
  995 F. Supp. 2d 274 (S.D.N.Y. 2014).....................................................................23

*Lenovo Adware Litig.,*
  No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ...............32

*Leyva v. Medline Indus., Inc.,*
  716 F.3d 510 (9th Cir. 2013)..................................................................................29

*Lindell v. Synthes USA,*
  No. 11-2053, 2014 WL 841738 (E.D. Cal. Mar. 4, 2014)......................................30

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,*
  244 F.3d 1152 (9th Cir. 2011).................................................................................17

- v -

*Lytle v. Nutramax Lab'ys, Inc.*,
  No. 22-55744, 2024 WL 3915361, --- F.4th ---- (9th Cir. Aug. 23, 2024).........31, 33

*Marty v. Anheuser–Busch Companies, LLC*,
  43 F.Supp.3d 1333 (S.D. Fla. 2014) ...................................................................30

*McCrary v. Elations Co., LLC*,
  No. EDCV 13-00242 JGB, 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) ..............22

*Microsoft Corp. v. Motorola. Inc.*,
  904 F.Supp.2d 1109 (W.D. Wash. 2012) ..............................................................27

*Miller v. Ghirardelli Chocolate Co.*,
  912 F. Supp. 2d 861 (N.D. Cal. 2012) ..................................................................28

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir.)...........................................................................................33

*Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) .................................................................................17

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
  647 N.E.2d 741 (1995) ...................................................................................22, 23

*Paduano v. Am. Honda Motor Co.*,
  169 Cal.App.4th 1453 (2009)................................................................................21

*Pelman v. McDonald's Corp.*,
  237 F. Supp. 2d 512 (S.D.N.Y. 2003) ..................................................................22

*Perez-Olano v. Gonzalez*,
  248 F.R.D. 248 (C.D. Cal. 2008) ..........................................................................15

*Petrosino v. Stearn's Prod., Inc.*,
  No. 16-CV-7735 (NSR), 2018 WL 1614349 (S.D.N.Y. Mar. 30, 2018) .................20

*Pettersen v. Circle K Stores*, Inc.,
  No. 321CV00237RBM, 2022 WL 17974463 (S.D. Cal. Nov. 23, 2022)...........26, 28

*Ries v. Ariz. Beverages USA. LLC.*,
  287 F.R.D. 523 (N.D. Cal. Nov. 27, 2012) ...........................................................29

*Roper v. Consurve, Inc.*,
  578 F.2d 1106 (5th Cir. 1978)...............................................................................17

*Ruiz Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016)...............................................................................19

*Shanks v. Jarrow Formulas. Inc.*,
  No. CV1809437, 2019 WL 4398506 (C.D. Cal. Aug. 27, 2019) ............................26

*Sharpe v. A&W Concentrate Co.*,
  No. 19-CV-768 (BMC), 2021 WL 3721392 (E.D.N.Y. July 23, 2021) ............23, 32

*Shvarts v. Budget Group, Inc.,*
  81 Cal. App.4th 1153 (2000) ..................................................................21

*Slaven v. BP Am., Inc.,*
  190 F.R.D. 649 (C.D. Cal. 2000) ............................................................13

*StarKist Co. v. Olean Wholesale Grocery Coop., Inc.,*
  214 L. Ed. 2d 233 (2022) .......................................................................33

*Staton v. Boeing Co.,*
  327 F.3d 938 (9th Cir. 2003) ..................................................................16

*Stewart v. Quest Diagnostics Clinical Lab'ys, Inc.,*
  No. 319CV02043RBMKSC, 2022 WL 5236821 (S.D. Cal. Oct. 5, 2022) ..............15

*Stutman v. Chem. Bank,* 95 N.Y.2d 24, 29 (2000) ........................................20

*Sykes v. Mel S. Harris & Assocs. LLC,*
  780 F.3d 70 (2d Cir. 2015) .....................................................................32

*Tait v. BSH Home Appliances Corp.,*
  289 F.R.D. 466 (C.D. Cal. 2012) .......................................................20, 23

*Testone v. Barlean's Organic Oils, LLC,*
  No. 19-CV-169 JLS (BGS), 2021 WL 4438391 (S.D. Cal. Sept. 28, 2021) .....16, 26, 28, 34

*Tobacco II Cases,*
  46 Cal. 4th 298 (2009) .......................................................................21, 22

*Vinole v. Countrywide Home Loans, Inc.,*
  571 F.3d 935 (9th Cir. 2009) ..................................................................19

*Vioxx Class Cases,*
  180 Cal.App.4th 116 (2009) ...................................................................22

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) .........................................................................13, 14

*Wendt v. Host Int'l. Inc..*
  125 F.3d 806 (9th Cir. 1997) ..................................................................27

*Werdebaugh v. Blue Diamond Growers,*
  No. 12-CV-2724-LHK, 2014 WL 2191901 (N.D. Cal. May 23, 2014) .14, 16, 30, 31

*Williams v. Gerber Prod. Co.,*
  552 F.3d 934 (9th Cir. 2008) ..................................................................21

*Wise v. Combe Inc.,*
  No. 22-CV-10787 (PMH), 2024 WL 1178851 (S.D.N.Y. Mar. 19, 2024)..............25

*Wolin v. Jaguar Land Rover N. Am., LLC,*
  617 F.3d 1168 (9th Cir. 2010) ................................................................15

*Yamagata v. Reckitt Benckiser LLC,*
No. 17-CV-03529-VC, 2019 WL 3815718 (N.D. Cal. June 5, 2019) ....................20

## Statutes

15 U.S.C. 45 ...................................................................................................21

Cal. Civ. Code § 1770 (a)(5) ...........................................................................21

Cal. Com. Code § 2313-14 ..............................................................................24

Cal. Com. Code § 2714(2) ...............................................................................30

N.Y. Gen, Bus. Law § 349 ........................................................................20, 22

N.Y. Gen, Bus. Law § 350 ........................................................................20, 22

N.Y. U.C.C. § 2-714 .......................................................................................30

## Other Authorities

Fed. R. Civ. P. 23, Notes of Advisory Committee on 2003 Amendments ..................18

## Rules

21 C.F.R. § 111.205 ..........................................................................................7

Fed. R. Civ. P. 23 ....................................................................................passim

## Regulations

21 C.F.R. § 111 .................................................................................................7

21 C.F.R. § 111.155 ..........................................................................................7

21 C.F.R. § 111.160 ..........................................................................................8

21 C.F.R. § 111.165 ..........................................................................................8

21 C.F.R. § 111.260 ..........................................................................................8

21 C.F.R. § 111.415 ..........................................................................................7

21 C.F.R. § 111.70 ............................................................................................7

21 C.F.R. § 111.75 ............................................................................................7

21 C.F.R. § 111.80 ............................................................................................8

## I. **INTRODUCTION**

Defendant Pharmacare U.S., Inc. is a marketing company and subsidiary of Pharmacare Laboratories PTY Ltd., formed to sell the "Sambucol" branded line of dietary supplements in the United States. Pharmacare Laboratories PTY Ltd. purchased the preexisting "Sambucol" branded line of dietary supplements in 2009. The Sambucol products claim that their active ingredient, Black Elderberry Extract, was developed by a world-renowned virologist and is scientifically tested to provide guaranteed immune support. Defendant "inherited" most of these representations from the previous owner and has been completely indifferent to whether the products were accurately labeled or could be legally sold. These claims spawned two class action lawsuits, the instant case and *Corbett, et al. v. Pharmacare U.S., Inc.,* No: 3:21-cv-00137 ("*Corbett*").

Through the products' uniform labels and online representations, Defendant boasts that the Sambucol products contain a unique Elderberry Extract, and that "[b]y using a proprietary method of extraction, only Sambucol® can guarantee consistent, immune supporting properties in every serving." As alleged in *Corbett*, if this marketing is true, these products contain a New Dietary Ingredient ("NDI"), which has not been authorized by the Food and Drug Administration ("FDA"), rendering these products illegal. *See Corbett v. PharmaCare U.S., Inc.,* No. 21CV137-JES, 2024 WL 1356220 (S.D. Cal. Mar. 29, 2024) (granting class certification). But if Defendant's Elderberry Extract is not unique and is simply everyday elderberry juice (as Defendant testified under oath in *Corbett* and the instant case alleges), that revelation would render the Sambucol products' labeling false and misleading. Predictably, in this Catch-22, Defendant avoids disclosing the exact nature of its Elderberry Extract, confusing the issue by giving contradictory disclosures and testimony. Indeed, Plaintiffs in both this case and *Corbett* have filed a Motion for Sanctions (ECF No. 60), addressing this issue.

Plaintiffs brought this class action for violations of California's Unfair Competition Law ("UCL), False Advertising Law ("FAL"), the Consumers Legal Remedies Act ("CLRA"), and New York's General Business Law ("GBL"), sections

349 and 350, as well as for breach of express warranty. Accordingly, Plaintiffs move for the certification of two Classes:

> **California Class**: All persons in California who, before March 31, 2023, purchased the Products[1] for personal or household use and not for resale.

