1               UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3  MONTIQUENO CORBETT, individually )
   and on behalf of all others   )
4  similarly situated; DAMARIS    )
   LUCIANO, individually and on   )
5  behalf of all others similarly )
   situated, et al.,           )
6                        )  No. 21-CV-00137-JES-AHG
         Plaintiffs,       )
7                        )
   v.                     )  October 9, 2024
8                        )
   PHARMACARE U.S., INC., a Delaware )
9  Corporation,             )
                        )
10        Defendant.        )
   _____)
11                        )
   LINDA SUNDERLAND, individually  )
12  and on behalf of all others   )
   similarly situated; BENJAMIN   )
13  BINDER, individually and on behalf)
   of all others similarly situated, )
14                        )  No. 23-CV-01318-JES-AHG
         Plaintiffs,       )
15                        )
   v.                     )
16                        )
   PHARMACARE U.S., INC., a Delaware )
17  Corporation ,           )
                        )  Courtroom 4B
18        Defendant.        )
   _____)  San Diego, California
19

20               TRANSCRIPT OF PROCEEDINGS
21                (Motion Hearing)

22

23   BEFORE THE HONORABLE JAMES E. SIMMONS JR., DISTRICT JUDGE

24

25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:        TRENTON KASHIMA
                                Milberg, et al.
 3                              402 W. Broadway, Suite 1760
                                San Diego, CA  92101
 4                              (619)810-7047

 5

 6
     FOR THE DEFENDANTS:        GIOVANNA FERRARI
 7                              LAWRENCE BUTLER
                                Seyfarth Shaw, LLP
 8                              560 Mission Street, Suite 3100
                                San Francisco, CA  94105
 9                              (415)544-1019
                                gferrari@seyfarth.com
10                              lbutler@seyfarth.com

11

12

13   COURT REPORTER:           AMANDA M. LeGORE
                                RDR, CRR, CRC, FCRR, CACSR
14                              U.S. District Court
                                333 West Broadway, Suite 420
15                              San Diego, CA 92101
                                amanda_legore@casd.uscourts.gov
16

