SEYFARTH SHAW LLP
Lawrence E. Butler (SBN 111043)
lbutler@seyfarth.com
Giovanna A. Ferrari (SBN 229871)
gferrari@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:    (415) 397-8549

SEYFARTH SHAW LLP
Joseph J. Orzano (SBN 262040)
jorzano@seyfarth.com
Seaport East, Suite 1200
Two Seaport Lane
Boston, MA  02210
Telephone:  (617) 946-4800
Facsimile:    (617) 946-4801

SEYFARTH SHAW LLP
Aaron Belzer (SBN 238901)
abelzer@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, CA  90067-3201
Telephone:  (310) 277-7200
Facsimile:   (310) 201-5219

Attorneys for Defendant
PHARMACARE U.S., INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA SUNDERLAND and BENJAMIN BINDER individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PHARMACARE U.S., INC., a Delaware Corporation,<br><br>Defendant. | Case No. 3:23-cv-01318-JES-AHG<br><br>**PHARMACARE U.S., INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL; MOTION TO EXCLUDE PLAINTIFFS' EXPERTS**<br><br>Dated:    January 15, 2025<br>Time:     10:00 a.m.<br>Judge:    Hon. James E. Simmons, Jr.<br>Ctrm:     4B |

# **TABLE OF CONTENTS**

I.    OPPOSITION TO CLASS CERTIFICATION.........................................................1

II.   BACKGROUND FACTS.........................................................................................4

    A.    The Class Claims—as Pled—are Based on One Theory of Deception. .........4

    B.    Sunderland's Claims are Based on a Different Theory of Deception.............5

    C.    Binder's Claims are Based on a Third Theory of Deception.........................5

    D.    Plaintiffs' Consumer Perception Expert Tested a Fourth Theory of Deception which will also be Used to Calculate Damages.............................6

    E.    The Class Product Labels Are Far From Uniform. .......................................9

    F.    This Case Is Entirely Attorney-Driven. ......................................................10

        1.    Plaintiffs Were Satisfied Long-Time Users of Class Products...........10

        2.    Milberg Recruited Plaintiffs to Assert an Implied Disease Claim. ....11

        3.    Plaintiffs Did Not Review the Complaint Before it was Filed...........12

        4.    Milberg Elicited or Attempted to Elicit Contradictory Sworn Testimony and Sham Affidavits to Conform to the Complaint...........13

        5.    Plaintiffs Have Had Virtually No Involvement in the Litigation. ......15

    G.    Milberg is Pursing Claims that Conflict with the Class's Claims. ..............16

III.  LEGAL STANDARD FOR CLASS CERTIFICATION.......................................17

IV.   PLAINTIFFS WILL NOT ADEQUATELY PROTECT THE INTERESTS OF THE CLASS AND THEIR CLAIMS ARE NOT TYPICAL ...............................18

    A.    Plaintiffs Are Not Members Of The Class They Seek To Represent. ..........18

    B.    Plaintiffs Face Unique Disqualifying Defenses / Lack Standing..................20

    C.    Milberg Cannot Represent any Class Because it is Conflicted.....................21

    D.    Milberg Is The "Driving Force" Behind This Litigation, Further Precluding A Finding Of Adequacy. .........................................................................23

V.    THE PROPOSED CLASS IS NOT SUFFICIENTLY NUMEROUS ....................24

VI.   COMMON ISSUES DO NOT PREDOMINATE..................................................25

    A.    Individual Inquiries of Article III Standing Preclude Predominance. ..........25

    B.    Individual Inquiries Of Statutory Standing Preclude Predominance............27

i

314065046v.7

1        1.    The Class Claims Require Individual Causation or Reliance.............27

2        2.    A Rebuttal Inference of Reliance Under California Law for Some Class Claims Does Not Solve the Predominance Problem.................28

C.    There is No Common Evidence that the Class Claims are False.................30

VII.    PLAINTIFFS HAVE NOT SHOWN DAMAGES RESULTING FROM THE CLASS CLAIM CAN BE CALCULATED ON A CLASSWIDE BASIS .........30

A.    Plaintiffs' Damages Model Does Not Measure the Class Claims. ..............31

B.    Plaintiffs' Damages Model Fails for Additional Reasons. ..........................32

VIII.   CLASS TREATMENT IS NOT SUPERIOR ........................................................33

IX.    DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS ..............35

A.    Legal Standard for Motion to Exclude.........................................................35

B.    Dr. Dennis's Perception and Materiality Survey Is Irrelevant And Unreliable. ....................................................................................................36

1.    The Survey Is Inapposite And Irrelevant Because It Does Not Match Plaintiffs' Theory Of Liability or Defendant's Label......................36

2.    The Survey Is Inapposite And Irrelevant Because Surveys Are Not Used to Test Express Claims. ..........................................................38

3.    The Survey Is Irrelevant and Unreliable Because It Does Not Replicate Marketplace Conditions....................................................39

4.    Dr. Dennis's Perception and Materiality Survey is Irrelevant and Unreliable Because it is a Biased And Leading Reading Test of Modified Claims. ...........................................................................41

C.    Dr. Dennis and Mr. Weir's Damages Studies / Models are Irrelevant and Unreliable. ....................................................................................................43

D.    Admitting Dr. Dennis's and Mr. Weir's Opinions Would Unfairly Prejudice PharmaCare. ....................................................................................................46

ii

314065046v.7

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re 5-hour ENERGY Marketing and Sales Practices Litig.*,
2017 WL 385042 (C.D. Cal. Jan. 24, 2017) ......................................................20

*Access, Inc. v. Cadrillion, LLC*,
2016 WL 1706042 (W.D.N.C., Apr. 28, 2016) ...............................................22

*Aholelei v. Dept. of Public Safety*,
488 F.3d 1144, 1149 (9th Cir. 2007) ...............................................................22

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ..................................................................................25, 33

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ..............................................................................26

*Avritt v. Reliastar Life Ins. Co.*,
615 F.3d 1023 (5th Circ. 2020) ........................................................................26

*Bodner v. Oreck Direct, LLC*,
2007 WL 1223777 (N.D. Cal. Apr. 25, 2007)...........................................23, 24

*Broussard v. Meineke Discount Meer Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ............................................................................33

*by, Montera v. Premier Nutrition Corp.*,
111 F.4th 1018 (9th Cir. 2024) .........................................................................31

*Cattie v. Wal-Mart Stores, Inc.*,
504 F. Supp. 2d 939 (S.D. Cal. 2007)...............................................................27

*Celestin v. Martelly*,
698 F.Supp.3d 443 (E.D.N.Y. 2023) ................................................................28

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...................................................................30, 31, 32, 44

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014)......................................................31, 32, 44

iii

*Consolidated Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ...................................................................25

*Daubert v. Merill Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...............................................................31, 35, 36, 46

*Devey v. Big Lots, Inc.*,
  635 F.Supp.3d 205 (W.D. N.Y. 2022)....................................................28

*Diacakis v. Comcast Corp.*,
  No. C11-3002, 2013 U.S. Dist. LEXIS 64523 (N.D. Cal. May 3, 2013)...........44

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974).............................................................................33

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................... 18, 25, 29, 30, 31, 35

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011).............................................................................25

*F.T.C. v. QT, Inc.*,
  448 F.Supp.2d 908 (N.D.Ill. 2006) .......................................................38

*FTC v. Bronson Partners, LLC*,
  564 F.Supp.2d 119 (D.Conn. 2008)................................................38, 39

*General Telephone Co. of Southwest v. Falcon*,
  457 U.S. 147, 158 n. 13 (1982) ...........................................................19

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981)...............................................................................23

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal., 2018)................................................29

*Hall v. Hall*,
  584 U.S. 59, 138 S. Ct. 1118, 200 L. Ed. 2d 399 (2018) ......................22

*Hammler v. Hernandez*,
  2020 WL 8970334 (S.D. Cal. March 5, 2020) ......................................35

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .........................................................19, 20

iv

*Harik v. Cal. Teachers Ass'n,*
   326 F.3d 1042 (9th Cir. 2003) ..................................................................25

*Hodes v. Van's International Foods,*
   2009 WL 2424214 (C.D. Cal. July 23, 2009).........................................33

*In re Hyundai,*
   881 F.3d (9th Cir. 2018) .........................................................................29

*Johannessohn v. Polaris Indus., Inc.,*
   9 F.4th 981 (8th Cir. 2021) .....................................................................26

*Karhu v. Vital,*
   621 F. App'x 645 (11th Cir. 2015) ..........................................................34

*Katz v. Realty Equities Corp.,*
   521 F.2d 1354 (2d Cir.1975) ...................................................................22

*Kilby v. CVS Pharmacy, Inc.,*
   2012 WL 1132854 (S.D. Cal. April 4, 2012) ..........................................35

*Kosta v. Del Monte Foods, Inc.,*
   308 F.R.D. 217 (N.D. Cal., July 30, 2015), at 230 ................................28

*Lin v. Canada Goose US, Inc.,*
   640 F.Supp.3d 349 (S.D.N.Y. 2022) .......................................................28

*Lou v. Ma Laboratories, Inc.,*
   2014 WL 68605 (N.D. Cal. 2014) ............................................................21

*Lust v. Merrell Dow Pharm., Inc.,*
   89 F.3d 594 (9th Cir. 1996) .....................................................................35

*Marcus v. BMW,*
   687 F.3d 583 (3d Cir. 2012) ....................................................................34

*Mazur v. Ebay,*
   257 F.R.D. 563 (N.D. Cal. 2009)..............................................................27

*McLaughlin v. Am. Tobacco Co.,*
   522 F.3d 215 (2nd Cir. 2008) ..................................................................18

*McMorrow v. Mondelez,*
   2020 1157191 (S.D. Cal. March 9, 2020) .......................31, 32, 38, 44

314065046v.7

*Miller v. Fuhu, Inc.*,
    2015 WL 7776794 (C.D. Cal. Dec. 1, 2015)........................................32, 44, 45

*Moheb v. Nutramax Labs., Inc.*,
    2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) .....................................................33

*Montera v. Premier Nutrition Corp.*,
    621 F.Supp.3d 1012 (N.D. Cal. Aug. 12, 2022) ................................................31

*Moore v. Margiotta*,
    581 F. Supp. 649 (E.D. N.Y. 1984) ..................................................................22

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F. Supp. 3d 1050 (C.D. Cal. 2015) ......................................................32, 45

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ...........................................................18, 26, 31, 36

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)..........................................................................................21

*Passman v. Peloton Interactive, Inc.*,
    2023 WL 3195941 (S.D.N.Y. May 2, 2023) ...............................................32, 45

*Persian Gulf, Inc. v. BP West Coast Products*,
    632 F.Supp.3d 1108 (S.D. Cal. Sept. 30, 2022) ...............................................35

*In re Phenylpropanolimine (PPA) Products Liab. Litig.*,
    214 F.R.D. 614 (W.D. Wash. 2003) ..................................................................34

*In re Quarterdeck Office Sys., Inc. Sec. Litig.*,
    1993 WL 623310 (C.D. Cal. Sept. 30, 1993) ...................................................20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013)..........................................................................26

*Rodriguez v. Gates*,
    No. CV 99-13190 GAF, 2002 U.S. Dist. LEXIS 10654 (C.D. Cal. May
    30, 2002) ............................................................................................................44

*San Pedro-Salcedo v. Haagen-Dazs Shoppe Co., Inc.*,
    2019 WL 6493978 (N.D. Cal. Dec. 3, 2019)....................................................20

314065046v.7

*Sanchez v. Wal Mart Stores, Inc.*, 2009 U.S. Dist. LEXIS 48428 (E.D. Cal. May 28, 2009)............................................................................24

*Senne v. Royals*,
315 F.R.D. 523 (N.D.Cal. 2016)..........................................................34

*Simpson v. Dart*,
23 F.4th 706 (7th Cir. 2022) ...............................................................25

*Six Mexican Workers v. Ariz. Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990) ............................................................33

*Sosna v. Iowa*,
419 U.S. 393, 403 (1975) ....................................................................19

*Spacone v. Sanford, L.P.*,
2018 WL 4139057 (C.D. Cal. Aug. 9, 2018) ......................................20

*Spencer v. Beavex*,
2006 WL 6500597 (S.D.Cal. Dec. 15, 2006) ......................................34

*Sueoka v. U.S.*,
101 Fed.Appx. 649 (9th Cir. 2004) .....................................................19

*Townsend v. Monster Beverage*,
303 F.Supp.3d 1010 (C.D. Cal. 2018) .................................................38

*TransUnion LLC v. Ramirez*,
141 S.Ct. 2190 (2021).....................................................................25, 26

*Tyson Foods v. Bouaphakeo*,
577 U.S. 442 (2016).............................................................................25

*United States v. Evans*,
728 F.3d 953 (9th Cir. 2013) ..............................................................44

*United States v. Finley*,
301 F.3d 1000 (9th Cir. 2002)..............................................................35

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
500 F. Supp. 3d 940 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022)........................32, 46

314065046v.7

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..........................................................................18, 24, 30, 33

*Webb v. Carter's Inc.*,
   272 F.R.D. 489 (C.D. Cal. Feb. 3, 2011) 489, 504 ..............................................34

*White v. Experian Information Solutions*,
   993 F.Supp.2d 1154 (C.D. Cal. 2014) *aff'd sub nom. Radcliffe v.
   Hernandez*, 818 F.3d 537 (9th Cir. 2016)...........................................................21

*Williams v. Gerber Prods. Co.*,
   52 F.3d 934, 938 (9th Cir. 2008) ........................................................................26

*Zagruzny v. Mercedes-Benz USA*,
   2020 WL 3968672 (C.D.Cal. June 4, 2020)........................................................46

*Zakaria v. Gerber Products Co.*,
   2016 WL 6662723 (C.D. Cal., Mar. 23, 2016).....................................................29

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ............................................................................18

**California Cases**

*Durell v. Sharp Healthcare*,
   183 Cal. App. 4th 1350 (2010) ...........................................................................27