> **New York Class**: All persons in New York who, before March 31, 2023, purchased the Products for personal or household use and not for resale.

Such claims are well-suited for class treatment. Under California and New York controlling authority and established caselaw, liability can be established on a classwide basis without any need to address individual issues.

Indeed, this Court has already certified a parallel class action, in *Corbett,* which involves the same product labels, similar legal claims, and theories of recovery. *Corbett*, 2024 WL 1356220. The Court should adopt similar reasoning here and certify the proposed Classes.

## II.     FACTS RELEVANT TO CLASS CERTIFICATION

### A.     The Sambucol Elderberry Supplements

Black Elderberry (also known as *Sambucus nigra*) is a flowering plant that produces small clusters of black berries. Although cooked elderberries are edible, uncooked berries and other parts of the plants are poisonous.

On May 3, 1988, Madeleine Bliah (later known as Madeleine Mumcuoglu, the virologist upon whom Defendant relies in its marketing and labeling of the Sambucol Products) filed U.S. Patent No. 4,742,046 for an elderberry extract. Declaration of Trenton R. Kashima, concurrently filed herewith ("Kashima Decl."), Ex. A. This Patent described the use of "lectins," carbohydrate-binding proteins obtained from the *Sambucus nigra* plant to inhibit the activity of enveloping viruses (particularly influenza

---

[1] "Products" refers to the Elderberry Original Syrup, Sambucol Black Elderberry Sugar Free, Sambucol Black Elderberry Syrup for Kids, Sambucol Black Elderberry Effervescent Tablets, Sambucol Black Elderberry Chewable Tablets, Sambucol Black Elderberry Pastilles, Sambucol Black Elderberry Daily Immune Drink Powder, and Sambucol Black Elderberry Advanced Immune Syrup.

virus type A). *Id.*, Ex. A, pp. 2, 5. The Patent described the method used to produce Dr. Mumcuoglu's therapeutic elderberry extract:

> [E]lderberries from *Sambucus nigra I* may be pressed without crushing the seeds and the extract recovered by centrifugation and filtration. The extract should then be ultra-centrifuged. The lectins may be recovered from the extract by affinity chromatography on a Sepharose-galactose column followed by elution. The lactose may be removed (for example, by passage through a Sephadex G25 column). The desorbed material is then resubjected to affinity chromatography on a Sepharose-galactose column. The first two peaks recovered during desorption are dialyzed against water and lyophilized. The first peak comprises *Sambucus nigra II* lectin which is not appreciably adsorbed on to the Sepharose-galactose column and the second peak comprises *Sambucus nigra I* lectin

*Id.*, Ex. A p. 4. The Patent warns that "[d]uring the drug processing the temperature should not exceed 70º C. since some lectins are destroyed by heat at that level." *Id.*,[2] In 2009, Dr. Mumcuoglu filed another patent application, No. US2009/0186101 A1, for use of this same elderberry extract as a treatment for the avian flu. *Id.*, Ex. B ¶ 0066.

Dr. Mumcuoglu started an Israeli health products company called Razei Bar Ltd. to market her elderberry extract. *Id.* Ex. F at ¶ 4. In 1995, Razei Bar Ltd. applied for a trademark for the name "Sambucol" to be used in "dietary supplements, namely liquid extracts and throat lozenges composed primarily of elderberry juice." *Id.* Ex. C. In support of the trademark application, Dr. Mumcuoglu stated the trademark was first used in connection with dietary supplements in interstate commerce on or about March 1, 1995. *Id.* The "Sambucol" trademark was used when describing Dr. Mumcuoglu's patented elderberry extract. *See* Ex. B ¶ 0066. The "Sambucol" trademark would eventually become the property of Defendant's parent company, PharmaCare PTY Ltd. following its purchase from Healthcare Brands International ("HBI") in 2009.[3] *Id.*, Exs. D-E; Ex. I pp. 99:12-102:23, Ex. Y. Additionally, ███████████████

---

[2] This is an important note because most pasteurization processes for juices exceed this temperature. *See* FDA, Guidance for Industry: Juice Hazard Analysis Critical Control Point Hazards and Controls Guidance, First Edition (2004), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guid ance-industry-juice-hazard-analysis-critical-control-point-hazards-and-controls-guida nce-first (recommended pasteurization for fruit juice at a minimum of 71.1º C (160º F) for 6 seconds).

[3] HBI purchased the marks from Razei Bar Ltd., Kashima Decl., Ex. D.

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ *Id*. at Ex. Y.

**B.  The Elderberry Juice in the Sambucol Products is Not Dr. Mumcuoglu's Patented Formula**

While Defendant's exact position regarding the formulation of the Products, and Dr. Mumcuoglu's involvement therein, has been confused by Defendant's contradictory defenses in this case and *Corbett*, evidence demonstrates that the Products did not use Dr. Mumcuoglu's patented formula.

Defendant did not develop the Sambucol Products and does not manufacture them or their ingredients. Instead, in August 2009, Defendant's parent (PharmaCare PTY Ltd.) purchased the Sambucol Black Elderberry Original Syrup, Kids Syrup, and chewable Tablets from HBI. *Id.*, Ex. I pp. 43:19-44:23, 50:10-23; Ex. K pp. 19:13-20:6. Defendant now claims in this case that it used HBI's formula for its initial offerings (which was purportedly based on Dr. Madeleine Mumcuoglu's formula). *Id.,* Ex. U pp. 14-17 (original responses).[4] However, Sambucol Black Elderberry Advance Immune Syrup, Advance Immune Capsules; Effervescent Tablets; Throat Lozenges (or Pastilles); Daily Immune Drink Powder; and Sugar Free Syrup were *created after 2009* and were formulated by Defendant's contract manufacturers or PharmaCare's UK office. *Id.*, Ex. I pp. 47:3-49:25, 52:10-53:1, 58:1-59:10, 60:8-21, 62:10-63:7, 75:13-76:2, 76:13-77:11, 77:12-78:6, 78:7-79:13; Ex. K pp. 19:13-20:16. From 2009 through the present, the Products' formula remained unchanged, with the exception of the Effervescent Tablets (changed in 2021-2022 to add a better performing effervescent ingredient) and the Chewable Tablets (changed to increase the amount of Elderberry Powder). *See id.*, Ex. I pp. 43:19-44:23, 47:3-49:25, 52:10-53:1, 50:10-23, 58:1-59:10, 60:8-21, 62:10-63:7, 71:6-21, 75:13-76:2, 76:13-77:11, 77:12-78:6, 78:7-79:13.

4  ███████████████████████████████████████████████

Yet, the evidence in this case suggests that the Products are not based on Dr. Mumcuoglu's formulation but rather are just elderberry juice. Defendant testified that it had no connection with Dr. Mumcuoglu, *id.*, Ex I pp. 97:17-99:15; 99:1-11, despite including her name on older labels of the Products and confirming that she was the "virologist" referenced on the Product's labels. *Id.*, Ex I pp. 97:17-99:14; *see also, e.g.*, Ex. CC. Indeed, Defendant's Vice President of Marketing admitted that ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████ *Id.*, Ex K pp. 66:13-19. ████████████████████████████████████████████████████████████████████ ██████████████ *Id.*, Ex. I at pp. 99:1-99:1. ████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████ *Id.* Based on its own testimony, Defendant has no credible claim that Dr. Mumcuoglu played any role in developing Elderberry Extract in the Products.[5]

Furthermore, the elderberry extract Defendant used in its Products was not derived from the method used in Dr. Mumcuoglu's Patent. *Id.*, Ex. I pp. 123:9-125:6, Ex. BBBB. Defendant, instead, testified that it ████████████████████ ████████████████████████████████████████████████████████████ *Id.*, Ex I pp. 36:24-37:14. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████ *Id.*, Ex I pp. 36:24-37:14; Ex. K pp. 34:19-35:25; *see also* Ex. DDDD. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

---

[5] Despite its clear testimony, Defendant now claims that Dr. Mumcuoglu was personally involved in reviewing Pharmacare's production process and supplier contracts and that Sambucol uses her formula, Kashima Decl., Ex. X at pp. 6-7. This contradiction is the subject of Plaintiffs' Motion of Sanctions (ECF No. 60). Regardless, the question of how the Products were made, is common to the Classes and only subject to one answer. Thus, this dispute should not affect the Court's decision on this Motion.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ *Id.*, Ex I pp. 39:5-40:6, 41:22-42:21, 92:19-96:15; Ex. K pp.

26:1-28:15, 33:14-34:12; *see also* Ex. CCCC (██████████████████████████

██████████████████████████████████). ████████████████████████████

██████████████████████ Ex. K pp. 37:9-38:6.