17   Reported by Stenotype:  Transcribed by Computer

18

19

20

21

22

23

24

25
```

1          (Wednesday, October 9, 2024; 10:05 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE CLERK:  Calling matters number 2 and 3,

6   21-CV-0137, Corbett, et al., versus PharmaCare U.S., Inc.  And

7   23-CV-1318, Sunderland, et al., versus PharmaCare U.S., Inc.,

8   et al., for motion hearings.

9          THE COURT:  All right.  Good morning, everyone.

10         THE ATTORNEYS:  Good morning, your Honor.

11         THE COURT:  I know I have seen everyone previously,

12   but can I just have appearances for today, please.

13         ATTORNEY KASHIMA:  Trenton Kashima on behalf of the

14   plaintiffs.

15         THE COURT:  Good morning, again.

16         ATTORNEY BUTLER:  Lawrence Butler and Giovanna Ferrari

17   on behalf of defendant PharmaCare U.S., Inc.

18         Good morning.

19         ATTORNEY FERRARI:  He announced me.

20         THE COURT:  Okay.  All right.  So we're here today for

21   motions filed in both cases.  It's the same motions in each

22   case:  Motion for sanctions and motion to consolidate the

23   cases.

24         There are several motions to file documents under

25   seal.  There is also a motion to amend or correct the motion

1    for sanctions and motion to consolidate cases.

2        At the onset -- the Court didn't do it initially -- I

3    am going to grant all motions to seal filed by each of the

4    parties.  And, going forward, we'll address -- I also will

5    grant the motion to amend or correct the motion for sanctions

6    and to consolidate cases.

7        And the issue going forward is the motion for

8    sanctions and the motion to consolidate cases.  The Court's

9    tentative is to deny the motion for sanctions, as well as deny

10   the motion to consolidate cases.  And I have to express some

11   concerns I have.

12       Reading through the motions and reading through the

13   briefings, there appeared to be -- I'll call them some

14   half-truths.  Some half-truths about some of the allegations

15   alleged and some innuendo.  And, frankly, some half-truths

16   about discovery deadlines; when they were, as well as the

17   impact of the interrogatory response by Mr. Halter.  So it

18   appears there have been some half-truths, for lack of a better

19   term.  That's the best way I can say it.

20       And I thought about whether I should be ordering

21   sanctions or not, based on some deliberate half-truths.  I'm

22   not going to do that today.  But I am concerned about the time

23   we're using and an issue that is not really an issue, in the

24   Court's opinion.  And I am concerned about the -- what appears

25   to be delay tactics in regards to going forward.  I know we

1  have a summary -- pretrial motions due in two months.  So I am

2  concerned about these issues and what may be a waste of

3  resources for the Court as well as the parties.

4       I -- so I wanted to express those concerns going

5  forward.  And I'm expressing them going forward, today, because

6  in any future issues that are similar to this, sanctions are on

7  the table, frankly.

8       So -- and I want to express those concerns.  And,

9  also, in the defendant's -- excuse me, the plaintiffs' motion

10  for sanctions, I have questions as to what discovery orders

11  that the plaintiff alleged the defendant violated because there

12  was none identified in the motion.  As well as whether the --

13  there was indeed a fact discovery close of September 16th, as

14  opposed to December 20th of last year, that the plaintiff

15  argued in their motion on page 12.  As well as to whether the

16  plaintiff had made any efforts to meet and confer in regards to

17  subpoenaing Mr. Halter, who lives overseas.  As well as

18  whether -- Mr. Rowe-Cerveny's testimony appears in the Court's

19  mind to be consistent with Mr. Halter's testimony.

20       So those are some concerns.  I know the plaintiff

21  views this differently.  This is the plaintiffs' motion.  I'll

22  give them a chance to address these issues.

23       But those are my concerns.  I don't believe there is

24  any violation of any discovery order, nor was there argued to

25  be.

1        I don't believe that there's any, for lack of a better

2   term -- as the plaintiff coined it -- a hiding of the ball in

3   discovery.

4        And, frankly, reading through the plaintiffs' motion,

5   I was very concerned about discovery and thought that the

6   plaintiff may have been hiding the ball.  And I read through

7   the defendant's motion, as well as their attachments.  And I

8   was curious as to why the plaintiff never laid out for the

9   Court that all of the actions with Mr. Halter and

10  Dr. Muncuoglu, M-U-N-C-U-O-G-L-U, occurred before PharmaCare

11  U.S. was even created.

12       The plaintiff never clarified that issue and just made

13  innuendo that Mr. Halter and Dr. Muncuoglu were working

14  throughout this entire time.  When that's blatantly not true,

15  based on the interrogatory response, as well as based on the

16  deposition of Mr. Rowe -- excuse me, Mr. Rowe-Cerveny.  Yes.

17  So I was curious as to why those dates weren't clarified.

18       And I drew some conclusions as to why they weren't

19  clarified.  But it appears to me that this -- this motion is

20  not a valid motion, and the Court's tentative is to deny it.

21       But I will hear from the plaintiff as to why they

22  believe there was indeed an attempt to, in their words, hide

23  the ball.  As well as whether the interrogatory responses

24  indeed contradicts the deposition testimony of

25  Mr. Rowe-Cerveny.  And I will hear the plaintiffs' position as

1   to why this Court should grant sanctions.

2           ATTORNEY KASHIMA:   Thank you, your Honor.

3           So there's a couple of issues.   I want to address the

4   latter issues first.

5             This is kind of an interesting case.   I've done a

6   couple of these dietary supplement cases.   And, generally, the

7   formulation of the dietary supplement is never a contentious

8   issue just because they're required to keep detailed records on

9   how to manufacture the product and how the product was

10  manufactured under the FDA.

11          What we've run into, and what I think has become

12  apparent in the opposition to our motion for sanctions, is

13  defendant is claiming that there is some unstated formula

14  that's being used.

15            Now, because of this, we're just simply unable to

16  answer some basic questions of the past.   Like, is the

17  elderberry extract manufactured using a manufacturing process

18  that dates back centuries, as suggested in interrogatory number

19  21?   That's Exhibit D to my declaration.   Or PharmaCare

20  specifically states it cannot possibly describe the exact

21  method by which elderberry extract presented in thousands if

22  not millions of food products, dating back at least six

23  centuries, was manufactured.   Nonetheless, numerous recipes

24  describe the process for manufacturing elderberry extract in

25  numerous food products.   Which consists of adding water to the

1    elderberries, heating the water and the elderberries, filtering

2    the mash; just as has been done with Sambucol.

3         Additionally, defendant's own testimony states that

4    this is just pasteurized elderberry juice.  But if you look at

5    page 6 of the opposition, defendant claims that defendant is

6    making all sorts of assumptions.  Making assumptions that they

7    should have been using the patented formula.

8         But I think it's that last assumption that's -- that's

9    particularly troubling on page 6; the last bullet point.  Where

10   defendant states that plaintiff is basically assuming that

11   there was -- that there wasn't some manufacturing process that

12   Dr. Mumcuoglu -- and we've just been calling her Dr. Madeline,

13   just because of the last name issues.

14        THE COURT:  I saw that in the deposition testimony.

15   Yes.

16        ATTORNEY KASHIMA:  That Dr. Madeline created, that

17   created a similar chemical process.  And if that's true, we

18   just need to know what it is.  And we've asked for that several

19   times.

20        If you look at exhibit -- sorry.  If you look at

21   Exhibit J, which is the interrogatories in Sunderland --

22   Interrogatory 3, 8, and 9 -- we're basically asking for the

23   identities of people involved in the formulation -- the

24   reformulation of the products.

25        We're asking the defendant to describe in detail the

1    role that Dr. Madeline played -- or any virologist played, for

2    that instance, in the development of the elderberry products;

3    including the freeze dried, spray dried, and liquid version of

4    the elderberry extract.  And, specifically, what was -- you

5    know, what was unique and what did Dr. Mumcuoglu actually

6    develop within this formula.

7         And we haven't gotten a straight answer for that.  In

8    one case it just seems to state that this is just elderberry

9    juice.  You just heat it -- heat the berries up, add water,

10   filter the mash, and perhaps it's pasteurized.  We're still not

11   clear on that, even though defendant's 30(b)(6) deponent

12   specifically said it's pasteurized, we're not quite sure

13   because they've presented documents that suggest it's not.

14        Now, obviously, a virologist didn't develop the

15   process for making juice, which has been around for centuries.

16   The defendant is right.  And they did -- she did develop the

17   process for pasteurization.

18        So the reason we brought this motion for sanctions is

19   to ask the fundamental question:  What did Dr. Madeline do, and

20   what is the exact formula?

21        THE COURT:  Well, that's not the question that you

22   brought for sanctions.  You brought this motion for sanctions,

23   saying that they deliberately withheld information in the

24   Corbett case.  So it's not a question or a debate.

25        You're definitively stating they deliberately withheld

1    information.  That -- that Dr. Madeline, for lack of -- since

2    I'll use the term the parties have been using.  That she --

3    that they have been working with her, in combination with her

4    to develop this formula.  And it's not just elderberry juice.

5    When the interrogatory response doesn't even say they have been

6    working with her.  They said they met with her once in 2009, I

7    believe, just to get -- hear how she created this formula.  And

8    there's no information, other than innuendo, that there was any

9    other conversations or any other work involved with her.

10            ATTORNEY KASHIMA:  Yes, your Honor.

11            And so, again, we have to go back to the deposition

12    that we took in Corbett and -- which is also being used in

13    Sunderland under our stipulation.

14            Now, if you look at page 20 -- and this is Exhibit e

15    to my declaration.  Defendant specifically testified that it

16    did nothing to independently confirm the formulation used was

17    the same formulation created by Dr. Madeline.

18            And at page 123 and 124, they stated that they didn't

19    use her patented formula.  And at 112 and 113, when I asked

20    about that interrogatory that said it was just juice and asked

21    what was, you know, unique about the process to make it,

22    defendant's testimony was, we believe this process keeps it as

23    close to the juice as possible, but it's all elderberry juice.

24            Now, lo and behold, in July, Dr. Halter -- or I'm

25    sorry.  Mr. Halter came forward, verified in an interrogatory

1    that said, well, I am the former director of PharmaCare, the

2    defendant in this case.   Not only of PharmaCare, the parent

3    company, but PharmaCare, the defendant in this case.   And I

4    personally met not only with Dr. Madeline but with the

5    manufacturers, to ensure that they get the formula correct.

6         THE COURT:   That's not what the interrogatory says.

7    It says -- it talks about the meeting with Dr. Madeline,

8    meeting with the manufacturer to discuss the process they were

9    using.

10         I think you're adding in some innuendo and suggestions

11    there that's not actually in the interrogatory.

12         ATTORNEY KASHIMA:   Let's see.   Let me pull up the

13    exact language, so I can read it for the Court.

14         ATTORNEY FERRARI:   Uhm --

15         THE COURT:   And I have it here.

16         ATTORNEY FERRARI:   I don't mean to interrupt, but I

17    created a slide for the Court with the Corbett testimony and

18    the rog 12.   If it pleases the Court, I would provide it to

19    opposing counsel.

20         THE COURT:   Do you have any opposition if I were to

21    see a copy of that?

22         ATTORNEY KASHIMA:   Seeing I haven't seen it, I can't

23    oppose it right now.

24         THE COURT:   Well, I want you to see it first, so --

25         (Pause.   Mr. Kashima handed document.)