*Scott v. Metabolife International, Inc.*,
   115 Cal. App. 4th 4041 (2004) ...........................................................................27

*Tucker v. Pac. Bell Mobile Svs.*,
   208 Cal. App. 4th 227-228 (2012).......................................................................28

*In re Vioxx*,
   180 Cal. App. 4th at 129 .....................................................................................28

**Other State Cases**

,,
   Dkt. 68-21, Dennis Rep. ......................................................................................43

*Diacakis v. Comcast Corp.*,
   2013 WL 1878921 (May 3, 2013) ................................. 24, 25, 26, 29, 30, 32, 44

*Hall v. Marriott International, Inc.*,
    2023 WL 4417265 (March 30, 2023) ....................................................32, 44

**Federal Statutes**

21 U.S.C.
    § 350b(a), (f) ........................................................................................16, 31

28 U.S.C.
    § 2072(b) ....................................................................................................34

Federal Food, Drug & Cosmetics Act ...............................................................16

**California Statutes**

Cal. Bus. & Prof. Code
    § 17200 *et. seq.* ..........................................................................................4
    § 17500 ........................................................................................................4

Cal. Civ. Code
    § 1750 *et. seq.* ..........................................................................................4
    § 1770(a) ....................................................................................................27

Cal. Com. Code
    § 2313(1)(a) ..............................................................................................27

**Other State Statutes**

N.Y. Gen. Bus. Law
    §§ 349, 350 .......................................................................................5, 28, 31

**Other Authorities**

Fed. R. Civ. P. 8(d)(2), (3) ..............................................................................22

Fed. R. Civ. P. 11 .............................................................................................22

Fed. R. Civ. P. 23(a)(3) .........................................................................18, 29, 30

Fed R. Civ. P. 23(a)(4) ....................................................................................19

Fed. R. Evid. Rule 23 ...........................................18, 23, 26, 30, 31, 32, 45

Fed. R. Evid. Rule 23(a) ...........................................................................3, 17, 29

Fed. R. Evid. Rule 23(a)(1) ...................................................................................24

Fed. R. Evid. Rule 23(b)(3) ........................................................17, 18, 25, 30, 34

Fed. R. Evid. 403 ...............................................................................35, 36, 46, 47

Fed. R. Evid. 702 .......................................................................................31, 35

314065046v.7

1

## I.    OPPOSITION TO CLASS CERTIFICATION

Proposed class representatives Linda Sunderland and Benjamin Binder ("Plaintiffs") seek to certify classes of **each and every** New York and California purchaser of a subset of Defendant's Sambucol® black elderberry supplements ("Class") based on certain labelling statements. Dkt. 68.[1] More specifically, both Plaintiffs allege they "reviewed the Product's labeling, where [they] saw and relied on Defendants' claims that its elderberry ingredient was developed by a world renowned virologist **and** was unique and proprietary[,]" and contend that Sambucol is not "unique and proprietary" and not "virologist developed" because it was not formulated in accordance with a long-since expired patent of an Israeli virologist named Dr. Madeline Mumcuoglu ("Class Claims"). Dkt. 1, ¶¶ 12, 17, and 27-37 (emphasis added). Plaintiffs seek to recover purportedly uniform price premium damages resulting from all purchasers' alleged uniform exposure to and reliance on the Class Claims. Dkt. 68-1.  As this Court is aware, the Class Claims were first proposed by Milberg in the *Corbett* lawsuit—not by any consumer and certainly not by Sunderland and Binder—and are based on a series of illogical and unfounded assumptions.  *Corbett* Dkt. 135 (Mtn. for Leave to Amend); Opp. to Motion for Sanctions, *Corbett* Dk. 235.  Discovery has confirmed the Class Claims should never have been filed, and a class should not be certified.

**As a threshold matter, Milberg requests this Court certify a class that has already been certified.** *Compare Corbett* class notice to "[a]ll persons who, from January 21, 2017 to March 29, 2024, purchased Defendant's Sambucol [Products] for personal or household use and not for resale in California" [*Corbett* Dkt. 249 at ¶9] with *Sunderland* proposed class of "[a]ll persons in California, who before March 31, 2023, purchased the Products[2] for personal or household use and not for resale" [Dkt. 68-1 at 2:3-4].  In doing so, Milberg confirms the need to establish the reasons why each consumer purchased the

---

[1]Unless otherwise indicated, all references to "Dkt." refer to the docket in *Sunderland*.
[2] Defendant sold its Sambucol® Black Elderberry supplements in 12 different formats, but Milberg only selected eight in this lawsuit.  Declaration of Giovanna A. Ferrari ("Ferrari Decl.") at ¶40.  All eight are part of the *Corbett* classes. *Corbett* Dkt. 45 at ¶1.

products to determine whether those consumers relied on / were harmed by a Disease Claim (as alleged in *Corbett*), an NDI Claim (as alleged in *Corbett*), a Class Claim (as alleged here), or some other claim. The need to perform that exercise proves that individual, fact-intensive inquiries predominate, and that class certification is (and was) inappropriate.

That exercise also reveals that Plaintiffs cannot and will not adequately protect the interests of the Class, and their claims are atypical. **Most fundamentally, Plaintiffs are not even members of the class they seek to represent**. Plaintiffs were not exposed to and did not rely on the labelling statements "virologist developed," "unique," and "proprietary," collectively, nor did they rely on the products' conformance with a patented formulation. Instead, Plaintiffs testified under oath in response to defense counsel questions that they purchased the products for a different reason, based on different claims. Indeed, Plaintiffs' discovery responses and testimony make clear that they were not deceived in the manner alleged in the Complaint, and are not even dissatisfied with Sambucol® products, thereby eliminating their standing to proceed. Plaintiffs are further subject to a variety of unique defenses, including those related to Milberg's recruitment of them to assert a *Corbett* Disease Claim (not the Class Claims), as well as challenges to their credibility. Additionally, Milberg's conflict of interest came to the fore when it sought a sanctions order which would have eliminated their own client Dobbs' claim as well as the *Corbett* NDI Claim class. This case is driven by counsel, not Plaintiffs as is required for class certification.

Plaintiffs have also failed to demonstrate that the proposed class is sufficiently numerous. Neither Milberg nor its expert has produced evidence of a single consumer who was purportedly deceived by the Class Claims. As such, Plaintiffs' reliance on sales data alone to establish numerosity is particularly inappropriate.

The record also establishes that not all New York and California purchasers were uniformly exposed to the Class Claim, meaning the threshold requirement to invoke the inference of class-wide reliance cannot be satisfied. **In fact, Plaintiffs' own evidence and evidence that Milberg selectively left out of its Motion shows that not all labels include the Class Claims.** The record is also bereft of any evidence of class-wide deception and

materiality. Plaintiffs' survey expert—at Milberg's instruction—attempted to test "virologist developed" alone. **To do so, however, he materially altered the product label to convey a statement that Defendant has <u>never</u> made on <u>any</u> of its labels.** What's more, he did not test and has no opinion on how consumers interpret "unique" or "proprietary," or the collective message of "virologist developed," "unique," and "proprietary." He also failed to test and has no opinion on whether consumers believe the products contain a patented elderberry extract or lectins. Plaintiffs similarly point to no common evidence of falsity. To the contrary, Plaintiffs' own evidence and the operative Complaint concede that Sambucol® was developed by a virologist. Dkt. 68-3 ("Kashima Decl."), ¶¶7-10, 34, Exs. B, C, D, E and Y (evidencing Dr. Mumcuoglu's (a virologist) 2009 patent application related to Sambucol, her trademarking of Sambucol, her subsequent assignment of Sambucol to Healthcare Brands International ("HBI"), and HBI's assignment of Sambucol to PharmaCare Laboratories PTY Ltd; Dkt. 1 at ¶30, 32. Milberg's argument that Sambucol® is not virologist developed because it purportedly did not follow a patented formulation for a pharmaceutical compound of non-toxic lectins designed to treat the flu is illogical, irrelevant, and unfounded, and is thus not a common issue relevant to the Rule 23(a) commonality and Rule (b)(3) predominance analysis.[3]

Common issues do not predominate for the additional reason that Plaintiffs have not demonstrated that damages can be calculated on a class-wide basis. Similar to Plaintiffs' consumer perception and materiality surveys, Plaintiffs' experts' conjoint survey and market simulation (for calculating damages) are not based on the Class Claims **or any labeling statement ever made by Defendant**, and are deficient for numerous additional reasons. The Court can and should deny class certification in this case because of the lack of evidence produced by Plaintiffs alone.

---

[3] Even if lectin testing were relevant (it is not), Plaintiffs' undisclosed "expert" NIS admitted its testing was inconclusive and failed to test the Class Products in a manner consistent with the patented process. Ferrari Decl., ¶¶ 38-39, Ex. L (NIS Labs Deposition) at 22:6-24:21; 34:13-35:11; 60:14-22; 63:2-78:5; 101:14-103:10; 106:10-108:20; 123:14-124:25; 129:16-25; 138:5-8; 144:19-145:15; Exs. 19, 22.

Lastly, class treatment is not superior.  Defendant objects to class treatment of claims that require a culling process to identify class members.  In any event, Plaintiffs have not proposed a plan, much less a manageable one, for identifying class members before trial, as would be required to preserve Defendant's right to present its (numerous) individual, fact-specific defenses to purchaser's claims.

## II.   BACKGROUND FACTS

### A.   The Class Claims—as Pled—are Based on One Theory of Deception.

The Complaint alleges that Defendant uniformly misled all New York and California purchasers of the Class Products to believe that the Class Products "contain a unique elderberry extract, which has been developed by a virologist (thus, likely with anti-viral properties) using a method of extraction that cannot be found in other elderberry dietary supplements."  Dkt. 1 at ¶¶ 5, 34.  Defendant allegedly accomplished this deception by uniformly labeling the Class Products with: "virologist developed," "[d]eveloped by a world renowned virologist[,]" and "unique" and "proprietary."  *Id.* at ¶¶ 5, 12, 17, 32, 33, 34.

Plaintiffs allege that the elderberry extract in the Class Products cannot be unique, proprietary and developed by a virologist because it is not the pharmaceutical compound of non-toxic lectins (or are not manufactured using the process for extracting non-toxic lectins from elderberries) described in a (long since expired) patent, which California and New York purchasers purportedly expected to be in the Class Products.  *Id.* ¶ 27; Dkt. 68-1, at 5.  In sum, Plaintiffs claim they "reviewed the Product's labeling, where [they] saw and relied on Defendants' claims that its elderberry ingredient was developed by a world renowned virologist **and** was unique and proprietary[,]" and contend that Sambucol is neither "unique and proprietary" nor "virologist developed" because it was not formulated in accordance with the patent. Dkt. 1, ¶¶ 12, 17, and 27-37 (emphasis added).

Based on the pled Class Claims, Plaintiffs assert five claims for relief: (1) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et. seq.* ("UCL"); (2) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"); (3) California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et. seq.* ("CLRA"); (4) New York's Deceptive

4

Acts and Practices Law, N.Y. Gen. Bus. Law §§ 349, 350; and (5) breach of express warranty. Dkt. 1.  Plaintiffs move to certify classes of all California and New York purchasers of the Class Products based on the Class Claims and pursuant to these claims for relief. Dkt. 68-1.

### B.    Sunderland's Claims are Based on a Different Theory of Deception.

Sunderland resides in Brooklyn, NY and regularly reviews class action lawsuit newsletters.  Ferrari Decl., Ex. B, Tr. at 10:9-10:18; 89:1-89:22.  The "major reason" she purchased certain Class Products was because of what she consistently referred to as a "virologist tested" claim, a claim Defendant does not make, and "immune support." *Id.* at 29:14-31:10; 40:3-25.[4]  Sunderland also mentioned "Black Elderberry."  *Id.*  Based on those claims, Sunderland expected that the Class Products would supplement her immune system, leading to fewer or less severe sickness.  *Id.* at 54:16-56:8.  She has never heard of Dr. Mumcuoglu or lectins. *Id.* at 87:5-87:7; 106:14-106:23. She admitted that she does not contend that the Sambucol brand was not developed by a virologist and does not contend that the contents of the Sambucol she purchased was not developed by a virologist. *Id.* at 63:22-64:24.  In other words, Sunderland interpreted a combination of claims different from those alleged in the Complaint, and possibly a claim Defendant does not even make, to convey that the Class Products would strengthen her immune system and help prevent or mitigate disease.  This unpled theory is referred to herein as the "Sunderland Claim."

### C.    Binder's Claims are Based on a Third Theory of Deception.

Binder is a resident of South Pasadena, CA.  Ferrari Decl., Ex. A, Tr. at 10:25-11:4.  Binder, like Sunderland, regularly reviews class action lawsuit newsletters.  *Id.* at 40:10-40:20; 44:3-44:45:4.  Binder purchased a Class Product "due to the claims printed on the packaging, specifically 'scientifically tested,' 'supports immunity,' and 'high antioxidant levels.'" Ferrari Decl., Ex. A, Depo. Ex. 1 (Binder 1/5/24 Verified Response to Rog No. 1);

---

[4] Sunderland referred to "virologist tested" seven times during her deposition.  Ferrari Decl., Ex. B, Tr. at 40:17; 54:19; 105:22; 106:11-12; 110:3; 110:6; 115:15.  Sunderland never once identified the claims "unique" and "proprietary," or formulated in accordance with a patent during her deposition.  *Id.*, Ex. B.