Even though the Products' labels characterize the elderberry ingredients as "elderberry extracts," Defendant seemingly now recharacterizes its elderberry ingredients as ordinary elderberry juice. *See* Transcript of Oct. 31, 2022 Hearing, ECF No. 119, p. 29:20-25 ("You literally have the manufacturing process for turning elderberries into elderberry juice...."); Ex. S pp. 26-27 (Defendant stated that the Elderberry Extract used in the Products was the same as used in products dating back to the late 1880's); Ex. W pp. 5-6 (Defendant stated that it uses the same "method [of manufacture] by which the elderberry extract present in thousands, if not millions, of food products dating back at least six centuries"). Given the use of high temperature pasteurization, this manufacturing process was the antithesis of Dr. Mumcuoglu's patented formula (which required the juice to be **cold pressed**).[6]

Defendant claims that these methods are unique and proprietary because they result in ████████████████████████████████████████████████████

*See id.*, Ex I pp. 108:4-111:15. ██████████████████████████

████████████████████████████████████████████████████

---

████████[6]████████████████████████████████████████nts that describe ██

████████████████████████████████████████ *See* Kashima Dec

deposition in the *Corb*████████████████████████████████ Mr. Rowe-Cerveny's

████████████████████████████████████████████████████

████████████████████████████████████F No. 60-1, at ¶ 50. This discrepancy is also addressed in the Motion of Sanctions (ECF No. 60). *See, supra,* n. 3.

█████████████████████████ *See id.*, Ex. I at p. 72:3-21. But ████████████

████████████████████████████████████████████████████████████████

██████████ *See id.*, Ex. I pp. 72:3-74:20. And, when asked to elaborate on what

exactly is unique and proprietary about Sambucol's Elderberry Extract, ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.*, Ex. I at pp. 108:4-114:1, 41:15-41:20 ("

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ ). This admission is not surprising as the process to make

pasteurized fruit juice is well-established and common in the industry.

There is a lack of documentary evidence in this case that appears to be a function

of Defendant's limited oversight over its production process. *See* Kashima Decl., Ex. I

pp. 44:12-56:16. The manufacturing, packaging, labeling, and holding of Dietary

Supplements is heavily regulated by "Current Good Manufacturing Practices" (or

"GMPs"). 21 C.F.R. § 111(a); 72 FR 347521. GMPs require that Defendant establish a

"master manufacturing record"[7] and monitor the manufacturing process to ensure that

product specifications are met. 21 C.F.R. § 111.75(b)-(c). This obligation includes

inspections to confirm that packaging specifications are met, such as the use of the

proper label. 21 C.F.R. §§ 111.70(f)-(g); 111.75(f)-(g); 21 C.F.R. §§ 111.415.

Regulations also require that Defendant confirm the identity of any component that is a

dietary ingredient and track its source. 21 C.F.R. §§ 111.75(a); 111.155(d).

Representative samples of components, packaging, and labels should be kept to

determine if the finished product meets the master manufacturing record. 21 C.F.R. §§

---

[7] The master manufacturing record is required for each unique formulation of a dietary supplement and must include, among other things, the name of the dietary supplement, a complete list of all components to be used, a representative label, and written instructions for each point of the manufacturing process. 21 C.F.R. § 111.205.

111.80; 111.160; 111.165.[8]

Defendant's regulatory compliance unquestionably is lacking. ████████████
██████████████████████████████████████████████████ Kashima Decl., Ex I pp. 64:23-65:1.[9] The ██████████████████████████████████████████████████████
██████████████████████████████████████████████████ *Id.*, Ex I pp. 87:11-88:11. And Defendant's record keeping regarding the label used on the Products has been incomplete. *See id.,* ¶¶ 38-47. ████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████ *See id.*, Ex M pp. 21:1-23:14; 38:7-48:16; 52:12-24; 61:14-64:2; Ex. K pp. 48:15-50:7. However, the formulation and labeling of the products have been materially uniform over the class period. And Defendant does at least ensure that the Products are manufactured to specification. *Id.*, Ex M pp. 69:14-70:25.

### C. Each of the Products Includes Uniform Misrepresentations that they were Developed by a Virologist

The labels on the Products are materially similar. The Sambucol Black Elderberry Chewable Tablets, Daily Immune Drink Powder, Advanced Immune Syrup, Original Syrup[10], and Syrup for Kids, all claim the following on the side of the label: "Virologist developed" and "Developed by a [world renowned] virologist, **Sambucol®** is the unique black elderberry extract that has been used in scientific studies. By using a proprietary method of extraction, only **Sambucol®** can guarantee consistent, immune supporting

---

[8] Such documents are included in the required "batch production records," which contain detailed information regarding the actual production process used for each batch, lot, or control number. 21 C.F.R. § 111.260.

[9] This may be because Ph██████████████████████████████████ r the formulation of the Products, ██████████████████████████████ *See* Kashima Decl., Ex. AA at PC██

[10] Plaintiff does not seek certification for the 500 ml version of the Sambucol Black Elderberry Original Syrup, as this product's outward label differed from the 4 and 7.8 oz version of the product. *Compare* Kashima Decl. Exs. CC-KK *with* LL; *See also id.*, ██████████████████████████ ionally, it was only sold for a short time period ██████████████████████████ *Id.*, Ex. K pp. 77:25-78:9.

properties in every serving." *See* Kashima Decl., ¶¶ 48-71, 80-98, 109-119; Exs. CC-NN, TT-EEE, JJJ-MMM; Appendix A.

The labels on Sambucol Black Elderberry Effervescent Tablets, Throat Lozenges, and Sugar Free Syrup differ insignificantly, conveying the same material information. Although the Black Elderberry Effervescent Tablets do not have the side label that includes the "Virologist developed" statement, the product has a substantially similar statement: "Developed by a [world renowned] virologist, **Sambucol**® is the unique black elderberry extract that has been used in scientific studies. By using a proprietary method of extraction, only **Sambucol**® can guarantee consistent, immune supporting properties in every serving." *See id.*, ¶¶ 120-125, Exs. PPP-RRR; Appendix A. Similarly, the Black Elderberry Throat Lozenges do not have the side label that claims it is "Virologist developed." *See id.*, ¶¶ 100-106, Exs. FFF-III; Appendix A. But the Throat Lozenges product includes the following statement on the side label: "Developed by a world renowned virologist, **Sambucol**®'s unique manufacturing process preserves and maximizes the naturally occurring health benefits of the Black Elderberry." *See id*.

In addition, the label on the Black Elderberry Sugar Free Syrup claims "Developed by a world renowned virologist, Sambucol® has been trusted by millions worldwide. Sambucol can be taken every day for continuous immune support." This label differs from the labels on other products, which instead include a paragraph claiming "Developed by a [world renowned] virologist, **Sambucol**® is the unique black elderberry extract that has been used in scientific studies… .". *See id.*, ¶¶ 72-79, Exs. PP-SS; Appendix A.

Defendant changed some labels slightly over relevant time period time. For example, labels on Black Elderberry Original Syrup and Kids Syrup dropped references to "DR MADELEINE MUMGUOGLU." *See id.*, Exs. GG and TT; Appendix A. Additionally, in April 2020, Defendant changed the back label on its Black Elderberry Advance Immune Syrup. *See id.*, Ex. OO; Appendix A. But, despite these minor

variations, each of these labels conveys the same fundamental "virologist developed" claims (the "Challenged Representation"). Collectively, these label claims will be known as the "Challenged Representations." An overview of the relevant labels at issue can be found in Appendix A, attached to the Declaration of Trenton R. Kashima.

Likely in response to this case, Defendant would eventually change its labels. In March 2023, Defendant started altering the Products' labeling to remove the Challenged Representations (both in this case and in *Corbett*), removing the "virologist developed" language. *Id.,* Exs. SSS-YYY. Defendant also changed its characterization of the "virologist developed" on its website to note that "[o]ur Original Syrup is our flagship product, developed initially by a virologist." Exs. ZZZ.

**D.   Common Evidence Demonstrates that Defendant's Labels are False**

Defendant made little if any effort to ensure that its labels were accurate. ███████████████████████████████████████████████████████ ████████████████████████████████████ *Id.*. Ex. I p. 217:1-22. But, Defendant's representative testified that ████████████████████ ████████████████████████████████████ *Id.*, Ex. I pp. 117:9-120:8; 120:22-121:8; 124:25-127:10. ████████████████ ████████████████████████████████████████████████████ *Id.*. Ex. K pp. 33:23-34:18; 37:5-8. And when shown the patent application for Dr. Mumcuoglu's Sambucol formulation, ████████████████████ ███████████████████████████████████████████████████████ ██████████████████ *Id.*. Ex. I pp. 120:9-124:23. So perhaps it's no surprise that testing shows the Products either do not contain the lectins associated with Dr. Mumcuoglu's original formulation of the Sambucol elderberry extract or contain only trace amounts. *Id.*, ¶¶ 139-141, Ex. BBBB.