```
 1              THE COURT:  And this is interrogatory number 12.
 2    Right?
 3              ATTORNEY KASHIMA:  This is interrogatory number 12 on
 4    Exhibit --
 5              THE COURT:  Yes.  I've been through that many times,
 6    to make sure I was fully up to speed as to the parties; based
 7    on I knew this would be an issue for the parties.  So --
 8              ATTORNEY KASHIMA:  So -- oh, sorry.
 9              THE COURT:  Sorry.
10         So you had a chance to review the slides that she
11    presented?  Do you have any opposition?
12              ATTORNEY KASHIMA:  You know, I have no opposition for
13    them presenting it.  I might oppose it once I have a chance to
14    read it and go through it.
15              THE COURT:  That's fine.
16              ATTORNEY FERRARI:  The last page of the -- sorry.
17    Thank you.
18         (Judge handed document.)
19              THE COURT:  Thank you very much.
20         I'm sorry for interrupting you.  You can start your
21    argument whenever you're ready.
22              ATTORNEY KASHIMA:  No problem.
23         And so -- sorry.  I'm just regathering my place.
24              THE COURT:  No problem.  Take your time.
25              ATTORNEY KASHIMA:  So I believe it's the last sentence
```

1    in the response to interrogatory number 12.

2         THE COURT:  Okay.

3         ATTORNEY KASHIMA:  After completion of the purchase of

4    H.B.I. Sambucol business, Mr. Halter traveled to Zurich to meet

5    with Dr. Madeline and Wolfgang Schwald to discuss how Sambucol

6    was developed, it's history, and also discuss the supply

7    agreements with Rauch and Nextpharma.

8         So he actually did meet with Dr. Mumcuoglu and a

9    representative from their production staff, which is Rauch.

10   The factory manager of, actually, Rauch.  To discuss how they

11   were going to produce this formula.

12        THE COURT:  That's not what this statement says.  It

13   says he meant with Dr. Mumcuoglu and Wolfgang Schultz [sic] to

14   discuss how Sambucol was developed and the history.

15        And then, the way the Court reads it, is he also

16   discusses the findings of Rauch and Nextpharma.  The way I read

17   it, that is a separate meeting than it was with Dr. Mumcuoglu.

18        But there's no -- there's no suggestion that he

19   discussed the formula here.  You just added that language.

20        ATTORNEY KASHIMA:  No, your Honor.  Discussed the

21   supply agreements.  And within the supply agreements, it's made

22   clear that PharmaCare was going to be providing Nextpharma and

23   Rauch the formulation that they were going to use in order to

24   create the products.  As a matter of fact, part of the purchase

25   agreement was the patent agreement for Dr. Mumcuoglu's formula.

1          And so it -- we're just not -- this is where

2    plaintiffs are having problems, is there seems to be a

3    high-level executive from PharmaCare U.S. --

4          THE COURT:  Well, actually at the time this occurred,

5    PharmaCare U.S. did not exist.

6          ATTORNEY KASHIMA:  Yes, your Honor.  I'm aware of

7    that.  But he was also a director at PharmaCare U.S. later on.

8          THE COURT:  I understand that.

9          But you're making an argument to import knowledge on

10   PharmaCare U.S., but the company did not exist when this

11   meeting occurred.

12         So whether he worked for them later and whether they

13   confirmed this later is obviously an important factor.  But to

14   say that PharmaCare U.S. conducted these things when the

15   company didn't exist when these events occurred, I think, is an

16   improper argument.

17         ATTORNEY KASHIMA:  I'm sorry, your Honor.  When I use

18   the term "PharmaCare," I'm using the term "PharmaCare,"

19   generally because PharmaCare has several different entities.

20         THE COURT:  It gets very confusing for me too.

21         ATTORNEY KASHIMA:  So PharmaCare U.S. is a subsidiary

22   of PharmaCare Laboratories PTY.

23         THE COURT:  Yes.

24         ATTORNEY KASHIMA:  And it was set up solely for the

25   purpose of selling the product in the United States.

1          PharmaCare U.S. doesn't seem to have any independent

2    contracts with manufacturers.  It doesn't seem to have any

3    independent contracts with distributors.  Those seem to run

4    through the parent entities or the European entity.  The

5    PharmaCare Europe -- or, sorry, U.K. entity.  So, basically,

6    the whole operation runs through these parent companies.

7          But moving on, back to Mr. Halter, is even if he

8    wasn't an employee of defendant PharmaCare U.S. -- and I'll be

9    more exact.  I apologize -- at the time, his knowledge is

10   imputed to them.

11         Plaintiff has cited several cases in both its opening

12   motion and its reply, noting that when you -- when a 30(b)(6)

13   deponent is put up, that deponent is noted to have -- or should

14   be prepared to speak to all of the knowledge of the

15   corporation, including the knowledge of the employees.

16         And this makes sense because corporate entities, of

17   course, can't speak.  And so the only way they find out

18   knowledge is through the -- their employees.

19         And the fact that a high-level executive was actually

20   involved in this process and this information just came out, we

21   believe that's a sanctionable conduct.  Is he should have been

22   disclosed.  Because defendants have already admitted that they

23   intend to raise him as a rebuttal witness.

24         Now, how he could be a rebuttal witness, when the only

25   thing he would be rebutting is the defendant's own testimony is

1    difficult to say.

2          But it's someone that should have been disclosed

3    before so we would have a chance to depose him.  And I think

4    that moves into the next question you brought up, is why we

5    should have to issue a subpoena to depose a foreign-based

6    entity, or individual.

7          However, Dr. -- or I'm sorry.  Mr. Halter, in

8    answering the interrogatories, inserted himself into this case.

9    Not only that, he made himself an agent or an employee of

10   defendant.  Because under Rule 33, the only people that can

11   verify an interrogatory on behalf of an organization must be an

12   agent or must be an employee.  They could have chose anybody

13   else to verify that -- that interrogatory.

14         But by inserting himself into this case as an agent

15   employee, it's someone that now we -- we can now depose through

16   the normal deposition process, the Rule 30 process; instead of

17   the Rule 45 process.  Just like we deposed other agents and --

18   and employees of defendant.  We did subpoena them.  We issued

19   deposition notices, including for Mr. Mark Crowley.

20         THE COURT:  Let me ask a question.  And I'm sorry for

21   interrupting.

22         ATTORNEY KASHIMA:  No.

23         THE COURT:  When it comes to depositions, I know the

24   parties reached a stipulation early on in Sunderland regarding

25   the taking of further depositions that the parties referenced

1   in the -- the motions and responses and replies.

2          And it appeared that the parties all agree that you

3   would -- like you mentioned earlier, use the depositions from

4   Corbett and Sunderland.  That all of them would be

5   transferable, for lack of a better term, and be admissible in

6   Sunderland.  And that the parties agree that in order to save

7   time and resources, that there would not be any further

8   depositions unless certain conditions were met.  And to that

9   point, that it wouldn't be -- that the stipulation didn't

10  address interrogatories.  But the way the stipulation was read,

11  it appeared the parties were agreeing that basically you didn't

12  need to do much discovery in Sunderland because you already had