Binder Tr. at 17:20-26:4. Based on those claims, Binder expected the Class Products "could help ward off catching a flu or cold and would boost or support his immunity." Ferrari Decl., Ex. A, Tr. at 17:20-26:4; 31:18-31:22; 32:18-33:1; 35:7-10; 36:25-37:3; 57:18-58:17. The words "virologist" and "patent" do not appear once in Binder's interrogatory response or the transcript of Defendant's deposition of Binder. Ferrari Decl., Ex. A. The terms "unique" and "proprietary" do not appear in Binder's deposition transcript at all. *Id.* Indeed, Binder does not know who developed Sambucol. *Id.*, Tr. at 118:16-119:15. He has never heard of Dr. Mumcuoglu or any of her patents or patent applications. *Id.* And, he does not know whether the Class Products he purchased were virologist developed or not. *Id.* at 120:2-120:4. In sum, like Sunderland, Binder expected the Class Products to support his immunity to help prevent disease. But, unlike Sunderland, Binder based his expectation in part on "high antioxidant levels" and not in part on "virologist tested." Binder's theory is referred to herein as the "Binder Claim."

### D.    Plaintiffs' Consumer Perception Expert Tested a Fourth Theory of Deception which will also be Used to Calculate Damages.

Dr. Dennis conducted a consumer survey for Plaintiffs. However, instead of testing the Class Claims, the Sunderland Claim, or the Binder Claim, he only *attempted* to test the statements "[v]irologist developed" and "[d]eveloped by a world renowned virologist," as directed by counsel. [Dkt. 68-21, Dennis Rep. at ¶18; Ferrari Decl. at Ex. K, Tr. 33:9-11, 40:21-43:5, 99:8-14]. Dr. Dennis did this to see if those phrases meant what he told survey respondents they said. [Dkt. 68-21, at ¶¶75-79]. Specifically, after Dr. Dennis stripped the product packaging of its branding, he showed respondents two side panels from a 7.8 oz Sambucol® Original Syrup that he materially altered. *Id.* at ¶68. Namely, he changed the language on the panel that said: "Developed by a world renowned virologist, **Sambucol®** is the unique black elderberry extract that has been used in scientific studies" to "Developed by a world renowned virologist, <u>this</u> is the unique elderberry extract that has been used in scientific studies." (underlining added to show word changes; bold in original). *Compare* Dkt. 68-12, p. 16 (actual label) *with* Dkt. 68-21, p. 20. In changing the bolded

6

word "**Sambucol®**" to "this," **Dr. Dennis made a claim Defendant has <u>never</u> made on <u>any</u> of its labels, and took one of the fundamental statements at issue in this case out of context**.[5] Ferrari Decl., ¶44. As if that alteration were not egregious enough, Dr. Dennis also drew a red box around the original and altered label statements the he wanted the respondents to focus on *exclusively*, and captioned the labels with a suggestive heading:



Dkt. 68-21, pp. 122, 126. Then he asked the respondents' two reading comprehension questions about the language in call-out boxes *only*: "Based on the information you see . . . in the red boxes, do you believe the packaging <u>is</u> or <u>is not</u> communicating this meaning [from the heading], or do you have no opinion?"; and "How <u>likely</u> or <u>not likely</u> are you to purchase this product because you believe the packaging is communicating th[e] meaning

---

[5] Certainly, whether the registered trademark "**Sambucol®**" or "this" (presumably referring to the unbranded packaging) is developed by a virologist materially effects a consumers' perception of a labeling claim. It is axiomatic that labelling claim litigation / testing address the *actual* label language and not language fabricated by an expert.

[in the heading]?" *Id.* Dr. Dennis's work is referred to herein as the "Tested Claim." [6]

With respect to the first question, not unsurprisingly, over 90% of the respondents admitted they could read the highlighted words, including the ones crafted by Dr. Dennis. Over 75% of those same respondents also stated they would be somewhat likely or more likely to purchase the product because they understood the highlighted words to mean the Black Elderberry extract was developed by a virologist. Dkt. 68-21, pp. 28-29. The Tested Claim, thus, not only failed to test the actual statements made by Defendant, it failed to test the Class Claims and what consumers perceive the phrase "virologist developed" to mean, which is the purpose of a consumer perception and materiality survey. It does not indicate whether respondents believe the "virologist developed" claim is true; it simply shows that they can read and understand an expert's express claim when directed to focus on it.

Even if his surveys used a reliable methodology (they do not) or provided relevant information (they do not) [*see* Motion to Exclude herein], Dr. Dennis offered no opinion on the meaning or materiality of the terms "unique" or "proprietary," and had no opinion on whether consumers believed the Class Products contain a patented elderberry extract or lectins. Ferrari Decl., Ex. K, Tr. at 99:15-100:5 (it was "not part of [his] assignment to measure consumers['] reactions" to the term "unique[,]" and he has no opinion on whether "the term 'unique' is either false, misleading, deceptive, or material . . ."); 100:6-10 (he has "no opinion on whether 'proprietary' is either false, misleading, deceptive, or material"– he "has no data on that"); 100:11-21 "[he] h[as] no opinion on whether consumers interpret the product advertising and marketing to mean that the products contain a patented elderberry extract" because he "didn't test that in [his] survey"); 100:22-25 (he has "no opinion on whether consumers interpret the product advertising and marketing to mean that the products contain lectins"). [7] He also failed to account for

---

[6] The test does not ask for the phrases to be read in context or about any other claims that a consumer might also believe provide a benefit.

[7] In contrast, Defendant's expert Mr. Keegan reviewed over 1,400 answers to open-end questions such as **state the reasons for purchasing the product**, or express your expectations for the product that were posed after showing survey respondents Defendant's

variations on the location and context (or even the existence) of the term "virologist developed" on the Class Products. Ferrari Decl., Ex. H, Keegan Reb. Rep. at fn. 9.

Dr. Dennis and Colin Weir also proposed a hypothetical and incomplete method to calculate class-wide damages based solely on the Tested Claim, not the Class Claims (or those proffered by Plaintiffs). Dkt. 68-21, Dennis Rep. at ¶¶18, 21-22, 28; Dkt. 68-20, Weir Rep. at ¶¶5, 6, 9; Ferrari Decl., Ex. K, Tr. at 11:20-12:13, 110:3-111:11, 113:6-119:19.

### E. The Class Product Labels Are Far From Uniform.

In the Motion, Plaintiffs' counsel represents that the Class Products had uniform labels. *See* Dkt. 68-1 at 1. That representation is false. As noted above, Defendant sold its Sambucol® Black Elderberry supplements in 12 different formats, each of which came in different sizes, are sold for different prices, target different audiences and were labeled with different claims. Not included in the Complaint are: (1) Gummies; (2) Gummies for Kids; (3) Advance Immune Capsules; and (4) Infant Drops. *Compare* Dkt. 68-1 at 1 *with Corbett* Dkt. 45 at ¶1. The four excluded products do not include any of the Class Claims, including "unique," "proprietary," and "virologist developed." Ferrari Decl., ¶32. Plaintiffs' counsel excised these Products from the Complaint and proposed Class; however, counsel cannot excise them from the real-world marketplace.

**Importantly, at least 16 Class Product labels do not include Class Claims.** Eight such labels are included in Plaintiffs' Motion [see Dkt. 68-3, Exs. PP, QQ, RR, SS, FFF, GGG, HHH, and III missing one of more Class Claims], and another eight were produced by Defendant but omitted from Plaintiffs' Motion [*See* Ferrari Decl. at ¶¶40-43 referencing Alix Russell Declaration at ¶¶1-6, Ex. A-G, I (four of which [E, F, G, and I] **do not include any of the Class Claims**)]. Even so, a cursory review of the labels selectively included in Plaintiffs' Motion at Appendix A demonstrates the labels are not uniform:

• Some included only a claim in small font among other lengthy paragraphs of text

---

actual, real-world packaging. Out of the 1,400 answers, **zero** respondents mentioned "virologist developed," "proprietary method," or "patent[,]" and only **three** mentioned "unique." Dkt. 68-16, Keegan Rep. at ¶10-12 and p. 40. Over 74% of the respondents did not have any knowledge of what a virologist is or does. *Id.* at ¶14.

on the side or back panels. Dkt. 68-4, pp. 32, 34, 36, 38-41.

- Some state "[d]eveloped by a Dr. Madeline Mumcuoglu." *Id*. at pp. 1, 17.
- Some state "[d]eveloped by a world renowned virologist, **Sambucol®** has been trusted by millions worldwide.  Sambucol can be taken every day for continuous immune support."  *Id*. at p. 13.
- Some state "[d]eveloped by a world renowned virologist, **Sambucol®** is the unique black elderberry extract that has been used in scientific studies.  By using a proprietary method of extraction, only Sambucol® can guarantee consistent, immune supporting properties in every serving.*"[8] *Id*. at p. 11.
- Some labels state "[d]eveloped by a world renowned virologist, **Sambucol's®** unique manufacturing process preserves and maximizes the naturally occurring health benefits of Black Elderberry.*[9]" *Id*. at 32.
- Some say "[v]irologist developed" with a checkmark, *id* at p. 33, some do not, *id* at p. 29-32.
- Some say only "virologist developed."  *Id*. at pp. 33, 35, 37.

### F.    This Case Is Entirely Attorney-Driven.

#### 1.    Plaintiffs Were Satisfied Long-Time Users of Class Products.

Sunderland regularly purchased Class Products daily for three years—from January 2020 through December 2022.  Ferrari Decl., Ex. B, Tr. at 29:14-32:8; 32:19-37:13.  With one exception, she claims she stopped purchasing the Class Products in December 2022 because they were no longer available at her local Walgreens. *Id*. at 94:4-94:8.[10] She continued consuming Class Products after the Complaint was filed, and was still consuming Class Products in February 2024 when she was deposed.  *Id*. at 42:8-45:20; 59:19-60:18.  She also purchased and consumed other elderberry supplement brands from 2022 to 2024.  *Id*. at 44:1-44:9.  When directly asked, Sunderland suggested she did not know whether the Class Products met her expectations, but after consideration, noted that she never got COVID. *Id.* at 56:21-59:18.  She also avoided the flu while consuming the Class Products.  *Id.* She expressed some disappointment that she continued to get colds

---

[8] The asterisk relates to: "*These statements have not been evaluated by the [FDA].  This product is not intended to diagnose, treat, cure or prevent any disease."  Dkt. 68-4, p. 11.
[9] The asterisk again refers to the FDA disclaimer.  Dkt. 68-4, p. 32.
[10] When shown a picture she produced of a Sambucol Product with an 11/27/23 date on the price tag, Sunderland was unable to deny that she purchased Sambucol in November 2023, four months after the Complaint was filed. *Id.* at 45:21-46:15 and p. 1 of Ex. 8.

10

while consuming Class Products, but noted she got colds before consuming Class Products and after when she consumed competing elderberry supplements. *Id*. at 97:17-98:4.

Binder also used Class Products for years. He consumed Class Products daily for seven years, from 2016 to June 2023. Ferrari Decl., Ex. A, Depos. Ex. 1 (1/5/24 Verified Response to Rog No. 1); Tr. at 17:20-26:4; 31:18-31:22; 32:18-33:1; 35:7-35:10; 36:25-37:3; 57:18-58:17. Binder stopped buying Class Products after reading the ClassAction.org newsletter discussed below. Ferrari Decl., Ex. A, Tr. at 40:10-40:23. He does not know whether the Class Products met his expectations, though. *Id*. Indeed, he thought it was doing him good while taking it. *Id*. at 42:3-42:11. However, he was experiencing financial difficulties when he received the ClassAction.org newsletters and "was like well, if it's not doing me any good [according to ClassAction.org] why am I spending so much money on this product." *Id*. at 40:10-40:23.

### 2.   Milberg Recruited Plaintiffs to Assert an Implied Disease Claim.

Shortly after the Court denied Milberg's motion for leave to amend to assert the Class Claims in the *Corbett* matter, Season 4, LLC (a third-party marketing firm that holds itself out as "ClassAction.org") emailed a newsletter, dated June 29, 2023 to its subscribers telling them that "[r]esearch has called into question . . . whether elderberry actually provides any benefit to those suffering from the flu, colds or seasonal allergies." Ferrari Decl., Ex. B, Tr. at 92:18-93:20; Depo. Ex. 3 (the "Newsletter"). The Newsletter advertised for plaintiffs to assert an implied disease claim based on a vague set of claims including "developed by a world renowned virologist," "supports the immune system," and other unidentified claims, similar to the since certified *Corbett* Disease Claim.

Specifically, the Newsletter stated "[a]ttorneys working with ClassAction.org are investigating whether Sambucol supplement maker PharmaCare US made false claims about the benefits of its black elderberry products or otherwise violated federal labeling requirements." Ferrari Decl., Ex. B; Depo. Ex. 3 at pp. 1-2  (emphasis added). It also stated: "the Sambucol Black Elderberry products claim to have been developed by a 'world renowned virologist' and are promoted alongside statements touting their ability to support

314065046v.7

the immune system and keep people healthy." *Id.* (emphasis added). The Newsletter suggested the claims were deceptive because "[r]esearch has called into question . . . whether elderberry actually provides any benefit to those suffering from the flu, colds or seasonal allergies." *Id.* (emphasis added). It did not claim the elderberry extract was not developed by a virologist, is not a patented formulation or does not contain lectins, and did not claim the products were not "unique." *Id*. Season 4's website advertised similarly. Ferrari Decl., Ex. B; Depo. Ex. 3 at pp. 3-5.

Plaintiffs signed up for ClassAction.org newsletters prior to June 2023. Ferrari Decl., Ex. B, Tr. 87:19-90:3; Ex. A, Tr. 42:12-42:23; 44:3-44:20; 44:21-45:8. After reviewing the Newsletter, Plaintiffs went to the ClassAction.org website and completed a "Get in Touch" form. Ferrari Decl., Ex. B, Tr. at 91:3-92:5; Ex. A, Tr. 73:11-74:1. Plaintiffs were first contacted by Milberg *after* completing the form. Ferrari Decl., Ex. B., Tr. 96:1-96:22; 98:5-98:12; 99:9-99:11; Ferrari Decl. Ex. A, Tr. 74:5-74:16; 79:25-80:25.[11] Plaintiffs decided to sue Defendant based on the Newsletter, and, in Sunderland's case, a subsequent brief conversation or email with Mr. Kashima or a Milberg paralegal. Ferrari Decl., Ex. B, Tr. 92:18-93:20, Depo. Ex. 3; Ferrari Decl., Ex. A, Tr. 45:9-45:11; 80:6-81:10.