Given the reality of this case, it is not surprising that Defendant removed references to Dr. Mumcuoglu (*id.*, Ex K pp. 66:13-9) and the "virologist claims" from the Product's labels (*id.,* Ex. SSS-YYY). Additionally, Defendant's marketing now

concedes that the Sambucol was only "developed *initially* by a virologist," suggesting that the current formulation is not the same as Dr. Mumcuoglu's formal. *Id.*, Ex ZZZ (emphasis added). Additionally, Defendant's new labels also concede contain elderberry juice concentrate in the ingredients labeling, not some unique and proprietary elderberry extract. *Id.,* Ex. SSS-YYY).[11]

Defendant is also unable to support its label claims by explaining what is unique about the Elderberry Extracts used in the Products. *Id.*, Ex. I pp. 108:4-111:15; 133:3-6. Defendant advertises that "using a proprietary method of extraction, only Sambucol can guarantee consistent, immune supporting properties in every serving."[12] *See id.*, Ex. I pp. 115:20-24; Appendix A. ███████████████████████████████████ ████████████████████████████████████████████████ ████████ *Id.*, Ex. I pp. 115:20-116:3. ██████████████████████ █████████████████████████████████████████████████ █████████████████████ *Id.*, Ex. I pp. 71:22-74:20. Nor can █████████ ██████████████████████████████████ *Id.,* Ex. I pp. 108:4-115:10; *see also id.*, Appendix A. This inability is not surprising if, as Defendant currently claims, its Products contain only normal, everyday elderberry juice. *See* Transcript of Oct. 31, 2022 Hearing, ECF No. 119, p. 29:20-25.

These Challenged Representations are not without consequence. Even Defendant agrees that the purpose of a label is to provide information to consumers and that information placed on a label is usually information that the manufacturer thinks might be important to consumers. *Id.* Ex I p. 225:12-226:18. Based on Plaintiffs' consumer surveys, conducted by Dr. J. Michael Dennis, 76.3% of consumers found the Challenged Representations to be material, based on the misrepresentation alleged.

---

[11] Defendant's website notes that Products have the "Same trusted formula." *Id.*, Ex ZZZ.
[12] ████████████████████████████████████████████████ ████████████████████████

Declaration of J. Michael Dennis, Ph.D., concurrently filed herewith ("Dennis Decl."), ¶ 84-87. Accordingly, Defendant's "virologist" claims injure consumers, who rely on these claims when purchasing the Products.

**E.   Defendant's Distribution of the Products**

Defendant does not distribute or directly retail the Products itself. Instead, Defendant uses ██████████████████████████████████████████████ ████████████████████████████████████████ Kashima Decl. Ex I pp. 80:8-84:18, Ex. O pp. 24:16-27:7. ████████████████████████ ██████████████████████████████████████████ *Id.* ██████ ██████████████████████████████████████████████ *Id.*

Defendant's distribution of the Products is also shown through retailers' sales data to consumers. As a result of the Litigation in *Corbett*, Plaintiffs have sales data from third-party retailers who sell the Products to consumers: Albertson's, Amazon, Bed Bath and Beyond, Costco, CVS, GNC, Kroger, Rite Aid, Sprouts, Target, Vitamin Shoppe, Walgreens, and Walmart (collectively the "Retailers"). *Id.* ¶ 148. These same Retailers have also been subpoenaed in this case. *Id.* ¶ 149. Albertson's, CVS, GNC, Kroger, Rite Aid, Sprouts, Target, Vitamin Shoppe, Walgreens, and Walmart have already responded and promised to provide sales data. *Id.* Amazon and Costco have agreed to provide sales data if the Class is certified. *Id.*

A third source of information regarding the distribution and sale of the Products is Circana, Inc. ("Circana"), formerly Information Resources, Inc., a data analytics and market research company which touts its ability to provide retailers "[r]eal-time visibility into consumers and markets in 23 countries, representing 75% of the world's GDP."[13] Circana is in the process of producing nationwide sales data for the Products, including dollar and unit volume as well as average price per unit by product, by state,

---

[13] Available at https://www.circana.com/intelligence/press-releases/2023/independent-research-firm-names-circana-a-strong-performer-in-retail-planning-platforms/ (last accessed Sept. 17, 2024).

and by month or week. Kashima Decl. ¶ 150.

Finally, based on Defendant's own records, between 2017 and 2022, it distributed approximately ███████████████████ Kashima Decl., ¶ 21; Exs. T & V.

## III. <u>ARGUMENT</u>

Class certification is split into two inquiries. First, plaintiffs must meet the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Once Rule 23(a)'s requirements are met, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Id*. To the extent a "rigorous analysis" requires the Court to "probe behind the pleadings," *Wal-Mart*, 564 U.S. at 349-51, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites ... are satisfied." *Id.* at 1195.

### A. **Plaintiffs Meet the Requirements of Rule 23(a)**

#### 1. <u>The Class Is Sufficiently Numerous and Ascertainable</u>

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. Generally, a class greater than 40 members suffices. *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). Here, since evidence obtained in discovery establishes that Defendant distributed more than ████████████ ███████ nationally during the relevant period, the Court can infer there are more class members than could be reasonably joined, as this Court concluded in *Corbett*, 2024 WL 1356220, at *5. *See also, e.g., Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 398 (N.D. Cal. 2021) (numerosity requirement satisfied when Rite Aid sold 600,000 units from 2014 through 2019); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501 (S.D. Cal. 2013) (numerosity established where millions of units were sold nationally and thousands in each state).

While the Ninth Circuit has held that "ascertainability" of the class members is

not a standalone requirement for class certification, it does require that the class be defined by objective criteria. *Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017). In addition, the Court assesses "if it is administratively feasible to determine whether a particular individual is a member of the class." *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 WL 2191901, at *9 (N.D. Cal. May 23, 2014) (cleaned up). In this case, membership in each Class is objectively defined by the purchase of specific products. *Id*. And because the relevant misrepresentations— "Virologist developed"—are on all of the Products' labels (Kashima Decl., Appendix A), each Class Member was exposed to the statements at issue. *See Astiana*, 291 F.R.D. at 501 (finding a class defined as "purchasers of Defendant's products" was not vague or confusing because "the alleged misrepresentations appeared on the actual packages of the products purchased, [so] there is no concern that the class includes individuals who were not exposed to the misrepresentation"). This is sufficient to satisfy the requirements of Rule 23(a)(1) under *Briseno*, 844 F.3d at 1132-33, as this Court concluded in *Corbett*, 2024 WL 1356220, at *6.

### 2. Common Questions of Fact and Law Exist

Rule 23(a)(2) is satisfied "if there are questions of fact and law which are common to the class." Fed. R. Civ. P. 23(a)(2). The plaintiff's burden for showing commonality under Rule 23(a)(2) is "minimal." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1020 (9th Cir. 1998). This requirement is "satisfied by the existence of a 'common contention' that is of 'such a nature that it is capable of classwide resolution.'" *Aho v. AmeriCredit Fin. Servs., Inc*., 277 F.R.D. 609, 616 (S.D. Cal. 2011) (quoting *Wal-Mart*, 564 U.S. at 350). "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (emphasis and internal quotation marks omitted).

Here, Plaintiffs and the Class share several significant factual and legal questions,

including whether the Challenged Representations are false and misleading because the Elderberry Extract was not developed by Dr. Mumcuoglu (or any other virologists). These questions alone suffice. *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 2466559, at *9 (N.D. Cal. May 30, 2014) (finding a class action challenging "all natural" claims on ten different products raised common questions of law and fact). However, because "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions," Plaintiffs will address commonality together with the Rule 23(b)(3) predominance inquiry below. *Stewart v. Quest Diagnostics Clinical Lab'ys, Inc.*, No. 319CV02043RBMKSC, 2022 WL 5236821, at *11 (S.D. Cal. Oct. 5, 2022). *See also Corbett*, 2024 WL 1356220, at *6.

### 3. Plaintiffs' Claims Are Typical of the Class

Plaintiffs must also establish that their claims are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508 (citation omitted). A plaintiff's claim is typical "if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 257-58 (C.D. Cal. 2008). Plaintiffs' claims need not be "substantially identical," but only "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

The typicality requirement is fulfilled because Plaintiffs and the absent Class Members have the same injury, resulting from a substantially similar theory of liability. *See infra* § III(B)(1). Additionally, Plaintiffs' claims rest on the same legal theories as those of the Class: violation of consumer protection laws. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010); *see infra* § III(B)(1). As such, Plaintiffs' claims are typical of the Class. *See Testone v. Barlean's Organic Oils*, LLC,

No. 19-CV-169 JLS (BGS), 2021 WL 4438391, at *9 (S.D. Cal. Sept. 28, 2021) (finding "typicality" requirement met when class representatives purchased products with same deceptive statements on the product label as on labels of products purchased by absent class members; holding that "typicality" does not require that class representatives purchased the same products as the absent class members so long as they suffered the same injuries from the same course of conduct); *Werdebaugh*, 2014 WL 2191901 at *17 ("Regardless of what other motivations Werdebaugh may have had when he purchased Blue Diamond's almond milk, he shares with the proposed class the same interests in determining whether Blue Diamond products were deceptively advertised and labeled."); *Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012) ("Plaintiffs and class members thus were all exposed to the same alleged misrepresentations on the packages and advertisements. The Court therefore finds that Plaintiffs have satisfied both the typicality and adequacy requirements.").