13  a lot of discovery in Corbett.  And it was all relatable or

14  could be used in Sunderland.

15         And then, shortly thereafter, there were multiple

16  interrogatories filed in Sunderland.  So -- well, let me ask

17  this question.

18         ATTORNEY KASHIMA:  Um-hmm.

19         THE COURT:  When did fact discovery close in Corbett?

20         ATTORNEY KASHIMA:  So fact discovery closed -- let me

21  double-check to make sure I get this date right.

22         (Pause, referring.)

23         ATTORNEY KASHIMA:  You know, let me bring it up.  But

24  fact discovery closed before the interrogatories were answered.

25         Now --

1          THE COURT:  What's the date that fact discovery

2   closed?

3          ATTORNEY KASHIMA:  I think it was before class

4   certification.  I have to go back and look.

5          THE COURT:  ECF 221 says fact discovery closed

6   February 16th of this year.

7          ATTORNEY KASHIMA:  So this -- I think this is

8   important.  Because you can't read that order out of context.

9          So that order was -- in -- in relation to a

10  stipulation which is ECF 220.

11         THE COURT:  Yes.

12         ATTORNEY KASHIMA:  Where the parties specifically

13  asked Judge Goddard to extend class certification only to

14  supplement the record.

15         And the reason for this is we had discovery up until

16  the discovery cutoff.  But the problem is, is the class

17  certification -- I mean, sorry, the class period extended until

18  the judge's order on class certification; which was quite a bit

19  after that.

20         And so we needed additional, mainly sales information

21  to cover this missing "doughnut period," I'm going to call it.

22         THE COURT:  The stipulation didn't limit it to sales

23  information, though.

24         ATTORNEY KASHIMA:  Yes, it did.  And so let me bring

25  that up right now for your Honor.

1          The reason I -- I'm so confident, your Honor, is I

2    drafted it.  And I negotiated it with defendant.  And so we

3    agreed that we weren't going to issue any additional discovery.

4          And I think that's why the judge in her order in 221

5    specifically admonished, quite hard, the parties for requesting

6    additional discovery.  And noted that if there is any

7    additional discovery that needs to be conducted, she needs to

8    know what it is and why it wasn't issued before.

9          THE COURT:  You were making another -- another

10   statement before I interrupted you.

11         ATTORNEY KASHIMA:  Sorry?

12         THE COURT:  You were making another statement before I

13   interrupted you?

14         ATTORNEY KASHIMA:  Oh, sorry, your Honor.  I was just

15   directing the judge to the order that's ECF 221.

16         THE COURT:  Yes, I have that.

17         ATTORNEY KASHIMA:  Where the judge says -- says,

18   explicitly:

19              "To the extent that the parties need additional

20              fact discovery from each other -- all third

21              parties, they need to provide the Court with full

22              explanation of the information sought."

23         And what plaintiffs took this as -- took it at face

24   value, given our stipulation.  That the -- Judge Goddard was

25   specifically ordering, you can do your supplemental discovery

1  and finish it up, and I'll extend the deadline for that.  But

2  the --

3           And I think that was her next sentence.  Is to the

4  extent you just need updated sales information, you know, I

5  suggest you work out that schedule.

6           But she noted, if you want additional discovery,

7  you're going to have to tell me why.

8           THE COURT:  Yes.

9           ATTORNEY KASHIMA:  Because this case has been going on

10 a while.

11          And so for that reason, plaintiffs understood that the

12 discovery deadline had lapsed for everything but the

13 supplemental discovery that the Court ordered.

14          Now, if we're mistaken in that reading of the order,

15 we apologize.  But we thought the Court made that pretty clear

16 in her admonishment, and we took that very seriously because we

17 didn't issue any additional discovery after that point.  That

18 this wasn't a free-range, you know, "get any discovery that you

19 want out of your system now."  But this is only to supplement

20 those things needed by the experts, in order to cut -- set up

21 the expert discovery.

22          THE COURT:  Okay.

23          ATTORNEY KASHIMA:  So, your Honor, because of that, we

24 didn't really have the opportunity in Corbett to address any of

25 these Halter issues.  To ask about these conversations that

1   were had between Mr. Halter and Dr. Madeline; Mr. Halter and

2   any of the suppliers; Mr. Halter, and H.I.B. [sic], about the

3   formulation.  That could have cleared up a lot of things in

4   this case, including exactly what the formulation was.

5        And in Sunderland we tried to take the deposition of

6   Mr. Halter and a 30(b)(6) representative on these exact

7   matters.  Matters that were only raised in the July

8   interrogatory response and attached documents.

9        And I think the record shows what happened then.

10  There was a disagreement between the parties, meet and confer

11  broke down, and nothing came of it.

12       THE COURT:  Yeah, I noticed there was -- there was two

13  dates set for the depositions for the plaintiff to the defense.

14  The dates didn't actually exist, for whatever reason.  And

15  then, from that point, it doesn't seem like there was much more

16  communication.  And then the motion was filed.

17       ATTORNEY KASHIMA:  Well, we did meet and confer by

18  telephone on that Friday, the Friday that the depositions were

19  supposed to go forward.

20       THE COURT:  Which Friday was that?  Because you

21  mention August 2nd, and then August 5th.  And you had the wrong

22  days of the week for both dates.

23       ATTORNEY KASHIMA:  You know, as I explained, the days

24  of the week were wrong but the dates were correct.

25       THE COURT:  If somebody tells me let's meet

1    Thursday -- or somebody tells me let's meet Tuesday,

2    October 7th, I'm not going to know which day you want to meet.

3    Because the day is wrong.  So I don't know if you want to meet

4    Tuesday, or if you want to meet on October 7th.

5            ATTORNEY KASHIMA:  Completely understand that.  And

6    that's why I set up a meet-and-confer call with defense

7    counsel, is -- you know, obviously, there were some things that

8    we needed to clean up, and that's one of them.

9            And, you know, from our initial communications, what I

10   thought was going to happen -- and this might be a

11   misunderstanding on my part.  But what I took away from that

12   call is that defense counsel was going to reach out to the

13   client and see if they're willing to conduct these depositions.

14           And if so, we obviously had to reschedule them at that

15   point.  I think the date had passed by the point that we got a

16   response.

17           And instead of getting a response, we got a pretty

18   lengthy letter.  And we tried to respond to that letter,

19   stating, look, we just want to take depositions on these

20   specific topics that were raised in discovery and the

21   stipulation.  Specifically, what was produced in July of this

22   year.

23           That -- that faced some rebuttal.  And, you know,

24   basically negotiations broke down at that point.

25           And so we're stuck with potentially having to face a

1    witness at trial who has significant and material information

2    about how the product was developed, what the formula actually

3    is, and Dr. Madeline's involvement therein.

4            And I think that's the basis of this motion, is we

5    shouldn't have to --

6            THE COURT:  Well, let me ask --