### 3.     Plaintiffs Did Not Review the Complaint Before it was Filed.

Milberg filed the Complaint without showing it to Sunderland. Ferrari Decl., Ex. B, Tr. at 94:4-95:25; 109:11-110:19.[12] Binder had no recollection of receiving or reviewing the Complaint before it was filed, but testified that he received it a few months before his February 2024 deposition (well after the July 18, 2023 filing of the Complaint). Ferrari Decl., Ex. A, Tr. at 65:11-66:12. Sunderland first received the Complaint when a Milberg

---

[11] In January 2024, Defendant subpoenaed, among other things, documents showing Plaintiffs' communications to Season 4 on the "Get in Touch" form. Season 4 and Milberg opposed the production of those documents, and Defendant's motion to compel (first filed in March 2024) has not yet been decided. Ferrari Decl. at ¶¶29-34. Defendant reserves the right to supplement its Opposition based on evidence later received.

[12] Sunderland initially believed her interrogatory responses were the Complaint. Ferrari Decl., Ex. B, Tr. at 82:3-83:7.

1  paralegal emailed it to her the night before her deposition.  Ferrari Decl., Ex. B, Tr. at 94:4-
2  95:25; 109:11-110:19.

### 4.    Milberg Elicited or Attempted to Elicit Contradictory Sworn Testimony and Sham Affidavits to Conform to the Complaint.

5      Daylight between Plaintiffs' claims and the putative Class Claims began to emerge
6  during discovery.  For example, **Binder's sworn interrogatory responses did not identify**
7  **any Class Claims at all**.  He averred that he purchased Class Products "due to the claims
8  printed on the packaging, specifically 'scientifically tested,' 'supports immunity,' and
9  'high antioxidant levels[,]'" and "[t]he language on the packaging led [him] to believe that
10  the Product could help ward off catching a flu or cold and would boost and support his
11  immunity."  Ferrari Decl., Ex. A, Depo. Ex. 1. At Binder's deposition, defense counsel
12  asked Binder about his interrogatory response and Binder **repeatedly confirmed** no other
13  statements other than the three listed in his discovery responses caused him to buy
14  Sambucol. Ferrari Decl. ¶¶4-6.

15      After Defendant's questioning, Mr. Kashima requested "ten minutes to regroup"
16  with Binder.  Ferrari Decl., Ex. A, Tr. at 101:14-101:18.  After 25 minutes, Mr. Kashima
17  proceeded to elicit from Binder false sworn testimony.  *Id.* at 101:19-109:5; *see also* Ferrari
18  Decl. at ¶¶9-10 and Def's Obj. to Evid. No. 110.  Specifically, in response to leading and
19  otherwise objectionable questions Binder now attested that he purchased the original syrup
20  because of "supports immune system," "virologist developed," and "scientifically tested."
21  *Id.*[13] Binder equally found important "great tasting syrup," "naturally flavored with the
22  goodness of elderberry," "use daily for maximum benefits." *Id.* Ultimately, Binder decided
23  that he relied on everything printed on the label except statements that were irrelevant to
24  him ("use for children over four years old") or contradicted his claims (the FDA disclaimer).

---

[13] If this testimony were admissible (it is not), Binder would be a member of the *Corbett*
Disease Claim Class.  In fact, he has not opted out of that sub-class.  *Corbett* Dkt. 249, pp.
10:11-14, 77, 78.

*Id.*[14]  In further contradiction to his discovery responses **and** his deposition testimony, Binder submitted a declaration in support of this Motion stating: "I believe that the Sambucol Products were virologist developed due to the language on the label and the packaging. I purchased the Sambucol products based on these beliefs." Dkt. 68:19 at 2:27-3:1; *see also* Ferrari Decl. at ¶¶ 11; Def's Obj. to Evid. No. 110.

Sunderland's discovery responses similarly failed to conform to the Class Claims. Her sworn interrogatory responses stated that she purchased Class Products "due to the language on the labeling, specifically 'Virologist Developed.'" Ferrari Decl., Ex. B. Depo. Ex. 7.   Those responses did not identify "unique," "proprietary," "world renowned virologist," or patented.

Despite her verified interrogatory responses, Sunderland testified at deposition that the "major reason" she purchased certain Class Products was because of their "virologist tested" claims, a claim Defendant does not make, and because of their "immune support." *Id.* at 29:14-31:10; 40:3-25. Sunderland also mentioned "Black Elderberry."   *Id*. According to Sunderland, those statements made her believe that Sambucol would prevent her from getting sick. *Id.* at 54:16-56:8; 66:7-16; 97:17-98:4.  Contrary to the Class Claims, she confirmed that she does not contend that the Sambucol brand was not developed by a virologist and does not contend that the contents of the Sambucol she purchased was not developed by a virologist. *Id*. at 63:22-64:24. And, when defense counsel showed her a picture of the Sambucol product she purchased, Sunderland testified that it was an accurate representation of the front of the package of all of her purchases of Sambucol lozenges even though the picture contains none of the Class Claims.  *Id.* and Depo. Ex. 8.

Upon completing Defendant's direct questioning of Sunderland, Russell Busch attempted to do the same thing Mr. Kashima did with Binder, this time using the Complaint as a guide for Sunderland to (unsuccessfully) read the Class Claims into the record.  Ferrari

---

[14] The words "virologist" and "patent" do not appear in Binder's deposition transcript before Milberg's questioning.  Ferrari Decl., Ex. A.

Decl., Ex. B, Tr. 112:12-115:16;[15] and ¶¶ 12-24.

### 5.    Plaintiffs Have Had Virtually No Involvement in the Litigation.

Despite the false statements in ¶5 of their declarations filed in support of the Motion (which should be stricken—see Def's Objs. to Evid. Nos. 110-113), Plaintiffs have not actively participated in this litigation and do not understand their duties as representatives.

Sunderland testified that she did not review the Complaint until 2024, after it was filed. Ferrari Decl., Ex. B, Tr. 7:13-10:8; 81:5-8; and 94:4-95:25 and 110:7-19 (referencing complaint at Depo. Ex. 4).  In fact, Sunderland only briefly spoke with Mr. Kashima in September or October 2023 (after the Complaint was filed).  *Id.*, Tr. at 96:1-97:6.  She never communicated with Mr. Kashima or any other Milberg lawyer again until she met Mr. Busch at her deposition in 2024.  *Id.* at 9:3-9:8; 98:5-98:12; 98:18-99:8. Sunderland believes she is not responsible for overseeing the progress of the case.  *Id.* at 99:18-100:24. By February 2024, she had communicated with a Milberg paralegal 12-14 times, but she testified that she receives no updates on the progress of the case from Milberg, and has never asked for one.  *Id.*  She does not know if she has a contract with Milberg, or how Milberg will be compensated.  *Id.* at 97:7-97:11; 100:25-101:3. Unlike the Complaint, which Sunderland was not provided prior to filing, a Milberg paralegal did email her draft interrogatory responses.  *Id.* at 26:11-28:22.  Sunderland briefly reviewed the interrogatory responses on her phone.  *Id*.  She made no changes other than to change the date she stopped purchasing Class Products.  *Id.*

Binder also believes Milberg is responsible for overseeing the progress of the case. Ferrari Decl., Ex. A, Tr. at 78:25-84:1.  He did not speak with a lawyer from Milberg until he met with Mr. Kashima at his deposition.  *Id.*  He had two conversations prior to his deposition preparation with someone at Milberg, both times with a paralegal.  *Id.*  He had a conversation with Mr. Kashima the day before his deposition, and between five and ten emails with a paralegal.  *Id.* at. 8:15-10:4.  He was not regularly updated about the case,

---

[15] The words "unique" and "proprietary" do not appear in Sunderland's deposition transcript before Milberg questions her.

1  and admitted "I've kind of been in the dark" and he has an aversion to coming to trial. *Id.*

2  at. 78:25-79:-23; 83:22-84:1; 86:23-25.

3  **G.    Milberg is Pursing Claims that Conflict with the Class's Claims.**

4  As this Court is aware, Milberg has filed two separate class actions against

5  Defendant. In *Corbett*—which is still pending after almost four years—Milberg (on behalf

6  of a Missouri and California class of consumers) alleges and continues to maintain that

7  Defendant cannot lawfully sell its Sambucol® branded dietary supplements in the United

8  States because Defendant does not disclose that the elderberry extract they contain is a

9  New Dietary Ingredient ("NDI") for which Defendant was required to, but did not, provide

10  the federal Food and Drug Administration ("FDA") with premarket notification as required

11  under the Federal Food, Drug & Cosmetics Act ("FDCA")(the "NDI Claim"). Milberg

12  bases its claim that the elderberry extract in the Sambucol® products is an NDI, requiring

13  premarket notification under the FDCA, solely on Defendant's labeling of certain of its

14  Sambucol® products as "virologist developed," "unique" and "proprietary." *Corbett* Dkt.

15  60-1 at 1:28-2:5. As a matter of law, Defendants' marketing statements do not determine

16  whether the elderberry extract in its Sambucol® products is an NDI, nor whether it is

17  chemically different from elderberry extracts previously marketed as, or in, conventional

18  foods. See 21 U.S.C. § 350b(a), (f).  To prove its claim, Milberg must instead prove that

19  elderberry extract (*i.e.*, the dietary ingredient in the Sambucol® products) was not

20  marketed as or in dietary supplements before 1994, and that the chemical structure or

21  composition of the elderberry extract in Sambucol® products is different from all other

22  elderberry extracts used in conventional foods. See 21 U.S.C. § 350b(a), (f).  <u>In other words,</u>

23  <u>the truth of Defendant's labeling statements is irrelevant to the determination of the NDI</u>

24  <u>Claim in *Corbett*</u>. There's no basis to assume that a dietary ingredient requires a premarket

25  notification simply because it is unique and proprietary / was virologist developed.

26  Milberg filed this action after the Court denied it leave to amend its operative

27  complaint in *Corbett* to assert the present claims.  Here, Milberg claims that the "virologist

28  developed," "unique," and "proprietary" statements are false or misleading because the

314065046v.7

elderberry extract in those products is not the pharmaceutical compound of non-toxic lectins (or are not manufactured using the process for extracting non-toxic lectins from elderberries) described in Dr. Mumcuoglu's 1988 patent. <u>Unlike its NDI Claim in *Corbett*, Milberg must prove that the statements "virologist developed," "unique" and "proprietary" are false</u>, and that those labeling statements would mislead a reasonable consumer into believing that Defendant's Sambucol® products contain a pharmaceutical composition of non-toxic lectins, derived from elderberries, as described in the patent. To do so, Milberg alleges and continues to maintain that the elderberry extract in the Sambucol® products is just "run-of-the-mill" elderberry juice. Of course, there is no basis to assume that the Sambucol® elderberry extract can *only* be unique and proprietary and developed by a virologist if it is the pharmaceutical compound of non-toxic lectins described in the patent. Such a belief would be manifestly unreasonable, and Plaintiffs have no evidence to support it, especially because Plaintiffs' own evidence shows the patent expired before Defendant existed. *See* Def's Objs. to Evid., No. 2. In any event, "just" juice does not require an NDI.

These completely contradictory theories create a conflict of interest for Milberg; the NDI Class fails if the Class prevails here (and vice-a-versa), and Milberg must therefore, prefer one client or class over another. This conflict of interest and inadequate representation of the *Corbett* NDI Class members (including named Plaintiff Dobbs) was recently reinforced by Milberg's Motion for Sanctions. Acting as Class Counsel for the certified California and Missouri NDI Classes in *Corbett*, Milberg sought an order in both *Corbett* and *Sunderland* precluding Defendant from asserting that the elderberry extract in its Sambucol® supplements is anything but pasteurized elderberry juice. If granted, that relief would have necessarily resulted in both a class-wide judgment for Defendant against the California and Missouri NDI Classes in *Corbett*, as well as a complete loss of all of Milberg's named client's–Dobb's–claims in that case.

## III.    LEGAL STANDARD FOR CLASS CERTIFICATION

A Court cannot certify a Rule 23(b)(3) class unless it determines that the requirements of both Rule 23(a) and 23(b)(3) are met. Under Rule 23(a), Plaintiffs must first prove, among

17

other things, that: (1) the class is so large that joinder is impracticable (numerosity); (2) there are one or more questions of law or fact common to the class (commonality); (3) that the named parties' claims are typical of the class (typicality); and (4) they will fairly and adequately protect the interests of other members of the class (adequacy of representation). Under Rule 23(b)(3), a court may certify a class only if it first determines that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members [predominance] and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy [superiority]."

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Plaintiffs must prove the Rule 23 requirements by a preponderance of the evidence. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). To do so, Plaintiffs must "affirmatively demonstrate," **through admissible evidence**, that they have satisfied all Rule 23 requirements. *Dukes*, 564 U.S. at 352; *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (evidence at certification must be admissible).

The Court must conduct a "rigorous analysis" and "probe behind the pleadings." *Dukes*, 564 U.S. at 350-351. "Frequently, this 'rigorous analysis' will entail some overlap with the merits of Plaintiffs' underlying claim. *Id.* This cannot be helped, '[as] class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (citation omitted). A court properly may resolve any factual or legal disputes that are material to its Rule 23 analysis, including questions regarding the merits. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2nd Cir. 2008).

## IV. PLAINTIFFS WILL NOT ADEQUATELY PROTECT THE INTERESTS OF THE CLASS AND THEIR CLAIMS ARE NOT TYPICAL

### A. Plaintiffs Are Not Members Of The Class They Seek To Represent.

"To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class." *Ellis*, 657 F.3d at 984; Fed. R. Civ. P. 23(a)(3). Relatedly, "[t]he named

plaintiffs must fairly and adequately protect the interests of the class." *Hannon*, 976 F.2d at 1031; Fed R. Civ. P. 23(a)(4). "These requirements tend to merge as guideposts for determining 'whether the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Sueoka v. U.S.*, 101 Fed.Appx. 649, 653 (9th Cir. 2004) citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n. 13 (1982). The U.S. Supreme Court and Ninth Circuit "have repeatedly held that a class representative must be a part of the class and possess the same interest and suffer the same injury as the class members." *Id.* citing *Sosna v. Iowa*, 419 U.S. 393, 403 (1975) ("A litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court.").