### 4. Plaintiffs and their Counsel Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires the class representative to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing this requirement, courts within the Ninth Circuit apply a two-part test: (1) do plaintiffs and class counsel have any conflicts of interest with other class members; and (2) will plaintiff and class counsel prosecute the action vigorously on behalf of the class. *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (*citing Hanlon*, 150 F.3d at 1020).

As to the first factor, there are no conflicts of interest among Plaintiffs and their counsel and the Classes. The Plaintiffs' interest in proving the alleged "virologist" allegations aligns with those of other class members. *See Johns*, 280 F.R.D. at 557 (finding plaintiffs adequate when they were exposed to the same misrepresentations on labels as absent class members); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 638 (S.D. Cal 2011) (finding adequacy requirement met when "[e]ach potential class member has the same issue: an allegedly false representation on [Clorox] packaging and damages in the

- 16 -

form of the purchase price or consequent property damage."); Declarations of Linda Sunderland and Benjamin Binder concurrently filed ("Sunderland Decl." and "Benjamin Decl.," respectively). There are no inherent competing interests between claimants and no unique injuries or defenses that could give rise to such a conflict. *See id*. at 637-38. Rather, each potential class member has the same underlying claim: that the Product's falsely claim they are developed by a virologist, rendering them a unique dietary supplement to Defendant's competitors. *Id*. at 638.

Plaintiffs and their counsel also must have sufficient "zeal and competence" to protect the interests of the rest of the class. *Fendler v. Westgate-Cal. Corp*., 527 F.2d 1168, 1170 (9th Cir. 1975). In answering the second adequacy question, "[t]he relevant inquiry is whether the plaintiffs maintain a sufficient interest in, and nexus with, the class so as to ensure vigorous representation." *In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934, 943 (9th Cir. 2015) (*quoting Roper v. Consurve, Inc*., 578 F.2d 1106, 1112 (5th Cir. 1978)). The record shows that Plaintiffs and their counsel have advocated vigorously on behalf of the Class, and they will continue to do so.

Plaintiffs have proven themselves to be adequate Class Representatives by stepping forward and assuming the responsibilities of litigating this case on behalf of all affected purchasers. They have shown their continued interest in and connection to this action and the Classes through their participation and contributions, including assisting their counsel in drafting the Complaints and initial disclosures, responding to interrogatories and document requests, and answering questions under oath in depositions. *See* Sunderland & Binder Decl. Plaintiffs have devoted significant time and effort to this litigation, and they will continue to do so. "The Rule does not require more." *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc*., 244 F.3d 1152, 1162 (9th Cir. 2011).

Plaintiffs' counsel meet the test for adequate class representation. Rule 23(g) and the accompanying Notes explain the role of adequate class counsel. The Rule is meant to "guide the court in assessing proposed class counsel as part of the certification

decision." Fed. R. Civ. P. 23, Notes of Advisory Committee on 2003 Amendments. Rule 23(g)(1)(C) provides that a court "must consider" the following: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(C).

Plaintiffs' counsel have vigorously prosecuted this case. Counsel expended significant time and resources in investigating the case; drafting the Complaint (ECF No. 1); opposing Defendant's motion to dismiss (ECF No. 12); and zealously pursuing discovery and retaining experts. Declaration of Nick Suciu III, concurrently filed herewith ("Suciu Decl."), ¶¶ 9-10. Plaintiffs' counsel also have conducted considerable third-party discovery *via* subpoenas to retailers of Products, Defendant's distributors, suppliers, and market research firms. *Id.*; Kashima Decl., ¶¶ 144-145,148-151. Plaintiff's counsel has also led and maintained its representation against Defendant in the related *Corbett* action, to ensure that class members' interests are furthered and maintained against Defendant's theories of defense. *Corbett*, 2024 WL 1356220, at *8 (finding that the fact that "the theories in the two cases are different, there is nothing to suggest that counsel cannot vigorously pursue both theories, as counsel often must do even in the same case presenting alternative theories. Thus, the Court does not find that this would make class counsel inadequate.")

Plaintiffs' counsel has decades of experience in class actions, other complex litigation, and consumer claims similar to the ones asserted here. The firm's resume details its successes in prosecuting these types of cases—successes that required knowledge of the applicable body of law, commitment to the class, and substantial investment of time and expenses. Suciu Decl., ¶¶ 4-6.

The absence of conflicts, the commitment of Plaintiffs and Plaintiffs' counsel to this case, and the substantial experience of counsel in successfully litigating cases of

this type support certification of the Class and appointment of Plaintiffs and Plaintiffs' counsel as Class Representatives and Class Counsel, respectively.

### B. Plaintiffs Meet the Requirements of Rule 23(b)

Rule 23(b)(3) examines two factors: (1) whether issues common to the Class "predominate" over individual questions; and (2) whether a class action is "superior" for adjudicating the controversy. *Hanlon*, 150 F.3d at 1022. Here, both factors are met. Indeed, courts have routinely concluded that false advertising cases, involving label claims, such as this one meet the Rule 23(b)(3) requirements. *See e.g.*, *Bradach v. Pharmavite, LLC*, 735 Fed. Appx. 251, 254-55 (9th Cir. May 17, 2018) (reversing denial of class certification in case brought under CLRA and UCL challenging healthy heart claims on dietary supplement label, noting that "courts have explained that CLRA and UCL claims are ideal for class certification" (cleaned up)); *Bailey*, 338 F.R.D. at 400 (granting class certification for false advertising claims brought under the CLRA, UCL, and FAL with respect to "rapid release" claims on gelcap labels).

### 1. Common Issues of Law and Fact Predominate

The predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Predominance exists "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication" *Hanlon*, 150 F.3d at 1022. "Accordingly, a central concern of the Rule 23(b)(3) predominance test is whether adjudication of common issues will help achieve judicial economy." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (cleaned up).

"Predominance is not, however, a matter of nose-counting. Rather, more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (citation omitted). Predominance "requires an

assessment of the relationship between individual and common issues which takes into consideration all factors that militate in favor of, or against, class certification." *Dilts v. Penske Logistics, LLC,* 267 F.R.D. 625, 634 (S.D. Cal. 2010).

      a.    *Plaintiffs' state law claims do not require any individualized analysis*

The issue of whether common questions of law or fact predominate "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). Plaintiffs' state law claims are particularly susceptible to class determination. It is well established that California's UCL, FAL, and CLRA and New York's GBL, section 349 & 350 are all based on an objective standard and require no individual evidence of deception or reliance. *See, e.g., Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) ("This objective test renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product."); *Yamagata v. Reckitt Benckiser LLC*, No. 17-CV-03529-VC, 2019 WL 3815718, at *1 (N.D. Cal. June 5, 2019) (The UCL, CLRA and FAL "permit plaintiffs to establish a violation by showing that class members purchased products after they were exposed to materially misleading advertisements, and under the statutes, materiality is measured using objective criteria."); *Johns*, 280 F.R.D. at 558 (in false advertising case brought under California's consumer protection statutes, "when plaintiffs are exposed to a common advertising campaign, common issues predominate"); *Petrosino v. Stearn's Prod., Inc.,* No. 16-CV-7735 (NSR), 2018 WL 1614349, at *7 (S.D.N.Y. Mar. 30, 2018) ("General Business Law §§ 349 and 350 employs an objective standard under which a fact finder must find if the "natural" label, is misleading to a reasonable consumer acting reasonably."); *Stutman v. Chem. Bank,* 95 N.Y.2d 24, 29 (2000) ("Further, as we have repeatedly stated, reliance is not an element of a section 349 claim.").