7            ATTORNEY KASHIMA:  -- do trial by surprise.

8            THE COURT:  Shouldn't that be the basis of a motion to

9    compel, as opposed to a motion for sanctions?

10           ATTORNEY KASHIMA:  The reason we have a motion for

11   sanctions is because discovery has closed in Corbett.  And so

12   I -- and, in the alternative, we did ask the Court to compel.

13           And so one of the things we asked the Court to do in

14   the sanctions motions is either one or two things in the

15   alternative.  Is either state that the defendant can't

16   contradict its own 30(b)(6) testimony and previous discovery

17   responses.  Or, in the alternative, force defendant to answer

18   some specific questions that they will be held to about what

19   the formula for the -- the elderberry extract actually is and

20   what did -- Dr. Mumcuoglu's involvement actually was.  So that,

21   on top of, you know, monetary sanctions and other sanctions, as

22   well.

23           And so we did ask in the alternative.  But we think

24   that the easiest method to deal with this is to hold defendant

25   to their own testimony.

1          So if it's just elderberry -- pasteurized elderberry

2     juice -- and, you know, we haven't gotten a clear answer from

3     the other side that that's particularly what the elderberry

4     extract is.  If it's just pasteurized elderberry juice and

5     that's all it is, and they're trying to claim that

6     Dr. Mumcuoglu invented pasteurization and how the juice,

7     (laughing) elderberries -- we're fine with that.  We'll take

8     this to trial on those facts.

9          But if they're trying to suggest that Mr. -- that

10    they're going to bring up rebuttal witnesses to counteract that

11    testimony, whoever they might be -- you know, they might be a

12    30(b)(6) deponent or something else.

13         THE COURT:  I didn't draw that inference.  But I

14    understand why you would.  But I did not draw the inference

15    that Mr. Halter would need to counteract that specific -- that

16    specific testimony.

17         ATTORNEY KASHIMA:  Well, that's the only two things

18    that he really gave information about in his interrogatory

19    response.  Is he discussed kind of the purchasing of the

20    product and how -- he discussed the formulation of the product

21    and Dr. Mumcuoglu's involvement therein -- therewith.  And so

22    we don't know if he would testify to other facts in rebuttal,

23    but those are the two main facts that have been disclosed to us

24    so far, that he knows.

25         And so we just don't want to be blindsided at trial by

1   moving forward based on the discovery that we've taken to date

2   and finding out -- at summary judgment or trial -- that, no,

3   that information is wrong; it's actually this formulation.

4          And if they can stipulate this is the formulation, and

5   this is the exact nature of her involvement -- like we asked

6   for in interrogatory number 8 and 9 on Exhibit J, the

7   Sunderland second -- or first set of interrogatories, we would

8   be fine with that.

9          THE COURT:  And -- well, here's the question I have.

10  Because I think we're taking interrogatory number 12, in this

11  meeting with Dr. Madeline.  And then suggesting that since this

12  meeting there has been continued involvement with her and her

13  involvement with this company, when there's no evidence and no

14  inference as to even suggest any of that.

15         ATTORNEY KASHIMA:  Well, let me apologize first, your

16  Honor, if our papers gave that appearance as to what we're

17  suggesting.  That's not what we're suggesting.

18         What we're -- what we know is that in defendant's

19  30(b)(6) testimony -- and I think this is at page 120 of the

20  30(b)(6) testimony.

21         They said, "We didn't do anything to independently

22  ensure."  And lo and behold, they -- they actually talked to

23  her.  Or someone within the organization actually talked to

24  her -- and with the suppliers.

25         Because of that, we have great concerns that the

1    discovery responses that we've gotten, so far, are incomplete

2    because we just don't know the nature of those conversations.

3         It might be simply just stating, yeah, it's just

4    juice.  Don't worry, it's just juice.  It would seem weird to

5    have this many meetings to confirm that you're using someone's

6    specific formula if it was just juice.

7         THE COURT:  Well, the response to interrogatory 12

8    doesn't mention multiple meetings with Dr. Madeline.

9         ATTORNEY KASHIMA:  No.  Again, I apologize.  Is they

10   had multiple meetings with suppliers to -- where they discussed

11   Dr. Madeline's formula.  She wasn't there, but they discussed

12   it.

13        THE COURT:  Interrogatory doesn't suggest that.  It

14   says, specifically, meeting with the suppliers -- excuse me

15   while I go through interrogatory number 12, to the attached

16   exhibit.

17        ATTORNEY KASHIMA:  So they -- this is defendant -- or,

18   sorry.  I guess, at this point, it would be PharmaCare PTY.

19        THE COURT:  Yes.

20        ATTORNEY KASHIMA:  "They also met with project

21            managers from H.I.B., and discussed the

22            manufacturing process for" --

23        THE COURT REPORTER:  I'm sorry.  I need you to read

24   slower, please.  "And discussed the."

25        ATTORNEY KASHIMA:  "They also met with project

1        managers from H.I.B.s, to discuss H.I.B.'s

2        financial position in the" elder -- I'm sorry --

3        "in the Sambucol business.  They also met with

4        project managers from H.I.B., and discussed the

5        manufacturing process for Sambucol; how

6        Dr. Madeline" -- we'll say -- "first made Sambucol

7        syrup in Israel.  How she then met with Wolfgang

8        Schwald, the factory manager at Rauch, and worked

9        with him to prepare -- prepare the delivery of

10       elderberry fruit extract in antiseptic containers

11       to Nextpharma."

12            So this is why I'm stating that it seems that they

13   actually had meetings to discuss this -- Dr. Madeline's formula

14   and how it was being used in the product, even when

15   Dr. Madeline wasn't there.

16            Now, this same manager would eventually meet with

17   Dr. Madeline and Mr. Halter to discuss the same things.  But at

18   this meeting, they were discussing Dr. Madeline's formula.

19            THE COURT:  Okay.  Anything else you wanted to address

20   before I hear from the defendants?

21            ATTORNEY KASHIMA:  You know, your Honor, at the

22   beginning you did mention a couple of things.  I don't know if

23   I've addressed all of the questions that the Court has.

24            And so if the Court had a different question at the

25   beginning, when it was giving its tentative, that I didn't

1   address, I am happy to do so now.  But I think we've hit all of

2   the points.

3           THE COURT:  I do not.  Thank you.

4           ATTORNEY KASHIMA:  Um-hmm.

5           THE COURT:  All right.  So who would like to argue?

6           ATTORNEY BUTLER:  I would, your Honor.

7           THE COURT:  Okay.

8           ATTORNEY BUTLER:  Just a few points.  We're not

9   claiming that there's some unstated formula.  I don't -- that's

10  a figment of Milberg's information.

11          Our 30(b)(6) witness testified how the manufacturing

12  process worked, and that's what we have to live with and that's

13  fine.

14          Mr. Kashima stated that the purchase agreement, when

15  we purchased the brand of Sambucol from H.B.I., included this

16  1988 patent.  That's false.  Doesn't mention that 1988 patent

17  because that patent had expired, and it could not have been

18  assigned to PharmaCare, PTY, at that time.