Here, Plaintiffs are not members of the proposed classes. Indeed, the proposed classes assert an entirely different theory of deception, based on different label claims, than either Sunderland and Binder. *See* Sections II., A-C. In addition, the Class Claims and the Sunderland and Binder Claims require different evidence. For instance, the proposed Class Claims require evidence that the "virologist developed," "unique," and "proprietary" statements convey the implied message that the Class Products contain a pharmaceutical compound of non-toxic lectins described in the 1988 patent, and that the implied information is material. The proposed class members will need to further present evidence that the Class Products do not contain the previously-patented compound. In contrast, Sunderland and Binder will need to present evidence of consumer deception, *i.e.,* that the particular (different) label claims they relied on, combined, conveyed the implied message that the Class Products prevent or mitigate disease, and that the implied message is material. Plaintiffs will also need to present evidence that the Class Products do not prevent or mitigate disease.

The claims of the putative class also involve different defenses. In response to the claims of the Class, Defendant would present evidence showing that the Class Products were virologist developed and that no reasonable consumer would interpret "virologist developed," "unique," and "proprietary" to refer to the compound that is described in the expired patent. In response to the Sunderland and Binder Claims, Defendant would present evidence that no

19

reasonable consumer would interpret the different claims that they relied on to convey a implied disease claim, and evidence that the Class Products support immunity.

In short, Plaintiffs are not members of the Class they seek to represent. The proposed class members do not have the same or similar injury as Plaintiffs, and Plaintiffs' claims are not typical of the putative class. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Class certification should be denied on that basis alone.

### B. Plaintiffs Face Unique Disqualifying Defenses / Lack Standing.

Class "certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with [unique] defenses." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "A plaintiff subject to unique defenses, especially as to his credibility and his demonstrated lack of familiarity with the suit, is an inadequate class representative." *In re Quarterdeck Office Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *5 (C.D. Cal. Sept. 30, 1993); *see also San Pedro-Salcedo v. Haagen-Dazs Shoppe Co., Inc.*, 2019 WL 6493978, at *5 (N.D. Cal. Dec. 3, 2019) (finding plaintiff inadequate where "after a recess and under questioning from her attorney, she [plaintiff] changed her testimony to accurately describe the allegations supporting her case."). Where "serious questions" about a plaintiff's standing are raised the plaintiff is "not reasonably well-situated to pursue the interests of the class," either. *Spacone v. Sanford, L.P.*, 2018 WL 4139057 (C.D. Cal. Aug. 9, 2018) ("Because there are at least serious questions going to Spacone's standing and his credibility to claim an economic injury but-for the alleged misrepresentation, the Court considers him as having interests antagonistic to the class and he is not reasonably well-situated to pursue the interests of the class.").

Here, Plaintiffs' solicitation by Milberg, their long-time use and satisfaction with the Class Products, contradictory testimony, and lack of knowledge regarding the Class Claims subjects them to multiple unique, disqualifying defenses. Indeed, Sunderland's belated and binding disclosure that she purchased the Class Product months after the Complaint was filed makes her particularly unsuitable to represent the interests of New York purchasers. *In re 5-hour ENERGY Marketing and Sales Practices Litig.*, 2017 WL 385042,

20

at *7 (C.D. Cal. Jan. 24, 2017) (explaining that plaintiffs who continued to purchase a drug despite purportedly knowing it had no benefit "even after they commenced their class action lawsuit" would lack standing).

### C. Milberg Cannot Represent any Class Because it is Conflicted.

Like a lawyer in any litigation, a class action attorney may not simultaneously represent two clients if those clients' interests are directly adverse, or if there is a significant risk that the dual representation will materially limit the lawyer's representation of one client. See ABA Model Rules of Prof'l Conduct R. 1.7(a); see also Id., Rule 5-105(a) ("A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment. …"). For this reason, "[c]ourts have consistently held that counsel cannot simultaneously represent a class and prosecute either individual or class claims against the same defendants in a different proceeding, even if there is partial overlap among the plaintiffs or class members in the cases." 1 MCLAUGHLIN ON CLASS ACTIONS § 4:39 (21st ed.); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("an attorney who represents another class against the same defendant may not serve as class counsel"); *Lou v. Ma Laboratories, Inc.*, 2014 WL 68605, at *2 (N.D. Cal. 2014) (finding counsel inadequate because "[w]hen there are different plaintiffs in different actions proceeding at the same time with the same claims, same counsel, and same defendants, the risk of counsel compromising one class for another is intensified"); *see also White v. Experian Information Solutions*, 993 F.Supp.2d 1154, 1161 (C.D. Cal. 2014) *aff'd sub nom. Radcliffe v. Hernandez*, 818 F.3d 537 (9th Cir. 2016)("The default rule for a concurrent conflict in California is automatic disqualification in all but a small number of cases.")

Here, Milberg has a concurrent and irreconcilable conflict of interest because it is arguing contradictory claims in two separate cases against the same defendant. The conflict arises because Milberg argues on behalf of one set of plaintiffs that the elderberry extract in Defendant's products is not virologist developed, new or unique (just elderberry juice), while simultaneously arguing on behalf of a different set of plaintiffs in the Corbett case that the

21

314065046v.7

same elderberry extract is virologist developed, new and unique (an NDI). These positions cannot logically coexist, as one undermines the other. By taking on both cases, Milberg has violated its ethical obligations; it cannot fully commit to either position without compromising the other. *See* Fed. R. Civ. P. 11; *Moore v. Margiotta*, 581 F. Supp. 649, 653 (E.D. N.Y. 1984) ("The interests need not conflict directly, but the mere fact of adjusting or compromising legal tactics or arguments to accommodate both classes of plaintiffs obviously impairs counsel's use of independent professional judgment as to each class").

The limited overlap between class members in both cases does not alleviate this conflict. Plaintiffs in Corbett do not (and cannot) allege the claims in this case, and vice versa. Consequently, neither Sunderland (a New York resident) nor the members of the proposed New York class in this case can recover anything if Milberg fails to prove that Defendant's elderberry extract is not virologist developed, unique and proprietary. At the same time, neither Dobbs (a Missouri resident) nor unnamed members of the certified Missouri NDI class in Corbett can recover anything if Milberg does not prove that the extract is virologist developed, unique and proprietary (an NDI).[16]

Given the irreconcilable conflict of interest and the ethical obligations at stake, Milberg cannot adequately represent *any* class. Milberg's ethical obligations extend to all named Plaintiffs and to all class members in *both* cases, and not just to potential members of

---

[16] Although federal rules permit a party to plead alternative or inconsistent claims or defenses, they do not apply to different claims made by different plaintiffs in separate actions. *See* Fed. R. Civ. P. 8(d)(2), (3); *Access, Inc. v. Cadrillion, LLC*, 2016 WL 1706042, at *2 (W.D.N.C., Apr. 28, 2016) (rules permitting pleading in the alternative "contemplate that inconsistent pleadings are proffered in the same case), *citing Aholelei v. Dept. of Public Safety*, 488 F.3d 1144, 1149 (9th Cir. 2007) (pleading in the same case should not be construed as an admission against an inconsistent pleading in same case). Nor in any event, does pleading alternative or inconsistent claims in separate lawsuits merge those suits into one lawsuit, change the rights of the parties, or make those who were parties in one suit parties in another. *See Hall v. Hall*, 584 U.S. 59, 138 S. Ct. 1118, 200 L. Ed. 2d 399, 407 (2018) (consolidation does not effect merger into single case); *Katz v. Realty Equities Corp.*, 521 F.2d 1354, 1358 (2d Cir.1975) (consolidation cannot effect any "physical merger of the actions or the defenses of the separate parties.")

overlapping California subclasses, and this conflict fundamentally undermines Milberg's ability to provide fair and adequate representation to all parties involved.[17]

### D. Milberg Is The "Driving Force" Behind This Litigation, Further Precluding A Finding Of Adequacy.

Additional discovery also demonstrates that this action is purely attorney driven, contrary to the Rule 23 adequacy requirement.  As the Supreme Court recognized in *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981), because class action lawsuits present opportunities for abuse, "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Id*. at 100.  There, the Supreme Court identified potential abuses to include "the heightened susceptibilities of nonparty class members to solicitation amounting to barratry as well as the increased opportunities of the parties or counsel to 'drum up' participation in the proceeding." 452 U.S. at 101, n.12.

In *Bodner v. Oreck Direct, LLC*, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007), the court denied plaintiff's motion for class certification on the grounds that counsel, and not plaintiff were the "driving force" behind the litigation. In that case, the court found that plaintiff became a plaintiff after responding to an advertisement by plaintiff's counsel seeking a class representative, that plaintiff did not review the complaint before it was filed, and that he did not meet his attorney until the day before his deposition.  *Id*. at *3. The court denied plaintiff's motion for class certification on the grounds he was not an adequate plaintiff, noting that "[i]t is clear from the record that plaintiff's counsel, and not plaintiff, is the driving force behind this action. Such a 'cart before the horse' approach to litigation is not the proper mechanism for the vindication of legal rights." *Id*. at *5-6. Finally, the court noted that it was clear that plaintiff's counsel "constructed [the] lawsuit before it had

---

[17] Milberg's recent Motion for Sanctions, which sought to preclude Defendant from arguing in either case that its elderberry extract is anything other than "pasteurized elderberry juice," shows that this conflict has already impaired Milberg's ability to advocate effectively for Plaintiff Dobbs, and the unamend members of the Missouri and California NDI Classes, whose recovery depends solely on Milberg proving the opposite.

314065046v.7

a plaintiff." *Id*. at *6-7. *See also Sanchez v. Wal Mart Stores, Inc.*, 2009 U.S. Dist. LEXIS 48428 (E.D. Cal. May 28, 2009), at *10.

Here, the record establishes the same thing, but worse. Plaintiffs, like the Plaintiffs in *Bodner*, signed on to this case after being solicited by counsel and after counsel had decided to commence this action—*based on misleading advertising in the Newsletter related to implied disease claims*. Plaintiffs never reviewed the Complaint before it was filed, and, after questioning by Defendant, Milberg solicited contradictory testimony to conform Plaintiffs' testimony to its own lawyer-created theory. It is evident from Plaintiffs' complete lack of knowledge regarding and involvement in the case that counsel has engaged in exactly the type of "cart before the horse" practice rejected in *Bodner*. Plaintiffs are patently inadequate; they are nothing more than shills for their lawyers.

## V.    THE PROPOSED CLASS IS NOT SUFFICIENTLY NUMEROUS

Plaintiffs' failure to identify any evidence showing that *any* potential class members exist bars certification. Rule 23(a)(1) requires a class to be "so numerous that a joinder of all members is impracticable." Fed. R Civ. P. 23(a)(1). A mere assertion that the class is sufficiently numerous based on Defendant's sales figures does not establish numerosity. Rather, Plaintiffs must present actual evidence of numerosity. *Dukes*, 131 S. Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties ...."). Failure to affirmatively present such evidence is sufficient grounds to deny certification. *Diacakis v. Comcast Corp*., 2013 WL 1878921, at *4 (May 3, 2013).

In *Diacakis*, the court found that Plaintiffs failed to present evidence of numerosity by rely solely on the defendant's sales figures, holding that:

> Plaintiff offers no evidence regarding the number of those subscribers who were allegedly misled by Comcast into believing there would be no modem-related fees if they signed up for the Triple Play package. The mere fact that there are numerous Triple Play subscribers, standing alone, is insufficient to show numerosity.

*Id.* at \*14.  To date, Milberg has not proffered evidence that a single consumer purchased Sambucol® because the product labeling misled them to believe that the Class Products contained the pharmaceutical compound of non-toxic lectins described in an expired patent granted to an Israeli virologist.  Given the absence of even one plaintiff who could maintain a Class Claim against Defendant, this Court should not assume that forty (40) such plaintiffs exist. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (generally 40 members are required for a class to be sufficiently numerous); *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003).

## VI.  COMMON ISSUES DO NOT PREDOMINATE

The "predominance" requirement of Rule 23(b)(3) "tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997).  The requirement's purpose is to "ensure [] that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. The requirement of predominance is only satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Ellis*, 285 F.R.D. 492, 538 (N.D. Cal. 2012). Determining whether common issues predominate requires an understanding of the elements of the claims and defenses to be litigated. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-810 (2011); *Simpson v. Dart*, 23 F.4th 706, 713 (7th Cir. 2022) (predominance analysis must be undertaken on a claim-by-claim basis).

### A.    Individual Inquiries of Article III Standing Preclude Predominance.

Article III requires that all absent class members must have Article III standing. *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2208 (2021) ("Every class member must have Article III standing in order to recover individual damages."); *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 466 (2016) ("Article III does not give federal courts the power to order relief

25

1  to any uninjured plaintiff, class action or not").[18]  Because the Supreme Court has clarified
2  that "[e]very class member must have Article III standing in order to recover individual
3  damages," *TransUnion*, 141 S. Ct. 2190, 2208, (2021), Rule 23 also requires a district court
4  to determine whether individualized inquiries into this standing issue would predominate
5  over common questions. *Olean*, 31 F.4th at 668 n12.  Here, Plaintiffs' proposed class
6  includes all purchasers of Class Products of two states, including uninjured consumers who
7  are completely satisfied with Sambucol® or, were purportedly injured in different ways,
8  such as those alleged in *Corbett*.