California's UCL fraudulent prong and the FAL generally prohibit "deceptive"

advertising. *Bank of the West v. Sup. Ct.*, 2 Cal.4th 1254, 1267 (1992). The CLRA also prohibits "unfair or deceptive acts or practices," such as "representing that goods or services have … characteristics, ingredients, uses, benefits, or quantities which they do not have." Cal. Civ. Code § 1770 (a)(5). Under each of these statutes, the test is the same: Plaintiffs only need to prove that a "reasonable consumer" is "likely to be deceived" by Defendant's misrepresentations. *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *see also Chapman v. Skype Inc.*, 220 Cal.App.4th 217, 230 (2013) ("The standards for determining whether a representation is misleading under the UCL and FAL apply equally to claims under the CLRA").[14] But the UCL establishes three separate and independent types of unfair competition: acts or practices that are unlawful, or unfair, in addition to those that are fraudulent. *Shvarts v. Budget Group, Inc.*, 81 Cal. App.4th 1153, 1157 (2000). The UCL unlawful and unfair prong are also governed by an objective standard, common to each member of the Class. *See Friedman v. AARP, Inc.*, 855 F.3d 1047, 1052 & 1055 (9th Cir. 2017) (holding that (1) the "unlawful prong" is established simply by violation of any state, federal, or local law and (2) an objective standard applies to both "fraudulent" and "unfair" prongs).[15]

Additionally, causation under the California UCL, FAL, and CLRA can be determined without individual inquiries. Courts have "repeatedly and consistently [held] that relief under the UCL [and FAL] is available without individualized proof of deception, reliance and injury." *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009). On the other hand, the CLRA "require[s] that 'plaintiffs … show not only that a defendant's conduct was deceptive but that the deception caused them harm." *In re*

---

[14] As a result, courts often analyze these three statutes together. *See, e.g., Paduano v. Am. Honda Motor Co.*, 169 Cal.App.4th 1453, 1468–73 (2009) (analyzing UCL and CLRA claims together); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1124–25 (N.D. Cal. 2010) (analyzing UCL, FAL, and CLRA claims together).

[15] To determine an "unfair" business practice, courts often "weigh the utility of the defendant's conduct against the gravity of the harm" or look to see if the harm in a manner "tethered" to a public policy enumerated in "specific constitutional, statutory or regulatory provisions." *Gregory v. Albertsons, Inc.*, 104 Cal. App. 4th 845, 852-53 (2002). Courts have also drawn on the standard and case law utilized in interpreting section 5 of the Federal Trade Commission Act. *Id.*, at 850, 852-53.

*Vioxx Class Cases*, 180 Cal.App.4th 116, 129 (2009). Yet, "[c]ausation, on a class-wide basis, may be established by materiality." *Id.* And, importantly, materiality is also judged through the eyes of a "reasonable consumer." *In re Tobacco II Cases*, 46 Cal.4th at 327; *see also McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB, 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13, 2014) ("[T]he determination of materiality, and thus reliance, is determined using objective criteria that apply to the entire class and do not require individualized determination"). *See also Corbett*, 2024 WL 1356220, at *14 (concluding that claims under the California UCL, FAL, and CLRA all apply a "reasonable person" standard).

The GBL sections 349 and 350 also apply an objective standard. New York GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any services in this state," while GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GBL. §§ 349 and 350. As the Second Circuit has explained, a "§ 349 claim has three elements: (1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have sustained injury as a result." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007); *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744–45 (1995). And section 350 adopts the same test. *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 525 (S.D.N.Y. 2003) (noting that the same elements apply to both section 349 and 350).

The first element is not predicated on any individual consumer's usage of the product; instead, it is based on whether "defendant's allegedly deceptive act or practice is directed to the consuming public and the marketplace." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 177 (2021). Accordingly, the "directed at consumers" requirement turns on whether Defendant made the product "available for sale to the general public, including through

its website [and other retailers]." *Id.* Because this element focuses on Defendant's conduct in marketing the Products, its analysis is common the Classes.

Additionally, the standard for deception under the GBL is the same as for the UCL, FAL, and CLRA. Whether an act or practice is misleading requires a showing that a reasonable consumer would have been misled by the defendant's conduct. *Oswego*, 85 N.Y.2d at 26. In determining whether the Product's label is misleading, this Court applies an objective test, viewing the allegedly misleading statement in the context of the product label as a whole. *See Fink v. Time Warner Cable,* 714 F.3d 739, 742 (2d Cir. 2013). New York courts have also held that reliance is not required to state a claim under GBL §§ 349 or 350. *DeCoursey v. Murad, LLC,* 673 F. Supp. 3d 194, 221 (N.D.N.Y. 2023) (collecting cases). Liability under the GBL, therefore, will not turn on individualized issues.

Similarly, injury can be determined on a class wide basis. Establishing an injury typically requires a plaintiff to 'allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase. *Koenig v. Boulder Brands, Inc*., 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014). This may come in the form of an overpayment or "price premium," whereby a plaintiff pays more than she would have but for the deceptive practice. *Izquierdo v. Mondelez Int'l, Inc*., No. 16-cv-04697, 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016). As noted below, a price premium can be established through a conjoint analysis, which will provide common proof of injury and damages. *Sharpe v. A&W Concentrate Co*., No. 19-CV-768 (BMC), 2021 WL 3721392, at *7 (E.D.N.Y. July 23, 2021) (discussing Dr. J. Michael Dennis damages model in a food labeling case).

Here, liability under the CLRA, UCL, FAL, and GBL sections 349 and 350 will not turn on the subjective beliefs of any individual consumer, but rather will require application of objective criteria. These objective legal standards render Plaintiffs' claims "ideal for class certification because they will not require the court to investigate 'class members' individual interaction with the product.'" *Tait*, 289 F.R.D. at 480.

- 23 -

*Breach of warranty claims under the UCC do not require any individualized analysis*

As for Plaintiffs' express warranty claims, both California and New York have adopted the same relevant sections of the UCC. Cal. Com. Code § 2313; N.Y. U.C.C. § 2-313. And like Plaintiffs' CLRA, UCL, FAL, and GBL sections 349 and 350 causes of action, these statutes apply an objective standard.

To state a claim for breach of express warranty under New York law, a plaintiff "must allege: '(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach.'" *Colpitts v. Blue Diamond Growers,* 527 F. Supp. 3d 562, 589 (S.D.N.Y. 2021) (quoting *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014)). Similarly, to state a claim for breach of express warranty under California law, a plaintiff must prove that "(1) the seller's statements constitute an 'affirmation of fact or promise' or a 'description of the goods'; (2) the statement was 'part of the basis of the bargain'; and (3) the warranty was breached." *Weinstat v. Dentsply Internat., Inc.*, 180 Cal. App. 4th 1213, 1227 (2010).

California and New York law do not require a showing of reliance to prevail on a breach of warranty claim. *Id.*; *see also Corbett*, 2024 WL 1356220, at *14 (holding that "[r]eliance is not required to be shown" as part of the cause of action for express warranty under California and Missouri law); *Ainger v. Michigan Gen. Corp.*, 476 F. Supp. 1209, 1224 (S.D.N.Y. 1979), *aff'd*, 632 F.2d 1025 (2d Cir. 1980) ("Transplanting tort principles [of reliance] into contract law seems analytically unsound… Thus, a claim for relief in breach of warranty is complete upon proof of the warranty as part of a contract and proof of its breach."); *see also CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 503 (1990) (same). Additionally, privity of contract is not required under California or New York law. *Corbett v. PharmaCare U.S., Inc.* ("*Corbett II*"), 567 F. Supp. 3d 1172, 1197 (S.D. Cal. 2021) (noting that "the Ninth Circuit identified a number

of specific exceptions to the privity rule such as cases when a 'plaintiff relies on written labels or advertisements of a manufacturer' and other 'special cases involving foodstuffs, pesticides, and pharmaceuticals, and where the end user is an employee of the purchaser'"); *Wise v. Combe Inc.*, No. 22-CV-10787 (PMH), 2024 WL 1178851, at *7 (S.D.N.Y. Mar. 19, 2024) (holding that privity is not required under New York and California law when the claim is based on Defendant's labels).

Plaintiffs' warranty claims are particularly suitable for class certification because they arise from Defendant's common label claims that the Products that contain a unique and proprietary, *virologist developed* Elderberry Extract, when they do not. Consequently, no aspect of the warranty claims will turn on any individual's experience with the Products.

c.     *Plaintiffs' claims can be determined by common evidence*

In addition to turning on legal claims suitable for class litigation, this case will be decided based on common evidence.

The Product's Labels and Formulation are Uniform

Here, the primary evidence at issue, of course, will be Defendant's labeling, which is common to the Class. *Fink*, 714 F.3d at 742 (explaining that "[t]he primary evidence in a consumer-fraud case arising out of allegedly false advertising is, of course, the advertising itself"); *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003) ("the primary evidence in a false advertising case is the advertising itself."); *see also* Kashima Decl., Appendix A. Additionally, determining the truth of these statements will turn on the formulation of the Black Elderberry Extracts within the Products (each of the Products contains ███████████████████████████████ ███████████████ ). And Defendant has testified that the Dr. Mumcuoglu was not involved in their development of Elderberry Extract in the Products, a fact that can be scientifically tested by comparing the Products to the "Sambucol" elderberry extract patented and trademarked by Dr. Mumcuoglu. Kashima Decl.*, ¶¶ 139-141; Exs. I pp.

117:9-120:8; 120:22-121:8; 124:25-126:8; Ex. K pp. 33:23-34:18; 37:5-8; BBBB.[16] The falsity of Defendant's representation will be determined based on common evidence.