19          I don't know -- I've tried several cases and -- as a

20  defendant -- representing the defendant.  And I've never been

21  able to put on a rebuttal witness.

22          So when Milberg says that we were going to put

23  Mr. Halter on as a rebuttal witness, that's also false.  What

24  we said was if we used him at all, it might be to impeach

25  whatever witnesses they put on to carry their burden of proof.

1        With respect to the -- Judge Goddard's order on the

2   discovery cutoff, I don't disagree with Mr. Kashima about the

3   back and forth prior to that order.

4        But, frankly, we've had a lot of stips and orders with

5   Judge Goddard, and she doesn't always agree with what we stip

6   to.

7        THE COURT:  I know she is a proponent of joint motions

8   by the parties.

9        ATTORNEY BUTLER:  Right.

10       THE COURT:  And she does not like to proceed other

11  than joint -- by way of other joint motions.

12       ATTORNEY BUTLER:  Right.  And so the order itself

13  could not be more clear that the discovery cutoff in Corbett is

14  September 16th.

15       I would be happy to answer any other questions you

16  have, your Honor.  But at this point, I was taught -- early in

17  my career -- when you're winning, just don't speak much.

18       THE COURT:  Well, I do have couple of questions.

19       The first is to Mr. Kashima's point regarding

20  Mr. Halter being used to answer the interrogatory number 12.

21  Offered him up as the agent of the company, essentially.  I

22  want to hear your response to that argument.  As to why now, if

23  he was answering an interrogatory, he should not be subject to

24  a deposition.

25       ATTORNEY BUTLER:  Well, he's not a managing agent of

1    the company.  He's a former director, and that's all.

2            THE COURT:  Yes.

3            (Pause, conferring.)

4            ATTORNEY BUTLER:  What?

5            (Pause, conferring.)

6            ATTORNEY BUTLER:  And he doesn't become one unless we

7    identify him at the time of the deposition.

8            And if it's a 30(b)(6) witness that he wants and

9    wanted, we might be able to bring Mr. Halter as a 30(b)(6)

10   witness, but that would be our choice; who's the person most

11   knowledgeable to answer whatever the topics are.  But

12   Mr. Halter, as an individual, is an Australian citizen.  He's

13   not an employee of any PharmaCare company.  He's been retired

14   for several years.

15           But at one point he was the former director of

16   PharmaCare U.S.  And he was the one with the knowledge about

17   the response to interrogatory number 12.

18           THE COURT:  And I think Mr. Kashima's point is by --

19   under Rule 33, only an agent or a director of the company can

20   respond to an interrogatory.  And his position, if I understand

21   correctly, is by having Mr. Halter respond to interrogatory,

22   you're designating him as an agent of the company.  I believe

23   that's his position.  And please correct me if I'm wrong.

24           ATTORNEY KASHIMA:  No, your Honor, that's our

25   position.

1          THE COURT:  All right.  So if that's his position, if

2     you're offering him up -- if under that argument, as a director

3     of the company or an agent of the company, why is he then not

4     subject to deposition as an agent of the company who was able

5     to speak on the company's behalf?

6          And I believe that that's the position that the

7     plaintiff is taking.

8          ATTORNEY BUTLER:  Well, he's not subject -- he's not

9     subject to -- under a notice.  If they want to take

10    Mr. Halter's deposition, they can go through the Hague

11    Convention and take his deposition.

12         Sunderland's discovery is still open.  If there's any

13    relevant data that they think he has in that case, they can

14    still do that.  But you don't get to serve us with a notice to

15    compel a person who was never an employee of PharmaCare U.S.,

16    Inc., to come to the United States and take a deposition.  He's

17    an Australian citizen.

18         THE COURT:  And that's another question I had.  It

19    wasn't clear to me.  But my understanding is -- and I've heard

20    some suggestions that Mr. Halter was a high-level executive for

21    PharmaCare U.S.A.

22         ATTORNEY BUTLER:  That's not true.

23         THE COURT:  And my looking through the responses, he

24    was never an employee of PharmaCare U.S.A.

25         ATTORNEY BUTLER:  That is correct, your Honor.

1          THE COURT:  He worked for PharmaCare PTY?

2          ATTORNEY BUTLER:  PharmaCare Laboratories PTY,

3   Limited.  Yes.  He never worked for PharmaCare U.S., Inc.

4          THE COURT:  Oh, okay.  So his -- his interrogatory

5   response was based on his employment as an employee of

6   PharmaCare Laboratories PTY, Limited?

7          ATTORNEY BUTLER:  Yes.

8          THE COURT:  Okay.  Anything else you want to -- any

9   other arguments you want to make before I hear one final --

10         ATTORNEY BUTLER:  Not unless you have any other

11  questions for me, your Honor.

12         THE COURT:  I do not.  Thank you.

13         ATTORNEY BUTLER:  Thank you.

14         THE COURT:  Mr. Kashima?

15         ATTORNEY KASHIMA:  Yes.  Sorry.  I'm just trying to

16  look up -- and I apologize.  I think this might be one of those

17  issues where we use "PharmaCare."

18         And so on page 6 of the interrogatory 12, starting

19  online 25, it states that the then director of PharmaCare,

20  Mr. Halter -- without stating what he was -- and we've seen

21  that in several different instances.  Where it states that he

22  was a director of PharmaCare.

23         We've done a few of these cases.  And usually when a

24  parent sets up a subsidiary, there's lot of times overlap

25  between the -- the directorship until they -- that subsidiary

1   gets off the foot.  So if the defense counsel is making the

2   representation that he was never an employee of PharmaCare,

3   we'll accept that.  You know, we -- we were unsure about that.

4        But I don't think it changes the point that the Court

5   was questioning defense counsel about, which is once you've

6   inserted yourself under Rule 33, to verify interrogatory

7   responses on behalf of a corporation, Rule 33 states that those

8   can only be verified by agents and employees.  And he might not

9   be an employee, but he's definitely an agent for purposes of

10  this litigation now.  He's inserted himself into that position.

11  And there's no reason that we shouldn't be able to call him for

12  deposition testimony.

13       Now, I'm not sure why defendant would be suggesting

14  that maybe he would be a Rule 30(b)(6) agent, now that they've

15  stated that he's not a managing director and never was an

16  employee.  So, you know, maybe they designated him as an agent.

17  But that -- you know, I've never been in one of those

18  situations where a Rule 30(b)(6) deponent was not an actual

19  employee or at least former employee.

20       So, you know, I -- that doesn't really make much

21  sense.  But, regardless, he's inserted himself into this

22  dispute.  They have suggested that he is going to be either a

23  rebuttal or an impeachment witness.

24       THE COURT:  Well, actually, they did not -- he just

25  clarified.  They -- they did not have him as a rebuttal.  So

1    potentially impeachment.  And --

2            ATTORNEY KASHIMA:  So --

3            THE COURT:  -- any time I heard "rebuttal" was in the

4    plaintiffs' motion.

5            ATTORNEY KASHIMA:  Well, I can only go off the

6    defendant's opposition.  If I could draw the Court's attention

7    to the defendant's opposition at page 14, specifically lines 6

8    and 7.  It says:

9            "Defendants also have no intent to use Mr. Halter

10           in Corbett except as a potential -- potentially as