9      *Diacakis* is instructive.  In that case, the plaintiff brought a putative class action
10 alleging that Comcast failed to disclose certain "hidden" charges in a bundled cable service
11 package that he purchased.  *Diacakis*, 2013 WL 1878921, at *1. The court held that the
12 proposed class, which consisted of all purchasers of the bundled cable package, was
13 overbroad because it included proposed class members that had not been deceived by the
14 alleged representations and omissions. In denying class certification, the court ruled that:

> Plaintiffs' [UCL, FAL, and CLRA claims] require a showing of consumer
> deception. S*ee Williams v. Gerber Prods. Co.*, 52 F.3d 934, 938 (9th Cir.
> 2008). Yet to be a member of the class proposed by Plaintiff, one need only
> have "purchased [the product]" .... In other words the class includes anyone
> who purchased any bundled package, irrespective of whether he or she was
> deceived by Comcast's alleged failure to disclose the existence of additional
> modem charges. Since the proposed class includes persons who were not
> injured in the same manner as Plaintiff, the proposed class is overbroad.

21 Plaintiffs' proposed classes are no different from the putative class in *Diacakis*.  Plaintiffs,
22 who suffered no injury because they were satisfied with the Class Products, or who, at most,

---

23 [18] *See also Johannessohn v. Polaris Indus., Inc.*, 9 F.4th 981, 988 (8th Cir. 2021) ("Because
24 the class has not been defined in such a way that anyone within it would have standing, the
   class cannot be certified"); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (5th Circ.
25 2020) (". . . [A] class cannot be certified if it contains members who lack standing"); *In re*
26 *Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013)
   (reversing class certification; damages model yielded false positives for class members
27 without injury); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51-54 (1st Cir. 2018) (reversing
28 class certification where 10% of class was uninjured).

suffered a different injury because they purchased Class Products for different reasons, seek to represent all purchasers of any Class Product in New York and California regardless of whether they were deceived at all, or deceived as alleged in the Complaint. Plaintiffs offer no evidence showing that every purchaser, a majority of purchasers, or indeed any purchasers in New York and California, share the sentiment expressed in the Complaint. As a result, individual fact-specific inquiries into class member injury will be required, and certification should be denied on that basis alone. *See Mazur v. Ebay*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) (denying class certification where class definition was over broad because it included unharmed individuals).

## B.    Individual Inquiries Of Statutory Standing Preclude Predominance.

Determining statutory standing, including elements of causation or reliance, will require similar fact-specific inquiries. Plaintiffs' argument that a class-wide inference of reliance avoids this problem should be rejected.

### 1.    The Class Claims Require Individual Causation or Reliance.

Initially, each claim Plaintiffs assert requires proof of causation or reliance. Relief under the CLRA is limited only to those consumers who "suffer[] damages as a result of" a defendant's alleged unlawful or deceptive acts. Cal. Civ. Code § 1770(a) (emphasis added); *see Cattie v. Wal-Mart Stores, Inc.,* 504 F. Supp. 2d 939, 946 (S.D. Cal. 2007). Likewise, a claim sounding in fraud under the UCL and FAL requires plaintiffs to prove that they relied on the defendant's allegedly false representations and that such reliance caused them harm. *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1363 (2010). Plaintiffs' express warranty claims require proof of causation. *See* Cal. Com. Code § 2313(1)(a) (express warranty claims require proof of an "affirmation of fact or promise" about the product that became part of the basis for the bargain); *Scott v. Metabolife International, Inc.*, 115 Cal. App. 4th 4041, 415-16 (2004) (causation an essential element of breach of express warranty).

The Court has tacitly recognized as much. *Corbett* Dkt. 210 at 28 (express warranty requires proof that the alleged mis-statement was "part of the basis of the bargain."); *id.* at 28 (CLRA requires every class member to prove "an actual injury caused by the unlawful

27

practice."); *id*. at 32 ("class certification of UCL claims is available only to those class members who were actually exposed to the business practice at issue.").

Similarly, even if the alleged representations are misleading, N.Y. GBL §§ 349, 350 requires causation. That is, the plaintiff must prove that she "suffered injury 'as a result of the allegedly deceptive act or practice.'" *Lin v. Canada Goose US, Inc.*, 640 F.Supp.3d 349, 360 (S.D.N.Y. 2022) (dismissing N.Y. GBL § 349 claim because the Complaint did not allege "Plaintiff saw the misrepresentations prior to his purchase and therefore made the purchases 'as a result' of the misrepresentations."); *Celestin v. Martelly*, 698 F.Supp.3d 443, 469 (E.D.N.Y. 2023) (to state a N.Y. GBL §§ 349, 350 claim "a plaintiff must 'describe in detail the allegedly misleading and deceptive statements . . upon which he relied in purchasing the product.'"); *see also Devey v. Big Lots, Inc.*, 635 F.Supp.3d 205, 214-215 (W.D. N.Y. 2022) (piecemeal and conclusory allegations that plaintiffs viewed back label representations at unspecified times and purportedly read and relied on them insufficient to allege causation under allegations that reasonable consumers viewed information a product's back label insufficient to plead NY GBL §§ 349, 350 claims). Breach of an express warranty also requires reliance. *Lin*, 640 F.Supp.3d at 362-63 (dismissing breach of express warranty under New York law because "[t]he SAC fails to state reliance on any express warranty . . . .").

### 2.    A Rebuttal Inference of Reliance Under California Law for Some Class Claims Does Not Solve the Predominance Problem.

That a (rebuttable) inference of reliance for some claims may arise in certain circumstances does not resolve the predominance issue. Under California law, a rebuttable inference of common reliance may arise for some claims, but only if Plaintiffs demonstrate that Defendant made the Class Claims to the entire class, the Class Claims are material, and all class members relied on them. *In re Vioxx*, 180 Cal. App. 4th at 129; *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217 (N.D. Cal., July 30, 2015), at 230; *Tucker v. Pac. Bell Mobile Svs.,* 208 Cal. App. 4th 227-228 (2012) (presumption does not arise "where the record will not permit it"). Here, the inference of reliance is not available for all proposed Class Claims.

28

Plaintiffs provide no evidence that such an inference arises, and, in fact, their evidence demonstrates such an inference cannot arise.

The record shows that the inference cannot be invoked because the *entire* class was **not** uniformly exposed to the Class Claims.  *See* Section II., E. As a result, no presumption of reliance can arise, and causation and reliance must be determined individually, destroying predominance.  *In re Hyundai*, 881 F.3d at 703 (9th Cir. 2018) (class certification is improper if not all consumers were uniformly exposed to an alleged deceptive claim); *Zakaria v. Gerber Products Co.*, 2016 WL 6662723, at *8  (C.D. Cal., Mar. 23, 2016) (denying certification where "it cannot be inferred that there is a high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it"); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1099-1100 (N.D. Cal., 2018) (denying certification because class-wide exposure cannot be inferred if challenged statement does not appear on the front of the packaging, is in small font, or is in the middle of a block of text). Plaintiffs make no such showing.

Moreover, Plaintiffs offer **no** evidence of consumer deception or materiality.  Their expert tested fabricated labels statements **that had never been conveyed by Defendant on any of its labels**,[19] not the Class Claims, and, Plaintiffs' themselves were not deceived as alleged in the Complaint. The Court must consider this lack of evidence, and deny class certification.  *Ellis* 657 F.3d at 981 ("it is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements.").  *Diacakis*, 2013 WL 1878921, at *6 (applying *Ellis* and explaining "while the Court makes no determination as to the ultimate merits of Plaintiff's claims, it must consider whether Plaintiff has presented evidence of classwide conduct to demonstrate typicality under Rule 23(a)(3). In light of the

---

[19] The *only* admissible evidence on consumer deception and materiality is from Defendant's expert Mr. Keegan, which demonstrates consumers are not deceived in the manner alleged and the Class Claims are not material.  *See* Dkt. 68-16; Ferrari Decl., Ex. M, Tr. 91:2-91:23; 101:15-102:17.  Indeed, relevant consumers do not even understand what a virologist is / does. Dkt. 68-16, ¶5; Ferrari Decl., Ex. M, Tr. 91:24-94:2.

314065046v.7

1  paucity of such evidence, the Court finds that Plaintiff has failed meet his burden of

2  demonstrating typicality under Rule 23(a)(3).").

3  ### C.    There is No Common Evidence that the Class Claims are False.

4  Plaintiffs identify a single common question—"whether the Challenged

5  Representations are false and misleading because the Elderberry Extract was not developed

6  by Dr. Mumcuoglu (or any other virologists)." Dkt. 68-1, at 15. Plaintiffs, however, point

7  to no common evidence that would tend to prove the falsity of the Class Claims. Indeed,

8  Plaintiffs' proffered common evidence is either irrelevant to the truth or falsity of the Class

9  Claims or tends to prove its truth. For instance, the existence of the 1998 patent that expired

10  before Defendant existed is not probative one way or the other. Evidence linking the transfer

11  of Sambucol® from Dr. Mumcuoglu to HBI to Defendant's parent company is strong

12  evidence of the truth of the Class Claims. In any event, since Plaintiffs point to no common

13  evidence that can actually prove their claims at trial, class certification must be denied. *See*

14  *Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard."); *Ellis*, 657

15  F.3d at 981 (predominance can only be met if resolution of some of the legal questions or

16  factual questions can be achieved through generalized proof" and "if these particular issues

17  are more substantial than the issues subject to only individualized proof"; *Diacakis*, 2013

18  WL 1878921, at *6 (plaintiff did not meet his burden at class certification stage where he

19  failed to present evidence of classwide conduct; mere allegations are insufficient).

20  Plaintiffs failed to establish predominance as a result.[20]

21  ## VII.   PLAINTIFFS HAVE NOT SHOWN DAMAGES RESULTING FROM THE CLASS CLAIM CAN BE CALCULATED ON A CLASSWIDE BASIS

22  To satisfy Rule 23(b)(3) predominance, Plaintiffs must also prove damages are

23  capable of class-wide measurement. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)

24

25  [20] Indeed, given the lack of common evidence to prove the sole common issue Plaintiffs

26  identify, and necessary individual factual determinations identified in this Section VI, Plaintiffs fail to even establish commonality. *Dukes*, 564 U.S. at 350 ("What matters to

27  class certification … is not the raising of common 'questions'—even in droves—but rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the

28  resolution of the litigation.")

314065046v.7

(reversing class certification order where it was "clear" plaintiffs' damages model "falls far short of establishing that damages are capable of measurement on a classwide basis" and predominance could not be met as a result). This inquiry is distinct from the admissibility standard under Rule 702 and *Daubert*.  A district court cannot stop its analysis after assessing the admissibility of expert testimony, but must conduct a "rigorous analysis" of the admissible expert testimony to determine whether the proposed damages model satisfies Rule 23. *Olean*, 31 F.4th at 666 n.9; *Ellis*, 657 F.3d at 982 (9th Cir. 2011). A plaintiff, therefore, must establish, through "evidentiary proof," that the proposed damages model can accurately "measure only those damages attributable to [his] theory" of liability. *Comcast*, 569 U.S. at 35. Thus, when a plaintiff alleges that he paid a price premium because of a misrepresentation, he must offer a damages model that isolates a price premium due solely to the alleged misrepresentation, based on the theory of deception alleged. *McMorrow*, 2020 WL 1157191, at *8; *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 578 (C.D. Cal. 2014). Plaintiffs proposed damages models do not meet these standards.[21]

## A.    Plaintiffs' Damages Model Does Not Measure the Class Claims.

Plaintiffs' experts initially proposed a damages model based on the terms "virologist developed" and "developed by a world renowned virologist," not the Class Claims.  *See* Section II., D.  That alone defeats Plaintiffs' attempt to prove class wide damages. However, when asked for details about what statements might be tested in his conjoint study, Dr. Dennis further limited his analysis to only "[d]eveloped by a world renowned virologist" [Dkt. 68-21 at ¶109], which likely has a materially different meaning than the "virologist

---

[21] Each of Defendant's damages arguments apply with equal force to GBL §§ 349 and 350 claims. GBL § 349(h) and § 350-e(3) authorize statutory damages, but only if those statutory damages exceed  actual damages.  Thus, actual damages for each and every NY class member must also be determined before the individual class member can be awarded statutory damages.  *Montera v. Premier Nutrition Corp.*, 621 F.Supp.3d 1012, 1016 (N.D. Cal. Aug. 12, 2022), *overturned in part on other grounds by*, *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018 (9th Cir. 2024).  Actual damages must also be determined for each and every New York class member to determine whether any statutory damages award comports with Due Process, as is required.  *Id.*

314065046v.7

developed" pled claim [Ferrari Decl., Ex. I, Dr. Wilcox Decl., ¶25b], especially if Dr. Dennis decides to take the phrase "[d]eveloped by a world renowned virologist" out of context like he did in the consumer survey. Put simply, Plaintiffs' hypothetical damages model will not test "virologist developed," "unique," "proprietary," or "patented." Because Plaintiffs have offered zero evidence that the proposed damages model can accurately "measure only those damages attributable to [their] theory" of liability, class certification should be denied. *Comcast*, 569 U.S. at 35; *McMorrow*, 2020 WL 1157191, at *8; *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 578 (C.D. Cal. 2014).