<u>The Reasonable Consumer Standard</u>

To the extent that deception or materiality is a necessary element of Plaintiffs' claims, this element is governed by the objective "reasonable consumer" standard and therefore predominates claims on behalf of every class member without any individual inquiry. *Pettersen v. Circle K Stores*, Inc., No. 321CV00237RBM, 2022 WL 17974463, at *9 (S.D. Cal. Nov. 23, 2022). As noted in *Petterson*, a reasonable consumer's beliefs and understanding can be established using consumer surveys, as well as Defendant's own documents, and thus is susceptible to generalized, class-wide proof. *Id.*; *see also Testone*, No. 19-CV-169 JLS, 2021 WL 4438391, at *14; *Hadley v. Kellogg Sales Co*., 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018); *Shanks v. Jarrow Formulas, Inc*., No. CV1809437, 2019 WL 4398506, at *6 (C.D. Cal. Aug. 27, 2019).

Given this objective standard, Plaintiffs generally do not need to submit consumer surveys and other similar evidence for class certification. *Pettersen,* 2022 WL 17974463, at *8-9; *see also Testone*, 2021 WL 4438391, at *14 ("[T]he Court finds more persuasive those cases requiring proof only of a common question of materiality and reliance rather than proof of those issues on the merits at the class certification stage." ); *see also Hadley*, 324 F. Supp. at 1117 (holding that materiality is a "common question" for purposes of Rule 23(b)(3) that can be resolved on a class-wide basis and defendant raised a merits dispute as to materiality that does not defeat class certification). However, even if such proof were required, Plaintiffs have established that they meet that burden.

Plaintiffs' expert, Dr. Dennis, conducted consumer surveys which found 96.5% of respondents believed that the Challenged Representations to mean that "The Black

---

[16] Although, as noted in the Motion for Sanctions, Defendant is trying to dispute its own testimony on this issue. *See* fn. 3.

Elderberry Extract in this product was developed by a virologist." Dennis Decl. ¶¶ 83-87. Additionally, 79.1% of respondents reported that they were much more likely or somewhat more likely to purchase the Products because they perceived the Challenged Representations to mean that "[t]he Black Elderberry Extract in this product was developed by a virologist." Dennis Decl. ¶ 85. By multiplying these two numbers together, the "materiality rate" is, therefore, 76.3%. Dennis Decl. ¶¶ 83-87. Put differently, more than three quarters of consumers were more likely to purchase the Products because of their belief that the Challenged Representations mean that the Elderberry Extract in the Products was developed by a virologist. *Id.*

While Defendant may challenge the validity of this analysis, such objections relate to the merits of the claims and not to class certification. *See Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (The Ninth Circuit has held that as a general matter, "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility."); *see also Corbett*, 2024 WL 1356220, at *22 ("Defendant's criticism, whether they will eventually carry the day or not to a fact finder, is not sufficience to convince the Court that evidence of consumer deception from a reasonable consumer standpoint cannot be proved or disproved on a class-wide basis through a well-designed survey."); *Microsoft Corp. v. Motorola, Inc*., 904 F.Supp.2d 1109, 1120 (W.D. Wash. 2012) ("Microsoft's criticisms of Mr. Sukumar's survey go to issues of methodology, survey design, reliability ... [and] critique of conclusions, and therefore go to the weight of the survey rather than its admissibility.").

Dr. Dennis's claims are also supported by Defendant's own internal marketing research and expert discovery. According to Defendant' own testimony, the Challenged representations are meant to convey "trust" to consumers. Kashima Decl., Ex. I pp. 240:7-17. Defendant knows this "trust" is important. Indeed, ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ *See id.*, Ex.

EEEE at PC001057. █████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ *Id.*, *also* Ex. FFFF at PC001148 (██████████████████

██████████████████████████████████████████████████████████

████████████████████). Indeed, even Defendant's own expert, Mark T. Keegan, found that 85 of 354 respondents (or 24 percent) found the "Developed by a world renowned virologist" label claim appealing. *See id.*, Exs. GGGG (at KEEGAN_EXHIBITS_160) & HHHH (see results for Q31_12).

To sum up, the Dennis survey found that the Challenged Representations were material and would lead consumers to believe that the Elderberry Extract in the Products was developed by a virologist. This is sufficient evidence that Plaintiffs' claims can be adjudicated on a class-wide basis. *Pettersen,* 2022 WL 17974463, at *8-9 (noting that even the most searching class certification standard only requires that Plaintiffs "put forth at least some evidence that the challenged statements were material, and that members of the public were likely to be deceived by these statements."); *see also Testone*, 2021 WL 4438391, at *8 ("Plaintiffs assert that there are common questions here, such as what the at-issue label statements would mean to a reasonable consumer and whether they would be deceptive to a reasonable consumer.").

d. *Plaintiffs May Assert Claims for Each of the Products*

The alleged claims may be asserted by the Plaintiffs for each of the Products. This Court has acknowledged that "[t]he prevailing view in the Ninth Circuit is to allow class action plaintiffs to bring claims for products they did not purchase 'as long as the products and alleged misrepresentations are substantially similar.'" *Corbett v. Pharmacare U.S., Inc.* ("*Corbett III*")*,* 544 F. Supp. 3d 996, 1011 (S.D. Cal. 2021) citing *Miller v. Ghirardelli Chocolate Co*., 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) and *Anderson v. Jamba Juice Co*., 888 F. Supp. 2d 1000, 1006 (N.D. Cal. 2012)). Missouri law, regarding the MMPA, is in accord. *Holman v. Ali Indus., LLC*, No. 4:22-CV-4133-NKL, 2023 WL 1438752, at *6-7 (W.D. Mo. Feb. 1, 2023).

"Plaintiff's claims here arise out of the allegedly [unlawful] statement, worded in several variations, made on every [label] . . . and therefore arise from the same facts and legal theory." *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 378 (N.D. Cal. June 18, 2020). To the extent that there are any variations in the Products' labels, they do not defeat commonality. *See Ries v. Ariz. Beverages USA, LLC*, 287 F.R.D. 523, 538–39 (N.D. Cal. Nov. 27, 2012) (noting that products with labels that represent the products as natural, including 100% All Natural, 100% Natural, All Natural, All Natural Flavors, Natural Flavors, 100% All Natural Tea, 100% Natural Tea, and All Natural Tonic, were similar enough to warrant class certification); *Allen v. Similasan Corp.*, 306 F.R.D. 635, 647 (S.D. Cal. 2015) ("There are six Products at issue, each with various labels throughout the class period. However, the front of every package of every Product states in some form that the Product 'relieves' specified symptoms. Though the labels changed, the efficacy representations remained essentially the same."). As discussed above, the label on each of the Products contains the same Challenged Representations, all delivering the identical message that the Products were developed by a Virologist (when they were not). *See* Kashima Decl., Exs. CC-RRR; Appendix A. Accordingly, the Products are sufficiently similar to warrant being included in the same class.

  e.  *The Class's restitution, damages, and other relief may be determined on a class-wide basis*

   Generally, concerns about manageability problems during the damages phase of a class action are not sufficient to defeat certification. *See Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he amount of damages is invariably an individual question and does not defeat class action treatment."); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004 ("[T]here is a big difference from the standpoint of manageability between the liability and remedy phases of a class action"); *Keegan v. Am. Honda Motor Co.,* 284 F.R.D. 504, 550 (C.D. Cal. 2012) (certifying class even though there was "no practicable way" to identify the class members entitled to payment). Nevertheless, damages and restitution in this case can be calculated on a

class-wide basis. "So long as the damages can be determined and attributed to a plaintiff's theory of liability, damage calculations for individual class members do not defeat class certification." *Lindell v. Synthes USA,* No. 11-2053, 2014 WL 841738, at *14 (E.D. Cal. Mar. 4, 2014). "According to the Ninth Circuit, 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Id.* (quoting *Leyva*, 716 F.3d at 514).

Here, consistent with their claims, legal theories, and sworn testimony, Plaintiffs primarily seek compensatory damages and/or restitution. Whether under California or New York consumer protection laws, the measure of these damages is the same: it is "the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *Werdebaugh*, 2014 WL 2191901, at *22 (citing *Colgan v. Leatherman Tool Group*, 135 Cal. App. 4th 663, 700 (2006)); *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.* ("*Goldemberg II*")*,* 317 F.R.D. 374, 393 (S.D.N.Y. 2016) (noting that the same "price premium" damages are available under New York law as under California law) *citing Marty v. Anheuser–Busch Companies, LLC*, 43 F.Supp.3d 1333, 1346 (S.D. Fla. 2014) ("premium price theory of damages has been recognized by multiple courts interpreting the state law consumer protection statutes" of New York, California, and Florida). Damages for breach of warranty are calculated similarly. Cal. Com. Code § 2714(2) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted"); N.Y. U.C.C. § 2-714(2) (same).