11           a rebuttal or impeachment witness."

12           So that's where we got that.  We're not making this up

13   out of thin air.  It was just in the opposition.  And it -- you

14   know, if they only meant one of those things, again, I'm going

15   to have to accept them.  It's their witness.

16           But that -- that's where we're getting this language.

17   That's why we were so confused.

18           And then the final --

19           THE COURT:  I get that.  And that's a reasonable

20   assumption to make when you see that language in there.

21           And it is very rare, if ever, that a rebuttal witness

22   is allowed in any -- or most civil cases.

23           ATTORNEY KASHIMA:  That's what we're kind of getting

24   at, your Honor.  We were really confused about how he could be

25   a rebuttal witness in a civil case where the only thing he

1    could testify is defendant's own actions.

2         So we were quite concerned when we saw they're

3    suggesting that he might be a rebuttal witness.

4         And the last thing is -- you know, defense counsel was

5    right about the patent.  The original 1988 patent was never in

6    the purchase agreement because it lapsed.  But the patent

7    applications that were kind of trying to re-up that previous

8    patent -- at least for avian flu, were.

9         And so it was those patent applications, the fact that

10   we even submitted evidence that H.I.B. was discussing these

11   patent applications internally when they were talking about

12   protection of the product.  That's what led us to believe that

13   they were using the patented formula.  It's the -- it's the

14   only evidence that we're had so far of Dr. Mumcuoglu's

15   involvement.  That -- that -- it's actually her formulation, is

16   this email that suggests that, hey, we -- we -- the -- you

17   know, from H.I.B. employees, stating that this patent, you

18   know, might -- did at one point protect the formula but it's

19   lapsed.  And the fact that the -- the patent application that

20   re-ups the same formulation is in the purchase agreement

21   itself.

22         THE COURT:  And I just have to point out something.  I

23   remember reading it through Mr. Rowe-Cerveny, C-E-R-V-E-N-Y, 's

24   deposition testimony.  On page 13 of 18 of his testimony, lines

25   4 through 6, his answer:

1          "It is our understanding that the formula that we

2          inherited when we bought Sambucol was the same

3          formula that was developed by Dr. Mumcuoglu --

4          cuoglu."

5      So you just said the only information you have that

6  she -- her formula might have been used was this new

7  interrogatory number 12, when Mr. Rowe-Cerveny in Corbett,

8  early on, said his understanding is that they've been using the

9  same formula since.

10      ATTORNEY KASHIMA:  No, your Honor.  Let me correct

11  that.

12      It -- we've always had a weird kind of question of

13  what the formulation actually is.  Because all we've had is --

14  and, you know, defendant has -- has stated that they're going

15  to live by the 30(b)(6) deposition, in open court.  So, you

16  know, I think that -- that handles one of the issues that we

17  came here to address with the Court.  Is that it is basically

18  juice that has been pasteurized.

19      And what's interesting about that, your Honor, is this

20  is the antithesis to the patented formula that Dr. Mumcuoglu

21  created with these antiviral properties.

22      The reason for that is the lectins within the

23  elderberry juice were identified as the mechanism that caused

24  the antiviral reaction.  These lectins denature at high

25  temperatures.

1          THE COURT:  Yes.

2          ATTORNEY KASHIMA:  And, of course, pasteurization is

3    sterilizing products at high temperature.  And so we've always

4    been quite confused.  And that's why when we saw page 6 of

5    defendant's opposition -- and let me bring it down, so I can

6    see the language.

7          You know, one of the assumptions that they claim that

8    we made is that the elderberry extract used in the Sambucol

9    products cannot be unique or have a proprietary manufacturing

10   process while still having the same chemical formulation as

11   elderberry extract previously presented in the supply chain.

12         And what this suggests to us -- and what Mr. Halter's

13   information suggests -- is this isn't just normal pasteurized

14   juice.  That this is something different.  That there is some

15   sort of unique and proprietary manufacturing process at issue

16   here that hasn't been disclosed to us.  Because, obviously, if

17   a virologist pours you a glass of pasteurized orange juice,

18   that's not virologist-developed, it's just pasteurized orange

19   juice.

20         So we're trying to figure out and actually get a

21   straight answer to what is Dr. Mumcuoglu's involvement in

22   this -- in this formulation.  What exactly did she formulate?

23         THE COURT:  Well, didn't Mr. Rowe-Cerveny answer those

24   questions?

25         ATTORNEY KASHIMA:  He basically stated that they tried

1    to keep the juice as close as possible, with a certain amount

2    of juice.

3         THE COURT:  Dr. Madeline's involvement with the

4    formula, didn't he address those?  I see numerous references in

5    his deposition to that.

6         ATTORNEY KASHIMA:  He -- you know, he doesn't

7    specifically state exactly what it is in that formula that she

8    developed.  Because, again, she can't develop pasteurization.

9    She didn't develop the juice-making process.  And defendants

10   even concede this in Interrogatory 21.  This is Exhibit D,

11   which states that they use the same juice process as things

12   that have been going on for centuries.  And this is kind of

13   part of our confusion, your Honor.

14        THE COURT:  And how would Mr. Halter's testimony

15   provide the insight that you're asking -- that you just

16   mentioned?

17        ATTORNEY KASHIMA:  If we go back to Mr. Halter's

18   interrogatory response, he stated that he actually talked with

19   Nextpharma and Rauch, who developed -- or manufacture the

20   elderberry extract to Dr. Mumcuoglu's standards.  We just read

21   that passage for the Court, where he said he specifically

22   discussed with them, you know, Dr. Mumcuoglu's development of

23   this elderberry extract.  And so if they're discussing how she

24   developed it, they probably know specifically what it is she

25   developed and how it is integrated into the elderberry extract.

1          THE COURT:  In 2009.

2          ATTORNEY KASHIMA:  In 2009.

3          And so they say they haven't changed the formulation

4     since.  So if it was the same in 2009, it's the same today.

5          THE COURT:  Prior to the formulation of this U.S.

6     company?

7          ATTORNEY KASHIMA:  Prior to this formation of the U.S.

8     company.

9          But, again, we've -- we've gotten other discovery

10    responses that predate PharmaCare U.S.  Matter of fact, the

11    reason we know that they inherited this product and its

12    labeling and its formulation from H.I.B., is because, you

13    know --

14         THE COURT:  I know you've been saying "H.I.B." the

15    whole time.  But it's "H.B.I."

16         ATTORNEY KASHIMA:  Sorry.  Health -- Healthcare Brands

17    International.

18         I'm mixing this up with another case, your Honor.  I

19    apologize.

20         The reason why we know all of this is because

21    corporate designees have testified to this.  But this all

22    predates PharmaCare U.S.  But they're still able to testify it,

23    because they're selling that product in the U.S.  So they

24    should have knowledge about how it's developed, specifically

25    because the FDA requires this knowledge.  But they should have