## B.    Plaintiffs' Damages Model Fails for Additional Reasons.

Plaintiffs' damages cannot be measured on a class-wide basis for the reasons stated in the Motion to Exclude filed concurrently herewith.  Specifically:

(1) The model fails to distinguish between injured class members and uninjured class members. *Hall v. Marriott International, Inc.*, 2023 WL 4417265, at *18-*19 (March 30, 2023) ("A model that potentially awards damages over half of the time where no harm exists is not sufficiently linked to Plaintiffs' theory of liability, nor is it capable of measuring the harm Plaintiffs allege. The Court is not satisfied that a damages model that awards damages to so many potentially uninjured consumers is viable under *Comcast*.");

(2) Their price-premium model is insufficiently defined.  *See Miller v. Fuhu, Inc.*, 2015 WL 7776794, *20 (C.D. Cal. Dec. 1, 2015)(excluding Dr. Dennis' hypothetical conjoint study because the plaintiff must actually design the conjoint survey in sufficient detail to enable the court to conduct the rigorous analysis that Rule 23 requires);

(3) Their price-premium model will not generate a price premium.  *See, e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (refusing to certify a class in part because conjoint analysis did not consider market supply); *Passman v. Peloton Interactive, Inc.*, 2023 WL 3195941, at *29-*30 (S.D.N.Y. May 2, 2023) ("Dennis's and Weir's analysis does not measure the degree to which they [putative class members] overpaid in th[e] but-for world because it holds supply fixed."); *cf. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940,

32

949 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022) ("[D]istrict courts across the country have excluded choice-based conjoint analyses that fail to accurately account for supply-side considerations"); and

(4) <u>An individualized inquiry on economic inquiry is required because of variances in the price and products.</u> Prices of the challenged products depend upon at least the unit count, form, retailer, discounts, coupons, and add-on services. Ferrari Decl., Ex. J, Ugone Reb., Exs. 4-8. Plus, the labeling claims vary on the Products. Ferrari Decl. ¶¶40-44.

## VIII. CLASS TREATMENT IS NOT SUPERIOR

"Included in the superiority analysis is whether the proposed class action would be manageable." *Moheb v. Nutramax Labs., Inc.*, 2012 WL 6951904, at * 8 (C.D. Cal. Sept. 4, 2012). The manageability inquiry "encompasses the whole range of practical problems" that could make class treatment inappropriate. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). Practical problems may include "potential difficulties in notifying class members of the suit, calculation of individual damages and distribution of damages." *Id.*; *see also Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990) ("manageability" requirement includes consideration of potential difficulties in calculation of individual damages and distribution of damages); *Hodes v. Van's International Foods*, 2009 WL 2424214, at *3 (C.D. Cal. July 23, 2009) (denying class certification in part due to concerns about how the plaintiffs would "identify each class member and prove which brand of [waffles] each member purchased, in what quantity, and for what purpose.").

Defendant has a right to litigate defenses to individual claims. *Dukes*, 564 U.S. at 367 (class cannot be certified that would deprive defendant right to litigate defenses to individual claims); *Broussard v. Meineke Discount Meer Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) ("[i]t is axiomatic that [class actions] cannot be allowed to expand the substance of the claims of class members"). To preserve those rights, actual class members, as opposed to mere purchasers, must be identified before liability is determined. *See Amchem v. Windsor,* 521 U.S. 591, 613 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with The Rules Enabling Act, which instructs that rules of procedure

33

1   'shall not abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b).").

2       Courts have repeatedly acknowledged the due process concerns that arise when a
3   defendant cannot challenge whether individuals meet the criteria for class membership.
4   *Karhu v. Vital,* 621 F. App'x 645 (11th Cir. 2015) ("[A]llowing class members to self-
5   identify without affording defendants the opportunity to challenge class members 'provide[s]
6   inadequate procedural protection to . . . [d]efendant[s]' and 'implicate[s their] due process
7   rights'"); *Marcus v. BMW,* 687 F.3d 583, 94 (3d Cir. 2012) ("Forcing [defendants] to accept
8   as true absent persons' declarations that they are members of the class . . . would have serious
9   due process implications."). **These due process concerns are heightened here where this**
10  **Court has already certified a class of "all purchasers" of the same Products, but based**
11  **on a different alleged harm.**

12      The need for a culling process to identify class members demonstrates the class is not
13  manageable, and individual factual questions predominate. *See, e.g., Senne v. Royals,* 315
14  F.R.D. 523, 566 (N.D.Cal. 2016) (declining to certify class because "there will be no simple
15  way to determine who is a member of each of the State Classes"); *Spencer v. Beavex,* 2006
16  WL 6500597, at *9 (S.D.Cal. Dec. 15, 2006) ("where, in order to ascertain membership in a
17  proposed class, a court must undertake a fact-specific, individualized determination for each
18  plaintiff prior to addressing the merits of the claims, class certification may not be
19  beneficial.").

20      In sum, Plaintiffs fail to prove that a class action is "superior" to other available
21  methods for adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3).  This is particularly
22  so where, as here, Plaintiffs could recover more than their counsel is seeking through
23  Defendant's refund policy (a fact which would be known to any consumer who scrutinized
24  the product labels sufficient to unearth each of the Class Claims). *Corbett* Dkt. 174-1, Rowe-
25  Cerveny Decl., ¶1-2.  *See Webb v. Carter's Inc.,* 272 F.R.D. 489 (C.D. Cal. Feb. 3, 2011)
26  489, 504; *In re Phenylpropanolimine (PPA) Products Liab. Litig.*, 214 F.R.D. 614, 622 (W.D.
27  Wash. 2003).

28

## IX.    DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS

Plaintiffs again retained Dr. J. Michael Dennis to: (1) conduct a consumer perception survey; (2) conduct a materiality survey; and (3) propose a methodology for measuring any price premium paid by consumers.  Plaintiffs also retained Mr. Colin Weir to help design Dr. Dennis' methodology for measuring a price premium.   Dr. Dennis's surveys and opinions are fatally flawed and fail on all three counts, and should be excluded under Fed. R. Evid. 702 and 403.  Indeed, his complete distortion of Defendant's label and disregard for the Class Claims render his opinions useless. Because Weir's opinions rely on Dr. Dennis's fatally flawed damages opinions, Weir's opinions should be excluded too.

### A.    Legal Standard for Motion to Exclude.

Under Fed. R. Evid. 702, the trial court is the gatekeeper responsible for ensuring that all expert evidence is reliable and relevant.  *Daubert v. Merill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *Hammler v. Hernandez*, 2020 WL 8970334, at *1 (S.D. Cal. March 5, 2020). Plaintiffs must establish by a preponderance of evidence that their expert's opinions are admissible.  *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *Persian Gulf, Inc. v. BP West Coast Products*, 632 F.Supp.3d 1108, 1164 (S.D. Cal. Sept. 30, 2022).

An expert witness must be qualified by "knowledge, skill, experience, training, or education" and may only provide testimony if his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue ... ." Fed. R. Evid. 702. Even then, the expert's testimony must be (1) based on sufficient facts or data; (2) the product of reliable principles and methods; and (3) the result of principles and methods reliably applied to the facts of the case.  Fed. R. Evid. 702; *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002); *Kilby v. CVS Pharmacy, Inc.*, 2012 WL 1132854, at *2 (S.D. Cal. April 4, 2012).

Even under *Daubert*, the Court must still weigh the balancing factors of Fed. R. Evid. 403, which permits the Court to exclude evidence if its probative value is substantially

outweighed by such factors as the danger of unfair prejudice and/or misleading the jury. Fed. R. Evid. 403. Because of the additional weight the jury places on expert testimony, "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than lay witnesses." *Daubert*, 509 U.S. at 595 (quotation marks and citation omitted).

The *Daubert* standard applies at the class certification stage. A district court must apply the *Daubert* standard to challenged expert testimony in support of class certification, and make a threshold determination whether the testimony is admissible. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods, LLC*, 31 F.4th 651, 665 n.7 (9th Cir. 2022).

**B.    Dr. Dennis's Perception and Materiality Survey Is Irrelevant And Unreliable.**

**1.    The Survey Is Inapposite And Irrelevant Because It Does Not Match Plaintiffs' Theory Of Liability or Defendant's Label.**

Instead of testing the Class Claims, the Sunderland Claim, or the Binder Claim, Dr. Dennis—at the direction of counsel—only *attempted* to test the statements "[v]irologist developed" and "[d]eveloped by a world renowned virologist" [Dkt. 68-21, Dennis Report at ¶18; Ferrari Decl. at Ex. K, Tr. 33:9-11, 40:21-43:5, 99:8-14], to see if those phrases mean what he told them they said [Dkt. 68-21, at ¶¶75-79]. What he actually tested, however, was even more limited and distinct from Plaintiffs' theory of liability. Specifically, after Dr. Dennis stripped the product packaging of its branding, he showed survey respondents two side panels from a 7.8 oz Sambucol® Original Syrup that he materially altered further. *Id.* at ¶68. Namely, he changed the language on the panel that said: "Developed by a world renowned virologist, **Sambucol®** is the unique black elderberry extract that has been used in scientific studies" to "Developed by a world renowned virologist, <u>this</u> is the unique elderberry extract that has been used in scientific studies." (underling added to show word change; bold in original). *Compare* Dkt. 68-12, p. 16 (the actual label) *with* 68-21, p. 20. The below illustrates Dr. Dennis's alterations:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

20    In changing the word "**Sambucol®**" to "this," **Dr. Dennis made a claim Defendant**
21 **has never made on any of its labels, and took one of the fundamental statements at**
22 **issue in this case out of context**. Ferrari Decl., ¶44. Certainly, whether "Sambucol®" is
23 developed by a virologist or "this" (presumably referring to the unbranded packaging) is
24 developed by a virologist materially effects a consumers' perception of a labeling claim.
25 It is axiomatic that labelling claim litigation address the actual label language and not
26 language fabricated by an expert; Dr. Dennis' testing of an express claim he made up has
27 zero probative value to this litigation.
28    Furthermore, none of the claims Dr. Dennis tested are consistent with the Class

37

Claims.  Indeed, at deposition he admitted that:

(1)     it was "not part of [his] assignment to measure consumers['] reactions" to the term "unique[,]" and he has no opinion on whether "the term 'unique' is either false, misleading, deceptive, or material . . . ." Ferrari Decl., Ex. K, Tr. at 99:15-100:5;

(2)     he has "no opinion on whether 'proprietary' is either false, misleading, deceptive, or material"– he "has no data on that . . . ." *Id.* at 100:6-10;

(3)     "[he] h[as] no opinion on whether consumers interpret the product advertising and marketing to mean that the products contain a patented elderberry extract" because he "didn't test that in [his] survey . . . ." *Id.* at 100:11-21; and

(4)     he has "no opinion on whether consumers interpret the product advertising and marketing to mean that the products contain lectins." *Id.* at 100:22-25.

Since the Tested Claims do not align with Class Claims, the Sunderland Claim, the Binder Claim, **or statements made by Defendant**, the results of Dr. Dennis's perception and materiality survey are irrelevant and unreliable.  Ferrari Decl., Ex. H, Keegan Reb. Rep. ¶30; *McMorrow v. Mondelez*, 2020 1157191, at *5-9 (S.D. Cal. March 9, 2020) (striking Dr. Dennis's opinions because his damages model was inconsistent with the plaintiffs' theory of liability); *cf. Townsend v. Monster Beverage*, 303 F.Supp.3d 1010, 1031 (C.D. Cal. 2018) (striking portion of expert report related to label statement as irrelevant where expert's questions did not accurately reflect the challenged statement noting that "the specific representations are critical in false advertising cases.")

### 2.  The Survey Is Inapposite And Irrelevant Because Surveys Are Not Used to Test Express Claims.

Under hornbook advertising law "[t]here are two types of advertising claims: express and implied." *F.T.C. v. QT, Inc.*, 448 F.Supp.2d 908, 957 (N.D.Ill. 2006). "Express claims directly represent the fact at issue while implied claims do so in an oblique or indirect way." *Id.* Generally, "the need for extrinsic evidence to determine whether an advertisement makes a particular claim hinges on the type of claim the advertisement makes." *FTC v. Bronson Partners, LLC*, 564 F.Supp.2d 119, 125-126 (D.Conn. 2008). "If

38

an advertisement makes a claim expressly, then extrinsic evidence [generally] is not necessary." *Id.*   Having an expert ask survey participants whether a label means what it says is not probative of anything.  Yet that is exactly what Dr. Dennis did here.  *See* Section II., D.  Unlike Mr. Keegan, Dr. Dennis did not test what consumers perceived the term "virologist developed" to mean.  Dkt. 68-16, ¶¶10-15. Instead, he asked survey participants to confirm the express statement he crafted.  Dkt. 68-21, p. 26. That's exactly the type of survey that is inappropriate and irrelevant.

### 3.    The Survey Is Irrelevant and Unreliable Because It Does Not Replicate Marketplace Conditions.

Dr. Dennis also makes no attempt to replicate real-world conditions consumers would encounter when making a purchasing decision.  Ferrari Decl., Keegan Reb. Rep., Ex. H, ¶¶ 20-34.  Replicating the marketplace conditions in which relevant consumers would encounter the challenged Products and claims in the real world is an important component of consumer survey design. *Id.*, ¶¶ 20-21, fn. 23, citing Jacoby, J. (2013) *Trademark Surveys, Volume I: Designing, Implementing, and Evaluating Surveys*, American Bar Association, p. 143 ("If there is a bottom line rule, it is that, while no survey is able to construct a perfect replica of all 'real world' buying situations, it *must* nonetheless use stimuli that, *at a minimum . . .* roughly emulat[e] marketplace conditions.") (emphasis added); and ¶32, citing Jacob, p. 486 (the stimulus "should faithfully represent the item *as it appears in the marketplace . . .* [and] *should not be diminished or supplemented in any way that would change how it appears in the marketplace.*") (emphasis in original).

Dr. Dennis's test stimulus is highly modified and does not look anything like the Sambucol Products, or any product, that Respondents would encounter in a real-world retail environment.  Ferrari Decl., Keegan Reb. Rep., Ex. H, ¶¶ 20-34.  First, he strips the product of its branding (compare the actual branding on the left as used in Mr. Keegan's consumer survey [Dkt. 68-16, p. 40] with Dr. Dennis's version on the right [Dkt. 68-21, p. 20]):

1
2
3
4
5
6
7
8
9
10
11
12




13  Then he alters the actual labeling language and meaning by replacing the bolded word

14  "**Sambucol®**" with the word "this" [*Compare* Dkt. 68-12, p. 16 (actual label) *with* Dkt.