### Conjoint Analysis

Whether called damages or restitution, this "calculation contemplates the production of evidence that attaches a dollar value to the 'consumer impact or advantage' caused by the unlawful business practice." *Werdebaugh,* 2014 WL 2191901*,* at *22; *see also Goldemberg II,* 317 F.R.D. at 394 ("Calculating a price premium can be as simple as computing the difference between the cost of the second best product in

the product class (without a deceiving label) and the cost of the product at issue (with the label)"). Damages and restitution can then be determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practice. Here, Plaintiffs propose two alternative damages models.

Plaintiffs propose that class damages/restitution can be demonstrated by using conjoint analysis to determine any price premium associated with the Challenged Representations. As noted by Dr. Dennis:

> The market price premium attributable to the Challenged Representations can be determined through one or more choice-based conjoint surveys, which will generate a set of thousands of data points that can be utilized by a market simulator that incorporates real-world demand and supply factors based on both the survey data and independent real world historical information regarding the Elderberry product marketplace.

Dennis Decl. ¶ 92. In a choice based conjoint survey:

> survey participants are presented with a "choice exercise" in which they are typically shown a set of 3 or 4 hypothetical products and asked to choose which of the products, if any, they would purchase. The hypothetical products in conjoint surveys are typically comprised of 6 to 8 "attributes" that reflect features that consumers consider in making purchasing decisions.[fn] For consumer-packaged goods, attributes that consumers typically consider in their purchasing decisions include things like product brand, packaging claims, product size and, of course, price.

Dennis Decl. ¶ 97. Plaintiffs' experts are prepared to conduct a conjoint analysis to determine the price premium associated with the Challenged Representations. *See generally* Dennis Decl. From there, Colin Weir—Plaintiffs' damages expert—will combine Dr. Dennis's analysis with Defendant's and third-party sales records to determine the total damages/restitution due to the Class. Declaration of Colin Weir, concurrently filed herewith ("Weir Decl."), ¶¶ 57-60; *see also Lytle v. Nutramax Lab'ys, Inc.*, No. 22-55744, 2024 WL 3915361, at *8 (9th Cir. Aug. 23, 2024) ("…the very structure of the conjoint survey allows for an overcharge to be associated with each individual statement and label, allowing the amount each class member is entitled to recover to be easily assessed based solely on the product the class member purchased.").

Conjoint analysis, by its nature, does not turn on the idiosyncrasies of any individual purchaser's transaction. Instead, it looks at market-wide data to determine how the market would determine damages. As a result, variations in purchase price and individual purchasing behavior do not alter the calculation of total, class-wide damages. *See* Weir Decl. ¶¶ 61-69. Indeed, this Court noted, in *Corbett*, that "choice-based conjoint surveys have routinely been found by courts to be accepted methodology to measure the difference in price that may arise from alleged misrepresentations made about products." *Corbett*, 2024 WL 1356220, at *27.[17] So a conjoint analysis will not be affected by individualized issues and is well suited for class actions.

## Statutory Damages

A successful plaintiff can recover statutory damages, in the amount of fifty dollars, for violations of GBL § 349 and five hundred dollars for violations of GBL § 350. *See* N.Y. Gen. Bus. Law §§ 349(h), 350-e(3). As noted in other labeling cases, given the limited value of the products, "most, if not all, class members will choose statutory damages, and statutory damages 'can be assessed on the basis of common proof.'" *Sharpe*, 2021 WL 3721392, at *7 (*citing Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 87 (2d Cir. 2015) ("It is not disputed that statutory damages under GBL § 349 can be assessed on the basis of common proof, as they are capped at $50.")). Indeed, damages in this instance are formulaic, multiplying the number of Products sold in New York by the statutory damages amount. No individualized issue will predominate.

---

[17] *See also, e.g., Hadley*, 324 F. Supp. 3d at 1110 (conjoint analysis is "widely-accepted as a reliable economic tool for isolating price premia."); *Dzielak v. Whirlpool Corp.*, No. 2:12-0089 (KM)(JBC), 2017 WL 1034197, at *6-8 (D.N.J. Mar. 17, 2017) (finding related methodology "passes muster under the Daubert considerations," including its "relationship to other established reliable techniques (particularly, the conjoint analysis technique of which it is a part)"); *In re: Lenovo Adware Litig.*, No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) (certifying class where damages model was based on conjoint analysis); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1027-31 (C.D. Cal. 2015) (concluding an expert's "conjoint analysis is, at this stage, sufficiently reliable to be used in calculating class-wide damages"); *Guido v. L'Oreal USA, Inc.*, No. 2:11-cv-01067-CAS (JCx), 2014 WL 6603730, at *4-8 (C.D. Cal. July 24, 2014) (collecting cases and finding conjoint analysis satisfied class certification requirements of *Comcast*).

Additionally, at class certification, Plaintiffs need only propose damages models that are reliable and relevant. *Lytle*, 2024 WL 3915361, at \*7-8; *Stewart v. Quest Diagnostics Clinical Lab'ys, Inc*., No. 319CV02043RBMKSC, 2022 WL 5236821, at \*6 (S.D. Cal. Oct. 5, 2022). As has been noted by the Ninth Circuit, the actual proposed damages analysis does not have to be conducted prior to class certification because such evidence goes to the merits of the claims. *Lytle, supra.*; *see also Johnson v. Nissan N. Am., Inc*., No. 3:17-CV-00517-WHO, 2022 WL 2869528, at \*5 (N.D. Cal. July 21, 2022) ("to the extent it matters, showing that a [conjoint] damages model is appropriate for purposes of class certification also does not require actually performing it, it just requires showing that it meets the legal requirements for class-based damages"). Instead, a review of the methodology is enough.

Finally, while Defendants may disagree with Plaintiffs' theories of damages/restitution, such a dispute should not alter the Court's analysis at class certification. *Lytle, supra* , at \*8; *Coffey v. WCW & Air, Inc*., No. 3:17CV90-TKW-HTC, 2020 WL 4519023, at \*5 (N.D. Fla. Mar. 25, 2020) ("Where, as here, a class-wide damages model is challenged at the certification stage, the Court simply determines whether the model is a "plausible" method for calculating class-wide damages."); *Jimenez v. Allstate Ins. Co*., No. CV-10-08486, 2019 WL 13088814, at \*15 (C.D. Cal. May 13, 2019) ("In general, issues of methodology, design, and reliability go to the weight of the survey evidence, rather than its admissibility. Thus, these issues often are addressed through cross examination."). Either Plaintiffs are entitled to statutory damages or not. Either Plaintiffs' conjoint analysis is the proper measure of damages/restitution or not. But neither of these legal questions differs for any of the members of the Class. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.,* 214 L. Ed. 2d 233 (2022) ("Therefore, a district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs'

burden of proof on that issue.").

2.    <u>A Class Action Is a Superior Method of Adjudication</u>

The second prong of Rule 23(b)(3) requires that class litigation be the superior method for adjudicating this dispute. Factors to be considered include class members' interest in individually controlling litigation; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing the class action. Fed. R. Civ. P. 23(b)(3)(A)–(D).

In this case, there are hundreds of thousands of Class Members, and their individual damages are modest. Given the necessary costly and extensive discovery, including the retention of expert witnesses, absent class members are unlikely to have an interest in individually controlling litigation over the Products. Indeed, Plaintiffs are unaware of any other litigation concerning the Products (other than the related *Corbett* case). Substantial connections between the Southern District of California and this case justify litigating before this Court. Defendant is located in this District (thus, the majority of witnesses are located in this District), and a substantial portion of the proposed Class Members reside in California. Kashima Decl., Ex I p. 22:1-2. All these factors support the conclusion that a class action is a superior method for adjudicating this dispute. *Testone,* 2021 WL 4438391, at *18–19. Finally, just as in *Testone*, *id.* at *19, "there is no indication . . . that there is any characteristic of this litigation that would make it more difficult to manage than other class action litigations routinely decided by district courts." Just as it did in *Corbett*, 2024 WL 1356220, *29, this Court should conclude "that Plaintiffs have met their burden to show that a class action is the superior method to adjudicate the classmember's claims" and grant class certification.

## IV.    <u>CONCLUSION</u>

For the above reasons, the Court should grant Plaintiffs' motion for class certification and appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel.

DATED: September 19, 2024

Respectfully submitted,

By: /s/ Trenton Kashima

Trenton Kashima (CA SBN No. 291405)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

Rachel Soffin (*pro hac vice*)
Russell Busch (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
First Horizon Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Email: rsoffin@milberg.com
Email: rbusch@milberg.com

Nick Suciu III (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
Email: nsuciu@milberg.com

Martha Geer (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
900 West Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
Email: mgeer@milberg.com

Luis Cardona (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
1311 Ponce de Leon Avenue
San Juan, PR 00907
Tel: (516) 862-0194
Email: lcardona@milberg.com

*Attorneys for Plaintiffs*
*and the Proposed Classes*