```
 1    knowledge about how it is developed, what is in it.
 2              And if they're claiming that it was developed by a
 3    virologist, they should know the substantiation for those
 4    claims.
 5              THE COURT:  Okay.  Thank you.
 6              I know I went into a new area we didn't discuss
 7    initially.  So if you wanted a brief opportunity to address the
 8    new areas, I'll certainly give that to you.
 9              ATTORNEY BUTLER:  I just want to say, your Honor, this
10    is not a motion to compel the deposition of Mr. Halter.  This
11    is not a motion to compel a 30(b)(6) deposition.  This is a
12    motion to sanction defendant for misleading the Court.
13              And we're getting far afield from that issue.
14              THE COURT:  All right.  Thank you.
15              All right.  So the Court, having reviewed the parties'
16    briefing, having heard the arguments today, I'm actually going
17    to rule on the motion for sanctions and to consolidate cases
18    today, from the bench.
19              So the first basis in which the plaintiffs have argued
20    to -- for -- for sanctions and to consolidate the cases, that
21    the defendants have both been deceitful in the hiding of
22    discovery and misleading both to the Court as well as to the
23    plaintiffs.  The Court, first of all, has -- cannot find and
24    has not found -- nor has there been any argument -- that there
25    have been any discovery order violations.  There's not been any
```

1    violations, and I do not believe that the defendants have

2    misled the Court, nor hid discovery.

3         I understand the argument that is made by the

4    plaintiffs.  However, I don't think it's a particularly

5    effective argument in regards to alleged deceit on behalf of

6    the defendants by Mr. Halter for the following reasons:

7         I think there's a lot read into the response to

8    interrogatory number 12, some of which we've gone through on

9    the record today.  And we're talking about an individual who

10   met with someone in 2009, before the formulation of the

11   defendant in this case; has never worked for the defendant in

12   this case; and has -- and I think -- based on a lot of innuendo

13   that was read into it -- I don't believe that it's an inference

14   the Court can draw, based on the actual response to

15   interrogatory number 12.  So I do not draw the inferences that

16   the plaintiff asks the Court to draw.  The interrogatory stands

17   on its own, and the wording of it.  As well as the words that

18   are being asked to be read into it, I don't think, are

19   reasonable inferences to draw from it.

20        So I don't believe that there has been any deceit.  I

21   don't believe the defendants have misled the Court.  I don't

22   believe that Mr. Halter was a witness whose identity should

23   have been disclosed earlier in the proceedings.

24        Frankly, I don't think his -- his -- the response --

25   to interrogatory number 12 has any probative value, per se, in

1    regards to the issues in dispute.  Especially in Corbett.  And,

2    frankly, maybe even Sunderland.

3         We are far along in the process.  The fact discovery

4    was open until February -- September 16th.  I know there was a

5    joint stipulation between the parties in regards to the

6    additional information they wanted to receive.  I don't think

7    that Mr. Halter's statement was given past the fact discovery

8    deadline disclosure.

9         It was within that discovery deadline closure.  And I

10   don't believe that this was something that was done to be

11   deceitful or to -- for lack of a better term -- gamesmanship;

12   as the Court has been asked to read into it.

13        Mr. Halter is a private citizen of a foreign country.

14   He is not and nor has he ever been an employee of PharmaCare

15   U.S.A.

16        And although he did give an answer to an issue -- the

17   Rule 33 issue the plaintiff raised, he did give an answer to an

18   interrogatory.  Rule 33, as the plaintiff raised, is correct.

19   That either an officer or agent of a company is the one

20   responsible for giving interrogatory.  That's an interesting

21   argument.  I'm not prepared to rule on that today.

22        I am not persuaded, per se, that Mr. Halter should

23   be -- well, I have not been asked to compel a deposition.  So

24   I'm not even ruling on an issue that's not before me.  So at

25   this point I am just not ruling that this was something done

1    for deceit.  And, therefore, I'm going to deny the motion for

2    sanctions.

3            For similar reasoning, I'm going to deny the motion to

4    consolidate the cases.  We are just less than two months away

5    from pretrial motions in Corbett, and we are much further

6    away -- we have a motion to certify the class in Sunderland in

7    January, prior to the pretrial motion deadline in Corbett.

8            I don't believe it would be appropriate to consolidate

9    these cases for the reasons I've stated when the request was

10   made a year ago.  And we are close to what may or may not be

11   dispositive motions in pretrial discovery in December.

12           So the Court is going to deny the request to

13   consolidate the cases, and we will proceed with the deadlines

14   previously set.

15           If there are any other motions the parties would like

16   the Court to rule on, you are certainly welcome to file those.

17   But I can only decide issues that are before me today.  There's

18   no motion to compel before me.  And that will be the order of

19   the Court.

20           Is there anything else we need to address, that we

21   were set to address today, that the Court has not addressed?

22           ATTORNEY KASHIMA:  No, your Honor.

23           THE COURT:  Any other issues we need to address so we

24   can prevent another hearing in the future; that can be

25   addressed, absent a notice motion?

1          ATTORNEY BUTLER:  No, your Honor.

2          ATTORNEY KASHIMA:  Your Honor -- sorry, your Honor.

3     There's only one thing.  I did contact defense counsel about

4     moving the expert discovery deadline back a week or two.  The

5     only reason for that is -- is Ms. Rachel Soffin, who has been

6     leading our expert discovery, is in St. Petersburg, Florida,

7     and is apparently getting hit by the second of two hurricanes.

8     And, unfortunately, it's left her without power and Internet,

9     and made it incredibly difficult for her to actually work with

10    our experts to get these expert reports on file.

11         So we -- we don't want to push any other deadlines

12    back, to the extent they can.  We -- we want to go forward on

13    this matter.  It's just we're hoping to get the expert and

14    rebuttal deadlines pushed back two weeks, just to allow her

15    some breathing room.

16         THE COURT:  That's a reasonable request.

17         Any opposition at all?

18         ATTORNEY FERRARI:  Yes.  And we were not able to meet

19    and confer because we were focusing on this motion.

20         It's merits experts in Corbett.  And what it is is in

21    completing the conjoint studies for which depositions have been

22    taken of these experts.  And they've provided reports

23    previously in the class portion and in the class in Sunderland.

24         And there are 11 attorneys that gave -- are listed on

25    these class motions.  Ms. Soffin is only one of them.  And

1    we've had this date on calendar for a long time.

2         I am much appreciative of the flood.  But what happens

3    when we move it two weeks back, it then puts the rebuttal right

4    before this December 20 dispositive motion in Corbett and

5    pretrial filings.  And I -- I can't file my dispositive motion

6    until the expert discovery closes, so the ball doesn't keep

7    moving.

8         And so, frankly, every time we have a continuance --

9    and we have a continuance for every deadline requested by

10   plaintiffs -- it costs my clients more and more; including this

11   motion that we're here for today.

12        So at some point it's just incredibly prejudicial to

13   us that they can't put another attorney on a deadline that's

14   due in a week.  It's still not due for another week.  And these

15   are reports that they've been working on.  Presumably, they

16   should be done.

17        So I -- I'm just -- it's -- it's very difficult for

18   me, as an advocate for my client, when we want to get a merits

19   motion on and we've moved these dates multiple times, for me to

20   continue to --

21        THE COURT:  I can tell the parties we're not moving

22   the pretrial deadline.  So we're not moving that at all.

23        This case has been going on for over three years now.

24   So, at some point, we need to go forward, have our pretrial

25   deadline, dispositive -- if there are dispositive motions that

1  are going to trial, we need to -- we need to get to a finality

2  at some point in this case.

3          This is my oldest case.  So I am eager to get to trial

4  and resolve this case and have the parties have their day in

5  court.

6          So here's what I'm going to do.  I'm not going to

7  change the deadline yet.  The parties have not had a chance to

8  meet and confer.  I'll ask you to meet and confer.  And then I

9  will subject you to the joint motion protocol with Judge

10 Goddard, if you like.

11         But I am just asking you to meet and confer, since you

12 haven't had a chance to do that.  And I don't want to do that

13 on the record right now.

14         ATTORNEY KASHIMA:  Okay.

15         ATTORNEY BUTLER:  All right, your Honor.

16         ATTORNEY FERRARI:  Thank you.

17         THE COURT:  All right.  Thank you very much, everyone.

18         ATTORNEY KASHIMA:  Thank you, your Honor.

19         (Conclusion of proceedings at 11:03 a.m.)

20

21

22

23

24

25

*Certificate*

--oOo--

I certify, by signing below, that the foregoing is a correct stenographic transcript of the oral proceedings had in the above-entitled matter this 15th day of October, 2024.  A transcript without an original signature or conformed signature is not certified.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/S/ Amanda M. LeGore

_____

AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290