15  68-21, p. 84] and adds red call-out boxes [Dkt. 68-21, p. 84, 88]:

16
17
18



19
20
21
22
23
24
25
26
27
28

Consumers would not encounter this type of packaging—wherein the singular side-panel Virologist Developed Claim is highlighted—in an actual marketplace purchasing scenario. By using unconventional, artificial stimuli that make no attempt to approximate real-word marketplace conditions, Dr. Dennis potentially impacted survey participants' responses in unknown ways, creating unidentified biases in the study data and rendering his results unreliable. Ferrari Decl., Keegan Reb. Rep., Ex. H, ¶¶ 20-34. His survey should be excluded.

### 4. Dr. Dennis's Perception and Materiality Survey is Irrelevant and Unreliable Because it is a Biased And Leading Reading Test of Modified Claims.

Dr. Dennis's survey is biased and leading, and engages in an unnatural reading test exercise that is not representative of the decision making process at retail.

As a threshold matter, Dr. Dennis admits he started "from the assumption that my task is to 'proceed on the hypothesis that the Defendant has committed the harmful act and that the act was unlawful.'" Dkt. 68-21, ¶20. As PharmaCare's rebuttal expert Mr.Keegan explains, the use of such a hypothesis that presumes an outcome—rather than a research question, which does not presume an outcome—is totally inappropriate in survey design, and not supported by the literature. Ferrari Decl., Ex. H, Keegan Reb. Rep. ¶¶12-13.

Further proceeding outside the norms of consumer testing, Dr. Dennis then chose to use only leading questions and suggestive stimuli in further defiance of applicable testing standards. To wit, after showing the survey respondents the suggestive and altered image on the previous page, Dr. Dennis asked them two reading comprehension questions about the language in call-out boxes *only*: "Based on the information you see . . . in the red boxes, do you believe the packaging is or is not communicating thus meaning [from the heading], or do you have no opinion?"; and "How likely or not likely are you to purchase this product because you believe the packaging is communicating th[e] meaning [in the heading]?" Dkt. 68-21, pp. 122, 126. He did not ask for the phrases in the call out boxes to be read in context, or about any other claims on the label that a consumer might also believe provide a benefit. Ferrari Decl., Ex. H, Keegan Reb. Rep. ¶30. Rather he explicitly

41

instructed the respondents: "We will ask about your understanding of *some parts* of the product packaging. *Those parts* will be in the red box . . . We will show you some possible ways that people might or might not understand the meaning of *those parts* of the packaging labels. We want you to tell us whether you think *those parts* of the packaging is communicating that meaning . . . ." Dkt. 68-21, p. 26 (emphasis added).

With respect to the first question, not unsurprisingly, over 90% of the respondents admitted they could read the highlighted words, including those that Dr. Dennis created. Over 75% of those same respondents also stated they would be somewhat likely or more likely to purchase the product because they understood the highlighted words to mean the Black Elderberry extract was developed by a virologist. Dkt. 68-21, pp. 28-29. The Tested Claims, thus, fail to inform the Court about whether or not respondent's believe the "virologist developed" claim is true; it simply shows that survey respondents can read an express claim crafted by an expert when they are instructed to focus on it.

Nothing about Dr. Dennis's grossly distorted packaging or questions replicates the real-world. Consumers do not have researchers with them asking them to match statements to a product package or asking them to engage in a cognitive reading test before deciding to make a purchase. Also, they certainly do not encounter de-branded packaging with red call-outs on them in the marketplace. Yet, Dr. Dennis has no valid basis for using the leading questions or for objecting to Mr. Keegan's use of open-ended questions. See Ferrari Decl., Ex. H, Keegan Reb. Rep. ¶¶42-43. As Defendant's expert Mr. Keegan explains, open-ended questions serve an important role as a measure of data quality. *Id.* at ¶44. Because Dr. Dennis "failed to include open-ended questions in his survey, both respondents' motivations for selecting the answers that they chose and the overall quality of the study data remain unknown[,]" and there is a limit to the reliability of his findings.[22]

---

[22] Had Dr. Dennis properly tested respondents' understanding of the Class Claims through open-ended questions, he would have discovered that respondents do not perceive a benefit from the product based on those Class Claims. For example, Defendant's expert Mr. Keegan reviewed over 1,400 answers to open-end questions such as **state the reasons for purchasing the product**, or express your expectations for the product) that were posed

42

Finally, Dr. Dennis did nothing meaningful to hide his purpose in the surveys. Dr. Dennis acknowledged "the risks of respondents if they were to figure out what the actual survey objectives are." Ferrari Decl. Ex. K, Dennis Tr. 67:15-18. Yet, he purported to distract respondents from the purpose of his survey by inserting a single "distractor" question that he admitted could theoretically only be answered one way: whether "supports immune system" means "product is being sold at a discount." Dkt. 68-21, Dennis Rep. at ¶ 74 n. 19; Ferrari Decl., Ex. K, Dennis Tr. 63:21-67:18.

## C.    Dr. Dennis and Mr. Weir's Damages Studies / Models are Irrelevant and Unreliable.

Dr. Dennis and Mr. Weir also proposed a hypothetical and incomplete method to calculate classwide damages based solely on the Tested Claim, not the Class Claims (or those proffered by Plaintiffs). Dkt. 68-21, Dennis Rep. at ¶¶18, 21-22, 28; Dkt. 68-20, Weir Rep. at ¶¶5, 6, 9; Ferrari Decl., Ex. K, Tr. at 11:20-12:13, 110:3-111:11, 113:6-119:19. Specifically, Plaintiffs' experts initially proposed to construct a damages model based on the terms "virologist developed" and "developed by a world renowned virologist," not the Class Claims. That alone renders their opinions irrelevant.

However, when asked for details about what statements might be tested in his conjoint study, Dr. Dennis further limited his analysis to only "[d]eveloped by a world

---

after showing survey respondents Defendant's actual, real-world packaging. Out of the 1,400 answers, **zero** respondents mentioned "virologist developed," "proprietary method," or "patent[ed,]" and only three mentioned "unique" as shown in his report illustration:

| Claim (and Variants) | Mentions: Reason for Purchase | Mentions: Expected Benefit |
|---|---|---|
| Unique | 3 | 0 |
| Proprietary method | 0 | 0 |
| Guarantee | 0 | 0 |
| Virologist developed | 0 | 0 |
| Patent | 0 | 0 |

Dkt. 68-16, Keegan Report at ¶10-12 and p. 40. Over 74% of the respondents did not have any knowledge of what a virologist is or does. *Id.* at ¶14.

43

314065046v.7

renowned virologist." Dkt. 68-21 at ¶109; Ferrari Decl., Ex. I, Dr. Wilcox Reb. Reop., ¶25b. Simply put, Plaintiffs hypothetical conjoint study and damages model will not test "virologist developed," "unique," "proprietary," or "patented." They should not be admitted without evidentiary proof that they can accurately "measure only those damages attributable to [Plaintiffs'] theory" of liability. *Comcast*, 569 U.S. at 35; *McMorrow*, 2020 WL 1157191, at *8; *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 578 (C.D. Cal. 2014). What's more, Plaintiffs' experts' price-premium analyses have zero probative value where, as here, Dr. Dennis has not and cannot prove the Class Claims are material. *United States v. Evans*, 728 F.3d 953, 962 (9th Cir. 2013) ("where 'the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.'") (quoting Fed. R. Evid. 104(b)).

The conjoint study / damages models should also be excluded for the following independent reasons:

<u>Plaintiffs' damages model fails to distinguish between injured class members and uninjured class members.</u> *See Hall v. Marriott International, Inc.*, 2023 WL 4417265, at *18-*19 (March 30, 2023) ("A model that potentially awards damages over half of the time where no harm exists is not sufficiently linked to Plaintiffs' theory of liability, nor is it capable of measuring the harm Plaintiffs allege. The Court is not satisfied that a damages model that awards damages to so many potentially uninjured consumers is viable under *Comcast*."); (2) *Diacakis v. Comcast Corp.*, No. C11-3002, 2013 U.S. Dist. LEXIS 64523 (N.D. Cal. May 3, 2013); *Rodriguez v. Gates*, No. CV 99-13190 GAF, 2002 U.S. Dist. LEXIS 10654, at *9 (C.D. Cal. May 30, 2002). Here, Plaintiffs' price-premium model fails to account for putative class members who suffered no injury because they were satisfied repeat customers. Ferrari Decl., Exs. H-J, Keegan Reb. Rep. at ¶5 a; Wilcox Reb. Rep. ¶ 25c; and Ugone Reb. Rep. at ¶19.

<u>Plaintiffs' price-premium model is insufficiently defined.</u> *See Miller v. Fuhu, Inc.*, 2015 WL 7776794, *20 (C.D. Cal. Dec. 1, 2015)(excluding Dr. Dennis' hypothetical conjoint study because the plaintiff must actually design the conjoint survey in sufficient

detail to enable the court to conduct the rigorous analysis that Rule 23 requires). Here, just as in *Miller*, Dr. Dennis's and Mr. Weir's reports mostly address the merits of conjoint surveys generally, and contemplate what they hypothetically might do if asked to design a conjoint survey for this case. Dr. Dennis identifies some attributes of a proposed conjoint survey for this case, but they are skeletal and he does not commit to using them. *See*, e.*g.*, Dkt. 68-21, Dennis Report ¶105 (identifying only three proposed attributes – brand, label claims, and price but admitting "my final design could . . . include[] a potential modification of the selected attributes"; ¶¶108, 110, and 111 (failing to identify numerous crucial elements, including competitor brands, distractor claims for the claims attribute, or the price points for the price attribute). He also fails to justify his assumptions for using only the 7.8 oz Original Syrup product or only testing the phrase "[d]eveloped by a world renowned virologist." Ferrari Decl., Ex. I, Wilcox Reb. Rep. ¶¶22-24.

Plaintiffs' price-premium model will not generate a price premium. Instead, Plaintiffs will provide only a measure of survey respondents' "willingness-to-pay" associated with the phrase "[d]eveloped by a world renowned virologist." Ferrari Decl., Ex. I, Wilcox Reb. Rep. ¶¶ 20-21; Ex. J, Ugone Reb. Rep. ¶¶ 5a, 16-17. Plaintiffs' model provides only information from the demand side of consumer behavior and thus yields measures known as willingness-to-pay rather than market prices (or market price differences), and provides no specific methodology through which he intends to consider supply-side factors. *Id.* A damages model based on measure of willingness to pay cannot reliably measure a price premium and should be excluded because it will generally overstates any relevant price premium or find a price premium where none exists. *Peloton*, 2023 WL 3195941, at * 29 ("It is only on the theory that Named Plaintiffs would not have had to pay the amount that they did—that Defendant would have offered its product at a lower price—that Named Plaintiffs would be entitled to recover any damages.") (emphasis added)). *See, e.g*., *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (refusing to certify a class in part because conjoint analysis did not consider market supply); *Passman v. Peloton*

45

Opposition to Motion For Class Certification; Motion to Exclude Plaintiffs' Experts
Case No. 3:23-CV-01318-JES-AHG
314065046v.7

*Interactive, Inc.*, 2023 WL 3195941, at \*29-\*30 (S.D.N.Y. May 2, 2023) ("Dennis's and Weir's analysis does not measure the degree to which they [putative class members] overpaid in th[e] but-for world because it holds supply fixed."); *cf. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022) ("[D]istrict courts across the country have excluded choice-based conjoint analyses that fail to accurately account for supply-side considerations").  The relevant price premium is also distorted because it fails to replicate the real-world market conditions by altering the branding on a single product format, while wholly ignoring other statements on the packing (including the Class Claims) that might drive a premium. Ferrari Decl., Ex. I, Wilcox Reb. Rep. ¶¶20-21.

An individualized inquiry on economic injury is required because of variances in the price and products. Prices of the challenged products depend upon at least the unit count, form, retailer, discounts, coupons, and add-on services. Ferrari Decl., Ex. J, Ugone Rep., Exs. 4-8.  Moreover, the labeling claims vary on the Class Products. Dkt. 68-4; Ferrari Decl. ¶¶40-44.

### D. Admitting Dr. Dennis's and Mr. Weir's Opinions Would Unfairly Prejudice PharmaCare.

Fed. R. Evid. 403 permits a court to exclude relevant evidence when its probative value is substantially outweighed by a danger of confusing the issues or misleading the jury, among other things.  *Zagruzny v. Mercedes-Benz USA*, 2020 WL 3968672, at \*2 (C.D.Cal. June 4, 2020) (Even if expert testimony passes the reliability and relevance tests under *Daubert*, it may still be excluded under Rule 403.").  Because of the "powerful" nature of expert testimony, a district court "exercises more control over experts than lay witnesses" through the use of Rule 403. *Daubert*, 509 U.S. at 595 (quotation omitted).

Here, there is **zero** probative value in Plaintiffs' class certification experts' opinions because they: (1) wholly fail to conform to the Class Claims and Defendant's actual labels; (2) are divorced from the real-world marketplace; (3) are biased and misleading; (4) are

incomplete; (5) fail to and/or cannot provide a price premium because individual issues predominate; and (6) fail to account for how their approach would avoid double recovery in the *Corbett* and *Sunderland* Cases.[23]  Conversely, the reports will certainly unfairly prejudice PharmaCare and will confuse and mislead the jury. As such, the record is sufficient to require the exclusion of Plaintiffs' class certification experts' reports and testimony under Federal Rule of Evidence 403.

DATED: October 25, 2024                    SEYFARTH SHAW LLP


By: /s/ Giovanna A. Ferrari
    Giovanna A. Ferrair
    Attorneys for Defendant
    PharmaCare U.S., Inc.

---

[23] Ferrari Decl., Ex. K, Dennis Tr. 101:25-102:17; 104:9-20; 107:17-25; 108:1-109:20; 109:21-111:11 (wherein Dr. Dennis admits: that "virologist developed" is a challenged representation in both cases; he tested the same product in both cases (7.8 ounce Original Syrup); the supply side considerations are the same in both cases; and Mr. Weir is doing the same work in both cases; but he cannot explain how the price premiums might be the same or different in both cases or how to avoid double recovery).

314065046v.7