# EXHIBIT B

```
1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3    ------------------------------x

4    LINDA SUNDERLAND and BENJAMIN  :

5    BINDER, individually and on    : Case No.

6    behalf of all others similarly : 3:23-cv-01318-JES-AHG

7    situated,                      :

8              Plaintiffs,          :

9         v.                        :

10   PHARMACARE U.S., INC., a       :

11   Delaware Corporation, and      :

12   PHARMACARE PTY LTD., an        :

13   Australian company,            :

14             Defendants.          :

15   ------------------------------x

16

17      VIDEOTAPED DEPOSITION OF LINDA SUNDERLAND

18             New York, New York

19           Tuesday, February 27, 2024

20              10:04 a.m. EST

21

22   Job No.: 526998

23   Pages: 1 - 120

24   Reported by:  Monique Vouthouris, CCR, RPR, CRR

25
```

Exhibit B
00135

Transcript of Linda Sunderland
Conducted on February 27, 2024                    2

1

2

3         Deposition of LINDA SUNDERLAND, held at the

4    offices of:

5

6

7              SEYFARTH SHAW LLP

8              620 8th Avenue

9              32nd Floor

10             New York, New York  10018

11             212.218.5500

12

13

14        Pursuant to notice, before Monique Vouthouris,

15   Certified Court Reporter, Register Professional

16   Reporter, Certified Realtime Reporter, and Notary

17   Public in and for the States of New York and New

18   Jersey.

19

20

21

22

23

24

25

Exhibit B
00136

Transcript of Linda Sunderland
Conducted on February 27, 2024                              3

```
1              A P P E A R A N C E S

2

3   ON BEHALF OF PLAINTIFFS LINDA SUNDERLAND AND

4   BENJAMIN BINDER, INDIVIDUALLY AND ON BEHALF

5   OF ALL OTHERS SIMILARLY SITUATED:

6        RUSSELL BUSCH, ESQ.

7        MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC

8        227 West Monroe Street

9        Suite 2100

10       Chicago, Illinois  60606

11       865.247.0080

12

13  ON BEHALF OF DEFENDANT PHARMACARE U.S., INC.:

14       JOSEPH J. ORZANO, ESQ.

15       SEYFARTH SHAW LLP

16       World Trade Center East

17       Two Seaport Lane

18       Suite 1200

19       Boston, Massachusetts  02210

20       617.946.4800

21

22  ALSO PRESENT:

23       HAROLD RODRIGUEZ, Planet Depos Videographer

24

25
```

Exhibit B
00137

Transcript of Linda Sunderland
Conducted on February 27, 2024                    4

1                    C O N T E N T S

2    EXAMINATION OF LINDA SUNDERLAND              PAGE

3      By Mr. Orzano                               6

4      By Mr. Busch                              111

5      By Mr. Orzano                             115

6      By Mr. Busch                              118

7

8

9

10

11                    E X H I B I T S

12            (Attached to transcript.)

13   DEPOSITION EXHIBITS                          PAGE

14    Exhibit 7   Plaintiff Linda Sunderland's     26

15                Responses and Objections to

16                Defendant Pharmacare U.S., Inc.'s

17                Interrogatories to Linda

18                Sunderland, Set One.

19    Exhibit 8   Pictures of box of Sambucol Black   37

20                Elderberry lozenges, Airborne

21                Elderberry gummies, and Emergen-C

22                Elderberry gummies,

23                SUNDERLAND_000001 - 3.

24

25

Exhibit B
00138

Transcript of Linda Sunderland
Conducted on February 27, 2024                    5

```
 1              P R O C E E D I N G S

 2

 3         THE VIDEOGRAPHER:  Here begins Media      10:04:32

 4   Number 1 in the videotaped deposition of Linda  10:05:26

 5   Sunderland in the matter of Sunderland, et al., versus  10:05:28

 6   Pharmacare U.S., Inc., et al., in the United States  10:05:31

 7   District Court, Southern District of California, Case  10:05:34

 8   Number 3:23-cv-01318-JES-AHG.               10:05:37

 9         Today's date is February 27, 2024.  The time  10:05:47

10   on the video monitor is 10:05 a.m.          10:05:50

11         The videographer today is Harold Rodriguez  10:05:55

12   representing Planet Depos.                  10:05:57

13         This video deposition is taking place at 620  10:05:58

14   Eighth Avenue, 32nd floor, New York, New York 10018.  10:06:03

15         Would counsel please voice-identify     10:06:06

16   themselves and state whom they represent.   10:06:08

17         MR. ORZANO:  Joe Orzano for defendant    10:06:10

18   Pharmacare U.S., Inc.                       10:06:12

19         MR. BUSCH:  Russell Busch for plaintiffs and  10:06:14

20   the proposed class.                         10:06:17

21         THE VIDEOGRAPHER:  The court reporter today  10:06:18

22   is Monique Vouthouris representing Planet Depos.  10:06:19

23         Will the witness now be sworn in, please.  10:06:22

24              LINDA SUNDERLAND,                   10:06:39

25   being first duly sworn or affirmed by the Notary,  10:06:39
```

Exhibit B
00139

Transcript of Linda Sunderland
Conducted on February 27, 2024                          6

| | | |
|---|---|---|
| 1 | <u>testifies as follows:</u> | 10:06:49 |
| 2 | EXAMINATION | 10:06:49 |
| 3 | BY MR. ORZANO: | 10:06:50 |
| 4 | Q    Good morning, Ms. Sunderland. | 10:06:50 |
| 5 | A    Good morning. | 10:06:52 |
| 6 | Q    As I indicated earlier, my name is Joe | 10:06:53 |
| 7 | Orzano.  I represent Pharmacare U.S. Inc. | 10:06:57 |
| 8 | Have you ever been deposed before? | 10:07:00 |
| 9 | A    No, I haven't. | 10:07:02 |
| 10 | Q    Then I'll just briefly go over some ground | 10:07:03 |
| 11 | rules for the deposition. | 10:07:07 |
| 12 | You understand you're under oath today? | 10:07:08 |
| 13 | A    Yes, I am. | 10:07:10 |
| 14 | Q    And we need a verbal answer.  When I ask a | 10:07:11 |
| 15 | question, I just ask that you provide a verbal answer | 10:07:15 |
| 16 | so that the court reporter can get an accurate record | 10:07:19 |
| 17 | of your testimony.  So nodding of the head, shaking of | 10:07:21 |
| 18 | the head is not going to give us a good record. | 10:07:25 |
| 19 | Understood? | 10:07:28 |
| 20 | A    Mm-hmm. | 10:07:29 |
| 21 | Q    If you don't understand a question that I | 10:07:30 |
| 22 | ask you, I just request that you let me know and I'll | 10:07:32 |
| 23 | try to rephrase it so that you do understand it.  But | 10:07:35 |
| 24 | if you don't ask me -- if you don't tell me that you | 10:07:39 |
| 25 | don't understand the question, I'll assume that you do | 10:07:43 |

Exhibit B
00140

Transcript of Linda Sunderland
Conducted on February 27, 2024                    7

| | | |
|---|---|---|
| 1 | understand it.  Fair? | 10:07:46 |
| 2 | A    Okay. | 10:07:47 |
| 3 | Q    If you need a break, just let us know.  I | 10:07:49 |
| 4 | just ask that you answer any pending question before | 10:07:53 |
| 5 | we do go on a break. | 10:07:56 |
| 6 | A    Okay. | 10:07:59 |
| 7 | Q    Are you on any medication today that would | 10:07:59 |
| 8 | impair your ability to give truthful testimony? | 10:08:02 |
| 9 | A    No. | 10:08:05 |
| 10 | Q    Any other reason that you can think of that | 10:08:05 |
| 11 | the deposition should not go forward today? | 10:08:08 |
| 12 | A    No. | 10:08:11 |
| 13 | Q    Did you do anything to prepare for today's | 10:08:11 |
| 14 | deposition? | 10:08:13 |
| 15 | A    No, not really.  I just reviewed the -- the | 10:08:14 |
| 16 | paperwork in my phone that I received from the lawyer. | 10:08:22 |
| 17 | Q    Okay.  What paperwork did you review? | 10:08:26 |
| 18 | A    This was the actual case that I, you know, | 10:08:28 |
| 19 | agreed to be, you know, be part of. | 10:08:32 |
| 20 | Q    Okay.  Could you be any more specific, what | 10:08:35 |
| 21 | particular documents you reviewed? | 10:08:38 |
| 22 | A    It's the document that states, you know, who | 10:08:40 |
| 23 | the plaintiff is and who the defendant is. | 10:08:47 |
| 24 | Q    The complaint, are you familiar with that | 10:08:52 |
| 25 | term? | 10:08:54 |

Exhibit B
00141

Transcript of Linda Sunderland
Conducted on February 27, 2024                8

| | | | |
|---|---|---|---|
| 1 | A | I believe, yes, the complaint. | 10:08:55 |
| 2 | Q | Did you review the complaint in its | 10:08:57 |
| 3 | entirety? | | 10:08:59 |
| 4 | A | Yes, I did. | 10:09:00 |
| 5 | Q | And had you seen the complaint before? | 10:09:01 |
| 6 | A | Yes. | 10:09:03 |
| 7 | Q | Okay.  When did you see the complaint? | 10:09:03 |
| 8 | A | Approximately -- I don't know approximately | 10:09:07 |
| 9 | how long.  Maybe a month ago it was sent to me via my | | 10:09:09 |
| 10 | email. | | 10:09:14 |
| 11 | Q | And that was the first time you saw the | 10:09:19 |
| 12 | complaint? | | 10:09:21 |
| 13 | A | Yes. | 10:09:21 |
| 14 | | MR. BUSCH:  Objection to form. | 10:09:22 |
| 15 | Q | And that -- the complaint was emailed to you | 10:09:28 |
| 16 | by your counsel you said? | | 10:09:32 |
| 17 | A | By the paralegal. | 10:09:34 |
| 18 | Q | Okay.  Who was that? | 10:09:37 |
| 19 | A | Tiffany Kuiper. | 10:09:38 |
| 20 | Q | And what email address do you -- did you use | 10:09:49 |
| 21 | to communicate with counsel? | | 10:09:53 |
| 22 | A | All caps, INSEAM20002@yahoo.com, three | 10:09:55 |
| 23 | zeroes. | | 10:10:08 |
| 24 | Q | So you reviewed the complaint.  Did you | 10:10:12 |
| 25 | review any other documents to prepare for today's | | 10:10:15 |

Exhibit B
00142

Transcript of Linda Sunderland
Conducted on February 27, 2024                    9

| | | |
|---|---|---|
| 1 | deposition? | 10:10:17 |
| 2 | A    No, I -- no, I didn't. | 10:10:18 |
| 3 | Q    Did you meet with counsel to prepare for | 10:10:20 |
| 4 | today's deposition? | 10:10:24 |
| 5 | A    No, I didn't. | 10:10:25 |
| 6 | Q    Talk to counsel to prepare for today's | 10:10:26 |
| 7 | deposition? | 10:10:28 |
| 8 | A    No. | 10:10:29 |
| 9 | Q    So no one asked you to review the complaint | 10:10:29 |
| 10 | to prepare for today's deposition? | 10:10:37 |
| 11 | MR. BUSCH:  Objection to form. | 10:10:39 |
| 12 | Q    You can answer. | 10:10:43 |
| 13 | A    No one asked me.  I just did it because I | 10:10:44 |
| 14 | wanted to -- wanted it fresh in my mind. | 10:10:47 |
| 15 | Q    You didn't do any other -- did you do any | 10:10:50 |
| 16 | other outside research to prepare for today's | 10:10:53 |
| 17 | deposition? | 10:10:55 |
| 18 | A    No. | 10:10:55 |
| 19 | Q    Look up anything on the internet? | 10:10:55 |
| 20 | A    No. | 10:10:57 |
| 21 | Q    Did you talk to anyone about today's | 10:10:57 |
| 22 | deposition? | 10:10:59 |
| 23 | A    No, I didn't. | 10:11:00 |
| 24 | Q    And, I'm sorry, I asked you before when you | 10:11:01 |
| 25 | first received the complaint.  I think you said it was | 10:11:20 |

Exhibit B
00143

Transcript of Linda Sunderland
Conducted on February 27, 2024                    10

| 1  | a month ago, correct? | 10:11:22 |
| 2  |        MR. BUSCH:  Objection to form. | 10:11:23 |
| 3  |   A   Approximately. | 10:11:25 |
| 4  |   Q   So you think your best estimate would be end | 10:11:27 |
| 5  | of January 2024? | 10:11:29 |
| 6  |        MR. BUSCH:  Objection.  Misstates prior | 10:11:31 |
| 7  | testimony.  Assumes facts not in the record. | 10:11:33 |
| 8  |   A   Approximately. | 10:11:37 |
| 9  |   Q   Could you just state your present | 10:11:39 |
| 10 | residential address again? | 10:11:49 |
| 11 |   A   My residential address is 321 Willoughby | 10:11:50 |
| 12 | Avenue, W-i-l-l-o-u-g-h-b-y, Avenue, Brooklyn, New | 10:11:55 |
| 13 | York 11205.  That's in Clinton Hill, it's a | 10:12:02 |
| 14 | brownstone. | 10:12:07 |
| 15 |   Q   Sounds nice. | 10:12:09 |
| 16 |   A   It is. | 10:12:10 |
| 17 |   Q   How long have you lived there? | 10:12:10 |
| 18 |   A   About 24 years. | 10:12:11 |
| 19 |   Q   Do you own any other real estate that you | 10:12:17 |
| 20 | reside in? | 10:12:21 |
| 21 |   A   I don't own that real estate; I rent. | 10:12:22 |
| 22 |   Q   Do you own any other -- do you own any real | 10:12:27 |
| 23 | estate? | 10:12:31 |
| 24 |   A   No. | 10:12:31 |
| 25 |   Q   Do you rent any other real estate? | 10:12:31 |

Exhibit B
00144

Transcript of Linda Sunderland
Conducted on February 27, 2024                    26

| | | |
|---|---|---|
| 1 | Q    In the Key Food case, do you know whether | 10:34:07 |
| 2 | that was filed in New York federal court or state | 10:34:11 |
| 3 | court? | 10:34:13 |
| 4 | A    I don't know.  I'm not even sure.  It was at | 10:34:14 |
| 5 | a New York Key Food, but I think their insurance was | 10:34:18 |
| 6 | outside of New York. | 10:34:26 |
| 7 | MR. ORZANO:  I'm going to mark this as | 10:34:50 |
| 8 | Exhibit 7. | 10:34:52 |
| 9 | (Defendant Exhibit 7 marked for | 10:35:09 |
| 10 | identification.) | 10:35:20 |
| 11 | Q    So just -- the court reporter handed you | 10:35:20 |
| 12 | what I've marked Exhibit 7.  Have you seen this | 10:35:26 |
| 13 | document before? | 10:35:29 |
| 14 | A    Yes, on my phone. | 10:35:29 |
| 15 | Q    And what is it? | 10:35:33 |
| 16 | MR. BUSCH:  Objection to form. | 10:35:34 |
| 17 | A    It's the complaint and -- and the actual | 10:35:38 |
| 18 | statement of who the plaintiff and the defendant are | 10:35:43 |
| 19 | and the total complaints and history of the -- of the | 10:35:47 |
| 20 | case. | 10:35:55 |
| 21 | Q    You said you saw it on your phone? | 10:35:56 |
| 22 | A    Mm-hmm. | 10:36:00 |
| 23 | Q    When did you see it on your phone? | 10:36:01 |
| 24 | A    I would say in approximately a month, two | 10:36:03 |
| 25 | weeks to a month ago.  I don't recall the date. | 10:36:08 |

Exhibit B
00145

Transcript of Linda Sunderland
Conducted on February 27, 2024                    27

| 1 | Q    And that was the first time you saw this | 10:36:13 |
| 2 | document? | 10:36:15 |
| 3 | MR. BUSCH:  Objection to form. | 10:36:15 |
| 4 | THE WITNESS:  I answer this?  Yes? | 10:36:18 |
| 5 | MR. BUSCH:  You can answer. | 10:36:21 |
| 6 | A    Yes. | 10:36:22 |
| 7 | Q    And you said you saw it on your phone.  Did | 10:36:29 |
| 8 | someone email it to you? | 10:36:35 |
| 9 | A    Yes, Tiffany Kuiper, the paralegal from | 10:36:36 |
| 10 | Milberg. | 10:36:41 |
| 11 | Q    Did you make any changes to it after you | 10:36:43 |
| 12 | received it? | 10:36:49 |
| 13 | MR. BUSCH:  Objection to form. | 10:36:49 |
| 14 | To the extent you can answer without any | 10:36:55 |
| 15 | details of discussions that you may have had with me | 10:36:58 |
| 16 | or anyone else in the office, you can answer. | 10:37:01 |
| 17 | A    I just added a date that it was an extension | 10:37:03 |
| 18 | of -- it was an extension of a time frame that I had | 10:37:09 |
| 19 | used the drug, I had used the vitamin supplement. | 10:37:14 |
| 20 | Q    Did you make that change in the document? | 10:37:18 |
| 21 | MR. BUSCH:  Objection to form. | 10:37:20 |
| 22 | You don't need the details about the process | 10:37:22 |
| 23 | where we drafted this document.  I think you | 10:37:25 |
| 24 | understand that that's not -- you're not entitled to | 10:37:27 |
| 25 | that. | 10:37:31 |

Exhibit B
00146

Transcript of Linda Sunderland
Conducted on February 27, 2024                    28

| 1 | MR. ORZANO: I don't understand. Is that an | 10:37:31 |
|---|---|---|
| 2 | objection? What's the basis of the objection? | 10:37:33 |
| 3 | Relevance? | 10:37:35 |
| 4 | MR. BUSCH: You're asking about attorney | 10:37:36 |
| 5 | work product and the process by which the -- the | 10:37:37 |
| 6 | client and the attorneys drafted this document. | 10:37:41 |
| 7 | MR. ORZANO: Are you -- are you instructing | 10:37:45 |
| 8 | her not to answer? | 10:37:48 |
| 9 | MR. BUSCH: Yes. | 10:37:49 |
| 10 | BY MR. ORZANO: | 10:37:50 |
| 11 | Q Let me take a step back. | 10:37:51 |
| 12 | What did you do when you received the | 10:37:53 |
| 13 | document? | 10:37:54 |
| 14 | A I just read it. | 10:37:54 |
| 15 | MR. BUSCH: Objection to form. | 10:37:55 |
| 16 | A I read it, that's all. I read it and I | 10:37:56 |
| 17 | emailed her and asked her to change a date because | 10:38:00 |
| 18 | there was -- it was -- I had used the Sambucol longer | 10:38:05 |
| 19 | than she had written in the document. She made the | 10:38:11 |
| 20 | change. | 10:38:16 |
| 21 | Q And no other changes other than that? | 10:38:18 |
| 22 | A No. | 10:38:22 |
| 23 | Q And if you turn to the last page of Exhibit | 10:38:22 |
| 24 | 7, it's entitled "Plaintiff Linda Sunderland's | 10:38:41 |
| 25 | Verification of Responses and Objections to Defendant | 10:38:49 |

Exhibit B
00147

Transcript of Linda Sunderland
Conducted on February 27, 2024                    29

| | | |
|---|---|---|
| 1 | Pharmacare U.S., Inc.'s Interrogatories to Linda | 10:38:52 |
| 2 | Sunderland, Set One." | 10:38:56 |
| 3 |      Do you see that? | 10:38:57 |
| 4 | A   Yes. | 10:38:58 |
| 5 | Q   And that's your signature verifying under | 10:38:58 |
| 6 | penalty of perjury that the responses are true and | 10:39:01 |
| 7 | correct? | 10:39:04 |
| 8 | A   Yes. | 10:39:05 |
| 9 | Q   And you signed it on January 5th, 2024? | 10:39:05 |
| 10 | A   I guess.  I don't know -- I don't remember | 10:39:14 |
| 11 | the actual date. | 10:39:18 |
| 12 | Q   Any reason to believe that's not accurate? | 10:39:20 |
| 13 | A   No. | 10:39:39 |
| 14 | Q   So if you can turn to page 2 of Exhibit 7. | 10:39:39 |
| 15 | A   Okay. | 10:39:44 |
| 16 | Q   At the bottom it says Interrogatory Number | 10:39:44 |
| 17 | 1. | 10:39:46 |
| 18 | A   Mm-hmm. | 10:39:47 |
| 19 | Q   And the question asks you to "Describe the | 10:39:53 |
| 20 | circumstances surrounding your purchase and use of the | 10:39:57 |
| 21 | products, including the date of each purchase, the | 10:40:00 |
| 22 | retail price paid, the method of payment, the specific | 10:40:03 |
| 23 | products purchased, the store name and location from | 10:40:07 |
| 24 | which you purchased the products, and frequency of | 10:40:10 |
| 25 | use." | 10:40:13 |

Exhibit B
00148

Transcript of Linda Sunderland
Conducted on February 27, 2024                    30

| | | | |
|---|---|---|---|
| 1 | | Do you see that? | 10:40:13 |
| 2 | A | Yes. | 10:40:14 |
| 3 | Q | And in response you identified the purchase | 10:40:14 |
| 4 | of two different types of products, the Sambucol Black | | 10:40:19 |
| 5 | Elderberry chewables and the Sambucol Black Elderberry | | 10:40:24 |
| 6 | lozenges, right? | | 10:40:29 |
| 7 | A | Yes. | 10:40:31 |
| 8 | Q | Is it true that the only Sambucol purchases | 10:40:31 |
| 9 | you made were the Sambucol chewables and the Sambucol | | 10:40:34 |
| 10 | lozenges? | | 10:40:40 |
| 11 | A | I would say possibly I bought also the | 10:40:41 |
| 12 | supplements. | | 10:40:44 |
| 13 | Q | Okay.  And what do you -- how are the | 10:40:45 |
| 14 | supplements different from the chewables and lozenges? | | 10:40:50 |
| 15 | A | They're an actual capsule that you swallow. | 10:40:54 |
| 16 | Q | But your interrogatory response doesn't | 10:41:00 |
| 17 | identify the capsules, correct? | | 10:41:07 |
| 18 | A | I don't see it. | 10:41:09 |
| 19 | Q | And you swore under penalty of perjury that | 10:41:13 |
| 20 | this response was true and correct? | | 10:41:18 |
| 21 | A | Yes. | 10:41:19 |
| 22 | | MR. BUSCH:  Objection to form. | 10:41:19 |
| 23 | Q | Is there a reason you didn't include the | 10:41:20 |
| 24 | capsules in this response? | | 10:41:23 |
| 25 | | MR. BUSCH:  Objection to form. | 10:41:25 |

Exhibit B
00149

Transcript of Linda Sunderland
Conducted on February 27, 2024                    31

| | | |
|---|---|---|
| 1 | A    I don't remember it until I saw it -- I see | 10:41:27 |
| 2 | it -- I saw it right now that there were supplements | 10:41:30 |
| 3 | as well that I used. | 10:41:33 |
| 4 | Q    What do you understand to be a supplement? | 10:41:36 |
| 5 | A    A vitamin supplement that was designed for | 10:41:40 |
| 6 | immunity purposes.  And I recall taking two, which was | 10:41:44 |
| 7 | the dose, on a daily basis. | 10:41:52 |
| 8 | Q    And are you talking -- when you say you were | 10:41:56 |
| 9 | taking two on a daily basis, are you talking about the | 10:41:59 |
| 10 | chewable -- chewables, the lozenges, or the capsules? | 10:42:03 |
| 11 | A    All three.  I mean, on -- different -- when | 10:42:07 |
| 12 | I bought the chewables, I took two, and when I bought | 10:42:12 |
| 13 | the elderberry lozenges, I took two.  And when I | 10:42:16 |
| 14 | bought the supplement, I took two.  But not all at the | 10:42:21 |
| 15 | same time.  There were different times I bought. | 10:42:24 |
| 16 | Q    So is it your understanding that the | 10:42:26 |
| 17 | chewables and the lozenges are not supplements? | 10:42:28 |
| 18 | MR. BUSCH:  Objection to form. | 10:42:31 |
| 19 | A    No, I believe they're all supplements. | 10:42:32 |
| 20 | Q    Okay.  So you never purchased any Sambucol | 10:42:35 |
| 21 | syrup products? | 10:42:48 |
| 22 | A    No. | 10:42:49 |
| 23 | Q    You never purchased any Sambucol | 10:42:50 |
| 24 | effervescent tablets? | 10:42:52 |
| 25 | A    No. | 10:42:56 |

Exhibit B
00150

Transcript of Linda Sunderland
Conducted on February 27, 2024                                    32

| | | |
|---|---|---|
| 1 | Q    Did you ever purchase any Sambucol | 10:42:56 |
| 2 | pastilles? | 10:43:01 |
| 3 | A    No. | 10:43:02 |
| 4 | Q    Did you ever purchase any Sambucol immune | 10:43:02 |
| 5 | drink powder? | 10:43:05 |
| 6 | A    No. | 10:43:07 |
| 7 | Q    Did you ever purchase any Sambucol gummies? | 10:43:07 |
| 8 | A    No. | 10:43:12 |
| 9 | Q    And on page 3 of Exhibit 7, the same | 10:43:18 |
| 10 | response to Interrogatory Number 1, you stated that | 10:43:22 |
| 11 | you purchased the Sambucol Black Elderberry chewables | 10:43:28 |
| 12 | and the Elderberry lozenges beginning in 2020 through | 10:43:35 |
| 13 | 2022; is that correct? | 10:43:42 |
| 14 | A    Yes.  Yes. | 10:43:43 |
| 15 | Q    So your only Sambucol purchases were during | 10:43:44 |
| 16 | that time period from 2020 through 2022? | 10:43:47 |
| 17 | MR. BUSCH:  Objection to form. | 10:43:51 |
| 18 | A    Yes.  Yes. | 10:43:52 |
| 19 | Q    When in 2020 did you first purchase | 10:43:55 |
| 20 | Sambucol? | 10:43:59 |
| 21 | A    The exact month? | 10:43:59 |
| 22 | Q    Your best estimate. | 10:44:01 |
| 23 | A    I would say roughly January, every month, | 10:44:03 |
| 24 | once a month from January 2020. | 10:44:08 |
| 25 | Q    And when in 2022 did you stop purchasing | 10:44:19 |

Exhibit B
00151

Transcript of Linda Sunderland
Conducted on February 27, 2024                    33

| | | | |
|---|---|---|---|
| 1 | | Sambucol?  December? | 10:44:23 |
| 2 | | MR. BUSCH:  Objection to form. | 10:44:25 |
| 3 | A | I can't remember. | 10:44:26 |
| 4 | Q | But it was definitely in 2022? | 10:44:32 |
| 5 | A | Yes. | 10:44:37 |
| 6 | Q | And it says "through 2022."  So can you give | 10:44:40 |
| 7 | | me an estimate as to what month at the end of '22 you | 10:44:45 |
| 8 | | used Sambucol -- | 10:44:50 |
| 9 | | MR. BUSCH:  Objection.  Asked and answered. | 10:44:50 |
| 10 | | I also have to correct an instruction that | 10:44:51 |
| 11 | | you improperly gave her earlier.  He said he was | 10:44:54 |
| 12 | | entitled to your best guess.  To the extent you can | 10:44:55 |
| 13 | | give a guess that you feel is accurate, you can give a | 10:44:57 |
| 14 | | best guess.  But if you don't feel comfortable giving | 10:45:00 |
| 15 | | any estimate at all because your memory isn't good | 10:45:03 |
| 16 | | enough, you don't have to give an estimate. | 10:45:07 |
| 17 | | BY MR. ORZANO: | 10:45:07 |
| 18 | Q | Just to correct the record, I never said | 10:45:08 |
| 19 | | that you have to give me your best -- | 10:45:11 |
| 20 | | MR. BUSCH:  We can read it back, Joe -- | 10:45:11 |
| 21 | Q | -- I draw a distinction between a guess and | 10:45:13 |
| 22 | | an estimate, and -- | 10:45:16 |
| 23 | A | I can't remember. | 10:45:17 |
| 24 | Q | Do you understand the difference between a | 10:45:17 |
| 25 | | guess and an estimate? | 10:45:19 |

Exhibit B
00152

Transcript of Linda Sunderland
Conducted on February 27, 2024                    34

| | | |
|---|---|---|
| 1 | A    Yeah.  But I can't remember the exact month. | 10:45:21 |
| 2 | I can't even estimate it offhand. | 10:45:25 |
| 3 | Q    Let me just back up because I don't want | 10:45:27 |
| 4 | there to be any confusion. | 10:45:30 |
| 5 | So I'm entitled to your best estimate, so an | 10:45:32 |
| 6 | estimate -- and I don't want you to guess.  So the | 10:45:34 |
| 7 | distinction between a guess and an estimate is that a | 10:45:36 |
| 8 | guess is if you have no basis for knowing something. | 10:45:40 |
| 9 | So if I ask you what's the length of my | 10:45:43 |
| 10 | dinner table at my house, you would have to guess to | 10:45:47 |
| 11 | answer that because you have no basis to know, | 10:45:49 |
| 12 | correct? | 10:45:52 |
| 13 | A    Mm-hmm. | 10:45:53 |
| 14 | Q    But if I ask you what's your estimate of the | 10:45:54 |
| 15 | length of the table in this room, I'm entitled to your | 10:45:57 |
| 16 | best estimate because you have a basis to give it to | 10:46:00 |
| 17 | me. | 10:46:00 |
| 18 | Do you understand that distinction? | 10:46:04 |
| 19 | MR. BUSCH:  I'll repeat the instruction I | 10:46:06 |
| 20 | gave you before.  To the extent you can feel | 10:46:08 |
| 21 | comfortable giving something that you feel is accurate | 10:46:12 |
| 22 | and an estimate, give your best estimate.  But to the | 10:46:13 |
| 23 | extent you don't feel like you can accurately give an | 10:46:16 |
| 24 | estimate, you don't have to do that. | 10:46:19 |
| 25 | And I appreciate not over-coaching my | 10:46:20 |

Exhibit B
00153

Transcript of Linda Sunderland
Conducted on February 27, 2024                    35

| | | |
|---|---|---|
| 1 | witness on how she can answer questions. | 10:46:23 |
| 2 | MR. ORZANO:  I would appreciate if you | 10:46:26 |
| 3 | let the witness answer.  I never got an answer to my | 10:46:29 |
| 4 | last question -- | 10:46:29 |
| 5 | THE WITNESS:  We say -- | 10:46:29 |
| 6 | (Simultaneous speaking.) | 10:46:29 |
| 7 | (Court Reporter clarification.) | 10:46:29 |
| 8 | Q    Yeah, we're all talking over -- another | 10:46:32 |
| 9 | ground rule I should have mentioned upfront:  Let's | 10:46:32 |
| 10 | not talk over each other because then we don't get a | 10:46:35 |
| 11 | good record and we make life difficult for the court | 10:46:39 |
| 12 | reporter and we don't want to do that. | 10:46:41 |
| 13 | So I had asked you if you understood the | 10:46:43 |
| 14 | distinction I was drawing between a guess and an | 10:46:45 |
| 15 | estimate.  And I think you nodded your head, but do | 10:46:48 |
| 16 | you understand that distinction? | 10:46:51 |
| 17 | A    Yes.  I would estimate December '22. | 10:46:52 |
| 18 | Q    How many times did you purchase the chewable | 10:47:07 |
| 19 | tablets? | 10:47:14 |
| 20 | A    Approximately once a month between 2020 and | 10:47:15 |
| 21 | 2022. | 10:47:25 |
| 22 | Q    And how many chewable tablets were in each | 10:47:32 |
| 23 | bottle you purchased? | 10:47:38 |
| 24 | A    I don't remember, but I would estimate 60. | 10:47:40 |
| 25 | Q    So each time you purchased the chewable | 10:47:48 |

Exhibit B
00154

Transcript of Linda Sunderland
Conducted on February 27, 2024                    36

| | | |
|---|---|---|
| 1 | tablets, your best recollection is that you purchased | 10:47:55 |
| 2 | them in the 60-count size? | 10:47:58 |
| 3 | A    Yes. | 10:48:01 |
| 4 | Q    Did you take the product as directed by the | 10:48:01 |
| 5 | directions for use? | 10:48:08 |
| 6 | A    Yes. | 10:48:10 |
| 7 | Q    So two tablets a day for the chewable | 10:48:11 |
| 8 | tablets? | 10:48:14 |
| 9 | MR. BUSCH:  Objection to form. | 10:48:15 |
| 10 | Q    And if you could -- sometimes you're just | 10:48:18 |
| 11 | nodding -- | 10:48:21 |
| 12 | A    Yes. | 10:48:22 |
| 13 | Q    -- so I'm having trouble getting an audible | 10:48:22 |
| 14 | response. | 10:48:25 |
| 15 | A    Yes. | 10:48:26 |
| 16 | Q    Okay.  So you did take the product as -- you | 10:48:26 |
| 17 | took the chewable tablets as directed by the | 10:48:28 |
| 18 | directions for use? | 10:48:31 |
| 19 | A    Yes. | 10:48:32 |
| 20 | Q    How many times did you purchase the | 10:48:35 |
| 21 | lozenges? | 10:48:38 |
| 22 | A    I don't remember exactly, but I would | 10:48:40 |
| 23 | estimate at least 12 times. | 10:48:46 |
| 24 | Q    Was your first purchase of a Sambucol | 10:48:57 |
| 25 | product the lozenges? | 10:49:01 |

Exhibit B
00155

Transcript of Linda Sunderland
Conducted on February 27, 2024                    37

| | | |
|---|---|---|
| 1 | A    Yes. | 10:49:02 |
| 2 | Q    And what size package of the lozenges did | 10:49:10 |
| 3 | you purchase? | 10:49:16 |
| 4 | A    I estimate it was 60 bottle -- 60-tablet | 10:49:16 |
| 5 | bottle. | 10:49:21 |
| 6 | Q    And did you purchase the same size every | 10:49:22 |
| 7 | time you purchased the lozenges? | 10:49:26 |
| 8 | A    Yes, I did. | 10:49:28 |
| 9 | Q    Then you also mentioned that you purchased | 10:49:29 |
| 10 | the capsules.  How many times did you purchase the | 10:49:33 |
| 11 | capsules? | 10:49:39 |
| 12 | A    I purchased the capsules I would estimate at | 10:49:40 |
| 13 | least eight to nine times. | 10:49:45 |
| 14 | Q    And is there a reason you purchased the | 10:50:04 |
| 15 | Sambucol products in those three different forms? | 10:50:07 |
| 16 | MR. BUSCH:  Objection to form. | 10:50:10 |
| 17 | A    They weren't always available when I went to | 10:50:10 |
| 18 | Walgreens.  I didn't go to other drug stores. | 10:50:16 |
| 19 | Q    So you would purchase the Sambucol product | 10:50:21 |
| 20 | that was available? | 10:50:24 |
| 21 | A    Exactly. | 10:50:25 |
| 22 | MR. ORZANO:  Mark this as Exhibit 8, which | 10:50:49 |
| 23 | is a document Bates stamped SUNDERLAND 1 to SUNDERLAND | 10:50:54 |
| 24 | 3. | 10:50:59 |
| 25 | (Defendant's Exhibit 8 marked for | 10:51:00 |

Exhibit B
00156

Transcript of Linda Sunderland
Conducted on February 27, 2024                              38

| | | |
|---|---|---|
| 1 | identification.) | 10:51:25 |
| 2 | Q    And the first page of Exhibit 8, do you | 10:51:25 |
| 3 | recognize this as a document produced by you in this | 10:51:28 |
| 4 | case? | 10:51:31 |
| 5 | A    Yes. | 10:51:31 |
| 6 | Q    And we'll discuss these more later, but I | 10:51:31 |
| 7 | just want to ask you now the image on the first page | 10:51:36 |
| 8 | of Exhibit 8, SUNDERLAND -- document Bates-stamped | 10:51:39 |
| 9 | SUNDERLAND 1, indicates that the lozenges contain 20 | 10:51:43 |
| 10 | lozenges. | 10:51:47 |
| 11 |          Is that the size package of the lozenges you | 10:51:48 |
| 12 | always purchased? | 10:51:53 |
| 13 |          MR. BUSCH:  Objection.  The document speaks | 10:51:54 |
| 14 | for itself. | 10:51:56 |
| 15 | A    I guess so.  I don't remember.  I remember | 10:51:56 |
| 16 | something like 60 for some reason.  But I may be | 10:52:02 |
| 17 | mixing it up with the capsules. | 10:52:08 |
| 18 | Q    So your best estimate was that you last | 10:52:20 |
| 19 | purchased the Sambucol product in December 2022. | 10:52:23 |
| 20 |          Do you remember which Sambucol product it | 10:52:26 |
| 21 | was? | 10:52:29 |
| 22 | A    I don't. | 10:52:29 |
| 23 | Q    Back to Exhibit 7, the response to | 10:52:39 |
| 24 | Interrogatory Number 1, you also identified several | 10:52:41 |
| 25 | places where you purchased Sambucol products, and you | 10:52:50 |

Exhibit B
00157

Transcript of Linda Sunderland
Conducted on February 27, 2024                    39

| | | |
|---|---|---|
| 1 | identify three different Walgreens locations and a | 10:52:54 |
| 2 | Myrtle Pharmacy in Brooklyn, New York? | 10:52:58 |
| 3 | A    Yes. | 10:53:03 |
| 4 | Q    Is it true that your only purchases of | 10:53:03 |
| 5 | Sambucol were at those locations? | 10:53:07 |
| 6 | A    Yes. | 10:53:09 |
| 7 | Q    And where are those three Walgreens located? | 10:53:10 |
| 8 | A    One is on Myrtle in Clinton Hill.  I don't | 10:53:16 |
| 9 | know the -- I think Myrtle and Washington.  One is on | 10:53:22 |
| 10 | Court Street in Brooklyn -- in Brooklyn Heights, and | 10:53:26 |
| 11 | Atlantic.  And one is on Fulton Street in Brooklyn, | 10:53:35 |
| 12 | Fulton and Jay Street. | 10:53:41 |
| 13 | Q    And why did you select those locations to | 10:53:57 |
| 14 | purchase Sambucol products? | 10:53:59 |
| 15 | MR. BUSCH:  Objection to form. | 10:54:01 |
| 16 | A    That's where I always shop. | 10:54:02 |
| 17 | Q    So you would shop at those locations for | 10:54:04 |
| 18 | other things? | 10:54:07 |
| 19 | A    Yes. | 10:54:07 |
| 20 | Q    And were there different Sambucol products | 10:54:08 |
| 21 | at those different locations? | 10:54:14 |
| 22 | A    Yes. | 10:54:16 |
| 23 | Q    What products -- what Sambucol products were | 10:54:16 |
| 24 | available at the Walgreens number 10678? | 10:54:30 |
| 25 | A    Well, I don't recall specifically each store | 10:54:35 |

Exhibit B
00158

Transcript of Linda Sunderland
Conducted on February 27, 2024                    40

| | | |
|---|---|---|
| 1 | what they had.  But they did have different products. | 10:54:39 |
| 2 | Sometimes the same, sometimes different. | 10:54:42 |
| 3 | Q    And again, in the same response on page 3 of | 10:54:45 |
| 4 | Exhibit 7, below the locations we just discussed, it | 10:55:02 |
| 5 | says "Plaintiff purchased the product due to the | 10:55:07 |
| 6 | language on the packaging, specifically 'Virologist | 10:55:10 |
| 7 | Developed' on the label." | 10:55:15 |
| 8 | A    Yes. | 10:55:16 |
| 9 | Q    So it's true that the only reason you | 10:55:16 |
| 10 | purchased the Sambucol products was due to the | 10:55:18 |
| 11 | language on the packaging stating "Virologist | 10:55:21 |
| 12 | Developed"? | 10:55:25 |
| 13 | MR. BUSCH:  Objection to form.  Misstates | 10:55:25 |
| 14 | the document. | 10:55:28 |
| 15 | A    It wasn't the only reason, but it was a | 10:55:28 |
| 16 | major reason.  I purchased it because it had said | 10:55:30 |
| 17 | immune support, virologist tested -- developed, and it | 10:55:34 |
| 18 | was immune support.  Also Black Elderberry. | 10:55:43 |
| 19 | Q    So you purchased the Sambucol products | 10:56:01 |
| 20 | because of the language "virologist developed," | 10:56:05 |
| 21 | "immune support," and "Black Elderberry" -- | 10:56:08 |
| 22 | A    Yes. | 10:56:11 |
| 23 | Q    -- and nothing else, correct? | 10:56:11 |
| 24 | A    Correct.  Also, I had never heard of | 10:56:12 |
| 25 | Sambucol, so it was a new product for me. | 10:56:17 |

Exhibit B
00159

Transcript of Linda Sunderland
Conducted on February 27, 2024                              41

| | | |
|---|---|---|
| 1 | Q    When you say it was a new product for you, | 10:56:25 |
| 2 | what do you mean? | 10:56:28 |
| 3 | A    I had never taken an immune support | 10:56:29 |
| 4 | supplement before Sambucol. | 10:56:35 |
| 5 | Q    Now, in your response you specifically | 10:56:47 |
| 6 | called out "virologist developed."  Is that because -- | 10:56:57 |
| 7 | why was that? | 10:57:01 |
| 8 | MR. BUSCH:  Objection to form. | 10:57:03 |
| 9 | A    It impressed me when I looked at it, those | 10:57:04 |
| 10 | words in the -- Walgreens, that it was something I | 10:57:08 |
| 11 | should purchase, because the other immune products | 10:57:14 |
| 12 | didn't have that on the side of the bottle. | 10:57:21 |
| 13 | Q    Now, in response to Interrogatory Number | 10:57:34 |
| 14 | 1 -- well, let me go back. | 10:57:41 |
| 15 | So Interrogatory 1 also asked you to | 10:57:44 |
| 16 | identify the retail price paid for the products, and | 10:57:47 |
| 17 | you did not identify the retail price paid for the | 10:57:49 |
| 18 | products. | 10:57:52 |
| 19 | Is it true that you don't know how much you | 10:57:54 |
| 20 | paid for your Sambucol purchases? | 10:57:56 |
| 21 | A    I don't remember.  Simply that, you know, | 10:57:58 |
| 22 | it's just something that I would pay for.  But I can | 10:58:04 |
| 23 | tell you it was somewhere between 9 and -- estimate | 10:58:07 |
| 24 | somewhere between $9 and 17 or 18. | 10:58:13 |
| 25 | Q    Do you have records of your purchases of the | 10:58:33 |

Exhibit B
00160

Transcript of Linda Sunderland
Conducted on February 27, 2024                    42

| | | |
|---|---|---|
| 1 | Sambucol products? | 10:58:36 |
| 2 | A    No.  I went back to Walgreens, but they | 10:58:37 |
| 3 | don't list these records, this in my record of | 10:58:40 |
| 4 | prescription drugs or anything like that. | 10:58:46 |
| 5 | Q    So you didn't maintain your receipts from | 10:58:48 |
| 6 | those purchases? | 10:58:50 |
| 7 | A    No. | 10:58:51 |
| 8 | Q    Going back to Exhibit 8, the first page | 10:58:52 |
| 9 | Bates stamped SUNDERLAND 1, is that picture of a box | 10:59:03 |
| 10 | of Sambucol that you actually purchased? | 10:59:10 |
| 11 | A    Yes. | 10:59:16 |
| 12 | Q    And when did you make that purchase? | 10:59:18 |
| 13 | A    I don't remember.  They're somewhere between | 10:59:20 |
| 14 | 2020 and 2022. | 10:59:29 |
| 15 | Q    Did you take this picture? | 10:59:33 |
| 16 | A    Yes. | 10:59:34 |
| 17 | Q    Why did you take a picture of the box of | 10:59:35 |
| 18 | Sambucol? | 10:59:37 |
| 19 | MR. BUSCH:  Objection to form. | 10:59:37 |
| 20 | A    I think I was asked to send the paralegal a | 10:59:38 |
| 21 | photograph of -- of drug -- of immune support that I | 10:59:52 |
| 22 | used, as well as that I currently used.  In this case, | 10:59:57 |
| 23 | Airborne and the second -- and Emergen-C are the two | 11:00:01 |
| 24 | that I use -- I frequently use. | 11:00:07 |
| 25 | Q    Okay.  We'll get to those. | 11:00:10 |

Exhibit B
00161

Transcript of Linda Sunderland
Conducted on February 27, 2024                          43

| | | |
|---|---|---|
| 1 | So just focusing on the picture in | 11:00:12 |
| 2 | SUNDERLAND 1, so you said the paralegal, Tiffany | 11:00:15 |
| 3 | Kuiper -- | 11:00:20 |
| 4 | A    Mm-hmm. | 11:00:20 |
| 5 | Q    -- at the Milberg law firm? | 11:00:21 |
| 6 | A    At Milberg, yes. | 11:00:23 |
| 7 | Q    So she asked you to go purchase the | 11:00:24 |
| 8 | Sambucol? | 11:00:27 |
| 9 | A    No.  Just to send me a photograph or any | 11:00:28 |
| 10 | proof that I had purchased these immune. | 11:00:31 |
| 11 | Q    Okay.  And so what did you do next?  You | 11:00:35 |
| 12 | took a picture of this box? | 11:00:37 |
| 13 | A    Yes. | 11:00:39 |
| 14 | MR. BUSCH:  Objection to form. | 11:00:39 |
| 15 | A    Yes. | 11:00:40 |
| 16 | Q    And where is this picture taken? | 11:00:42 |
| 17 | A    I don't -- I don't remember. | 11:00:44 |
| 18 | Q    Did you have this box in your home? | 11:00:50 |
| 19 | A    Possibly. | 11:00:52 |
| 20 | Q    When did Tiffany Kuiper ask you to take a | 11:00:58 |
| 21 | picture of the Sambucol product? | 11:01:04 |
| 22 | MR. BUSCH:  Objection to form. | 11:01:06 |
| 23 | THE WITNESS:  Should I answer? | 11:01:09 |
| 24 | MR. BUSCH:  Yes. | 11:01:11 |
| 25 | A    Approximately two months ago. | 11:01:12 |

Exhibit B
00162

Transcript of Linda Sunderland
Conducted on February 27, 2024                    44

| | | |
|---|---|---|
| 1 | Q    So it's possible that two months ago you | 11:01:17 |
| 2 | still had a box of Sambucol in your home? | 11:01:19 |
| 3 | A    Yeah.  I stopped taking them because I | 11:01:23 |
| 4 | changed brands.  But I alternate between Airborne, | 11:01:28 |
| 5 | Emergen-C, and Sambucol.  I don't -- so I have all | 11:01:34 |
| 6 | three products in my house. | 11:01:38 |
| 7 | Q    Okay.  So you're still taking the Sambucol | 11:01:40 |
| 8 | supplements? | 11:01:45 |
| 9 | A    Occasionally -- | 11:01:45 |
| 10 | MR. BUSCH:  Objection to form. | 11:01:47 |
| 11 | A    Yes. | 11:01:47 |
| 12 | Q    And which Sambucol supplements are you still | 11:01:48 |
| 13 | taking? | 11:01:51 |
| 14 | A    Advanced Immune Support, this one here, the | 11:01:52 |
| 15 | dietary supplement. | 11:01:55 |
| 16 | Q    Okay.  This says "Lozenges."  Do you see on | 11:01:57 |
| 17 | the bottom right of the box it says "20 Lozenges"? | 11:02:02 |
| 18 | A    Yes. | 11:02:05 |
| 19 | Q    Okay.  So you still -- so when was the last | 11:02:05 |
| 20 | time you consumed a Sambucol lozenge? | 11:02:07 |
| 21 | MR. BUSCH:  Objection to form. | 11:02:10 |
| 22 | A    I don't remember, but I would say over five | 11:02:11 |
| 23 | months ago.  I alternate between that and the Airborne | 11:02:13 |
| 24 | and the Emergen-C.  So I don't know exactly the date. | 11:02:22 |
| 25 | Q    And do you have any other Sambucol products | 11:02:33 |

Exhibit B
00163

Transcript of Linda Sunderland
Conducted on February 27, 2024                    45

| | | |
|---|---|---|
| 1 | in your home other than the lozenges? | 11:02:36 |
| 2 | A    I did have a bottle of supplements that were | 11:02:39 |
| 3 | capsules, which I recently threw away. | 11:02:44 |
| 4 | Q    And when did you throw away the capsules? | 11:02:48 |
| 5 | A    Possibly a month ago. | 11:02:53 |
| 6 | Q    Why did you throw them away? | 11:02:54 |
| 7 | A    They were finished, I had finished using | 11:02:57 |
| 8 | them. | 11:02:59 |
| 9 | Q    So you finished them -- did you finish them | 11:03:00 |
| 10 | around the time you threw out the packaging? | 11:03:03 |
| 11 | A    Yes, definitely. | 11:03:06 |
| 12 | Q    So you finished the capsules about a month | 11:03:06 |
| 13 | ago? | 11:03:09 |
| 14 | A    Yes. | 11:03:09 |
| 15 | Q    And when did you -- do you have any Sambucol | 11:03:21 |
| 16 | chewable tablets at home? | 11:03:24 |
| 17 | A    Probably. | 11:03:27 |
| 18 | Q    When is the last time you consumed a | 11:03:30 |
| 19 | Sambucol chewable tablet? | 11:03:34 |
| 20 | A    Probably within the last three months. | 11:03:36 |
| 21 | Q    Please don't throw out any more Sambucol | 11:03:44 |
| 22 | packaging that you still possess. | 11:04:12 |
| 23 | So if I look at the image again on Exhibit | 11:04:28 |
| 24 | 8, Bates stamped SUNDERLAND 1, do you see the price -- | 11:04:30 |
| 25 | there's like a sticker with a price on it where it | 11:04:36 |

Exhibit B
00164

Transcript of Linda Sunderland
Conducted on February 27, 2024                    46

| 1 | says $8.89? | 11:04:40 |
| 2 | A    Yes. | 11:04:42 |
| 3 | Q    And above that, there's a yellow strip that | 11:04:43 |
| 4 | has - on the top it says "92-3847," but then below it, | 11:04:46 |
| 5 | it says "112723"? | 11:04:54 |
| 6 | A    Mm-hmm. | 11:04:57 |
| 7 | Q    Is it possible that that indicates a | 11:05:01 |
| 8 | purchase around the time of November 27th, 2023? | 11:05:07 |
| 9 | MR. BUSCH:  Objection to form. | 11:05:10 |
| 10 | A    I don't know. | 11:05:13 |
| 11 | Q    Do you have any reason to believe that you | 11:05:18 |
| 12 | did not make a purchase of the Sambucol lozenges in | 11:05:20 |
| 13 | November 2023? | 11:05:23 |
| 14 | MR. BUSCH:  Objection to form. | 11:05:24 |
| 15 | A    No.  No. | 11:05:26 |
| 16 | Q    And the image on SUNDERLAND 1, is that an | 11:05:47 |
| 17 | accurate representation of the front of the packages | 11:05:53 |
| 18 | of all of your purchases of the Sambucol lozenges? | 11:05:55 |
| 19 | MR. BUSCH:  Objection to form. | 11:05:59 |
| 20 | A    Yes.  Yes. | 11:06:00 |
| 21 | Q    And again, so this -- the sticker, the price | 11:06:01 |
| 22 | here is $8.89.  I think you gave me an estimate of the | 11:06:12 |
| 23 | range that you believe you paid for Sambucol products, | 11:06:17 |
| 24 | a range from 9 to $18? | 11:06:20 |
| 25 | A    Mm-hmm. | 11:06:22 |

Exhibit B
00165

Transcript of Linda Sunderland
Conducted on February 27, 2024                          47

| | | |
|---|---|---|
| 1 | Q    Does this refresh your recollection at all | 11:06:23 |
| 2 | as to the price you paid for products, that it might | 11:06:29 |
| 3 | have been below $9? | 11:06:31 |
| 4 | MR. BUSCH:  Objection to form. | 11:06:34 |
| 5 | A    No. | 11:06:43 |
| 6 | Q    When you made purchases of Sambucol | 11:06:43 |
| 7 | products, did you purchase any of them at a discount? | 11:06:46 |
| 8 | A    No. | 11:06:51 |
| 9 | Q    So this pricing sticker on SUNDERLAND 1 says | 11:06:51 |
| 10 | regular price 10.69 and then the price is 8.89. | 11:07:00 |
| 11 | And you purchased this product, correct? | 11:07:05 |
| 12 | MR. BUSCH:  Objection to form. | 11:07:07 |
| 13 | A    Yes. | 11:07:07 |
| 14 | Q    And it's your understanding -- does that | 11:07:08 |
| 15 | refresh your recollection as to whether you ever paid | 11:07:13 |
| 16 | -- purchased a Sambucol product at a discount? | 11:07:15 |
| 17 | MR. BUSCH:  Objection to form. | 11:07:19 |
| 18 | A    I wasn't aware that it was discounted | 11:07:19 |
| 19 | because it was that price.  You know, I didn't notice | 11:07:22 |
| 20 | anything that said that it wasn't -- never another | 11:07:24 |
| 21 | price and it was discounted.  It wasn't on sale.  It | 11:07:29 |
| 22 | wasn't on sale. | 11:07:32 |
| 23 | Q    Right.  But, again, this sticker indicates | 11:07:33 |
| 24 | there was a regular price and then the price is 8.89. | 11:07:37 |
| 25 | MR. BUSCH:  Objection.  The document speaks | 11:07:41 |

Exhibit B
00166

Transcript of Linda Sunderland
Conducted on February 27, 2024                    48

| 1 | for itself. | 11:07:43 |
| 2 | A    I'm not aware it was discounted, didn't -- | 11:07:44 |
| 3 | Q    Okay.  So it's possible you purchased | 11:07:49 |
| 4 | Sambucol product at a discount; you just may not have | 11:07:50 |
| 5 | been aware of it? | 11:07:54 |
| 6 | MR. BUSCH:  Objection to form. | 11:07:55 |
| 7 | A    It wasn't on sale, if that's what you're | 11:07:57 |
| 8 | asking.  It's usually discounted if it's on sale, but | 11:07:59 |
| 9 | it was not listed as on sale.  It was just on the | 11:08:02 |
| 10 | shelf. | 11:08:05 |
| 11 | Q    So when you think of discount, you're | 11:08:07 |
| 12 | thinking sort of the word "sale," sort of an | 11:08:09 |
| 13 | advertised sale price? | 11:08:12 |
| 14 | A    Mm-hmm. | 11:08:13 |
| 15 | Q    And you're drawing a distinction between | 11:08:14 |
| 16 | that and this sticker which advertises a regular price | 11:08:16 |
| 17 | but then a different lower retail price? | 11:08:19 |
| 18 | MR. BUSCH:  Objection to form. | 11:08:22 |
| 19 | A    Correct.  Yes. | 11:08:23 |
| 20 | Q    And you may have purchased the Sambucol | 11:08:24 |
| 21 | products, and indeed, you purchased this product that | 11:08:26 |
| 22 | had an advertised regular price and a lower retail | 11:08:29 |
| 23 | price? | 11:08:31 |
| 24 | MR. BUSCH:  Objection to form. | 11:08:32 |
| 25 | A    Yes. | 11:08:33 |

Exhibit B
00167

Transcript of Linda Sunderland
Conducted on February 27, 2024                          49

| 1  | Q    And that could have happened on other | 11:08:33 |
|----|---|---|
| 2  | occasions as well; you just don't know? | 11:08:35 |
| 3  | MR. BUSCH:  Objection to form. | 11:08:36 |
| 4  | A    I don't remember. | 11:08:37 |
| 5  | Q    So the answer to my question is yes? | 11:08:38 |
| 6  | MR. BUSCH:  Objection.  Misstates prior | 11:08:41 |
| 7  | testimony. | 11:08:42 |
| 8  | A    I only consider sale -- sale products that | 11:08:43 |
| 9  | are displayed sale items and then I will decide | 11:08:48 |
| 10 | whether or not to purchase them on sale.  But I | 11:08:54 |
| 11 | don't -- I never look for discounted products. | 11:08:58 |
| 12 | Q    Right.  Understood.  So I understand your | 11:09:03 |
| 13 | understanding of sale prices. | 11:09:07 |
| 14 | I'm asking you something a little bit | 11:09:11 |
| 15 | different, which is specific to how this was | 11:09:13 |
| 16 | advertised with a regular price and then a lower | 11:09:16 |
| 17 | retail price -- | 11:09:18 |
| 18 | A    It might have happened before.  I hadn't | 11:09:19 |
| 19 | noticed it being reduced. | 11:09:22 |
| 20 | Q    And that was the question I was going to get | 11:09:24 |
| 21 | out. | 11:09:26 |
| 22 | So just so we have a clear record, so it's | 11:09:26 |
| 23 | possible that you made other purchases like this one | 11:09:28 |
| 24 | where there was a higher regular price but then a | 11:09:31 |
| 25 | lower retail price; you just don't know? | 11:09:35 |

Exhibit B
00168

Transcript of Linda Sunderland
Conducted on February 27, 2024                              50

| 1 | MR. BUSCH:  Objection to form. | 11:09:37 |
|---|---|---|
| 2 | A    I don't remember. | 11:09:38 |
| 3 | Q    Was $8.89 the cost of each of your purchases | 11:09:54 |
| 4 | of Sambucol lozenges? | 11:09:59 |
| 5 | A    I don't remember.  But I don't think so.  I | 11:10:01 |
| 6 | think it was higher. | 11:10:04 |
| 7 | Q    How much higher? | 11:10:06 |
| 8 | MR. BUSCH:  Objection to form. | 11:10:07 |
| 9 | A    I think it was anywhere between 9 and 17 or | 11:10:08 |
| 10 | $18. | 11:10:12 |
| 11 | Q    For the 20 lozenges? | 11:10:14 |
| 12 | A    No.  For the supplements that were | 11:10:16 |
| 13 | capsules -- | 11:10:19 |
| 14 | Q    I'm just asking you -- | 11:10:19 |
| 15 | A    The capsules, the supplements -- I mean the | 11:10:22 |
| 16 | lozengers, I don't remember.  I simply don't remember | 11:10:23 |
| 17 | what I paid. | 11:10:26 |
| 18 | Q    So just to be clear, I'm just asking about | 11:10:27 |
| 19 | the lozenges -- | 11:10:30 |
| 20 | A    Okay. | 11:10:31 |
| 21 | Q    -- just to -- and so you don't remember one | 11:10:32 |
| 22 | way or the other whether you paid more or less than | 11:10:35 |
| 23 | 8.89 for your other purchases of lozenges? | 11:10:38 |
| 24 | A    I think I paid more. | 11:10:41 |
| 25 | Q    Okay.  And just for the lozenges, how much | 11:10:42 |

Exhibit B
00169

Transcript of Linda Sunderland
Conducted on February 27, 2024                    51

| | | |
|---|---|---|
| 1 | more do you think you paid for lozenges on other | 11:10:46 |
| 2 | occasions? | 11:10:48 |
| 3 | A    Possibly $3 more, 3 or $4 more. | 11:10:49 |
| 4 | Q    So the price was variable? | 11:10:53 |
| 5 | MR. BUSCH:  Objection to form. | 11:10:54 |
| 6 | A    As far as I can recall. | 11:10:56 |
| 7 | Q    And did the price, to the best that you can | 11:11:02 |
| 8 | recall, did the price vary even in the same location? | 11:11:05 |
| 9 | MR. BUSCH:  Objection to form. | 11:11:08 |
| 10 | A    No, I don't think so.  It was usually | 11:11:09 |
| 11 | consistent in the same location.  But whatever it was, | 11:11:12 |
| 12 | I can't recall what it was. | 11:11:16 |
| 13 | Q    Okay.  So the price -- when you say your | 11:11:17 |
| 14 | best recollection was the price varied for the | 11:11:19 |
| 15 | 20-count lozenges, it was a different price in a | 11:11:22 |
| 16 | different retail location? | 11:11:25 |
| 17 | A    No -- | 11:11:27 |
| 18 | MR. BUSCH:  Objection. | 11:11:28 |
| 19 | A    -- not at Walgreens.  The same price at each | 11:11:28 |
| 20 | Walgreens. | 11:11:32 |
| 21 | Q    And it might have been different at the | 11:11:33 |
| 22 | Myrtle Pharmacy? | 11:11:35 |
| 23 | A    Correct. | 11:11:37 |
| 24 | Q    More expensive at the Myrtle Pharmacy? | 11:11:38 |
| 25 | A    Less. | 11:11:43 |

**Exhibit B**
**00170**

Transcript of Linda Sunderland
Conducted on February 27, 2024                    52

| | | |
|---|---|---|
| 1 | Q    So the image on SUNDERLAND 1, where was -- | 11:11:50 |
| 2 | where did the box say "virologist developed"? | 11:11:57 |
| 3 | A    On the side or the back -- the side or the | 11:12:01 |
| 4 | back, as I recall. | 11:12:05 |
| 5 | Q    And are those the exact words that were used | 11:12:07 |
| 6 | on the side or the back, "virologist developed"? | 11:12:20 |
| 7 | A    Yes. | 11:12:23 |
| 8 | Q    Now, switching to the chewable tablets, how | 11:12:42 |
| 9 | much did you pay for the chewable tablets? | 11:12:46 |
| 10 | A    Offhand, I can't remember.  I just don't | 11:12:49 |
| 11 | remember. | 11:12:53 |
| 12 | Q    Can you give me an estimate? | 11:12:53 |
| 13 | A    It was somewhere between, I would say, 12 | 11:12:54 |
| 14 | and 17 or $18. | 11:12:59 |
| 15 | Q    So the price of the chewable tablets was | 11:13:04 |
| 16 | variable as well? | 11:13:07 |
| 17 | MR. BUSCH:  Objection to form. | 11:13:07 |
| 18 | A    Yes.  Yes. | 11:13:08 |
| 19 | Q    And was it variable between the Walgreens | 11:13:09 |
| 20 | pharmacy and the Myrtle? | 11:13:12 |
| 21 | A    Yes, but -- yes, but not between each | 11:13:14 |
| 22 | Walgreens. | 11:13:17 |
| 23 | Q    Did you notice any other variability in the | 11:13:22 |
| 24 | pricing other than by the location? | 11:13:26 |
| 25 | A    No. | 11:13:45 |

Exhibit B
00171

Transcript of Linda Sunderland
Conducted on February 27, 2024                         53

| | | |
|---|---|---|
| 1 | Q    And how much did you pay for the capsules? | 11:13:45 |
| 2 | A    I don't remember exactly, but I would say | 11:13:50 |
| 3 | somewhere between 18 -- 17 or $18. | 11:13:53 |
| 4 | Q    And same question, was that -- well, let me | 11:14:03 |
| 5 | ask you this.  So 17 to $18, was the price of the | 11:14:12 |
| 6 | capsules less variable than the other Sambucol | 11:14:15 |
| 7 | products you were purchasing? | 11:14:18 |
| 8 | MR. BUSCH:  Objection to form. | 11:14:19 |
| 9 | A    What does that mean? | 11:14:20 |
| 10 | Q    Well, for the other products you mentioned a | 11:14:22 |
| 11 | greater difference in price.  And here you're saying | 11:14:24 |
| 12 | only really -- the price of the capsules only really | 11:14:27 |
| 13 | varied by a dollar. | 11:14:31 |
| 14 | A    Maybe higher.  You know, something like | 11:14:33 |
| 15 | between 17 and 19, something like -- just a lower | 11:14:35 |
| 16 | variable. | 11:14:40 |
| 17 | Q    And was the variation, again, between | 11:14:42 |
| 18 | Walgreens and Myrtle? | 11:14:44 |
| 19 | A    I don't know.  I usually only bought them at | 11:14:46 |
| 20 | Walgreens. | 11:14:49 |
| 21 | Q    Is that because they were only available at | 11:14:50 |
| 22 | Walgreens? | 11:14:53 |
| 23 | A    I don't know that.  I only went to | 11:14:53 |
| 24 | Walgreens.  I go to Walgreens primarily -- | 11:14:55 |
| 25 | Q    Okay. | 11:14:58 |

Exhibit B
00172

Transcript of Linda Sunderland
Conducted on February 27, 2024                    54

| | | |
|---|---|---|
| 1 | A    -- as my drug store. | 11:14:59 |
| 2 | Q    When did you first learn of Sambucol, the | 11:15:21 |
| 3 | brand? | 11:15:23 |
| 4 | A    Probably -- the exact date I wouldn't know, | 11:15:26 |
| 5 | but roughly 2019. | 11:15:30 |
| 6 | Q    How did you first learn about it? | 11:15:35 |
| 7 | A    I noticed it in Walgreens on the shelf. | 11:15:38 |
| 8 | Q    And was there a typical form of the Sambucol | 11:15:44 |
| 9 | that you saw on the shelf that you first saw on the | 11:15:55 |
| 10 | shelf? | 11:15:58 |
| 11 | MR. BUSCH:  Objection to form. | 11:15:58 |
| 12 | A    I don't remember. | 11:15:59 |
| 13 | Q    Were you sick at the time? | 11:16:04 |
| 14 | MR. BUSCH:  Objection to form. | 11:16:05 |
| 15 | A    No, I was not.  I use vitamins every day. | 11:16:06 |
| 16 | Q    And what did you think the Sambucol products | 11:16:16 |
| 17 | would do for you? | 11:16:19 |
| 18 | A    Well, because they made the -- you know, | 11:16:20 |
| 19 | they said they were virologist tested, and, you know, | 11:16:25 |
| 20 | developed, I thought this was going to really help | 11:16:30 |
| 21 | with my immune system.  As I'm getting older, they say | 11:16:33 |
| 22 | your immune system gets weaker, and I really felt I | 11:16:39 |
| 23 | needed to buy an immune -- immune vitamin or | 11:16:45 |
| 24 | supplement, which I hadn't done yet in my life.  And I | 11:16:49 |
| 25 | felt this was the -- the reason I bought it was just | 11:16:53 |

Exhibit B
00173

Transcript of Linda Sunderland
Conducted on February 27, 2024                    55

| | | |
|---|---|---|
| 1 | to supplement my immune system, which is getting | 11:16:58 |
| 2 | weaker. | 11:17:01 |
| 3 | Q    And what was your expectation of -- of | 11:17:03 |
| 4 | immune support? | 11:17:08 |
| 5 | MR. BUSCH:  Objection to form. | 11:17:10 |
| 6 | A    I would have less colds.  I wouldn't get ill | 11:17:11 |
| 7 | in general, less frequently.  If I did get sick, I | 11:17:15 |
| 8 | would get less sick.  I would not be catching viruses | 11:17:20 |
| 9 | as frequently as other people.  It could be a backup. | 11:17:25 |
| 10 | Q    So your expectation was that it would | 11:17:32 |
| 11 | prevent you from getting sick? | 11:17:36 |
| 12 | MR. BUSCH:  Objection.  Misstates prior | 11:17:38 |
| 13 | testimony. | 11:17:42 |
| 14 | Q    You were nodding your head -- | 11:17:43 |
| 15 | A    I said it would help me get stronger, my | 11:17:45 |
| 16 | immune system get stronger.  Hopefully that means I | 11:17:49 |
| 17 | would get less illness. | 11:17:54 |
| 18 | Q    So ultimately, your belief was that the | 11:17:56 |
| 19 | Sambucol product would prevent you from getting sick? | 11:18:00 |
| 20 | A    Yes. | 11:18:03 |
| 21 | MR. BUSCH:  Objection.  Misstates prior | 11:18:03 |
| 22 | testimony. | 11:18:06 |
| 23 | You can answer. | 11:18:07 |
| 24 | Q    And if you got sick, your expectation was | 11:18:07 |
| 25 | that the Sambucol products would treat your illness? | 11:18:10 |

Exhibit B
00174

Transcript of Linda Sunderland
Conducted on February 27, 2024                              56

| | | |
|---|---|---|
| 1 | MR. BUSCH:  Objection.  Misstates prior | 11:18:14 |
| 2 | testimony. | 11:18:16 |
| 3 | A    That's not true.  I -- I -- if I got sick, I | 11:18:16 |
| 4 | would not say it was definitely because of taking or | 11:18:24 |
| 5 | not taking an immunity pill. | 11:18:27 |
| 6 | Q    But did you believe that it would help | 11:18:31 |
| 7 | prevent you get sick? | 11:18:33 |
| 8 | A    Yes. | 11:18:36 |
| 9 | Q    And help treat you if you became sick? | 11:18:36 |
| 10 | A    No, not treat me.  Just prevent me from | 11:18:39 |
| 11 | getting ill.  If I got sick, I would go to a doctor | 11:18:42 |
| 12 | and he would prescribe medicine for that specific | 11:18:45 |
| 13 | illness. | 11:18:49 |
| 14 | Q    I'm just trying to understand.  So I think | 11:18:50 |
| 15 | you said earlier that your expectation was that if you | 11:18:53 |
| 16 | did get sick, you would be less sick or your symptoms | 11:18:55 |
| 17 | would be less -- | 11:18:59 |
| 18 | A    I didn't say that -- | 11:19:01 |
| 19 | Q    No? | 11:19:01 |
| 20 | A    No. | 11:19:09 |
| 21 | Q    And did the Sambucol products meet your | 11:19:20 |
| 22 | expectations? | 11:19:23 |
| 23 | MR. BUSCH:  Objection to form. | 11:19:24 |
| 24 | A    You know, I'll never know.  I'll never know | 11:19:26 |
| 25 | if an immunity support supplement does meet your | 11:19:30 |

Exhibit B
00175

Transcript of Linda Sunderland
Conducted on February 27, 2024                    57

| | | |
|---|---|---|
| 1 | expectations. | 11:19:35 |
| 2 | All I know is I did have the COVID shots and | 11:19:37 |
| 3 | the booster shots.  I do have my annual flu shot.  So | 11:19:41 |
| 4 | I didn't get COVID and I didn't get the flu, but I did | 11:19:48 |
| 5 | take immunity support during those times. | 11:19:53 |
| 6 | So I'll never really know if it was the | 11:19:57 |
| 7 | immunity support capsule that prevented my illness or | 11:19:59 |
| 8 | was it the COVID shot and booster, was it the flu | 11:20:04 |
| 9 | shot.  I'll never know exactly if immunity pills, | 11:20:09 |
| 10 | which I currently take, are really helping to prevent | 11:20:14 |
| 11 | illness. | 11:20:17 |
| 12 | Q    So during the time that you were consuming | 11:20:19 |
| 13 | Sambucol products, did you get COVID? | 11:20:24 |
| 14 | A    No, I never got COVID. | 11:20:26 |
| 15 | Q    Did you get the flu? | 11:20:28 |
| 16 | A    Never -- no, I didn't get the flu. | 11:20:30 |
| 17 | Q    Did you get a cold? | 11:20:35 |
| 18 | A    Yes.  I usually get a winter cold. | 11:20:49 |
| 19 | Q    And you started taking Sambucol in I think | 11:21:00 |
| 20 | you said January of 2020 was your best guess? | 11:21:06 |
| 21 | A    Yes. | 11:21:09 |
| 22 | Q    And you had taken it up until fairly | 11:21:10 |
| 23 | recently.  How many colds have you gotten during that | 11:21:14 |
| 24 | time frame? | 11:21:18 |
| 25 | A    I would have to estimate. | 11:21:19 |

Exhibit B
00176

Transcript of Linda Sunderland
Conducted on February 27, 2024                    58

| | | |
|---|---|---|
| 1 | Q    You said a winter cold.  Is that about one a | 11:21:21 |
| 2 | year? | 11:21:24 |
| 3 | A    Yeah, one a year. | 11:21:25 |
| 4 | Q    So it sounds like, just to summarize, you | 11:21:42 |
| 5 | haven't concluded one way or the other as to whether | 11:21:46 |
| 6 | Sambucol products met your expectations? | 11:21:50 |
| 7 | MR. BUSCH:  Objection to form.  Misstates | 11:21:51 |
| 8 | prior testimony. | 11:21:54 |
| 9 | A    I don't know if any immunity products | 11:21:54 |
| 10 | eventually work.  I don't know if Sambucol works | 11:21:59 |
| 11 | better than Airborne, which is another brand.  I don't | 11:22:05 |
| 12 | know. | 11:22:39 |
| 13 | Q    So you have been taking -- you have been | 11:22:39 |
| 14 | consuming Sambucol, the products, now for about four | 11:22:42 |
| 15 | years.  So is it fair to say you got some value from | 11:22:46 |
| 16 | the Sambucol products? | 11:22:52 |
| 17 | MR. BUSCH:  Objection to form. | 11:22:52 |
| 18 | A    I hope so. | 11:22:53 |
| 19 | Q    When you say you hope so, is that because | 11:22:56 |
| 20 | you don't know one way or the other? | 11:22:59 |
| 21 | MR. BUSCH:  Objection to form. | 11:23:01 |
| 22 | A    Well, I had faith that they would give me | 11:23:02 |
| 23 | immunity, and I don't know for sure that they worked. | 11:23:06 |
| 24 | But I have -- I had faith and I purchased them in good | 11:23:10 |
| 25 | faith.  And I still purchase immunity pills and take | 11:23:14 |

Exhibit B
00177

Transcript of Linda Sunderland
Conducted on February 27, 2024                                59

| | | |
|---|---|---|
| 1 | them every day. | 11:23:22 |
| 2 | Q    And including Sambucol? | 11:23:24 |
| 3 | MR. BUSCH:  Objection to form. | 11:23:27 |
| 4 | A    Right now I'm using Airborne. | 11:23:29 |
| 5 | Q    Prior to first consuming Sambucol products, | 11:23:35 |
| 6 | had you gotten the flu? | 11:23:41 |
| 7 | A    Yes. | 11:23:43 |
| 8 | Q    Had you gotten a cold before you started | 11:23:44 |
| 9 | taking Sambucol products? | 11:23:52 |
| 10 | A    Yes. | 11:23:54 |
| 11 | Q    Before you started taking Sambucol products, | 11:23:55 |
| 12 | about how many times a year would you get a cold? | 11:23:57 |
| 13 | A    Well, during the winter I get more than one | 11:24:00 |
| 14 | cold, believe it or not.  I get at least two -- two | 11:24:04 |
| 15 | colds. | 11:24:07 |
| 16 | Q    Okay.  We're talking about the time period | 11:24:08 |
| 17 | before you started taking Sambucol. | 11:24:11 |
| 18 | A    At least two colds. | 11:24:14 |
| 19 | Q    Would you ever purchase Sambucol products | 11:24:39 |
| 20 | again? | 11:24:41 |
| 21 | MR. BUSCH:  Objection to form. | 11:24:41 |
| 22 | A    Possibly. | 11:24:43 |
| 23 | Q    Under what circumstances? | 11:24:47 |
| 24 | A    I think if -- right now I'm using Airborne | 11:24:50 |
| 25 | brand.  So I -- I want to stick with Airborne for a | 11:24:59 |

Exhibit B
00178

Transcript of Linda Sunderland
Conducted on February 27, 2024                    60

| | | |
|---|---|---|
| 1 | while and see if it makes a change in my system.  If | 11:25:05 |
| 2 | it doesn't, I -- I might change to another product.  I | 11:25:09 |
| 3 | don't know if I would go with Sambucol again because I | 11:25:17 |
| 4 | did get colds with -- when I was on Sambucol. | 11:25:24 |
| 5 | Q    Did you get a cold this winter? | 11:25:40 |
| 6 | A    Yes. | 11:25:43 |
| 7 | Q    And you were taking Airborne this winter? | 11:25:44 |
| 8 | A    I was taking Airborne and the other one, | 11:25:49 |
| 9 | Emergen-C -- third page, Emergen-C Elderberry, | 11:25:57 |
| 10 | alternating. | 11:26:02 |
| 11 | Q    And the Sambucol, correct? | 11:26:03 |
| 12 | MR. BUSCH:  Objection to form. | 11:26:05 |
| 13 | A    No.  I stopped taking the Sambucol in 2022. | 11:26:06 |
| 14 | Q    I thought -- so your previous testimony was | 11:26:12 |
| 15 | you threw out a package of -- at least one package of | 11:26:16 |
| 16 | Sambucol within the last couple weeks to a month | 11:26:21 |
| 17 | because you had last finished the package -- | 11:26:24 |
| 18 | A    Oh, that is true.  That is true.  Yeah. | 11:26:27 |
| 19 | Q    So I want to go back to the language that | 11:26:50 |
| 20 | you mentioned you relied on in purchase the Sambucol | 11:26:54 |
| 21 | products.  And first, I just want to talk about | 11:26:57 |
| 22 | "virologist developed." | 11:27:00 |
| 23 | A    Mm-hmm. | 11:27:01 |
| 24 | Q    What do you understand it to mean, | 11:27:02 |
| 25 | "virologist developed"? | 11:27:04 |

Exhibit B
00179

Transcript of Linda Sunderland
Conducted on February 27, 2024                    61

| | | |
|---|---|---|
| 1 | MR. BUSCH:  Objection to form. | 11:27:05 |
| 2 | A    Virologist, in my mind, is a doctor or a | 11:27:06 |
| 3 | scientist that deals with the study and maybe | 11:27:09 |
| 4 | analyzation of viruses and tries to create or develop | 11:27:16 |
| 5 | some kind of medicine to deal with viruses, a doctor | 11:27:22 |
| 6 | who deals with medicine development. | 11:27:31 |
| 7 | Q    And what's that understanding based on? | 11:27:36 |
| 8 | MR. BUSCH:  Objection to form. | 11:27:42 |
| 9 | A    Analyzing the word "virologist," you know, | 11:27:44 |
| 10 | as a word, as a scientist. | 11:27:49 |
| 11 | Q    So you didn't do any research -- | 11:27:51 |
| 12 | A    No. | 11:27:51 |
| 13 | Q    -- this is just your understanding? | 11:27:53 |
| 14 | A    No. | 11:27:54 |
| 15 | MR. BUSCH:  Objection to form. | 11:27:55 |
| 16 | Q    And what's your understanding of what | 11:27:59 |
| 17 | specifically was virologist developed? | 11:28:02 |
| 18 | MR. BUSCH:  Objection to form. | 11:28:05 |
| 19 | A    I would say the contents of the Sambucol | 11:28:06 |
| 20 | product, the actual content of the capsule or the | 11:28:12 |
| 21 | lozenger, what it contained. | 11:28:17 |
| 22 | Q    Do you know what's contained in the Sambucol | 11:28:24 |
| 23 | products that you purchased? | 11:28:26 |
| 24 | MR. BUSCH:  Objection to form. | 11:28:27 |
| 25 | A    Based on the side of the bottle, it said | 11:28:28 |

Exhibit B
00180

Transcript of Linda Sunderland
Conducted on February 27, 2024                    62

| | | |
|---|---|---|
| 1 | what it was containing.  And I recall it saying | 11:28:32 |
| 2 | elderberry juice, but I can't remember the other | 11:28:36 |
| 3 | products. | 11:28:39 |
| 4 | Q    And what's your understanding based on? | 11:28:42 |
| 5 | MR. BUSCH:  Objection to form. | 11:28:47 |
| 6 | A    Looking at the side of the bottle, reading | 11:28:48 |
| 7 | the label. | 11:28:51 |
| 8 | Q    So you didn't do any research to see -- | 11:28:52 |
| 9 | A    No, I didn't. | 11:28:54 |
| 10 | Q    Would you agree, though, that "virologist | 11:29:01 |
| 11 | developed" by itself could refer to the brand | 11:29:04 |
| 12 | Sambucol? | 11:29:07 |
| 13 | MR. BUSCH:  Objection to form. | 11:29:07 |
| 14 | A    No, I wouldn't think of it that way. | 11:29:08 |
| 15 | Q    So in your view, a reasonable consumer | 11:29:10 |
| 16 | couldn't interpret the same packaging to mean | 11:29:13 |
| 17 | virologist -- the brand Sambucol was virologist | 11:29:17 |
| 18 | developed? | 11:29:20 |
| 19 | MR. BUSCH:  Objection to form. | 11:29:20 |
| 20 | A    Well, I would think that it was, even if, | 11:29:21 |
| 21 | you know -- because it stated it on the bottle, on the | 11:29:28 |
| 22 | side of the package. | 11:29:33 |
| 23 | Q    That the brand itself was, right? | 11:29:34 |
| 24 | A    Yes. | 11:29:36 |
| 25 | MR. BUSCH:  Objection to form. | 11:29:37 |

Exhibit B
00181

Transcript of Linda Sunderland
Conducted on February 27, 2024                    63

| | | |
|---|---|---|
| 1 | A    I didn't see it on any other brand. | 11:29:38 |
| 2 | Q    So is it fair, then, to say that your | 11:29:44 |
| 3 | understanding was also -- so you initially said that | 11:29:47 |
| 4 | you believe that I think what was in the product was | 11:29:51 |
| 5 | virologist developed, but you also believe that the | 11:29:54 |
| 6 | brand Sambucol was developed by a virologist? | 11:29:57 |
| 7 | MR. BUSCH:  Objection.  Misstates prior | 11:30:01 |
| 8 | testimony. | 11:30:03 |
| 9 | A    Yes. | 11:30:03 |
| 10 | Q    And would you agree, then, as well that | 11:30:08 |
| 11 | "virologist developed" could refer to the trademark | 11:30:17 |
| 12 | Sambucol? | 11:30:20 |
| 13 | MR. BUSCH:  Objection to form. | 11:30:20 |
| 14 | A    I don't know what trademark means. | 11:30:23 |
| 15 | Q    Are you familiar with the sort of an R in a | 11:30:26 |
| 16 | circle next to a brand name? | 11:30:30 |
| 17 | A    No, I've never noticed that. | 11:30:33 |
| 18 | Q    No?  So you don't have any understanding one | 11:30:35 |
| 19 | way or the other what a trademark is? | 11:30:40 |
| 20 | MR. BUSCH:  Objection.  Asked and answered. | 11:30:42 |
| 21 | A    No. | 11:30:45 |
| 22 | Q    Is it your contention that the brand | 11:31:30 |
| 23 | Sambucol was not developed by a virologist? | 11:31:33 |
| 24 | MR. BUSCH:  Objection to form. | 11:31:36 |
| 25 | A    No, I think it was, based on the side of the | 11:31:37 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Exhibit B
00182

Transcript of Linda Sunderland
Conducted on February 27, 2024                    64

| | |
|---|---|
| 1   box where it said in writing. | 11:31:43 |
| 2        Q    So you don't contend that that statement is | 11:31:48 |
| 3   false? | 11:31:51 |
| 4             MR. BUSCH:  Objection to form. | 11:31:51 |
| 5        A    No, I believed it.  It influenced me. | 11:31:52 |
| 6        Q    I'm not asking you whether you believed it | 11:31:56 |
| 7   or whether it influenced you.  I'm asking you whether | 11:31:59 |
| 8   you believe it's true or false. | 11:32:02 |
| 9             MR. BUSCH:  Objection. | 11:32:05 |
| 10       A    I believe it was true. | 11:32:06 |
| 11       Q    You don't have any reason to believe that | 11:32:08 |
| 12  it's false? | 11:32:11 |
| 13       A    No. | 11:32:12 |
| 14       Q    And do you have any reason to believe that | 11:32:12 |
| 15  the -- what's in the Sambucol products you purchased | 11:32:17 |
| 16  was virologist developed or was not virologist | 11:32:19 |
| 17  developed? | 11:32:24 |
| 18            Let me ask -- let me ask you that again. | 11:32:25 |
| 19  I'll try to phrase it more clear. | 11:32:27 |
| 20            Do you have any reason to believe that what | 11:32:30 |
| 21  was in the Sambucol products you purchased was not | 11:32:32 |
| 22  virologist developed? | 11:32:34 |
| 23            MR. BUSCH:  Objection to form. | 11:32:36 |
| 24       A    No. | 11:32:37 |
| 25            THE WITNESS:  I have to use the ladies' | 11:32:41 |

Exhibit B
00183

Transcript of Linda Sunderland
Conducted on February 27, 2024                    65

| | | |
|---|---|---|
| 1 | room.  Would that be okay if I take a break? | 11:32:43 |
| 2 | MR. ORZANO:  Certainly.  Take a five-minute | 11:32:46 |
| 3 | break. | 11:32:49 |
| 4 | THE VIDEOGRAPHER:  Off the record, 11:32 | 11:32:49 |
| 5 | a.m. | 11:32:52 |
| 6 | (Recess 11:32 a.m. - 11:40 a.m.) | 11:32:53 |
| 7 | THE VIDEOGRAPHER:  Back on the record, 11:40 | 11:40:09 |
| 8 | a.m. | 11:40:12 |
| 9 | BY MR. ORZANO: | 11:40:14 |
| 10 | Q    So, Ms. Sunderland, I want to ask you about | 11:40:14 |
| 11 | -- we just talked about "virologist developed."  I | 11:40:17 |
| 12 | want to also -- you also said that you relied on the | 11:40:21 |
| 13 | language "Black Elderberry" on the packaging. | 11:40:24 |
| 14 | You don't contend that the products did not | 11:40:28 |
| 15 | contain Black Elderberry, correct? | 11:40:32 |
| 16 | A    Correct. | 11:40:34 |
| 17 | Q    And what was your understanding of the | 11:40:40 |
| 18 | language, "Black Elderberry"? | 11:40:42 |
| 19 | A    That there is something that supports immune | 11:40:44 |
| 20 | -- immunity and it is contained in black elderberry. | 11:40:50 |
| 21 | Q    And is that based on just the packaging | 11:40:55 |
| 22 | alone? | 11:41:01 |
| 23 | A    Yes. | 11:41:01 |
| 24 | Q    So you didn't do any research into black | 11:41:01 |
| 25 | elderberry? | 11:41:05 |

Exhibit B
00184

Transcript of Linda Sunderland
Conducted on February 27, 2024                    66

| | | |
|---|---|---|
| 1 | A    No, I didn't, no. | 11:41:05 |
| 2 | Q    And you said you also relied on the language | 11:41:08 |
| 3 | "immune support." | 11:41:12 |
| 4 | A    On what? | 11:41:13 |
| 5 | Q    Immune support. | 11:41:15 |
| 6 | A    Immune support, yes. | 11:41:17 |
| 7 | Q    And what's your understanding of the | 11:41:18 |
| 8 | language "immune support"? | 11:41:19 |
| 9 | MR. BUSCH:  Objection to form. | 11:41:21 |
| 10 | A    Immune support means, to me, that whatever | 11:41:22 |
| 11 | the product is, it's going to help me prevent me from | 11:41:26 |
| 12 | getting ill and build my strength. | 11:41:31 |
| 13 | Q    And what do you mean by build your strength? | 11:41:44 |
| 14 | A    That if I use this product consistently, | 11:41:47 |
| 15 | monthly, every day, it will help give me support in my | 11:41:49 |
| 16 | need for immunity as I grow older. | 11:41:56 |
| 17 | Q    And I think you testified earlier that you | 11:42:00 |
| 18 | don't know one way or the other whether it was | 11:42:02 |
| 19 | effective in meeting those expectations? | 11:42:08 |
| 20 | MR. BUSCH:  Objection to form. | 11:42:11 |
| 21 | A    Yes. | 11:42:12 |
| 22 | Q    If you go back to Exhibit 7, which was your | 11:42:36 |
| 23 | interrogatory responses. | 11:42:39 |
| 24 | A    Mm-hmm. | 11:42:41 |
| 25 | Q    On page 4 -- or actually, the bottom of page | 11:42:42 |

Exhibit B
00185

Transcript of Linda Sunderland
Conducted on February 27, 2024                    67

| | | |
|---|---|---|
| 1 | 3 is the question.  So we asked you to -- let me know | 11:42:52 |
| 2 | when you get there. | 11:42:55 |
| 3 | A    3?  Page 3? | 11:42:56 |
| 4 | Q    Yeah, bottom of page 3. | 11:42:58 |
| 5 | A    Okay.  All right. | 11:43:01 |
| 6 | Q    So under Interrogatory Number 3, we asked | 11:43:02 |
| 7 | you to "Describe the circumstances surrounding your | 11:43:04 |
| 8 | purchase and use of other elderberry products," and | 11:43:07 |
| 9 | then it goes on. | 11:43:10 |
| 10 | And in response, you said you "Began | 11:43:11 |
| 11 | purchasing the Goli Immune vitamin gummies with | 11:43:15 |
| 12 | elderberry extract, Airborne Immune Support Elderberry | 11:43:20 |
| 13 | gummies, and Emergen-C Elderberry Daily Immune Support | 11:43:24 |
| 14 | and Botanicals gummies as of January 2023." | 11:43:28 |
| 15 | A    Correct. | 11:43:35 |
| 16 | Q    And that's a true statement? | 11:43:36 |
| 17 | A    Yes. | 11:43:38 |
| 18 | Q    Did you start buying any other elderberry | 11:43:41 |
| 19 | products after you stopped buying Sambucol products? | 11:43:45 |
| 20 | A    No. | 11:44:01 |
| 21 | Q    In Exhibit 8, SUNDERLAND 2 -- | 11:44:01 |
| 22 | A    What page? | 11:44:07 |
| 23 | Q    It's the second page in the packet, Exhibit | 11:44:07 |
| 24 | 8.  Is that a copy of a bottle of Airborne Immune | 11:44:11 |
| 25 | Support elderberry gummies you purchased and used? | 11:44:23 |

Exhibit B
00186

Transcript of Linda Sunderland
Conducted on February 27, 2024                    68

| | | |
|---|---|---|
| 1 | A    It is a copy of a photograph of Airborne | 11:44:26 |
| 2 | that I currently use, but it's -- I photographed it in | 11:44:30 |
| 3 | the drug store.  I have it at home and I purchased it | 11:44:34 |
| 4 | at Walgreens and the bottle I own is in Walgreens -- I | 11:44:38 |
| 5 | mean from Walgreens. | 11:44:45 |
| 6 | Q    Okay.  So the -- you took this photograph? | 11:44:47 |
| 7 | A    Yes. | 11:44:49 |
| 8 | Q    At the request of Tiffany Kuiper? | 11:44:50 |
| 9 | MR. BUSCH:  Objection to form. | 11:44:52 |
| 10 | A    Yes. | 11:44:53 |
| 11 | Q    And when did you take the photograph? | 11:44:54 |
| 12 | A    I would say approximately a month or two | 11:44:57 |
| 13 | months ago. | 11:45:01 |
| 14 | Q    And you took this photograph at Walgreens? | 11:45:03 |
| 15 | A    No.  At the Myrtle Pharmacy. | 11:45:08 |
| 16 | Q    At Myrtle, okay. | 11:45:11 |
| 17 | And just to clarify, did you purchase this | 11:45:13 |
| 18 | specific bottle? | 11:45:16 |
| 19 | A    Yes.  I purchased this specific brand and | 11:45:17 |
| 20 | bottle at Walgreens. | 11:45:19 |
| 21 | Q    So you now have this bottle at home? | 11:45:20 |
| 22 | A    Yes. | 11:45:23 |
| 23 | Q    And please don't throw away that bottle. | 11:45:31 |
| 24 | A    Sure. | 11:45:38 |
| 25 | Q    And how many bottles of this particular | 11:45:39 |

Exhibit B
00187

Transcript of Linda Sunderland
Conducted on February 27, 2024                    69

| 1 | elderberry product did you purchase? | 11:45:44 |
|---|---|---|
| 2 |     A    Airborne? | 11:45:46 |
| 3 |     Q    Yeah. | 11:45:47 |
| 4 |     A    Well, I buy them usually two -- buy one, get | 11:45:49 |
| 5 | one half price.  So I buy two a month and I've | 11:45:52 |
| 6 | purchased at least six bottles. | 11:46:00 |
| 7 |     Q    So you were purchasing two bottles a month | 11:46:08 |
| 8 | since January 2023? | 11:46:11 |
| 9 |     A    Maybe more. | 11:46:12 |
| 10 |     Q    And is there a reason you switched to | 11:46:19 |
| 11 | purchasing gummies? | 11:46:21 |
| 12 |     A    Just to see how they would -- how I would | 11:46:23 |
| 13 | react.  I take other gummy pills.  I take vitamins | 11:46:28 |
| 14 | every day, and I also take -- in those vitamins, I | 11:46:33 |
| 15 | take gummies.  So I added that to my gummy regime. | 11:46:35 |
| 16 |     Q    But you never tried the Sambucol gummies? | 11:46:41 |
| 17 |     A    No. | 11:46:44 |
| 18 |     Q    Why not? | 11:46:44 |
| 19 |     A    I don't know.  Maybe they weren't available | 11:46:45 |
| 20 | in the Walgreens that I usually go to. | 11:46:47 |
| 21 |     Q    And do you like the gummy form of these | 11:46:49 |
| 22 | products? | 11:46:52 |
| 23 |     A    Yes, I do. | 11:46:52 |
| 24 |     Q    So the form of the elderberry product is a | 11:46:53 |
| 25 | factor in your purchasing decisions? | 11:47:04 |

Exhibit B
00188

Transcript of Linda Sunderland
Conducted on February 27, 2024                           70

| | | |
|---|---|---|
| 1 | A    Not necessarily.  Basically it's -- I would | 11:47:07 |
| 2 | say the advertising on the bottle that influences me | 11:47:12 |
| 3 | the most. | 11:47:15 |
| 4 | Q    I'm not asking you what influences you the | 11:47:17 |
| 5 | most.  I'm asking you does the form of the elderberry | 11:47:20 |
| 6 | product factor into your purchasing decision? | 11:47:23 |
| 7 | A    No, it doesn't. | 11:47:26 |
| 8 | Q    Does Airborne offer elderberry products in | 11:47:27 |
| 9 | other -- in forms other than gummies? | 11:47:30 |
| 10 | A    I don't know. | 11:47:33 |
| 11 | Q    You haven't seen any other form of | 11:47:34 |
| 12 | Airborne -- | 11:47:37 |
| 13 | A    I don't know.  I haven't seen any other but | 11:47:38 |
| 14 | gummies, yes. | 11:47:42 |
| 15 | Q    So you just purchased the form of the | 11:47:43 |
| 16 | elderberry supplement from Airborne that was available | 11:47:46 |
| 17 | in the store that you shopped in? | 11:47:47 |
| 18 | A    Exactly. | 11:47:50 |
| 19 | Q    And it looks like the sticker on SUNDERLAND | 11:47:51 |
| 20 | 2, the price was $17.35 at the Myrtle Pharmacy. | 11:47:55 |
| 21 | Is that what you paid for it when you | 11:48:00 |
| 22 | purchased it? | 11:48:03 |
| 23 | A    No.  I purchased it at Walgreens for about | 11:48:04 |
| 24 | 19, but I got the second bottle half price. | 11:48:06 |
| 25 | Q    So Walgreens had a buy one get a second one | 11:48:13 |

Exhibit B
00189

Transcript of Linda Sunderland
Conducted on February 27, 2024                    71

| | | |
|---|---|---|
| 1 | half off? | 11:48:18 |
| 2 | A    Yes. | 11:48:19 |
| 3 | Q    And every time you purchased the Airborne at | 11:48:19 |
| 4 | Walgreens, it was buy one, get one half off? | 11:48:22 |
| 5 | A    Yes. | 11:48:27 |
| 6 | Q    You said you did purchase this Airborne | 11:48:27 |
| 7 | supplement on SUNDERLAND 2 from the Myrtle Pharmacy, | 11:48:30 |
| 8 | correct? | 11:48:36 |
| 9 | A    No, I didn't say that. | 11:48:36 |
| 10 | Q    You did not purchase this bottle -- | 11:48:36 |
| 11 | A    No, I was in the Myrtle Pharmacy, I noticed | 11:48:38 |
| 12 | this was a bottle I purchased before at Walgreens and | 11:48:43 |
| 13 | so I photographed it. | 11:48:46 |
| 14 | Q    Is there a reason you went to Myrtle to | 11:48:50 |
| 15 | photograph it instead of where you purchased it at | 11:48:53 |
| 16 | Walgreens? | 11:48:55 |
| 17 | A    It was closer to my house at the time on | 11:48:56 |
| 18 | that that day. | 11:49:01 |
| 19 | Q    It was closer to your home on that day? | 11:49:01 |
| 20 | A    Yeah.  I happened to be shopping in the area | 11:49:04 |
| 21 | and I went into this Myrtle Pharmacy to use the Xerox | 11:49:06 |
| 22 | machine and so I noticed that on the shelf. | 11:49:13 |
| 23 | Q    Did you buy it at Walgreens because of the | 11:49:19 |
| 24 | buy one, get one half off? | 11:49:23 |
| 25 | A    Yes. | 11:49:26 |

Exhibit B
00190

Transcript of Linda Sunderland
Conducted on February 27, 2024                              72

| | |
|---|---|
| 1 | Q    And when you consumed the Airborne | 11:49:32 |
| 2 | elderberry supplement, did you take it according to | 11:49:34 |
| 3 | the directions for use? | 11:49:38 |
| 4 | A    Yes. | 11:49:39 |
| 5 | MR. BUSCH:  Objection to form. | 11:49:39 |
| 6 | Q    And you're still using it? | 11:49:49 |
| 7 | A    Yes. | 11:49:51 |
| 8 | MR. BUSCH:  Objection to form. | 11:49:51 |
| 9 | Q    And when you first purchased the Airborne | 11:50:02 |
| 10 | elderberry supplement, what language on the packaging | 11:50:08 |
| 11 | caused you to purchase that particular supplement? | 11:50:12 |
| 12 | A    There was nothing on the -- just the word | 11:50:16 |
| 13 | "elderberry" possibly.  The word "elderberry" had -- | 11:50:26 |
| 14 | and "immune system" were the eye-catching words for | 11:50:32 |
| 15 | me. | 11:50:38 |
| 16 | Q    And what were your expectations for the | 11:50:38 |
| 17 | Airborne product based on that language? | 11:50:41 |
| 18 | A    I hoped it would improve my immune system | 11:50:44 |
| 19 | for the future. | 11:50:48 |
| 20 | Q    And you don't know one way or the other | 11:50:57 |
| 21 | whether the Airborne product met that expectation | 11:51:00 |
| 22 | either? | 11:51:03 |
| 23 | A    I don't know.  I'm using it now. | 11:51:03 |
| 24 | Q    Then turning in the same exhibit, turning to | 11:51:08 |
| 25 | the next page, it has the Emergen-C product. | 11:51:13 |

**Exhibit B**
**00191**

Transcript of Linda Sunderland
Conducted on February 27, 2024                               73

| | | | |
|---|---|---|---|
| 1 | A | Okay. | 11:51:16 |
| 2 | Q | Is that a picture that you took? | 11:51:16 |
| 3 | A | Yes.  In that Myrtle Pharmacy, yes. | 11:51:22 |
| 4 | Q | Okay.  Again, at the request of -- you took | 11:51:28 |
| 5 | the picture at the request of Tiffany Kuiper? | | 11:51:31 |
| 6 | A | Yes. | 11:51:36 |
| 7 | MR. BUSCH:  Objection to form. | | 11:51:37 |
| 8 | Q | And did you purchase this specific bottle at | 11:51:37 |
| 9 | Myrtle or did you just take a picture? | | 11:51:40 |
| 10 | A | I just took a picture, but I had purchased | 11:51:42 |
| 11 | it at Walgreens, I believe. | | 11:51:47 |
| 12 | Q | And how many bottles of Emergen-C elderberry | 11:52:05 |
| 13 | supplements did you purchase? | | 11:52:11 |
| 14 | MR. BUSCH:  Objection to form. | | 11:52:12 |
| 15 | A | I don't remember, but I would estimate maybe | 11:52:13 |
| 16 | one or two at the most. | | 11:52:18 |
| 17 | Q | And when did you first purchase it? | 11:52:22 |
| 18 | A | God, it must have been at least 2021.  The | 11:52:26 |
| 19 | reason I bought it was because Sambucol wasn't | | 11:52:41 |
| 20 | available on the shelf. | | 11:52:45 |
| 21 | Q | And then when did you next purchase | 11:52:49 |
| 22 | Emergen-C? | | 11:52:52 |
| 23 | A | I don't recall.  I don't remember, it was so | 11:52:53 |
| 24 | far ago, long ago. | | 11:52:56 |
| 25 | Q | I'm sorry.  How many times did you say you | 11:52:57 |

Exhibit B
00192

Transcript of Linda Sunderland
Conducted on February 27, 2024                    74

| | | |
|---|---|---|
| 1 | purchased it? | 11:53:00 |
| 2 | A    One or two. | 11:53:01 |
| 3 | Q    Just one or two times? | 11:53:02 |
| 4 | A    Yeah. | 11:53:03 |
| 5 | Q    And do you remember when the last time you | 11:53:04 |
| 6 | purchased it was? | 11:53:05 |
| 7 | A    Somewhere in 2021, '22. | 11:53:07 |
| 8 | Q    So you basically purchased it a couple of | 11:53:09 |
| 9 | times when Sambucol wasn't available? | 11:53:12 |
| 10 | A    Exactly. | 11:53:14 |
| 11 | Q    It looks like it cost $15.67? | 11:53:16 |
| 12 | A    Okay. | 11:53:20 |
| 13 | Q    Although this is I guess at Myrtle. | 11:53:20 |
| 14 | A    Yeah. | 11:53:20 |
| 15 | Q    Is that around what you paid? | 11:53:24 |
| 16 | A    It's usually more expensive at Walgreens, | 11:53:26 |
| 17 | but they offer usually points, you know, and you get | 11:53:28 |
| 18 | points when you purchase things at Walgreens.  So I | 11:53:33 |
| 19 | buy it at Walgreens usually. | 11:53:36 |
| 20 | Q    And how many gummies are in the Emergen-C | 11:53:45 |
| 21 | bottle that you purchased? | 11:53:51 |
| 22 | A    I think there were 50, but I don't know -- I | 11:53:53 |
| 23 | don't remember. | 11:53:58 |
| 24 | Q    Did you always buy the same size bottle? | 11:53:58 |
| 25 | A    Yes. | 11:54:01 |

Exhibit B
00193

Transcript of Linda Sunderland
Conducted on February 27, 2024                     75

```
1        Q    I guess only two times?                      11:54:01

2        A    Yes.                                         11:54:04

3        Q    And when you consumed the Emergen-C          11:54:05

4   elderberry supplement, did you consume it according to 11:54:08

5   directions for use?                                    11:54:12

6        A    Yes, I did.                                  11:54:13

7        Q    And what was the language on the Emergen-C   11:54:15

8   elderberry supplement that caused you to purchase it?  11:54:18

9             MR. BUSCH:  Objection to form.               11:54:22

10       A    "Immune support," "elderberry," caught my    11:54:23

11  eye.                                                   11:54:30

12       Q    And did you have the same expectations for   11:54:33

13  the Emergen-C product as you had for the Airborne      11:54:35

14  product --                                             11:54:40

15       A    Yes.                                         11:54:40

16       Q    -- based on the language, which was the same 11:54:40

17  expectation you had for the Sambucol products?         11:54:43

18       A    Yes.                                         11:54:46

19            MR. BUSCH:  Objection to form.               11:54:46

20       Q    And similarly, with respect to the Emergen-C 11:54:54

21  product, you don't know one way or the other whether   11:54:57

22  it met your expectations either?                       11:55:02

23       A    I did get a cold.                            11:55:03

24       Q    When you were --                             11:55:05

25            (Simultaneous speaking.)                     11:55:05
```

Exhibit B
00194

Transcript of Linda Sunderland
Conducted on February 27, 2024                    76

| | | |
|---|---|---|
| 1 | A    I did get a cold. | 11:55:09 |
| 2 | Q    Just try to -- I'll try not to talk over | 11:55:11 |
| 3 | you.  But, yeah, sometimes when I'm getting the | 11:55:13 |
| 4 | question out, just give me a few minutes to finish | 11:55:16 |
| 5 | it -- | 11:55:18 |
| 6 | A    Okay. | 11:55:19 |
| 7 | Q    Hopefully not a few minutes, a few seconds | 11:55:20 |
| 8 | to finish. | 11:55:22 |
| 9 | A    Okay. | 11:55:25 |
| 10 | MR. ORZANO:  Would you read back what you | 11:55:54 |
| 11 | have. | 11:55:59 |
| 12 | (The following is read by the Court | 11:55:59 |
| 13 | Reporter: | 11:55:59 |
| 14 | "QUESTION:  And similarly, with respect to | 11:54:54 |
| 15 | the Emergen-C product, you don't know one way or the | 11:54:56 |
| 16 | other whether it met your expectations either? | 11:55:01 |
| 17 | "ANSWER:  I did get a cold.") | 11:55:04 |
| 18 | Q    In response to Interrogatory Number 3, you | 11:56:03 |
| 19 | also identified the Goli Immune vitamin gummies with | 11:56:26 |
| 20 | elderberry extract. | 11:56:30 |
| 21 | You didn't produce a photo of that product. | 11:56:33 |
| 22 | Why not? | 11:56:36 |
| 23 | A    I stopped using it and I threw away the | 11:56:36 |
| 24 | bottle. | 11:56:42 |
| 25 | Q    But did Tiffany Kuiper ask you to take | 11:56:42 |

Exhibit B
00195

Transcript of Linda Sunderland
Conducted on February 27, 2024                    77

| 1 | photos of the Goli Immune -- | 11:56:46 |
| 2 | A    I didn't -- | 11:56:49 |
| 3 | MR. BUSCH:  Objection to form. | 11:56:49 |
| 4 | Don't answer any more specifics about what | 11:56:50 |
| 5 | was discussed between you and our office. | 11:56:53 |
| 6 | THE WITNESS:  Okay. | 11:56:55 |
| 7 | Q    I thought you said you -- you already | 11:56:55 |
| 8 | testified that you had gone to Myrtle to take | 11:56:58 |
| 9 | photographs of the elderberry products that you had | 11:57:01 |
| 10 | taken. | 11:57:04 |
| 11 | A    I didn't say that. | 11:57:06 |
| 12 | Q    Okay.  What -- | 11:57:06 |
| 13 | A    I said I went to Myrtle because I wanted -- | 11:57:06 |
| 14 | in the neighborhood, in my neighborhood, they have a | 11:57:11 |
| 15 | Xerox machine and I use it.  I wanted to buy some | 11:57:14 |
| 16 | products as well, and I was in the pharmacy in Myrtle | 11:57:18 |
| 17 | Pharmacy and I noticed they had Sambucol products | 11:57:23 |
| 18 | because they weren't available during the pandemic. | 11:57:26 |
| 19 | So I took a photograph. | 11:57:32 |
| 20 | Q    Does Myrtle carry the Goli Immune vitamin | 11:57:39 |
| 21 | gummies? | 11:57:43 |
| 22 | A    I don't think so, but I don't know for sure. | 11:57:43 |
| 23 | Q    You didn't look that day when you went -- | 11:57:45 |
| 24 | A    No. | 11:57:48 |
| 25 | Q    How many bottles of the Goli Immune vitamin | 11:57:48 |

Exhibit B
00196

Transcript of Linda Sunderland
Conducted on February 27, 2024                    78

| | | |
|---|---|---|
| 1 | gummies did you purchase? | 11:57:53 |
| 2 | A    I've purchased at least eight. | 11:57:55 |
| 3 | Q    When did you first purchase them? | 11:58:02 |
| 4 | A    I purchased them this year -- actually, in | 11:58:04 |
| 5 | 2023.  Sorry. | 11:58:13 |
| 6 | Q    So you first purchased them in 2023? | 11:58:14 |
| 7 | A    Mm-hmm -- no, not first.  In 2022 and in | 11:58:17 |
| 8 | 2023.  I have been buying a line of their products. | 11:58:21 |
| 9 | Q    I'm sorry? | 11:58:32 |
| 10 | A    I have been buying a line of their products, | 11:58:32 |
| 11 | which includes gummies that are green, green gummies, | 11:58:35 |
| 12 | and -- that have all kinds of vitamins in them, as | 11:58:40 |
| 13 | well as the black -- the elderberry gummies. | 11:58:44 |
| 14 | Q    And when you purchased -- and so did you | 11:58:49 |
| 15 | stop purchasing the Goli gummies? | 11:58:53 |
| 16 | A    Just decided to go with -- just recently, I | 11:58:56 |
| 17 | decided to go with Airborne and concentrate on using | 11:59:01 |
| 18 | just that one brand and see if it has any effect on my | 11:59:05 |
| 19 | health. | 11:59:09 |
| 20 | Q    Okay.  And when did you last purchase the | 11:59:09 |
| 21 | Goli -- | 11:59:11 |
| 22 | A    Goli?  About -- God, about at least six | 11:59:14 |
| 23 | months ago. | 11:59:19 |
| 24 | Q    And did you always buy the same size bottle? | 11:59:23 |
| 25 | A    Goli's, yes. | 11:59:27 |

Exhibit B
00197

Transcript of Linda Sunderland
Conducted on February 27, 2024                    79

| | | |
|---|---|---|
| 1 | Q    How many gummies were in a bottle? | 11:59:29 |
| 2 | A    I don't remember.  I would say roughly 30. | 11:59:32 |
| 3 | Q    Do you have any Goli black elderberry gummy | 11:59:36 |
| 4 | packaging at home? | 11:59:41 |
| 5 | A    Not anymore, no.  I have the green gummies | 11:59:41 |
| 6 | from -- they call it greens, but I don't have any of | 11:59:46 |
| 7 | the elderberries. | 11:59:51 |
| 8 | Q    But you had a bottle of the Goli Immune | 11:59:52 |
| 9 | gummies in 2023? | 11:59:56 |
| 10 | A    Yes. | 11:59:57 |
| 11 | Q    And you threw it out? | 11:59:57 |
| 12 | A    Yes. | 12:00:02 |
| 13 | Q    When in 2023 did you throw it out? | 12:00:03 |
| 14 | A    I don't remember.  Estimate probably | 12:00:07 |
| 15 | November 2023.  I don't remember, though. | 12:00:12 |
| 16 | Q    When you consumed the Goli Immune gummies, | 12:00:15 |
| 17 | did you take them according to the directions for use? | 12:00:25 |
| 18 | A    Yes. | 12:00:27 |
| 19 | Q    And what was the language on the packaging | 12:00:28 |
| 20 | of the Goli gummies that caused you to purchase that | 12:00:36 |
| 21 | brand? | 12:00:40 |
| 22 | MR. BUSCH:  Objection to form. | 12:00:40 |
| 23 | A    There wasn't any, that -- anything specific. | 12:00:41 |
| 24 | Q    And did you have the same expectations for | 12:00:50 |
| 25 | the Goli gummies that you had for the other black | 12:00:52 |

Exhibit B
00198

| | | |
|---|---|---|
| 1 | elderberry products we discussed? | 12:00:56 |
| 2 | A    Yes. | 12:00:57 |
| 3 | Q    And similarly, you don't know one way or the | 12:01:05 |
| 4 | other whether the Goli Black Elderberry gummies met | 12:01:08 |
| 5 | your expectations for the project? | 12:01:11 |
| 6 | A    I did get a cold, more than one. | 12:01:13 |
| 7 | Q    When did you get the colds?  Was that in | 12:01:27 |
| 8 | 2023? | 12:01:32 |
| 9 | A    In the winter.  In the winter. | 12:01:32 |
| 10 | Q    Of 2023? | 12:01:35 |
| 11 | A    Yes. | 12:01:36 |
| 12 | MR. BUSCH:  Objection to form. | 12:01:36 |
| 13 | A    Yes.  And this year as well. | 12:01:38 |
| 14 | Q    Then you also mentioned in your | 12:01:54 |
| 15 | interrogatory response that you began purchasing the | 12:01:57 |
| 16 | botanicals -- is that a separate type of supplement? | 12:02:05 |
| 17 | So you say -- if you look at Exhibit 7, on | 12:02:08 |
| 18 | the top of page 4, it lists the products that you | 12:02:10 |
| 19 | began purchasing in January 2023.  And it says | 12:02:14 |
| 20 | "Emergen-C Elderberry Daily Immune Support and | 12:02:18 |
| 21 | Botanicals Gummies." | 12:02:22 |
| 22 | A    I think the botanical gummies were -- were | 12:02:25 |
| 23 | the Goli -- I didn't realize that I -- I -- I added, | 12:02:31 |
| 24 | you know, botanical gummies were the Goli. | 12:02:37 |
| 25 | Q    Okay.  So since you stopped purchasing the | 12:02:44 |

Exhibit B
00199

Transcript of Linda Sunderland
Conducted on February 27, 2024                    81

| | | |
|---|---|---|
| 1 | Sambucol Black Elderberry products, the only other | 12:02:49 |
| 2 | black elderberry products you have been purchasing are | 12:02:55 |
| 3 | the Goli, the Airborne, and the Emergen-C? | 12:02:56 |
| 4 | A    Yes. | 12:02:59 |
| 5 | Q    So earlier, we talked about the complaint | 12:03:30 |
| 6 | and the fact that you had reviewed it, I think you | 12:03:33 |
| 7 | said perhaps a month ago? | 12:03:36 |
| 8 | A    Mm-hmm. | 12:03:39 |
| 9 | Q    Do you know when the complaint was filed? | 12:03:40 |
| 10 | A    No. | 12:03:45 |
| 11 | MR. BUSCH:  Objection to form. | 12:03:46 |
| 12 | A    I don't know. | 12:03:51 |
| 13 | Q    Who are you suing in this case? | 12:03:58 |
| 14 | MR. BUSCH:  Objection to form. | 12:04:08 |
| 15 | A    My lawyers are suing Pharmacare, I believe. | 12:04:10 |
| 16 | Q    Do you know the names specifically of the | 12:04:18 |
| 17 | defendants in the case? | 12:04:22 |
| 18 | MR. BUSCH:  Objection to form. | 12:04:23 |
| 19 | A    No. | 12:04:26 |
| 20 | Q    What's your understanding -- well, let me | 12:04:27 |
| 21 | ask you this.  So you said that your lawyers are suing | 12:04:44 |
| 22 | Pharmacare. | 12:04:48 |
| 23 | Do you have a -- what do you mean by that? | 12:04:50 |
| 24 | MR. BUSCH:  Objection to form. | 12:04:55 |
| 25 | A    They represent me, as well -- and I'm | 12:04:57 |

Exhibit B
00200

Transcript of Linda Sunderland
Conducted on February 27, 2024                    82

| | | |
|---|---|---|
| 1 | testifying on behalf of myself and they'd represent me | 12:04:59 |
| 2 | as well as the national use of Sambucol. | 12:05:02 |
| 3 | Q    Are you asserting any claims in the case? | 12:05:08 |
| 4 | MR. BUSCH:  Objection to form.  Calls for | 12:05:10 |
| 5 | legal conclusion. | 12:05:13 |
| 6 | A    I agree.  I'm standing by -- by the paper, | 12:05:15 |
| 7 | you know, this argument that they have written. | 12:05:24 |
| 8 | Q    Okay.  You're referring with your hand to a | 12:05:30 |
| 9 | document. | 12:05:32 |
| 10 | A    Yeah. | 12:05:32 |
| 11 | Q    Could you -- what document are you referring | 12:05:32 |
| 12 | to? | 12:05:34 |
| 13 | A    To the complaint document. | 12:05:35 |
| 14 | Q    Okay.  And what exhibit is that? | 12:05:38 |
| 15 | A    7. | 12:05:45 |
| 16 | Q    So is it your understanding that that is the | 12:05:53 |
| 17 | complaint filed in the case, Exhibit 7? | 12:06:00 |
| 18 | MR. BUSCH:  Objection to form.  Asks for a | 12:06:02 |
| 19 | legal conclusion. | 12:06:05 |
| 20 | A    I agree with the lawyer. | 12:06:06 |
| 21 | MR. BUSCH:  After I lodge my objections, | 12:06:09 |
| 22 | answer to the best of your ability.  But the best of | 12:06:11 |
| 23 | your ability isn't to answer -- don't try to create an | 12:06:14 |
| 24 | answer, only answer to the extent that you feel | 12:06:19 |
| 25 | comfortable putting yourself on the record with an | 12:06:23 |

Exhibit B
00201

Transcript of Linda Sunderland
Conducted on February 27, 2024                83

| | | |
|---|---|---|
| 1 | <u>answer.</u> | 12:06:26 |
| 2 | <u>A    Well, to my knowledge, this is the</u> | 12:06:26 |
| 3 | <u>complaint.</u> | 12:06:28 |
| 4 | <u>Q    Have you -- other than that document, have</u> | 12:06:29 |
| 5 | <u>you seen any other documents in the case?</u> | 12:06:30 |
| 6 | MR. BUSCH:  Objection to form. | 12:06:34 |
| 7 | A    No, I haven't.  No, I haven't. | 12:06:34 |
| 8 | Q    Just give your counsel a second because now | 12:06:38 |
| 9 | you two are talking over each other -- | 12:06:41 |
| 10 | A    Okay. | 12:06:41 |
| 11 | Q    -- just give me a few seconds to finish and | 12:06:41 |
| 12 | then your counsel -- | 12:06:46 |
| 13 | MR. BUSCH:  It's absolutely not natural.  We | 12:06:46 |
| 14 | like to kind of like interchange when we talk | 12:06:48 |
| 15 | normally.  Just give yourself a second. | 12:06:50 |
| 16 | THE WITNESS:  I will. | 12:06:52 |
| 17 | MR. BUSCH:  It's not natural, so we | 12:06:54 |
| 18 | understand.  But -- | 12:06:57 |
| 19 | THE WITNESS:  Okay. | 12:06:57 |
| 20 | MR. BUSCH:  -- it's a practice. | 12:06:58 |
| 21 | BY MR. ORZANO: | 12:07:12 |
| 22 | Q    So referring to Exhibit 7 -- | 12:07:12 |
| 23 | A    All right. | 12:07:15 |
| 24 | Q    -- the bottom of page 6, let me know when | 12:07:16 |
| 25 | you get there. | 12:07:30 |

Exhibit B
00202

Transcript of Linda Sunderland
Conducted on February 27, 2024                    84

1      A    Yeah, I'm there.                                    12:07:30

2      Q    We asked you to "Identify any documents that        12:07:31

3  support the allegations in your complaint," and then         12:07:33

4  there's a long series of objections.                         12:07:38

5           But at the bottom of page 7 is your                 12:07:41

6  response, and the last paragraph on page 7 says,             12:07:45

7  "Plaintiff identifies all documents referenced in           12:07:50

8  plaintiff's complaint, documents that may be produced        12:07:52

9  in response to plaintiffs' discovery requests, as well      12:07:56

10 as documents produced in the Corbett v. Pharmacare          12:07:59

11 U.S., Inc. matter."                                          12:08:03

12          Do you see that?                                    12:08:04

13     A    Yes.                                                12:08:05

14     Q    Specifically, what documents produced in the       12:08:08

15 Corbett v. Pharmacare U.S., Inc. matter support the         12:08:13

16 allegations in your complaint?                               12:08:18

17          MR. BUSCH:  Objection to form.  Calls for          12:08:20

18 legal conclusion.                                            12:08:22

19     A    I have no proof from -- from Pharmacare that        12:08:25

20 they've submitted any evidence.                              12:08:32

21     Q    Do you know what the Corbett v. Pharmacare          12:08:37

22 U.S., Inc. case is?                                          12:08:41

23          MR. BUSCH:  Objection to form.                     12:08:44

24     A    Yes, the Sambucol case.                            12:08:44

25     Q    Are you involved in that case?                     12:08:48

Exhibit B
00203

Transcript of Linda Sunderland
Conducted on February 27, 2024                                    85

| 1  | A    Yes, I am. | 12:08:50 |
| 2  | MR. BUSCH:  Objection to form. | 12:08:51 |
| 3  | Q    How are you involved in that case? | 12:08:52 |
| 4  | A    We're suing -- my lawyers are suing | 12:08:54 |

5    Pharmacare for misrepresentation of the virologist's     12:08:56

6    advertising on the side of the box.                      12:09:05

7       Q    Are you aware there are two different             12:09:08

8    lawsuits against Pharmacare that have been filed by       12:09:10

9    your counsel?                                             12:09:16

10      A    Yes.                                              12:09:17

11      Q    Okay.  And you understand one is the Corbett      12:09:17

12   case referred to in your interrogatory response, and     12:09:20

13   the other one is the case that you're here for a          12:09:24

14   deposition today in?                                      12:09:27

15      A    I wasn't aware of the Corbett.                    12:09:29

16      Q    So you did not know that your counsel has         12:09:36

17   filed a separate lawsuit against Pharmacare?              12:09:38

18      MR. BUSCH:  Objection to form.  Asked and             12:09:40

19   answered.                                                 12:09:41

20      A    I didn't know.                                    12:09:41

21      Q    So just to go back to the interrogatory           12:09:49

22   response then, just to close the loop, so you don't       12:09:52

23   know what documents produced in Corbett v. Pharmacare,    12:09:56

24   which would be the other case that your lawyers have      12:10:00

25   filed against Pharmacare, what documents support your     12:10:02

Exhibit B
00204

Transcript of Linda Sunderland
Conducted on February 27, 2024                          86

| | | |
|---|---|---|
| 1 | allegations in this case? | 12:10:06 |
| 2 | A    I don't know. | 12:10:07 |
| 3 | MR. BUSCH:  Objection to form.  Calls for a | 12:10:07 |
| 4 | legal conclusion. | 12:10:09 |
| 5 | Q    Have you -- so you already said the only | 12:10:10 |
| 6 | documents that you've seen in this case are Exhibit 7, | 12:10:12 |
| 7 | the only document you've seen.  So just to close the | 12:10:15 |
| 8 | loop on this too, you haven't seen any documents | 12:10:19 |
| 9 | produced in the Corbett v. Pharmacare case? | 12:10:23 |
| 10 | A    No. | 12:10:45 |
| 11 | Q    Going back to Exhibit 7, on page 11. | 12:10:45 |
| 12 | A    All right.  Yes. | 12:10:51 |
| 13 | Q    Let me know when you get to Interrogatory | 12:10:57 |
| 14 | Number 10. | 12:10:59 |
| 15 | A    Okay. | 12:11:00 |
| 16 | Q    We asked you to "Describe all tests of the | 12:11:00 |
| 17 | products performed by you or on your behalf."  And in | 12:11:03 |
| 18 | response you said that you have completed lectin | 12:11:08 |
| 19 | testing referenced in the complaint. | 12:11:12 |
| 20 | Do you see that? | 12:11:15 |
| 21 | A    No.  Where is it? | 12:11:18 |
| 22 | Q    So continuing on to page 12, the response is | 12:11:19 |
| 23 | at the top of page 12. | 12:11:22 |
| 24 | A    Completed the lectin testing reference -- I | 12:11:32 |
| 25 | have -- I don't remember the lectin test. | 12:11:37 |

Exhibit B
00205

Transcript of Linda Sunderland
Conducted on February 27, 2024                    87

| | | |
|---|---|---|
| 1 | Q    So you have no idea what that lectin testing | 12:11:40 |
| 2 | is referring to? | 12:11:43 |
| 3 | MR. BUSCH:  Objection to form. | 12:11:43 |
| 4 | A    No.  No. | 12:11:44 |
| 5 | Q    Do you know what a lectin is? | 12:11:51 |
| 6 | MR. BUSCH:  Objection to form. | 12:11:53 |
| 7 | A    No. | 12:11:53 |
| 8 | Q    Have you ever heard of NIS Labs? | 12:11:59 |
| 9 | A    No. | 12:12:22 |
| 10 | Q    Did you ever request any lectin testing? | 12:12:37 |
| 11 | MR. BUSCH:  Objection to form. | 12:12:40 |
| 12 | A    No. | 12:12:41 |
| 13 | Q    So staying with Exhibit 7, if you turn to | 12:12:56 |
| 14 | Interrogatory Number 8, it's on page 8. | 12:13:01 |
| 15 | A    All right. | 12:13:05 |
| 16 | Q    It's on the top of page 8.  Let me know when | 12:13:06 |
| 17 | you get there. | 12:13:14 |
| 18 | A    Okay. | 12:13:19 |
| 19 | Q    So Interrogatory Number 8 asks you to | 12:13:20 |
| 20 | identify all persons with whom you've had any | 12:13:26 |
| 21 | communications related to the allegations in your | 12:13:29 |
| 22 | complaint. | 12:13:31 |
| 23 | Do you see that? | 12:13:31 |
| 24 | A    Yes. | 12:13:32 |
| 25 | Q    And then in response, turning to the next | 12:13:32 |

Exhibit B
00206

Transcript of Linda Sunderland
Conducted on February 27, 2024                    88

| | | |
|---|---|---|
| 1 | page, on page 9, the response is just above where it | 12:13:36 |
| 2 | says Interrogatory Number 9. | 12:13:40 |
| 3 | A    Mm-hmm. | 12:13:43 |
| 4 | Q    And specifically it says "Additionally, | 12:13:45 |
| 5 | plaintiff received an email newsletter and viewed a | 12:13:48 |
| 6 | website regarding the claims in this case." | 12:13:51 |
| 7 | Do you see that? | 12:13:54 |
| 8 | A    Yes. | 12:13:54 |
| 9 | Q    Who did you receive an email newsletter | 12:13:55 |
| 10 | from? | 12:14:12 |
| 11 | MR. BUSCH:  Objection to form. | 12:14:13 |
| 12 | A    I received an email about class action | 12:14:14 |
| 13 | lawsuits in general, and this -- Sambucol was one of | 12:14:20 |
| 14 | the class action lawsuits that I -- caught my eye in | 12:14:26 |
| 15 | the newsletter on my email. | 12:14:30 |
| 16 | Q    And did you have to sign up for that | 12:14:38 |
| 17 | newsletter? | 12:14:40 |
| 18 | MR. BUSCH:  Objection to form. | 12:14:40 |
| 19 | A    I think so. | 12:14:42 |
| 20 | Q    When did you -- excuse me. | 12:14:43 |
| 21 | When did you first start receiving the | 12:14:45 |
| 22 | newsletter? | 12:14:47 |
| 23 | A    I don't remember.  But I could estimate.  It | 12:14:48 |
| 24 | was probably at least two years ago.  But that's an | 12:14:53 |
| 25 | estimate.  I don't remember. | 12:15:05 |

Exhibit B
00207

Transcript of Linda Sunderland
Conducted on February 27, 2024                    89

| | | |
|---|---|---|
| 1 | Q    Why did you sign up two years ago for the | 12:15:08 |
| 2 | ClassAction.org newsletter? | 12:15:13 |
| 3 | MR. BUSCH:  Objection to form. | 12:15:15 |
| 4 | A    It was sent to my email and it interested | 12:15:16 |
| 5 | me.  I read it and I thought it offered a | 12:15:22 |
| 6 | subscription, that you could get a free subscription. | 12:15:27 |
| 7 | They didn't say how often they would send it to you in | 12:15:31 |
| 8 | your email.  Just out of curiosity, I wanted to keep | 12:15:37 |
| 9 | up with information like that in case I used any of | 12:15:41 |
| 10 | the products that come up in lawsuits for reasons -- | 12:15:45 |
| 11 | for whatever reasons. | 12:15:49 |
| 12 | Q    And how frequently did you receive the | 12:15:51 |
| 13 | newsletter? | 12:15:54 |
| 14 | A    I can't recall on that.  At least once a | 12:15:56 |
| 15 | month. | 12:15:58 |
| 16 | Q    And did you read the newsletter when you | 12:15:59 |
| 17 | received it? | 12:16:01 |
| 18 | A    Occasionally I did, yes. | 12:16:02 |
| 19 | Q    So sometimes you would, sometimes you | 12:16:04 |
| 20 | wouldn't? | 12:16:07 |
| 21 | A    I wouldn't have the time sometimes to do it, | 12:16:07 |
| 22 | but I more than likely read it. | 12:16:11 |
| 23 | Q    How did you first hear about | 12:16:15 |
| 24 | ClassAction.org? | 12:16:18 |
| 25 | A    It just came up on my email as a -- as an | 12:16:20 |

**PLANET DEPOS**
888.433.3767 | WWW.PLANETDEPOS.COM

Exhibit B
00208

Transcript of Linda Sunderland
Conducted on February 27, 2024                                    90

| | | |
|---|---|---|
| 1 | email that I received.  I didn't ask for it.  It just | 12:16:24 |
| 2 | was like advertising sent it -- it was sent to my | 12:16:28 |
| 3 | email. | 12:16:31 |
| 4 | Q    So if you turn to Exhibit 7, the next | 12:16:32 |
| 5 | Interrogatory Number 9. | 12:16:42 |
| 6 | A    Yes. | 12:16:45 |
| 7 | Q    It asks you to "Describe any communications | 12:16:46 |
| 8 | between you and ClassAction.org." | 12:16:56 |
| 9 | And your response is on page 11, just above | 12:16:59 |
| 10 | Interrogatory Number 10.  It says, "On or about June | 12:17:08 |
| 11 | 29th, 2023, plaintiff viewed a website | 12:17:11 |
| 12 | Classaction.org/elderberry-supplement-lawsuit on | 12:17:21 |
| 13 | ClassAction.org regarding this case, and provided her | 12:17:21 |
| 14 | contained information on the form provided.  Plaintiff | 12:17:25 |
| 15 | also received an email newsletter regarding several | 12:17:28 |
| 16 | cases, including the involving Sambucol from | 12:17:31 |
| 17 | Newsletter@classaction.org on the same date." | 12:17:36 |
| 18 | So I just want to understand.  So you -- | 12:17:45 |
| 19 | prior to June 29th, 2023, when you went to the website | 12:17:48 |
| 20 | for ClassAction.org, you had already been receiving | 12:17:52 |
| 21 | the ClassAction.org newsletter? | 12:17:56 |
| 22 | MR. BUSCH:  Objection to form. | 12:17:59 |
| 23 | A    I don't know for sure, but I would say yes. | 12:17:59 |
| 24 | Q    Is there a reason you went to the | 12:18:04 |
| 25 | ClassAction.org website on that day? | 12:18:06 |

Exhibit B
00209

Transcript of Linda Sunderland
Conducted on February 27, 2024                    91

| | | |
|---|---|---|
| 1 | A    I just received the newsletter and I looked | 12:18:08 |
| 2 | at it.  It was just came up in my email. | 12:18:13 |
| 3 | Q    So you think you received the newsletter | 12:18:17 |
| 4 | first that day and then went to the website? | 12:18:19 |
| 5 | A    Yes. | 12:18:21 |
| 6 | Q    Prior to June 29th, 2023, had you seen | 12:18:39 |
| 7 | anything on the ClassAction.org website or in its | 12:18:43 |
| 8 | newsletter regarding Sambucol? | 12:18:47 |
| 9 | A    I don't think so, but I don't remember.  I | 12:18:49 |
| 10 | -- back 2023, it's a while ago. | 12:18:55 |
| 11 | Q    Were the emails from ClassAction.org sent to | 12:19:02 |
| 12 | the same email address you previously provided? | 12:19:06 |
| 13 | A    Yes.  Yes. | 12:19:09 |
| 14 | Q    Do you still have those emails? | 12:19:09 |
| 15 | A    Probably, yes. | 12:19:12 |
| 16 | Q    You haven't searched for them -- | 12:19:13 |
| 17 | A    No. | 12:19:13 |
| 18 | Q    -- in response to discovery in the case? | 12:19:15 |
| 19 | A    No. | 12:19:17 |
| 20 | Q    Don't delete those emails, please. | 12:19:18 |
| 21 | A    Sure. | 12:19:22 |
| 22 | Q    So it says in the interrogatory response | 12:19:42 |
| 23 | that after you went to the website, you provided | 12:19:44 |
| 24 | information on the form provided. | 12:19:50 |
| 25 | What information did you provide? | 12:19:53 |

Exhibit B
00210

Transcript of Linda Sunderland
Conducted on February 27, 2024                              92

| | | |
|---|---|---|
| 1 | A    As I recall, it asked something like, do you | 12:19:55 |
| 2 | ever use this product, that's all I can remember, and | 12:20:02 |
| 3 | I said yes.  And maybe how often.  It also asked for | 12:20:06 |
| 4 | my name, and, of course, my email address, stuff like | 12:20:23 |
| 5 | that. | 12:20:26 |
| 6 | Q    Is that the first time you had submitted | 12:20:26 |
| 7 | information to ClassAction.org? | 12:20:34 |
| 8 | A    Yes. | 12:20:37 |
| 9 | Q    And do you recall, as you're sitting here | 12:20:38 |
| 10 | today, any additional information you provided on that | 12:20:46 |
| 11 | initial form you submitted? | 12:20:48 |
| 12 | A    No. | 12:21:34 |
| 13 | Q    I'm going to show you what's been previously | 12:21:34 |
| 14 | marked as Exhibit 3.  So this was produced by you in | 12:21:37 |
| 15 | this case in response to discovery. | 12:22:01 |
| 16 | Have you seen this before? | 12:22:03 |
| 17 | A    Yes. | 12:22:05 |
| 18 | Q    Now, the first page of Exhibit 3, on the top | 12:22:05 |
| 19 | it says "ClassAction.org newsletter." | 12:22:13 |
| 20 | Do you see that? | 12:22:16 |
| 21 | A    Yes. | 12:22:16 |
| 22 | Q    And it looks like an email? | 12:22:17 |
| 23 | A    Yes. | 12:22:19 |
| 24 | Q    Is this the newsletter you received -- | 12:22:19 |
| 25 | A    Yes -- | 12:22:19 |

Exhibit B
00211

Transcript of Linda Sunderland
Conducted on February 27, 2024                    93

| | | | |
|---|---|---|---|
| 1 | Q | -- on June 29th, 2023? | 12:22:21 |
| 2 | A | -- I think so.  I think so, yes. | 12:22:23 |
| 3 | Q | So the newsletter is entitled "AMEX and | 12:22:25 |
| 4 | | Business Owners, Elderberry Supplements and More." | 12:22:33 |
| 5 | | Do you see that? | 12:22:35 |
| 6 | A | Yes. | 12:22:36 |
| 7 | Q | And then the second paragraph, it says, "We | 12:22:37 |
| 8 | | have investigations into the effectiveness of Sambucol | 12:22:42 |
| 9 | | Black Elderberry supplements." | 12:22:45 |
| 10 | | Do you see that? | 12:22:46 |
| 11 | A | Where is that? | 12:22:48 |
| 12 | Q | It's in the second paragraph. | 12:22:52 |
| 13 | A | Oh, I see. | 12:22:54 |
| 14 | Q | It says, "Then, we have investigations" -- | 12:22:55 |
| 15 | A | Yes.  I see it now, yes. | 12:22:58 |
| 16 | Q | So you had complaints about the | 12:23:07 |
| 17 | | effectiveness of the Sambucol Black Elderberry | 12:23:09 |
| 18 | | supplements? | 12:23:14 |
| 19 | | MR. BUSCH:  Objection to form. | 12:23:14 |
| 20 | A | Yes. | 12:23:16 |
| 21 | | MR. ORZANO:  Let's take a five-minute break. | 12:23:49 |
| 22 | | THE WITNESS:  Okay. | 12:23:52 |
| 23 | | THE VIDEOGRAPHER:  Off the record at 12:23 | 12:23:52 |
| 24 | | p.m. | 12:23:55 |
| 25 | | (Recess 12:23 p.m. - 12:44 p.m.) | 12:23:56 |

Exhibit B
00212

Transcript of Linda Sunderland
Conducted on February 27, 2024                    94

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Back on the record 12:44 | 12:44:20 |
| 2 | p.m. | 12:44:23 |
| 3 | BY MR. ORZANO: | 12:44:24 |
| 4 | Q    So I don't think I specifically asked you | 12:44:24 |
| 5 | this earlier, but why did you stop buying Sambucol | 12:44:27 |
| 6 | products in December 2020 -- 2022?  Sorry. | 12:44:31 |
| 7 | A    It was during the pandemic and they weren't | 12:44:38 |
| 8 | available on the shelf for some reason at Walgreens. | 12:44:41 |
| 9 | Q    I'll show you what's previously been marked | 12:45:02 |
| 10 | as Exhibit 4. | 12:45:08 |
| 11 | So you had testified earlier that the only | 12:45:12 |
| 12 | document in the case you had seen was Exhibit 7, | 12:45:14 |
| 13 | correct? | 12:45:18 |
| 14 | A    Mm-hmm. | 12:45:21 |
| 15 | Q    So just to confirm, you haven't seen what I | 12:45:22 |
| 16 | just showed you as Exhibit 4? | 12:45:24 |
| 17 | MR. BUSCH:  Objection to form. | 12:45:26 |
| 18 | A    I don't think so, no. | 12:45:28 |
| 19 | Q    Okay. | 12:45:42 |
| 20 | A    Oh, wait.  I might have.  I might have.  I | 12:45:43 |
| 21 | recognize a page.  I think I might have seen it.  Let | 12:45:46 |
| 22 | me just check. | 12:45:51 |
| 23 | MR. BUSCH:  Another thing that doesn't feel | 12:45:52 |
| 24 | natural, and that's totally okay, is if you need a | 12:45:54 |
| 25 | moment -- | 12:45:56 |

Exhibit B
00213

Transcript of Linda Sunderland
Conducted on February 27, 2024                    95

| | | |
|---|---|---|
| 1 | MR. ORZANO:  Russell -- | 12:45:56 |
| 2 | MR. BUSCH:  -- this is counseling her on | 12:45:56 |
| 3 | what she -- | 12:45:58 |
| 4 | MR. ORZANO:  Russell, you're allowed in a | 12:45:59 |
| 5 | deposition to object and that's it.  You're not | 12:46:01 |
| 6 | allowed to discuss and coach the witness. | 12:46:03 |
| 7 | MR. BUSCH:  I'm not coaching the witness. | 12:46:05 |
| 8 | I'm simply instructing her that she can take the time | 12:46:06 |
| 9 | she needs to feel comfortable to review a document. | 12:46:10 |
| 10 | That's all I was going to say. | 12:46:17 |
| 11 | A    I did see this.  I did see the second -- | 12:46:18 |
| 12 | this Exhibit 4. | 12:46:21 |
| 13 | Q    Okay.  And when did you see it? | 12:46:21 |
| 14 | A    I saw it last night. | 12:46:24 |
| 15 | Q    So the first time you saw it was last night? | 12:46:32 |
| 16 | A    Yes. | 12:46:35 |
| 17 | MR. BUSCH:  Objection to form. | 12:46:35 |
| 18 | A    I think so, yes. | 12:46:37 |
| 19 | Q    And why -- why did you look at it last | 12:46:39 |
| 20 | night? | 12:46:42 |
| 21 | MR. BUSCH:  Objection to form. | 12:46:42 |
| 22 | A    The -- Tiffany sent it to me in an email. | 12:46:43 |
| 23 | Q    So did you review it in preparation for your | 12:46:59 |
| 24 | deposition today? | 12:47:02 |
| 25 | A    Yes. | 12:47:02 |

Exhibit B
00214

Transcript of Linda Sunderland
Conducted on February 27, 2024                    96

| | | |
|---|---|---|
| 1 | Q    Going back to your communications with | 12:47:03 |
| 2 | ClassAction.org, after you submitted your form to | 12:47:40 |
| 3 | ClassAction.org, what happened next? | 12:47:44 |
| 4 |      MR. BUSCH:  Objection to form. | 12:47:47 |
| 5 | A    I did receive a phone call many months | 12:47:48 |
| 6 | later, not right away, from Trenton Kashima, who works | 12:47:54 |
| 7 | for Milberg as an attorney, asking me if I wanted to | 12:48:05 |
| 8 | participate in a trial or a court action against | 12:48:13 |
| 9 | Sambucol because he had read my submittal -- | 12:48:18 |
| 10 | submission to the newsletter. | 12:48:21 |
| 11 | Q    And I think you submitted the form on June | 12:48:26 |
| 12 | 29th, 2023? | 12:48:29 |
| 13 | A    Mm-hmm. | 12:48:30 |
| 14 | Q    And when did Trenton Kashima reach out to | 12:48:31 |
| 15 | you? | 12:48:37 |
| 16 | A    I think somewhere September or October of | 12:48:37 |
| 17 | 2023. | 12:48:42 |
| 18 | Q    And I'm sorry if you said this.  How did he | 12:48:46 |
| 19 | reach out to you? | 12:48:49 |
| 20 | A    He called me on the phone. | 12:48:50 |
| 21 | Q    And how long did you talk with him for? | 12:48:53 |
| 22 | A    Ten minutes or less, ten minutes or less. | 12:48:56 |
| 23 | Q    Did you want to sue Pharmacare before you | 12:49:01 |
| 24 | visited ClassAction.org on June 29th, 2023? | 12:49:24 |
| 25 |      MR. BUSCH:  Objection to form. | 12:49:28 |

Exhibit B
00215

Transcript of Linda Sunderland
Conducted on February 27, 2024                    97

| | |
|---|---|
| 1 | A    I didn't think of doing that.  I was | 12:49:29 |
| 2 | disappointed with the product, but I didn't think of | 12:49:33 |
| 3 | suing them. | 12:49:37 |
| 4 | Q    Did you want to sue Pharmacare before you | 12:49:39 |
| 5 | first talked with Trenton Kashima? | 12:49:45 |
| 6 | A    No. | 12:49:50 |
| 7 | Q    Did you sign a written contract with your | 12:49:50 |
| 8 | lawyers? | 12:49:52 |
| 9 | MR. BUSCH:  Objection to form. | 12:49:53 |
| 10 | A    I think so.  I'm not sure.  I don't -- I | 12:49:54 |
| 11 | don't know for sure.  I really don't know -- remember. | 12:50:01 |
| 12 | Q    Do you have an understanding one way or the | 12:50:11 |
| 13 | other, if you do have a contract, what the terms of it | 12:50:13 |
| 14 | are? | 12:50:16 |
| 15 | MR. BUSCH:  Objection to form. | 12:50:16 |
| 16 | A    No. | 12:50:17 |
| 17 | Q    And you said before you visited | 12:50:25 |
| 18 | ClassAction.org on June 29th, 2023, you said you were | 12:50:31 |
| 19 | disappointed in Sambucol. | 12:50:37 |
| 20 | How were you disappointed? | 12:50:38 |
| 21 | A    Because I continued to get winter colds and | 12:50:40 |
| 22 | I thought it would, you know, eliminate winter colds. | 12:50:44 |
| 23 | I got dramatic winter colds; a lot of sneezing, a lot | 12:50:50 |
| 24 | of coughing, but I didn't go to the doctor for | 12:50:54 |
| 25 | medicine. | 12:50:58 |

Exhibit B
00216

Transcript of Linda Sunderland
Conducted on February 27, 2024                    98

| | | |
|---|---|---|
| 1 | Q    So you thought it would prevent you from | 12:50:58 |
| 2 | getting a cold, but you still got colds when you were | 12:51:00 |
| 3 | taking Sambucol? | 12:51:03 |
| 4 | A    Yeah. | 12:51:12 |
| 5 | Q    Do you have any -- well, let me ask you | 12:51:13 |
| 6 | this.  Have you communicated with anyone else at the | 12:51:15 |
| 7 | Milberg firm prior to today other than Tiffany Kuiper | 12:51:18 |
| 8 | and Trenton Kashima? | 12:51:23 |
| 9 | A    No. | 12:51:26 |
| 10 | Q    And have you communicated with Trenton | 12:51:26 |
| 11 | Kashima other than the one phone call we discussed? | 12:51:30 |
| 12 | A    No.  Oh, no, no. | 12:51:32 |
| 13 | MR. BUSCH:  Just a moment.  In general, | 12:51:37 |
| 14 | you're allowed to answer any question pertaining to if | 12:51:41 |
| 15 | a discussion happened with you or me or Trenton, | 12:51:44 |
| 16 | regardless of the nature of it.  Just don't divulge | 12:51:47 |
| 17 | any of the contents of that.  I just -- it's for -- | 12:51:50 |
| 18 | Q    And had you met -- well, so you hadn't | 12:51:54 |
| 19 | communicated with Russell Busch prior to today? | 12:51:58 |
| 20 | A    No. | 12:52:01 |
| 21 | MR. BUSCH:  Objection to form. | 12:52:02 |
| 22 | Q    Had you heard the name Russell Busch prior | 12:52:04 |
| 23 | to today? | 12:52:06 |
| 24 | A    No. | 12:52:10 |
| 25 | Q    Have you communicated with any other lawyer | 12:52:10 |

Exhibit B
00217

Transcript of Linda Sunderland
Conducted on February 27, 2024                    99

| | | | |
|---|---|---|---|
| 1 | at Milberg -- | | 12:52:14 |
| 2 | A | No. | 12:52:14 |
| 3 | Q | -- other than Russell Busch and Trenton | 12:52:16 |
| 4 | Kashima? | | 12:52:18 |
| 5 | A | No. | 12:52:23 |
| 6 | Q | Do you know the names of any other lawyers | 12:52:23 |
| 7 | at Russell Busch's law firm? | | 12:52:26 |
| 8 | A | No. | 12:52:33 |
| 9 | Q | Do you have any prior relationship with | 12:52:33 |
| 10 | anyone at the Milberg law firm? | | 12:52:36 |
| 11 | A | No. | 12:52:43 |
| 12 | Q | Are you guaranteed any payment from this | 12:52:43 |
| 13 | lawsuit? | | 12:52:46 |
| 14 | MR. BUSCH: Objection to form. | | 12:52:47 |
| 15 | A | I don't know. | 12:52:48 |
| 16 | Q | Are you a plaintiff in this case? | 12:53:04 |
| 17 | A | Yes. | 12:53:06 |
| 18 | Q | Who do you believe is responsible for | 12:53:06 |
| 19 | overseeing the progress of this case, you or your | | 12:53:10 |
| 20 | attorneys? | | 12:53:13 |
| 21 | MR. BUSCH: Objection to form. | | 12:53:13 |
| 22 | A | I would say either Trenton Kashima and | 12:53:16 |
| 23 | Russell Busch -- Russell Busch. | | 12:53:20 |
| 24 | Q | So your attorneys? | 12:53:24 |
| 25 | A | Yes. | 12:53:25 |

Exhibit B
00218

Transcript of Linda Sunderland
Conducted on February 27, 2024                    100

| | | |
|---|---|---|
| 1 | Q    Do you receive updates on the progress of | 12:53:27 |
| 2 | the case from your attorneys? | 12:53:31 |
| 3 | A    No. | 12:53:34 |
| 4 | Q    Have you ever asked for an update on the | 12:53:34 |
| 5 | case? | 12:53:39 |
| 6 | A    No. | 12:53:40 |
| 7 | Q    Did you talk to any other lawyers before | 12:53:41 |
| 8 | hiring Milberg to represent you in this case? | 12:53:51 |
| 9 | A    No. | 12:53:54 |
| 10 | Q    Did you do any research on the Milberg law | 12:53:54 |
| 11 | firm prior to hiring them? | 12:53:58 |
| 12 | A    No. | 12:54:00 |
| 13 | Q    How often have you communicated with anyone | 12:54:00 |
| 14 | from Milberg since the case was filed? | 12:54:09 |
| 15 | A    Well, the paralegal, Tiffany, and I have | 12:54:12 |
| 16 | spoken at least 12 times on the phone and in emails. | 12:54:17 |
| 17 | Q    So 12 times total, even on the phone? | 12:54:27 |
| 18 | A    Approximately, maybe 12 to 14 times. | 12:54:33 |
| 19 | Q    When you've spoken with Tiffany on the | 12:54:37 |
| 20 | phone, how long were those phone calls? | 12:54:40 |
| 21 | A    Approximately five minutes or less. | 12:54:42 |
| 22 | Q    What's the longest phone call you've had | 12:54:49 |
| 23 | with anyone at the Milberg firm? | 12:54:52 |
| 24 | A    Possibly six minutes or less, five minutes. | 12:54:55 |
| 25 | Q    Do you know how your lawyers will be | 12:55:07 |

Exhibit B
00219

Transcript of Linda Sunderland
Conducted on February 27, 2024                    101

| | | |
|---|---|---|
| 1 | <u>compensated if you lose this case?</u> | 12:55:16 |
| 2 | MR. BUSCH:  Objection to form. | 12:55:18 |
| 3 | A    No. | 12:55:20 |
| 4 | Q    What is your goal in this lawsuit? | 12:55:21 |
| 5 | MR. BUSCH:  Objection to form. | 12:55:23 |
| 6 | A    To represent myself as a user of this | 12:55:24 |
| 7 | product, Sambucol, as well as a national -- you know, | 12:55:29 |
| 8 | as a national -- represent the national use of the | 12:55:33 |
| 9 | product. | 12:55:39 |
| 10 | Q    When you say represent the national use of | 12:55:40 |
| 11 | the product, what do you mean? | 12:55:42 |
| 12 | A    For everyone who has used the product | 12:55:43 |
| 13 | throughout the United States, to be the person -- one | 12:55:46 |
| 14 | of the -- I didn't know there was another person, | 12:55:52 |
| 15 | actually, Binder, who represents the plaintiffs who | 12:55:55 |
| 16 | used this product in the United States. | 12:56:04 |
| 17 | Q    And are you seeking anything on behalf of | 12:56:06 |
| 18 | those individuals? | 12:56:09 |
| 19 | MR. BUSCH:  Objection to form.  Calls for a | 12:56:09 |
| 20 | legal conclusion. | 12:56:11 |
| 21 | A    I don't -- I'm not.  Maybe the lawyers are. | 12:56:12 |
| 22 | Q    Do you know one way or the other whether | 12:56:19 |
| 23 | you're seeking anything specific for the class -- | 12:56:23 |
| 24 | A    I think that -- that it's understood that | 12:56:26 |
| 25 | there will be compensation for everyone who has ever | 12:56:30 |

Exhibit B
00220

Transcript of Linda Sunderland
Conducted on February 27, 2024                                    102

| | | |
|---|---|---|
| 1 | used this product; if they file a claim, they will get | 12:56:34 |
| 2 | some degree of reimbursement. | 12:56:37 |
| 3 | Q    Anything else? | 12:56:43 |
| 4 | A    No. | 12:56:53 |
| 5 | Q    How much compensation are you seeking for | 12:56:53 |
| 6 | each class member? | 12:56:56 |
| 7 | MR. BUSCH:  Objection to form. | 12:56:57 |
| 8 | A    I'm not personally.  I don't know what the | 12:56:58 |
| 9 | lawyers' decision is, but I'm not personally. | 12:57:04 |
| 10 | Q    So you don't know one way or the other? | 12:57:06 |
| 11 | A    No. | 12:57:16 |
| 12 | Q    Do you consider yourself a member of the | 12:57:16 |
| 13 | following class during the fullest period allowed by | 12:57:19 |
| 14 | law, all persons in the United States who purchased | 12:57:23 |
| 15 | Sambucol for personal use and not for resale? | 12:57:26 |
| 16 | A    Yes. | 12:57:30 |
| 17 | Q    Do you know Benjamin Binder? | 12:57:52 |
| 18 | A    No. | 12:57:58 |
| 19 | Q    Have you communicated with Benjamin Binder | 12:57:58 |
| 20 | prior to filing this lawsuit? | 12:58:02 |
| 21 | A    No. | 12:58:05 |
| 22 | Q    Have you ever heard the name Montiqueno | 12:58:05 |
| 23 | Corbett? | 12:58:10 |
| 24 | A    No. | 12:58:10 |
| 25 | Q    Do you know Rob Dobbs? | 12:58:10 |

Exhibit B
00221

Transcript of Linda Sunderland
Conducted on February 27, 2024                              103

| | | | |
|---|---|---|---|
| 1 | A | No. | 12:58:13 |
| 2 | Q | Have you ever heard the name Allison | 12:58:14 |
| 3 | Goddard? | | 12:58:21 |
| 4 | A | No. | 12:58:21 |
| 5 | Q | Have you ever seen the scheduling order in | 12:58:21 |
| 6 | this case? | | 12:58:24 |
| 7 | A | No. | 12:58:25 |
| 8 | Q | Do you know any of the deadlines in the | 12:58:25 |
| 9 | case? | | 12:58:35 |
| 10 | A | No. | 12:58:35 |
| 11 | Q | Do you plan on attending a trial in this | 12:58:35 |
| 12 | case? | | 12:58:39 |
| 13 | A | If I'm asked to, yes. | 12:58:39 |
| 14 | Q | Do you know where the trial would be | 12:58:41 |
| 15 | located? | | 12:58:46 |
| 16 | A | No. | 12:58:47 |
| 17 | Q | Do you know where the case is filed? | 12:58:47 |
| 18 | | MR. BUSCH:  Objection to form. | 12:58:51 |
| 19 | A | No. | 12:58:52 |
| 20 | Q | Do you understand that you'll be personally | 12:59:02 |
| 21 | responsible to pay Pharmacare's costs in this lawsuit | | 12:59:04 |
| 22 | if you don't prevail? | | 12:59:09 |
| 23 | | MR. BUSCH:  Objection to form. | 12:59:10 |
| 24 | A | I didn't know that. | 12:59:12 |
| 25 | Q | Do you represent anyone other than yourself | 12:59:18 |

Exhibit B
00222

Transcript of Linda Sunderland
Conducted on February 27, 2024                    104

| | | |
|---|---|---|
| 1 | in this lawsuit? | 12:59:20 |
| 2 | MR. BUSCH:  Objection to form.  Asked and | 12:59:21 |
| 3 | answered. | 12:59:23 |
| 4 | A    I represent all people who ever used | 12:59:26 |
| 5 | Sambucol in the nation. | 12:59:29 |
| 6 | Q    Do you seek to represent any other classes | 12:59:38 |
| 7 | of individuals? | 12:59:40 |
| 8 | MR. BUSCH:  Objection.  Calls for legal | 12:59:41 |
| 9 | conclusion. | 12:59:45 |
| 10 | A    No. | 12:59:45 |
| 11 | Q    Did you ever seek a refund for any of your | 12:59:46 |
| 12 | purchases of Sambucol? | 13:00:28 |
| 13 | A    No. | 13:00:35 |
| 14 | MR. BUSCH:  Objection to form. | 13:00:35 |
| 15 | A    No, no. | 13:00:36 |
| 16 | Q    Why not? | 13:00:37 |
| 17 | A    I didn't think of doing that. | 13:00:38 |
| 18 | Q    Were you aware that you could get a full | 13:00:44 |
| 19 | refund for your Sambucol purchases if you were | 13:00:48 |
| 20 | dissatisfied with the product? | 13:00:50 |
| 21 | MR. BUSCH:  Objection to form.  It assumes | 13:00:52 |
| 22 | facts not in the record. | 13:00:54 |
| 23 | A    No. | 13:00:56 |
| 24 | Q    If you did know that a refund was available, | 13:00:56 |
| 25 | would you have asked for one? | 13:01:00 |

Exhibit B
00223

Transcript of Linda Sunderland
Conducted on February 27, 2024                    105

| | | |
|---|---|---|
| 1 | MR. BUSCH:  Objection.  Calls for | 13:01:02 |
| 2 | speculation. | 13:01:03 |
| 3 | A    No. | 13:01:03 |
| 4 | Q    Did you ever see a reference to refunds | 13:01:04 |
| 5 | being available on the packages of Sambucol you | 13:01:07 |
| 6 | purchased? | 13:01:10 |
| 7 | MR. BUSCH:  Objection.  Asked and answered. | 13:01:10 |
| 8 | A    No. | 13:01:13 |
| 9 | Q    Why do you believe you can be an adequate | 13:01:29 |
| 10 | class representative in this case? | 13:01:32 |
| 11 | MR. BUSCH:  Objection.  Calls for legal | 13:01:34 |
| 12 | conclusion. | 13:01:37 |
| 13 | A    I used this product for two years and | 13:01:37 |
| 14 | regularly every month, so I think that I would be a | 13:01:39 |
| 15 | good representative of -- of who used the product and | 13:01:43 |
| 16 | did not have a good relationship to it because I did | 13:01:49 |
| 17 | get colds. | 13:01:53 |
| 18 | Q    Anything else? | 13:01:56 |
| 19 | A    Well, I believed in the product packaging, | 13:02:02 |
| 20 | that influenced me in purchasing the product.  So I | 13:02:09 |
| 21 | thought that it was better over another elderberry | 13:02:13 |
| 22 | product because of the virologist tested and produced, | 13:02:17 |
| 23 | he not only tested it, but he created it. | 13:02:25 |
| 24 | Q    So the "virologist developed" claim? | 13:02:29 |
| 25 | A    Yeah. | 13:02:32 |

Exhibit B
00224

Transcript of Linda Sunderland
Conducted on February 27, 2024                    106

| 1 | Q    Any other reasons you think you would be an | 13:02:39 |
|---|---|---|
| 2 | adequate class representative? | 13:02:41 |
| 3 | A    I think just those two are very important. | 13:02:43 |
| 4 | MR. ORZANO:  Can you read back her answer -- | 13:02:43 |
| 5 | one prior back, the longer one. | 13:03:26 |
| 6 | (The following is read by the Court | 13:03:26 |
| 7 | Reporter: | 13:03:26 |
| 8 | "ANSWER:  Well, I believed in the product | 13:02:03 |
| 9 | packaging, that influenced me in purchasing the | 13:02:07 |
| 10 | product.  So I thought that it was better over another | 13:02:11 |
| 11 | elderberry product because of the virologist | 13:02:16 |
| 12 | tested and produced, he not only tested it, but he | 13:02:22 |
| 13 | created it.") | 13:02:27 |
| 14 | Q    You said "he not only tested it," are you | 13:03:27 |
| 15 | referring to a virologist? | 13:03:30 |
| 16 | A    Yes. | 13:03:32 |
| 17 | Q    Are you referring to anyone specifically | 13:03:33 |
| 18 | when you say "he"? | 13:03:35 |
| 19 | MR. BUSCH:  Objection to form. | 13:03:37 |
| 20 | A    Well, I didn't know his name, but I assumed | 13:03:38 |
| 21 | it was a male. | 13:03:41 |
| 22 | Q    But you don't know who the virologist was? | 13:03:42 |
| 23 | A    No, I don't. | 13:03:47 |
| 24 | Q    And you testified earlier you have not | 13:03:48 |
| 25 | retained any receipts for the Sambucol products? | 13:04:09 |

Exhibit B
00225

Transcript of Linda Sunderland
Conducted on February 27, 2024                              107

| | | |
|---|---|---|
| 1 | A    No. | 13:04:15 |
| 2 | Q    Why not? | 13:04:15 |
| 3 | A    I don't keep receipts usually.  I -- I | 13:04:16 |
| 4 | didn't know that I would need them in the future, so I | 13:04:22 |
| 5 | didn't keep them. | 13:04:25 |
| 6 | Q    Do you think that's typical of consumers? | 13:04:26 |
| 7 | MR. BUSCH:  Objection to form.  Calls for | 13:04:30 |
| 8 | speculation. | 13:04:34 |
| 9 | A    I don't know what is typical for consumers. | 13:04:34 |
| 10 | For myself, usually I keep a receipt one or two days | 13:04:37 |
| 11 | and then I discard it. | 13:04:41 |
| 12 | Q    So if other consumers similarly have not | 13:05:09 |
| 13 | retained receipts of their purchases of Sambucol | 13:05:12 |
| 14 | products, how do you think the court should determine | 13:05:15 |
| 15 | how much to reimburse plaintiffs if you were to | 13:05:19 |
| 16 | prevail in the lawsuit? | 13:05:22 |
| 17 | MR. BUSCH:  Objection to form.  Calls for a | 13:05:24 |
| 18 | legal conclusion.  Calls for speculation. | 13:05:25 |
| 19 | A    I wouldn't know.  I think it's a matter of | 13:05:28 |
| 20 | trust that people would even say that they used it for | 13:05:31 |
| 21 | a prolonged period.  If they used it once and they had | 13:05:38 |
| 22 | no receipts, they should get a smaller compensation | 13:05:43 |
| 23 | than someone who used -- who can say they used it | 13:05:50 |
| 24 | three times or five times or more. | 13:05:53 |
| 25 | If they can produce receipts, then, of | 13:05:58 |

Exhibit B
00226

Transcript of Linda Sunderland
Conducted on February 27, 2024                      108

| | | |
|---|---|---|
| 1 | course, that there should be some ruling, of course, | 13:06:01 |
| 2 | on if they used it, they can produce five receipts or | 13:06:05 |
| 3 | something like that. | 13:06:12 |
| 4 |     Q   So the court should just trust consumers who | 13:06:12 |
| 5 | come forward and say that they purchased the Sambucol | 13:06:16 |
| 6 | products? | 13:06:19 |
| 7 |         MR. BUSCH:  Objection to form. | 13:06:20 |
| 8 |     A   Yes.  If they -- but limit them, the people | 13:06:20 |
| 9 | who didn't keep the receipts, to a certain number of | 13:06:23 |
| 10 | -- to a certain amount of compensation. | 13:06:28 |
| 11 |     Q   And should the court similarly trust | 13:06:31 |
| 12 | consumers who come forward and state how much they | 13:06:34 |
| 13 | recall that they paid for the products? | 13:06:37 |
| 14 |         MR. BUSCH:  Objection to form.  Calls for | 13:06:38 |
| 15 | speculation. | 13:06:40 |
| 16 |     A   Yes, but I think they have to produce | 13:06:40 |
| 17 | receipts, to be honest. | 13:06:43 |
| 18 |     Q   Do you think the consumer should only be | 13:06:47 |
| 19 | able to recover a monetary amount for reimbursement if | 13:06:50 |
| 20 | they produce receipts showing how much they paid? | 13:06:54 |
| 21 |         MR. BUSCH:  Objection.  Asked and answered. | 13:06:56 |
| 22 | Calls for legal conclusion. | 13:07:00 |
| 23 |     A   I think if you don't have your receipt, you | 13:07:02 |
| 24 | can get some compensation depending on how many | 13:07:05 |
| 25 | bottles you recall using.  But there should be a limit | 13:07:08 |

Exhibit B
00227

Transcript of Linda Sunderland
Conducted on February 27, 2024                    109

| | | |
|---|---|---|
| 1 | to how many, maybe five. | 13:07:11 |
| 2 | Q    Based on what the consumer says? | 13:07:16 |
| 3 | A    Yes. | 13:07:19 |
| 4 | Q    Are you personally aware of any other class | 13:07:19 |
| 5 | members? | 13:07:58 |
| 6 | A    No. | 13:08:00 |
| 7 | MR. BUSCH:  Objection.  Asked and answered. | 13:08:00 |
| 8 | Q    I just want you to go back briefly to | 13:08:20 |
| 9 | Exhibit 4. | 13:08:24 |
| 10 | A    Okay. | 13:08:25 |
| 11 | Q    I don't know if I directly asked you this, | 13:08:25 |
| 12 | but what is your understanding of what Exhibit 4 is? | 13:08:35 |
| 13 | MR. BUSCH:  Objection.  Calls for legal | 13:08:38 |
| 14 | conclusion. | 13:08:40 |
| 15 | A    I guess my -- a description of the nature of | 13:08:42 |
| 16 | the action against Pharmacare, the actual case broken | 13:08:56 |
| 17 | down into, you know, allegations. | 13:09:04 |
| 18 | Q    And do you have an understanding one way or | 13:09:12 |
| 19 | the other as to what role this document plays in the | 13:09:16 |
| 20 | case? | 13:09:19 |
| 21 | MR. BUSCH:  Objection.  Calls for legal | 13:09:19 |
| 22 | conclusion. | 13:09:25 |
| 23 | A    No.  Well, in general, I think it's asking | 13:09:25 |
| 24 | for Pharmacare to take responsibility for the product | 13:09:29 |
| 25 | Sambucol and its users in the past because of their | 13:09:36 |

Exhibit B
00228

Transcript of Linda Sunderland
Conducted on February 27, 2024                    110

| | | |
|---|---|---|
| 1 | use of false advertising, or possibly the fact that | 13:09:42 |
| 2 | the product was sold and there used to be -- it used | 13:09:48 |
| 3 | to be virologist tested -- you know, created, and then | 13:09:56 |
| 4 | it was no longer -- it was sold, so that the product | 13:10:02 |
| 5 | wasn't the same product on the market as it was | 13:10:09 |
| 6 | once -- when it was virologist tested. | 13:10:13 |
| 7 | Q    Do you have an understanding one way or the | 13:10:16 |
| 8 | other whether this document is submitted to the court? | 13:10:19 |
| 9 | MR. BUSCH:  Objection to form. | 13:10:21 |
| 10 | A    I think it is. | 13:10:24 |
| 11 | Q    And again, you reviewed this last night in | 13:10:26 |
| 12 | preparation for the deposition? | 13:10:31 |
| 13 | MR. BUSCH:  Objection to form. | 13:10:32 |
| 14 | A    I actually read it quickly.  I didn't spend | 13:10:36 |
| 15 | more than 10 minutes reading it. | 13:10:39 |
| 16 | Q    Okay.  And that was the first time you read | 13:10:42 |
| 17 | it? | 13:10:44 |
| 18 | MR. BUSCH:  Objection to form. | 13:10:44 |
| 19 | A    Yes. | 13:10:45 |
| 20 | MR. ORZANO:  Let's go off the record. | 13:10:52 |
| 21 | THE VIDEOGRAPHER:  Off the record at | 13:10:56 |
| 22 | 1:10 p.m. | 13:10:59 |
| 23 | (Recess 1:10 p.m. - 1:20 p.m.) | 13:10:59 |
| 24 | THE VIDEOGRAPHER:  Back on the record, | 13:20:08 |
| 25 | 1:20 p.m. | 13:20:15 |

Exhibit B
00229

Transcript of Linda Sunderland
Conducted on February 27, 2024                              111

| | | |
|---|---|---|
| 1 | MR. ORZANO:  So I have no further questions | 13:20:17 |
| 2 | at this time.  Pharmacare does reserve the right to | 13:20:19 |
| 3 | bring you back to continue the deposition.  A number | 13:20:22 |
| 4 | of documents have come up today that haven't been | 13:20:25 |
| 5 | produced in response to discovery requests.  And we | 13:20:28 |
| 6 | also have a continuing discovery dispute with | 13:20:31 |
| 7 | ClassAction.org, which your counsel is aware of, which | 13:20:33 |
| 8 | we believe we're entitled to additional documents from | 13:20:37 |
| 9 | ClassAction.org as well. | 13:20:41 |
| 10 | And so while we don't have additional | 13:20:43 |
| 11 | questions at this time, we do reserve the right to | 13:20:45 |
| 12 | continue it, pending receipt of those additional | 13:20:48 |
| 13 | documents. | 13:20:51 |
| 14 | MR. BUSCH:  And plaintiffs reserve the right | 13:20:51 |
| 15 | to oppose and have given ample opportunity to | 13:20:54 |
| 16 | reschedule to ensure depositions would take place | 13:20:58 |
| 17 | after receiving those documents. | 13:21:02 |
| 18 | EXAMINATION | 13:21:09 |
| 19 | BY MR. BUSCH: | 13:21:10 |
| 20 | Q    Ms. Sunderland, I just have a couple of | 13:21:11 |
| 21 | questions for you.  Could you look at the document | 13:21:14 |
| 22 | labeled Exhibit 4. | 13:21:17 |
| 23 | A    All right. | 13:21:19 |
| 24 | Q    Now, do you recall having communications | 13:21:27 |
| 25 | with your counsel around the beginning of this case? | 13:21:32 |

Exhibit B
00230

Transcript of Linda Sunderland
Conducted on February 27, 2024                    112

| | | | |
|---|---|---|---|
| 1 | A | Yes. | 13:21:35 |
| 2 | | MR. ORZANO:  Leading.  Asked and answered. | 13:21:36 |
| 3 | A | Yes. | 13:21:39 |
| 4 | Q | In the beginning of the case, were there -- | 13:21:39 |
| 5 | | were there any communications where you were asked to | 13:21:46 |
| 6 | | review documents or information that would be a part | 13:21:50 |
| 7 | | of documents? | 13:21:53 |
| 8 | | MR. ORZANO:  Leading.  Asked and answered. | 13:21:53 |
| 9 | A | No. | 13:21:57 |
| 10 | | MR. ORZANO:  Calls for speculation.  Lacks | 13:21:57 |
| 11 | | foundation. | 13:22:00 |
| 12 | Q | On the Exhibit 4, can you turn to page 4, | 13:22:01 |
| 13 | | please. | 13:22:06 |
| 14 | A | Sure. | 13:22:07 |
| 15 | Q | On page 4, could you read paragraph 11 into | 13:22:16 |
| 16 | | the record? | 13:22:22 |
| 17 | A | "Plaintiff Sunderland purchased Sambucol | 13:22:23 |
| 18 | | Black Elderberry chewable tablets over the last two | 13:22:28 |
| 19 | | years, with her last purchase in March 2023." | 13:22:32 |
| 20 | Q | Could you read paragraph 12, please? | 13:22:37 |
| 21 | A | "Prior to and at the same time of each | 13:22:40 |
| 22 | | purchase of the Sambucol Black Elderberry chewable | 13:22:42 |
| 23 | | tablets, Plaintiff Sunderland was exposed to, saw, and | 13:22:47 |
| 24 | | relied upon defendants' materially misleading | 13:22:51 |
| 25 | | representations on the product's packaging and | 13:22:56 |

Exhibit B
00231

Transcript of Linda Sunderland
Conducted on February 27, 2024                    113

| | | |
|---|---|---|
| 1 | labeling.  She reviewed the product's labeling where | 13:22:59 |
| 2 | she saw and relied on defendant's claims that its | 13:23:03 |
| 3 | elderberry ingredient was developed by a | 13:23:07 |
| 4 | world-renowned virologist and was unique and | 13:23:10 |
| 5 | proprietary." | 13:23:14 |
| 6 |     Q    Do either of those paragraphs that you just | 13:23:15 |
| 7 | read look familiar to you? | 13:23:18 |
| 8 |     A    Vaguely. | 13:23:20 |
| 9 |     Q    Okay.  You testified earlier that you saw | 13:23:21 |
| 10 | "virologist developed" representations on product | 13:23:28 |
| 11 | labels and that those were at least part of the reason | 13:23:32 |
| 12 | for you purchasing the products. | 13:23:37 |
| 13 |       Would you -- does having seen those | 13:23:43 |
| 14 | representations that you previously testified to alter | 13:23:49 |
| 15 | at all your perception of the value of the products? | 13:23:55 |
| 16 |       MR. ORZANO:  Vague and ambiguous.  Leading. | 13:23:59 |
| 17 | Misstates the prior testimony. | 13:24:03 |
| 18 |     A    When I saw these "virologist created" on the | 13:24:05 |
| 19 | packaging itself, it totally influenced my purchasing | 13:24:12 |
| 20 | of the product. | 13:24:17 |
| 21 |     Q    Did it influence your perception of the | 13:24:19 |
| 22 | value of the product? | 13:24:23 |
| 23 |       MR. ORZANO:  Leading. | 13:24:23 |
| 24 |     A    It increased the value of the product. | 13:24:25 |
| 25 |     Q    Okay.  And then if we could look at Exhibits | 13:24:30 |

Exhibit B
00232

Transcript of Linda Sunderland
Conducted on February 27, 2024                          114

| | | |
|---|---|---|
| 1 | 7 and 8, which, although they are the higher numbers, | 13:24:34 |
| 2 | were the first documents that you saw today for your | 13:24:37 |
| 3 | reference. | 13:24:40 |
| 4 | On the one with the pictures, Exhibit | 13:24:46 |
| 5 | 000003. | 13:24:51 |
| 6 | A    Mm-hmm. | 13:24:52 |
| 7 | Q    Bear with me just a moment. | 13:25:08 |
| 8 | Earlier you were asked about the Emergen-C | 13:25:45 |
| 9 | elderberry product that you purchased, and defense | 13:25:51 |
| 10 | counsel asked you if Daily Immune Support was a | 13:25:55 |
| 11 | separate product from the botanicals gummies. | 13:26:02 |
| 12 | Do you recall that? | 13:26:06 |
| 13 | A    Yes. | 13:26:07 |
| 14 | Q    Can you read, please, the label on the | 13:26:08 |
| 15 | picture that I had you reference. | 13:26:12 |
| 16 | A    Elderberry -- "Emergen-C Elderberry Daily | 13:26:15 |
| 17 | Immune Support and Botanical Gummies." | 13:26:19 |
| 18 | Q    Does that refresh your memory at all as to | 13:26:23 |
| 19 | whether or not they were two separate products or the | 13:26:27 |
| 20 | same product? | 13:26:29 |
| 21 | A    It was the same product.  I just remembered | 13:26:30 |
| 22 | the words "botanical gummies."  I thought it was a | 13:26:33 |
| 23 | separate one when I told Tiffany. | 13:26:38 |
| 24 | MR. BUSCH:  Okay.  No further questions. | 13:26:41 |
| 25 | MR. ORZANO:  Just a few questions. | 13:26:44 |

Exhibit B
00233

Transcript of Linda Sunderland
Conducted on February 27, 2024                              115

| | | |
|---|---|---|
| 1 | FURTHER EXAMINATION | 13:26:50 |
| 2 | BY MR. ORZANO: | 13:26:50 |
| 3 | Q    When you say that you -- | 13:26:51 |
| 4 | THE VIDEOGRAPHER:  Counsel -- thank you. | 13:26:56 |
| 5 | Q    When you say that the claim "virologist | 13:26:59 |
| 6 | developed" increased the value of the Sambucol | 13:27:03 |
| 7 | products in your view, what do you mean? | 13:27:06 |
| 8 | A    I feel it made it more valuable to me to | 13:27:10 |
| 9 | purchase because this claim that a scientist, who I | 13:27:13 |
| 10 | assume was a doctor possibly as well, a medical doctor | 13:27:18 |
| 11 | who was a scientist, had created this product, and it | 13:27:23 |
| 12 | was so important and worth -- it was going to | 13:27:28 |
| 13 | definitely stop me from having my winter colds.  It | 13:27:32 |
| 14 | was going to improve my immunity.  So it became very | 13:27:36 |
| 15 | valuable when I saw that it had been virologist tested | 13:27:41 |
| 16 | and created. | 13:27:45 |
| 17 | Q    Did the other elderberry products that you | 13:27:45 |
| 18 | purchased also say that they were virologist | 13:27:48 |
| 19 | developed? | 13:27:50 |
| 20 | A    No, none of had them on their brand, on | 13:27:51 |
| 21 | their packaging. | 13:27:55 |
| 22 | Q    And do you know one way or the other whether | 13:27:56 |
| 23 | you paid more for the Sambucol products than the other | 13:27:58 |
| 24 | elderberry products that you purchased? | 13:28:01 |
| 25 | A    I believe I paid more for Sambucol. | 13:28:04 |

**PLANET DEPOS**
888.433.3767 | WWW.PLANETDEPOS.COM

Exhibit B
00234

Transcript of Linda Sunderland
Conducted on February 27, 2024                    116

| | | |
|---|---|---|
| 1 | Q    Do you know? | 13:28:06 |
| 2 | A    I think so, definitely.  I definitely paid | 13:28:07 |
| 3 | more for Sambucol. | 13:28:09 |
| 4 | Q    So if we look at Exhibit 8, which I think | 13:28:11 |
| 5 | you still have in front of you. | 13:28:15 |
| 6 | A    8? | 13:28:19 |
| 7 | Q    Yes, Exhibit 8. | 13:28:21 |
| 8 | A    Yes. | 13:28:22 |
| 9 | Q    So the first page of Exhibit 8 has the price | 13:28:22 |
| 10 | 8.89 for the Sambucol -- | 13:28:26 |
| 11 | A    Yeah. | 13:28:29 |
| 12 | Q    -- lozenges, correct? | 13:28:29 |
| 13 | Page SUNDERLAND 2 has the Airborne | 13:28:32 |
| 14 | elderberry gummies.  It says $17.35, correct? | 13:28:35 |
| 15 | A    Yes. | 13:28:43 |
| 16 | Q    That's more than 8.89, correct? | 13:28:43 |
| 17 | A    Yes. | 13:28:46 |
| 18 | Q    And the Emergen-C Elderberry supplements | 13:28:46 |
| 19 | have the price $15.67 on SUNDERLAND 3, correct? | 13:28:50 |
| 20 | A    Yes. | 13:28:53 |
| 21 | Q    That's also more than 8.89 for the Sambucol | 13:28:54 |
| 22 | products, correct? | 13:28:57 |
| 23 | A    But I did purchase mostly the supplements as | 13:28:59 |
| 24 | well as the lozenges and the other -- the lozenges and | 13:29:03 |
| 25 | the other product that I purchased.  And the | 13:29:08 |

Exhibit B
00235

Transcript of Linda Sunderland
Conducted on February 27, 2024                    117

| | | |
|---|---|---|
| 1 | supplements were at least $19.  The chewables and the | 13:29:10 |
| 2 | lozenges were less money, but the supplements in form | 13:29:17 |
| 3 | of a capsule were more expensive. | 13:29:21 |
| 4 | Q    So possibly the capsules were more | 13:29:24 |
| 5 | expensive -- | 13:29:27 |
| 6 | A    Yes. | 13:29:27 |
| 7 | Q    -- than the other elderberry products? | 13:29:27 |
| 8 | A    Correct. | 13:29:29 |
| 9 | Q    But the chewable products and the lozenges | 13:29:30 |
| 10 | were not? | 13:29:34 |
| 11 | A    Yes. | 13:29:34 |
| 12 | MR. BUSCH:  Objection to form. | 13:29:35 |
| 13 | A    Yes. | 13:29:35 |
| 14 | Q    And you also mentioned that the Sambucol | 13:29:37 |
| 15 | products, at least some of them, you purchased at | 13:29:41 |
| 16 | Walgreens, you purchased one you got half off the | 13:29:46 |
| 17 | second Sambucol product, correct? | 13:29:51 |
| 18 | A    Yes. | 13:29:53 |
| 19 | MR. BUSCH:  Objection to form. | 13:29:53 |
| 20 | Q    Was that similarly available for the | 13:29:54 |
| 21 | Emergen-C and the Airborne products? | 13:29:56 |
| 22 | A    No. | 13:30:09 |
| 23 | Q    Now, you haven't conducted any study one way | 13:30:09 |
| 24 | or the other as to whether the claim "virologist | 13:30:13 |
| 25 | developed" creates a price premium for Sambucol brand | 13:30:16 |

Exhibit B
00236

Transcript of Linda Sunderland
Conducted on February 27, 2024                    118

| | | |
|---|---|---|
| 1 | products? | 13:30:20 |
| 2 | A    No. | 13:30:21 |
| 3 | MR. BUSCH:  Objection to form.  Calls for a | 13:30:21 |
| 4 | legal conclusion. | 13:30:23 |
| 5 | A    No. | 13:30:24 |
| 6 | MR. ORZANO:  Nothing further at this time, | 13:30:25 |
| 7 | subject to my earlier reservation of rights to bring | 13:30:27 |
| 8 | Ms. Sunderland back to continue the deposition. | 13:30:31 |
| 9 | FURTHER EXAMINATION | 13:30:40 |
| 10 | BY MR. BUSCH: | 13:30:40 |
| 11 | Q    Just a couple further questions from me on | 13:30:41 |
| 12 | that. | 13:30:44 |
| 13 | On the same document, on the first page of | 13:30:44 |
| 14 | the document, can you tell from the image the quantity | 13:30:51 |
| 15 | of the product? | 13:30:56 |
| 16 | A    20, yes. | 13:30:57 |
| 17 | Q    Turning to the second page, can you tell | 13:30:58 |
| 18 | from the picture the quantity of the product? | 13:31:02 |
| 19 | A    Yes.  50. | 13:31:04 |
| 20 | Q    On the third page, same question. | 13:31:06 |
| 21 | A    Yes -- oh, no.  It doesn't give the amount | 13:31:09 |
| 22 | how many were in the bottle. | 13:31:15 |
| 23 | MR. BUSCH:  No further questions. | 13:31:17 |
| 24 | MR. ORZANO:  No further questions at this | 13:31:26 |
| 25 | time.  Thank you. | 13:31:27 |

Exhibit B
00237

Transcript of Linda Sunderland
Conducted on February 27, 2024                    119

1          THE VIDEOGRAPHER:  Going off the record at          13:31:30

2     p.m.                                                      13:31:32

3          (Time noted: 1:31 p.m.)

4

5                    * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B
00238

Transcript of Linda Sunderland
Conducted on February 27, 2024                                120

```
 1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2

 3

 4       I, MONIQUE VOUTHOURIS, New Jersey License No.

 5   30XI00083400, the officer before whom the foregoing

 6   remote deposition was taken, do hereby certify that

 7   the foregoing transcript is a true and correct

 8   record of the testimony of LINDA SUNDERLAND; that

 9   said testimony was taken by me stenographically and

10   thereafter reduced to typewriting under my

11   direction; that reading and signing was not

12   requested; and that I am neither counsel for,

13   related to, nor employed by any of the parties to

14   this case and have no interest, financial or

15   otherwise, in its outcome.

16       IN WITNESS WHEREOF, I have hereunto set my hand

17   this 1st day of March 2024.

18

19

20

21   _____

22   Monique Vouthouris, CCR, RPR, CRR

23   Notary Public of the State of New York

24   My commission expires: December 1, 2027

25
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Exhibit B
00239

ClassAction.org Newsletter - newsletter@classaction.org



JUNE 29, 2023

## AMEX and Business Owners, Elderberry Supplements and More

Welcome to the latest edition of the ClassAction.org newsletter. To kick things off, business owners may have been paying thousands of dollars more than they should have due to AMEX's potentially illegal rules against merchants surcharging customers or "steering" them toward cards with lower swipe fees. If you own a **small- to mid-sized business and you take American Express** credit cards, make sure to check out our first story to find out why you could be owed money back.

Then, we have investigations into the effectiveness of **Sambucol Black Elderberry supplements** and the potentially defective rear subframes in 2020-2022 **Ford Explorer STs** and 2021-2022 **Lincoln Aviator** vehicles.

We'll round things out with attorneys looking into a potential lawsuit on behalf of those who lost money on FLOW crypto tokens. And, as always, we have the latest class action settlements that you may be able to claim. Keep reading for the details.

– Ty Armstrong, Writer/**Community Manager**

## American Express Swipe Fees: Merchants May Be Owed Thousands



Attorneys working with ClassAction.org are gathering **small- to medium-sized business owners** to take legal action against **American Express**. They believe American Express's rules against merchants surcharging customers or "steering" them toward cards with lower fees are illegal and have **cost the typical small business owner tens of thousands of dollars.**

In a world free of AMEX's rules, merchants would be able to advertise that customers could save money by using less expensive credit cards or simply ask that shoppers use more business-friendly payment methods. Essentially, businesses would be paying far less in fees to credit card networks if not for AMEX's limitations.

Attorneys are now looking to help merchants take action via a process known as mass arbitration, which occurs when hundreds or thousands file individual arbitration claims against the same company over the same issue at the same time. While there are no guarantees, it's believed **merchants could be owed anywhere between $10,000 and $70,000.**

**If you're a merchant who accepts American Express and other credit cards, you may be able to** join others taking action. Head over to this page to learn more.

## Do Sambucol Black Elderberry Supplements Live Up to Their Advertisements?



Attorneys working with ClassAction.org are investigating whether Sambucol supplement maker **Pharmacare US** made false claims about the benefits of its black elderberry products or otherwise violated **federal labeling requirements.**

Specifically, the **Sambucol Black Elderberry** products claim to have been developed by a "world renowned virologist" and are promoted alongside statements touting their ability to support the immune system and keep people healthy. Research has called into question, however, whether elderberry **actually provides any benefit** to those suffering from the flu, colds or seasonal allergies.

So, if you purchased certain Sambucol Black Elderberry products in 2019 or later while living in **New York or California,** attorneys want to hear from you as part of their investigation.

Potentially, a class action lawsuit could **help consumers get back the money they spent** on the elderberry supplements at issue and force the manufacturer to relabel its products. You can find a list of potentially affected products and a chance to share your story over on **this page.**

IN OTHER NEWS



EXHIBIT 3
WIT: TT Binder
DATE: 2-20-24
Jeanine Curcione, CSR, RPR

Exhibit B
00240

Concerns are being raised about a potentially dangerous issue in 2020-2022 Ford Explorer STs and 2021-2022 Lincoln Aviators.

Specifically, attorneys have reason to believe these vehicles were **manufactured with inferior and unsafe rear subframes**, a structure that supports the axle, suspension and powertrain, and that this may lead to catastrophic vehicle damage and **put drivers at an increased risk of an accident.**

One lawsuit involving the Ford Explorer ST has already been filed, and attorneys want more drivers who've experienced rear subframe problems to come forward. A successful lawsuit **could help drivers recover money** for repair costs, time spent diagnosing and fixing their vehicles, loss of vehicle value, and more.

**Do you own or lease a 2020-2022 Ford Explorer ST or 2021-2022 Lincoln Aviator?** If your rear axle bolt fractured or you experienced symptoms like vibrating, grinding noises, lack of acceleration or components dropping from under the car, learn more **here**.

## Did You Lose Money on FLOW Crypto Tokens?

If you lost money on **FLOW crypto tokens** on a U.S.-based exchange, you aren't alone. Attorneys working with ClassAction.org have reason to believe that the **Flow blockchain's native token may have been illegally sold as an unregistered security**, leaving buyers without certain protections under federal securities laws.

The attorneys are now looking to file a class action lawsuit against FLOW issuer Dapper Labs alleging that the token's availability on crypto exchanges was illegal and financially harmed investors.

A class action lawsuit could help FLOW token buyers get back money they lost as a result of purchasing potentially unregistered securities. It could also possibly force FLOW issuer Dapper Labs to comply with federal securities laws.

If you **lost money as a result of buying FLOW** on a U.S.-based crypto exchange, such as Coinbase, FTX or Binance.US, head over to **this page** to help this investigation.

SETTLEMENTS

## New Settlements

**DIRECTV Telemarketing Calls**
This settlement covers people who received telemarketing calls from certain DIRECTV dealers.

**Wipe Out! Products**
You may be included in this settlement if you bought Wipe Out! Wipes, Wipe Out! Multi-Surface Wipes, or Wipe Out! Multi-Surface Decontaminant Spray on or before April 19, 2023.

**Artnaturals Hand Sanitizer**
If you bought a hand sanitizer product that was sold or otherwise distributed by Artnaturals, Inc. between January 1, 2015 through May 23, 2023, you may be included in this settlement.

## Settlements Ending Soon

- **Pork Pricing**
  (June 30, 2023)

- **Orlando Family Physicians – Data Breach**
  (July 1, 2023)

- **SuperCare Health – Data Breach**
  (July 5, 2023)

- **Sound Generations – Data Breach**
  (July 11, 2023)

- **Juul Products**
  (July 14, 2023)

**To view a complete list of settlements and to find out how you can file a claim, click here.**

FORWARD TO A FRIEND

Know someone who might be
interested in our newsletter?
Why not forward this email to them?

CONNECT WITH US





ClassAction.org

**Having trouble reading this?**
View it in your browser.

Please do not reply to this message.
Replies to this message are routed to an unmonitored mailbox. Thank you.

Unsubscribe from Newsletter
2 North Rd., Ste 2, Warren, NJ 07059

**Exhibit B**
**00241**

PLT_000001

ClassAction.org    LAWSUIT LIST    SETTLEMENTS    BLOG    LEARN    Q  Search lawsuits, settlements and more...

# Lawsuit Investigation Looks into Sambucol Black Elderberry Supplements Over Labeling, Health Claims

Last Updated on June 21, 2023

COMMENTS    SHARE

**AT A GLANCE**

**This Alert Affects:**

People who purchased certain Sambucol Black Elderberry products in 2019 or later and live in New York or California.

**What's Going On?**

Attorneys working with ClassAction.org are investigating whether Sambucol supplement maker PharmaCare US made false claims about the benefits of its elderberry products or otherwise violated federal labeling requirements. If so, they may be able to get a class action lawsuit started on behalf of those who bought the products.

**How a Class Action Lawsuit Can Help**

If filed and successful, a lawsuit could help consumers get back some of the money they spent on the elderberry supplements. It could also force the manufacturer to relabel its products and revise or remove any claims found to be fraudulent.

**Which Products Are Being Looked Into?**

The full list can be found below.

**What You Can Do**

If you're a New York or California resident who bought one of the Sambucol Black Elderberry products listed below in 2019 or later, fill out the form on this page to find out how you can help the investigation.



## Get in Touch

First Name

Last Name

Email

Phone Number

Zip Code

Case Details

By submitting this form, I agree to the Terms, Disclaimer and Privacy Notice.

? What happens when I fill out this form?

SUBMIT



Attorneys working with ClassAction.org would like to speak to people who purchased any of the following elderberry products:

- Sambucol Black Elderberry Original Syrup
- Sambucol Black Elderberry Sugar Free Syrup
- Sambucol Black Elderberry Syrup for Kids
- Sambucol Black Elderberry Effervescent Tablets
- Sambucol Black Elderberry Chewable Tablets
- Sambucol Black Elderberry Pastilles
- Sambucol Black Elderberry Daily Immune Drink Powder
- Sambucol Black Elderberry Advanced Immune Syrup



## About Us

ClassAction.org is a group of online professionals (designers, programmers and writers) with years of experience in the legal industry.

We work closely with class action and mass tort attorneys across the country and help with investigations into corporate wrongdoing.

MORE

They're investigating whether these products live up to their advertised claims and whether they were properly labeled under federal guidelines. If not, a class action lawsuit could help consumers get their money back.

As they work to determine whether a lawsuit can be filed, the attorneys need to hear from people who purchased the Sambucol Black Elderberry supplements to assist with their investigation.

STAY CURRENT

## Sign Up for Our Newsletter

New cases and investigations, settlement deadlines, and news straight to your inbox.

your@email.com

SIGN ME UP

If you're a New York or California resident and you purchased any of the Sambucol Black Elderberry products listed above in 2019 or later, fill out the form on this page to find out how you can help.

## Elderberry Health Claims

Elderberry, also known as *Sambucus nigra*, has been widely used in supplements for its anti-inflammatory and antioxidant properties.

Manufacturers have made a wide range of claims on these supplements, including that they:

Exhibit B
00242

boost the immune system

- Shorten the duration of colds and the flu
- Reduce the severity of cold, upper respiratory tract infection
  and flu symptoms
- Defend against harmful bacteria
- Contain ingredients that are "clinically proven" to reduce cold
  and allergy symptoms

The Sambucol Black Elderberry products specifically claim to have been developed by a "world renowned virologist," and the supplements' packaging and advertising are rife with statements touting their apparent ability to support the immune system and keep people healthy. On the Sambucol website, Pharmacare states that its proprietary elderberry extract is "recommended by experts."

> Research has called into question, however, whether elderberry actually
> provides any benefit to those suffering from the flu, colds or seasonal
> allergies.

For instance, in April 2019, the University of Sydney reported that eating elderberries could help minimize flu symptoms. Weeks later, the Australian university had to retract its claim after a report by *The Sydney Morning Herald* revealed that the study was funded in part by Sambucol maker Pharmacare and involved no actual testing on humans or even mice.

Further, it has been reported as recently as February 2019 that no "large randomized controlled trials" have been carried out to date to determine whether elderberry is effective in treating or preventing the flu.

The National Institutes of Health has also spoken out about elderberry and its purported immune-boosting properties and made the following conclusions.

- Research has indicated that elderberry *may* reduce flu symptoms. This evidence, however, "is not strong enough to support its use for this purpose."
- A "few" studies have hinted that products containing elderberry *and other ingredients* could help with sinusitis; however, it is not clear whether elderberry plays any role in this, considering that the products also contain other herbs.
- Not enough information is available to show "whether elder flower and elderberry are helpful for any other purposes."
- Certain parts of the elderberry plant are considered toxic. Even if these parts are removed, the toxic substance could still be present on the plant and cause vomiting, nausea and diarrhea if consumed in large quantities.

## Sambucol Black Elderberry Reviews, Complaints

Several reviews have been posted online from consumers who've had issues with their Sambucol elderberry products or found that the supplements didn't provide the immune support they expected. A sample of these complaints can be seen below [sic throughout]:



Taste is fine. Shipping and delivery was fine. Whole family took this during this cold/flu season hoping to ward off some of the nasty thing going around. By all got sick anyhow—multiple times —with colds/flus that lingered on for weeks. Really hoped this would do something to help— especially considering all the great 5 star reviews. With the high price I can't justify buying this without seeing results."
— KRISTY SCHOFER, SAMBUCOL BLACK ELDERBERRY ORIGINAL SYRUP REVIEW, AMAZON.COM



I ordered this with high hopes since it's the "original" Elderberry Syrup, but sadly, it could great (almost all sugar) but didn't do a thing for my cold. I might as well drank water and saved the high cost of this overpriced "cure." With each dose, they really milk you with the product, it saying you to take it 4x a day! to suppress at a time so you can order more quickly [and] buy you cash in more). No, I had like with a Zicam Spray and Oscillococum but this stuff is like taking a sugar pill"
— ESOMAC, SAMBUCOL BLACK ELDERBERRY ORIGINAL SYRUP REVIEW, AMAZON.COM

Exhibit B
00243



My husband and I both tried this. We have could have been in the 10% [...] of use. Received but we over did. I tried it as maintenance, tried it as coming down with something, tried it when sick – no help."

KITTYKAT SAMBUCOL BLACK ELDERBERRY ORIGINAL SYRUP
REVIEW, AMAZON.COM



Did not work for my kids. I decided to stick with it for 3 days to see if it was me. After 3 days of use, it did nothing. My girls still had congin and runny noses"
— MICHELLE, RAW DEAL BLACK ELDERBERRY LIQUID FOR KIDS
REVIEW. AMAZON.COM



"didn't do anything really.  my little one got a really bad cough and cold 2 weeks after starting this, so it didn't prevent or help"
— TR, SAMBUCOL BLACK ELDERBERRY SYRUP FOR KIDS REVIEW. AMAZON.COM

I did not like the Sambucol Black Elderberry Pastille Throat Lozenges at all. They tasted like hard rubber. They did nothing for me. I just absolutely hated them"
— VICTORIA, SAMBUCOL BLACK ELDERBERRY PASTILLE REVIEW. CVS.COM

If Pharmacare is making misleading claims about the benefits of its elderberry products – or is otherwise improperly labeling its supplements – the company could potentially be held accountable through a class action lawsuit.

## How a Class Action Could Help

Class action lawsuits, if filed and successful, could help consumers get back the money they spent on Sambucol Black Elderberry supplements. It's possible that consumers paid more than they would have had they known the truth about the supplements they were taking. Further, the manufacturer could be forced to relabel its products and change any claims determined to be fraudulent.

## What You Can Do

If you bought any of the Sambucol Black Elderberry products listed above in 2019 or later and you live in New York or California, fill out the form on this page.

After you get in touch, an attorney or legal representative may reach out to you directly to address your concerns and explain how you may be able to help get a class action lawsuit started. It costs nothing to get in touch, and you're not obligated to take legal action if you don't want to.

Before commenting, please review our comment policy.

⌄ LOAD COMMENTS

The information submitted on this page will be forwarded to Milberg Coleman Bryson Phillips Grossman, PLLC who has sponsored this investigation.

Search ClassAction.org



Exhibit B
00244

1   Trenton R. Kashima (SBN No. 291405)
2   **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
    402 West Broadway St., Suite 1760
3   San Diego, CA 92101
    Tel: (619) 810-7047
4   tkashima@milberg.com

5   *Attorneys for Plaintiffs and the Class*

6   [Additional Counsel Listed on Signature Page]

7

8                    **UNITED STATES DISTRICT COURT**

9           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**   **'23CV1318 JES  BGS**

10
    LINDA SUNDERLAND and              Case No.:
11  BENJAMIN BINDER individually and
    on behalf of all others similarly situated,
12                                    **PLAINTIFFS' CLASS ACTION**
                    Plaintiffs,       **COMPLAINT**
13
         v.
14                                    **JURY TRIAL DEMANDED**
    PHARMACARE U.S., INC., a
15  Delaware Corporation, and
    PHARMACARE LABORATORIES
16  PTY LTD., an Australian company,

17                  Defendant.

18

19

20

21

22

23

24

25

26

27          ┌─────────────────────────────┐
            │ EXHIBIT  4                  │
28          │ WIT: IT Binder             │
            │ DATE 2-20-24               │
            │ Jeanine Curcione, CSR, RPR │
            └─────────────────────────────┘

────────────────────────────────────────────
    COMPLAINT

Exhibit B
00245

Plaintiffs Linda Sunderland and Benjamin Binder (collectively "Plaintiffs"), through their undersigned attorneys, file this Class Action Complaint against Defendant PharmaCare U.S., Inc. and Pharmacare Laboratories PTY Ltd. ("Defendants"), individually and on behalf of all others similarly situated, and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE ACTION

1.     This class action is brought individually by Plaintiffs on behalf of consumers who purchased Defendants' Elderberry Original Syrup, Sambucol Black Elderberry Sugar Free, Sambucol Black Elderberry Syrup for Kids, Sambucol Black Elderberry Effervescent Tablets, Sambucol Black Elderberry Chewable, Sambucol Black Elderberry Pastilles, Sambucol Black Elderberry Daily Immune Drink Powder, and Sambucol Black Elderberry Advanced Immune Syrup (collectively the "Elderberry Products" or the "Products") in California, New York, and nationwide (the "Class").

2.     Black elderberry, which is derived from a flowering plant called *Sambucus*, has become a popular dietary supplement in recent years. The increased popularity of "natural remedies" drives sales of elderberry products. According to a report published by the American Botanical Council in 2019, sales of elderberry supplements more than doubled in the United States between 2017 and 2018 to a total of nearly $51 million. Between January and March of 2018, elderberry supplement sales were more than $100 million dollars in the US alone. Elderberry sales in the first half of 2020 grew by triple digits compared to sales during the same period in 2019, showing the greatest growth in the mainstream dietary supplement market, where it is currently the third top-selling herbal ingredient. The mainstream dietary supplement market includes grocery stores, drug stores, and mass

- 1 -

COMPLAINT

Exhibit B
00246

merchandisers such as club, dollar, and military stores.[1]

3.　　According to IRI (now known as Circana), a market research firm that tracks retail sales of supplements, in March 2020, sales of elderberry supplements increased by 415% over the prior year as consumers sought products that might offer protection from the novel coronavirus.[2]  The "immune support" dietary supplement market, including supplements containing elderberry, is thus an extraordinarily fast-growing segment of the dietary supplement market, in part due to the Coronavirus Pandemic.

4.　　With hundreds of elderberry supplement options available for consumers to purchase, in order to stand out from the competition, Defendants promote its Elderberry Products as "the most trusted brand sold worldwide" and prominently displays a badge on its website proclaiming that its Products are the "No. 1 Best Selling Black Elderberry in the US."[3]

5.　　To further stand out from the competition, on the labels of its Elderberry Products, as well as on its website and in other marketing directed at consumers, Defendants state: "*Developed by a world renowned virologist*, Sambucol is the *unique* black elderberry extract that has been used in scientific studies.  By using a *proprietary method* of extraction, *only Sambucol can guarantee* consistent, immune supporting properties in every serving." (Emphasis added).  A reasonable consumer would understand such claims to mean that the Elderberry Products contain a unique elderberry extract, which has been developed by a virologist (thus, likely with anti-viral properties), using a method of extraction that cannot be found in other elderberry dietary supplements.

---

[1] https://www.globenewswire.com/news-release/2020/08/31/2086400/0/en/US-Herbal-Supplement-Sales-Increase-by-8-6-in-2019-Record-Breaking-Sales-Predicted-for-2020.html.

[2] https://www.nytimes.com/2020/03/23/well/live/coronavirus-supplements-herbs-vitamins-colds-flu.html.

[3] https://sambucolusa.com/.

- 2 -

COMPLAINT

Exhibit B
00247





Thus, Defendants warrant that all of the Products contain its proprietary, virologist developed, elderberry extract. However, such claims are false and misleading.

6. Here, Defendants advertise that the Elderberry Products were "developed by a world renowned virologist," a reference to Dr. Madeleine Mumcuoglu. Dr. Mumcuoglu and her company (Razei Bar Ltd.) originally trademarked the "Sambucol" branding, the same trademark that is currently owned by Defendants. *See* U.S. Trademark Nos. 75326070 and 74680785. Dr. Mumcuoglu also applied for patents for her Trademarked "Sambucol" Elderberry Extract. *See* U.S. Patent No. 4,742,046; Patent Application US2009/0186101 A1. This patented formulation was based on a specific cold pressed Elderberry Extract that contains a unique anti-viral compound, elderberry lectins.

7. While uniformly marketing the product as a unique formulation developed by a world-renowned virologist, Defendants have argued that its "unique" and "propriety" Elderberry Extract is simply run-of-the-mill Elderberry Juice during

COMPLAINT

Exhibit B
00248

1  an ancillary litigation.  Accordingly, Plaintiffs' counsel ordered testing to determine

2  if the Defendants' so-called "unique" and "propriety" Elderberry Extract was

3  actually the same "unique" and "propriety" formula developed by Dr. Mumcuoglu.

4  The results confirm it is not.  There are no lectins in the Elderberry Products.

5       8.  With knowledge of growing consumer demand for supplements

6  containing elderberry, Defendants intentionally marketed and sold their illegal

7  Elderberry Products using false and misleading labeling and advertising.

8  Defendants' prominent and systematic mislabeling of the Products and its false and

9  deceptive advertising form a pattern of unlawful and unfair business practices that

10  harms the public and, if unstopped, could lead to substantial societal harm.

11       9.  Plaintiffs bring this suit to halt Defendants' unlawful sales and

12  marketing of its Elderberry Products and for damages they sustained as a result of

13  the illegal sales and false and misleading marketing.  Declaratory and injunctive

14  relief is of particular importance given the likely consequences of Defendants'

15  actions.

16                     **PARTIES**

17       10.  Plaintiff Linda Sunderland is a resident and citizen of New York.

18       11.  Plaintiff Sunderland purchased Sambucol Black Elderberry Chewable

19  Tablets over the last two years, with her last purchase in March 2023.

20       12.  Prior to and at the time of each purchase of the Sambucol Black

21  Elderberry Chewable Tablets, Plaintiff Sunderland was exposed to, saw, and relied

22  upon Defendants' materially misleading representations on the Products' packaging

23  and labelling.  She reviewed the product's labeling, where she saw and relied on

24  Defendants' claims that its elderberry ingredient was developed by a world

25  renowned virologist and was unique and propriety.

26       13.  By purchasing Defendants' illegally sold and falsely advertised

27  Elderberry Products, Plaintiff Sunderland suffered injury in fact and lost money.

28       14.  Plaintiff Sunderland would like to continue purchasing Defendants'

- 4 -

COMPLAINT

Exhibit B
00249

Elderberry Products if they were legally sold supplements and if Defendants' false and misleading statements were true. Plaintiff Sunderland is, however, unable to rely on Defendants' representations in deciding whether to purchase Defendants' products in the future.

15.    Plaintiff Benjamin Binder is a resident and citizen of California.

16.    Plaintiff Binder purchased Sambucol Black Elderberry Original Syrup over the last four years, with his last purchase in June 2023.

17.    Prior to and at the time of each purchase of the Sambucol Black Elderberry Original Syrup, Plaintiff Binder was exposed to, saw, and relied upon Defendants' materially misleading representations on the Products' packaging and labelling.  He reviewed the product's labeling, where he saw and relied on Defendants' claims that its elderberry ingredient was developed by a world renowned virologist and was unique and propriety.

18.    By purchasing Defendants' illegally sold and falsely advertised Products, Plaintiff Binder suffered injury in fact and lost money.

19.    Plaintiff Binder would like to continue purchasing Defendants' Products if they were legally sold supplements and if Defendants' false and misleading statements were true. Plaintiff Binder is, however, unable to rely on Defendants' representations in deciding whether to purchase Defendants' products in the future.

20.    Defendant PharmaCare U.S., Inc. is a Delaware corporation with its principal place of business at 5030 Camino de la Siesta, Suite 200, San Diego, California 92108. Defendant PharmaCare U.S., Inc. is responsible for the marketing and distribution of the Elderberry Products in the United States.  Defendant PharmaCare U.S., Inc. is responsible for reviewing the accuracy of the Elderberry Products labels sold in the United States, and will make periodic changes to such labels.

21.    Defendant Pharmacare Laboratories Pty Ltd. (or Pharm-A-Care

COMPLAINT

Exhibit B
00250

1  Laboratories Pty. Ltd.) is an Australian company with its principal place of business
2  at 18 Jubilee Ave Warriewood, 2102 Australia.  Defendant Pharmacare Pty Ltd.
3  (both individually and through its whole own subsidiaries) owns the Sambucol
4  trademark, is responsible for the formulation and manufacturing of the Elderberry
5  Products (both in the U.S. and internationally), and is responsible for the original
6  labels on the Elderberry Products.

7                      **JURISDICTION AND VENUE**

8          22.    This Court has original jurisdiction over this controversy pursuant to 28
9  U.S.C. § 1332(d).   The amount in controversy in this class action exceeds
10  $5,000,000, exclusive of interest and costs, there are tens of thousands of Class
11  members, and there are numerous Class members who are citizens of states other
12  than Defendants' states of citizenship.

13         23.    This Court has personal jurisdiction over Defendant PharmaCare U.S.,
14  Inc.'s in this matter because Defendant is a resident of California, and Defendants'
15  acts and omissions giving rise to this action occurred in the state of California.

16         24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and
17  (c) because a substantial part of the events or omissions giving rise to Plaintiffs'
18  claims occurred in this District and because Defendants transact business and/or has
19  agents within this District and has intentionally availed themselves of the laws and
20  markets within this district.

21                        **FACTUAL ALLEGATIONS**

22         25.    This dispute arises out of Defendants' marketing of the Sambucol
23  branded dietary supplements, which contains as its primary dietary ingredient, Black
24  Elderberry extract.

25         26.    Black Elderberry (also known as *Sambucus nigra*) is a flowering plant
26  that produces small clusters of small black berries.  Elderberries have been used for
27  hundreds of years.  However, raw elderberries, as well as elderberry seeds, stems,
28  and leaves, contain a toxin, cyanogenic glycosides, that can cause serious illness and

- 6 -

COMPLAINT

Exhibit B
00251

1    even death. Accordingly, elderberries have to be cooked before they can be used, in

2    order to neutralize the cyanogenic glycosides. This is traditionally done by boiling

3    the elderberries, using the resulting juice or mash. This method is also used to create

4    traditional elderberry juices and extracts.

5         27.    In May 3, 1988, a patent was filed by Madeleine Bliah (later known as

6    Madeleine Mumcuoglu), U.S. Patent No. 4,742,046. Patent No. US4742046. This

7    Patent described the use of *lectins* obtained from the *Sambucus nigra* plant for

8    inhibiting the activity of enveloping viruses (particularly influenza virus type A).

9    The Patent described the method of extraction for Dr. Mumcuoglu's therapeutic

10   elderberry extract, which focused on isolating elderberry lectins (which Dr.

11   Mumcuoglu claimed had anti-viral properties):

12
13        elderberries from *Sambucus nigra I* may be pressed without crushing
          the seeds and the extract recovered by centrifugation and filtration. The
14        extract should then be ultra-centrifuged. The lectins may be recovered
          from the extract by affinity chromatography on a Sepharose-galactose
15        column followed by elution. The lactose may be removed (for example,
          by passage through a Sephadex G25 column). The desorbed material is
16        then resubjected to affinity chromatography on a Sepharose-galactose
          column. The first two peaks recovered during desorption are dialyzed
17        against water and lyophilized. The first peak comprises *Sambucus nigra*
          *II* lectin which is not appreciably adsorbed on to the Sepharose-
18        galactose column and the second peak comprises *Sambucus nigra I*
          lectin
19
20
21   *Id.* at p. 4. The Patent warns that "[d]uring the drug processing the temperature

22   should not exceed 70° C. since some lectins are destroyed by heat at that level." *Id.*

23        28.    This temperature limitation is an important note, as most pasteurization

24   process for commercial juice products will normally exceed this temperature. *See*

25   FDA, Guidance for Industry: Juice Hazard Analysis Critical Control Point Hazards

26   and    Controls    Guidance,    First    Edition    (2004),    available    at

27   https://www.fda.gov/regulatory-information/search-fda-guidance-

28   documents/guidance-industry-juice-hazard-analysis-critical-control-point-hazards-

COMPLAINT

Exhibit B
00252

and-controls-guidance-first (recommended pasteurization for fruit juice at a minimum of 71.1° C (160° F) for 6 seconds, but may be much higher). This is likely the reason for Dr. Mumcuoglu's specific method of extraction.

29.    Accordingly, the formula that Dr. Mumcuoglu developed, which Defendants touted in its marketing and labeling of the Elderberry Products, was not traditional elderberry juice. Instead, it was a method of isolating the lectins within elderberries for their anti-viral properties.

30.    During this period, Dr. Mumcuoglu also started an Israeli health products company, Razei Bar Ltd., to market her elderberry extract. In April 1995, Razei Bar Ltd. applied for a U.S. trademark, No. 74680785, on the word "Sambucol" for "dietary supplements, namely liquid extracts and throat lozenges composed primarily of elderberry juice." The "Sambucol" trademark would eventually become the property of Defendant PharmaCare Laboratories Pty Ltd.

31.    In 2009, Dr. Mumcuoglu would file a patent application, No. US2009/0186101 A1, to test this same elderberry extract discussed in the above patent as a novel method for the treatment of the avian flu virus. Patent Application US2009/0186101 A1. In this patent application, Dr. Mumcuoglu would specifically refer to her previous patented therapeutic elderberry extract using the trademarked term "Sambucol." *Id.* Additionally, there is no doubt that these patents describe the unique "Sambucol" elderberry extract that Dr. Mumcuoglu developed and trademarked.

32.    In order to increase demand, the Elderberry Products' labeling specifically advertises that the Products contained a "unique" and "proprietary" elderberry extract "developed by a world renowned virologist." The virologist referenced was Dr. Mumcuoglu. Defendants originally included Dr. Mumcuoglu's name on some of the Products' labels, but this reference was removed. It appears that there is currently no connection between Dr. Mumcuoglu and Defendants or the current version of the Elderberry Products.

- 8 -

Exhibit B
00253

33.     Nonetheless, Defendants continued to advertise on several of the Products' labels that the Products were in fact virologist developed.  For example, the label of the Products contained statements, such as:

- the Products were "Virologist developed"

- "Developed by a [world renowned] virologist, Sambucol® is the unique black elderberry extract that has been used in scientific studies. By using a proprietary method of extraction, only Sambucol® can guarantee consistent, immune supporting properties in every serving."

- "Developed by a world renowned virologist, Sambucol® is the unique manufacturing process preserves and maximizes the naturally occurring health benefits of the Black Elderberry."

- "Developed by a world renowned virologist, Sambucol® has been trusted by millions worldwide."

It is believed that Defendants included this language to build trust in the Sambucol brand and gain a competitive advantage in the marketplace.

34.     At all relevant times, Defendants marketed its Products in a consistent and uniform manner.  Each of the Class Products' labels specifically reference that they were virologist developed and contained the same elderberry extracts. Defendants sell the Products in all 50 states on its website and through various distributors and retailers across the United States.

35.     For the first time during an ancillary litigation, Defendants' counsel revealed that these claims may be false.  During a discovery hearing, where the plaintiffs were seeking formulations for the Products, Defendants' counsel claimed that:

I don't know why plaintiff is saying he needs the formulation for it to determine chemical analysis. You literally have the manufacturing process for turning elderberries into elderberry juice, from which an expert should be able to opine on whether that results in any chemical alteration to the elderberry juice.

- 9 -

Exhibit B
00254

1  *Corbett et al. v. Pharmacare U.S., Inc.*, No: 3:21-cv-00137-JES-AHG, ECF No. 119,

2  at p. 29:20-25. The import of this statement is significant, as it seems to be a judicial

3  admission that the "unique" and "proprietary" Elderberry Extract in the Elderberry

4  Products (touted to have been developed by a virologist), was simply elderberry

5  juice.

6      36.    Notably, with respect to the virologist developed extract that

7  Defendants tout on its marketing and labeling, Dr. Mumcuoglu (the referenced

8  virologist) applied for two Patents for the use of an extract containing the *lectins*

9  obtained from the *Sambucus nigra* plant for inhibiting the activity of viruses, namely

10  the flu. Lectins are the defining component of Dr. Mumcuoglu's formula.

11      37.    Plaintiffs testing of the Elderberry Products confirm that there are no

12  elderberry lectins in the Products. Therefore, Defendants are not using Dr.

13  Mumcuoglu's unique and proprietary formulation, which was developed (in part) to

14  retain the lectins. Accordingly, Defendants' "virologist developed" claims are

15  demonstrably false.

16      38.    Defendants knew, or could not be unaware, of the falsity of the

17  Elderberry Products' labels as alleged herein. Defendants both reviewed and created

18  the labels on the Elderberry Products, as well as their formulations. Defendants also

19  purchased the ingredients within the Elderberry Products, including the Elderberry

20  Extract. Finally, Defendants were also aware of Dr. Mumcuoglu's Elderberry

21  Extract formulation (as it was in a publicly available patent) and her involvement in

22  the development of the Sambucol dietary supplements. Indeed, even during

23  Defendants' ownership of the Elderberry Products, some of the Products' labels still

24  referenced Dr. Mumcuoglu. Thus, Defendants could not have been unaware that the

25  Elderberry Products did not contain an "unique" and "proprietary" Elderberry

26  Extract, developed by a virologist. Instead, it contained simply elderberry juice.

27      39.    Defendants continue to falsely label its Elderberry Products as being

28  "virologist developed" and containing an "unique" and "proprietary" Elderberry

- 10 -

COMPLAINT

Exhibit B
00255

1    Extract.  Yet, without complex and costly scientific testing, consumers would be

2    unable to determine that Defendant's labels are false.  Without injunctive relief,

3    consumers will be unable to determine if Defendants' labels remain incorrect or if

4    the Elderberry Products actually use Dr. Mumcuoglu's formulation.  Additionally,

5    Plaintiffs and other consumers continue to be injured by Defendants' fraudulent

6    business practices.

7        40.    Additionally, Defendants cause consumers to suffer a monetary injury.

8    Each of the Elderberry Products do not contain the "unique" and "proprietary"

9    virologist developed Elderberry Extract, as advertised and warranted.  Accordingly,

10   Plaintiffs and other claims members are entitled to the difference between the

11   Elderberry Products provided and the Elderberry Products as warranted.

12                    **TOLLING AND ESTOPPEL ALLEGATIONS**

13       41.    Defendants have actual knowledge, or should have actual knowledge,

14   that its Elderberry Products do not contain the "unique" and "proprietary" virologist

15   developed Elderberry Extract, as advertised and warranted for the reasons stated

16   above.

17       42.    Although Defendants were aware of the deception in their advertising,

18   marketing, packaging, and sale of the Elderberry Products chemicals, it took no steps

19   to disclose to Plaintiffs or Class Members that their Products do not contain the

20   "unique" and "proprietary" virologist developed Elderberry Extract.

21       43.    Despite their knowledge otherwise, Defendants have fraudulently

22   misrepresented the Elderberry Products contain the "unique" and "proprietary"

23   virologist developed Elderberry Extract, actively concealing this fact from Plaintiffs

24   and other Class Members.

25       44.    Defendants have made, and continue to make, affirmative false

26   statements and misrepresentations to consumers, regarding the inclusion of the

27   purported "unique" and "proprietary" virologist developed Elderberry Extract in the

28   Elderberry Products.

- 11 -

COMPLAINT

Exhibit B
00256

45.   The exact formulation of the Elderberry Extract in the Elderberry Products is not reasonably detectible to Plaintiffs and Class Members.

46.   At all times, Defendants actively and intentionally misrepresented the qualities and characteristics of the Elderberry Products, while concealing the true nature of the Elderberry Extract in its Products. Accordingly, Plaintiffs' and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

47.   Defendants misrepresented the Elderberry Products and concealed the true nature of the Elderberry Extract in their Products for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

48.   As a result of Defendants' intentional misrepresentations and active concealment of the true nature of the Elderberry Extract in their Elderberry Products, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendants are estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the true nature of the Elderberry Extract in their Elderberry Products.

49.   Further, the causes of action alleged herein did not occur until Plaintiffs and Class Members discovered that the Products contained PFAS chemicals. Plaintiffs only became aware of the true nature of the Elderberry Extract in their Products through Defendants' admission at a recent hearing before this Court. *Corbett et al. v. Pharmacare U.S., Inc.*, No: 3:21-cv-00137-JES-AHG, ECF No. 119, at p. 29:20-25. Prior to this admission, there was no publicly available information regarding the exact formulation of the Elderberry Extract in Defendants' Elderberry Products which would contradict Defendants' assertion that the Elderberry Extract in their Elderberry Products was a "unique" and "proprietary" virologist developed formulation.

## CLASS ACTION ALLEGATIONS

50.   Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23, on behalf

- 12 -

Exhibit B
00257

1    of the below-defined Classes:

2    **National Class:**

3    All persons in the United States who, during the relevant statute of limitations,
     purchased the Elderberry Original Syrup, Sambucol Black Elderberry Sugar
4    Free, Sambucol Black Elderberry Syrup for Kids, Sambucol Black Elderberry
     Effervescent Tablets, Sambucol Black Elderberry Chewable Tablets,
5    Sambucol Black Elderberry Pastilles, Sambucol Black Elderberry Daily
6    Immune Drink Powder, and Sambucol Black Elderberry Advanced Immune
     Syrup for personal or household use and not for resale.
7

8    **California Subclass:**

9    All persons in California who, during the relevant statute of limitations,
     purchased the Elderberry Original Syrup, Sambucol Black Elderberry Sugar
10   Free, Sambucol Black Elderberry Syrup for Kids, Sambucol Black Elderberry
     Effervescent Tablets, Sambucol Black Elderberry Chewable Tablets,
11   Sambucol Black Elderberry Pastilles, Sambucol Black Elderberry Daily
12   Immune Drink Powder, and Sambucol Black Elderberry Advanced Immune
     Syrup for personal or household use and not for resale.
13

14   **New York Subclass:**

15   All persons in New York who, during the relevant statute of limitations,
     purchased the Elderberry Original Syrup, Sambucol Black Elderberry Sugar
16   Free, Sambucol Black Elderberry Syrup for Kids, Sambucol Black Elderberry
     Effervescent Tablets, Sambucol Black Elderberry Chewable Tablets,
17   Sambucol Black Elderberry Pastilles, Sambucol Black Elderberry Daily
     Immune Drink Powder, and Sambucol Black Elderberry Advanced Immune
18   Syrup for personal or household use and not for resale.

19   Specifically excluded from these definitions are: (1) Defendants, any entity in which

20   Defendants have a controlling interest, and its legal representatives, officers,

21   directors, employees, assigns and successors; (2) the Judge to whom this case is

22   assigned and any member of the Judge's staff or immediate family; and (3) Class

23   Counsel. Plaintiffs reserve the right to amend the Class definition and Subclass

24   definitions as necessary.

25   51.    Certification of Plaintiffs' claims for class-wide treatment are

26   appropriate because Plaintiffs can prove the elements of the claims on a class-wide

27   basis using the same evidence that individual Class members would use to prove

28   those elements in individual actions alleging the same claims.

- 13 -

COMPLAINT

Exhibit B
00258

52.    The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of hundreds of thousands of consumers. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Defendants and its authorized retailers.

53.    The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased the Elderberry Products that were manufactured, marketed, advertised, distributed, and sold by Defendants. Furthermore, the factual basis of Defendants' misconduct is common to all Class Members because Defendants have engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

54.    Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

a.    Whether the Elderberry Products are advertised and warranted as containing a "unique" and "propriety" Elderberry Extract, developed by a virologist;

b.    Whether the claims Defendants made and is making regarding the Products are unfair or deceptive, specifically, whether the Elderberry Products actually contain "unique" and "propriety" Elderberry Extract, developed by a virologist;

c.    Whether Defendants knew or should have known that the representations and advertisements regarding the Products were false and misleading;

d.    Whether Defendants have breached express warranties in the sale and marketing of the Elderberry Products;

- 14 -

Exhibit B
00259

e.    Whether Defendants' conduct violates public policy;

f.    Whether Defendants' acts and omissions violate California law;

g.    Whether Defendants' acts and omissions violate New York law;

h.    Whether the Plaintiffs and the Class Members suffered monetary injury, and, if so, what is the measure of the appropriate damages or, in the alternative, restitution;

i.    Whether Plaintiffs and the Class Members are entitled to an injunction, damages, restitution, equitable relief, and other relief deemed appropriate, and, if so, the amount and nature of such relief.

55.    Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

56.    The elements of Rule 23(b)(2) are met. Defendants will continue to commit the unlawful practices alleged herein, and Class Members will remain at an unreasonable and serious safety risk as a result of the Defect. Defendants have acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

57.    The elements of Rule 23(b)(3) are also met. Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendants' misconduct.

- 15 -

Exhibit B
00260

Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

58.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

59.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

## CAUSES OF ACTION

### COUNT I
**California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq.  ("UCL")**
**(On Behalf of the National Class and California Subclass)**

60.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as though set forth fully herein.

61.    Plaintiffs bring this claim individually and on behalf of all members of the National Class and Plaintiff Binder brings this claim individually and on behalf of California Subclass against Defendants.

62.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

63.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute business acts and practices.

64.    <u>Unlawful</u>:  The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws: the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.* and the Consumers Legal Remedies Act, Cal. Civ. Code

- 16 -

Exhibit B
00261

1    §§ 1750 *et seq.*;

2        65.    <u>Unfair</u>: Defendants' conduct with respect to the labeling, advertising,

3    and sale of the Products was "unfair" because Defendants' conduct was immoral,

4    unethical, unscrupulous, or substantially injurious to consumers and the utility of

5    their conduct, if any, does not outweigh the gravity of the harm to their victims.

6        66.    Defendants' conduct with respect to the labeling, advertising, and sale

7    of the Products was and is also unfair because it violates public policy as declared

8    by specific constitutional, statutory or regulatory provisions, including but not

9    limited to the applicable sections of the Consumers Legal Remedies Act and the

10    False Advertising Law.

11        67.    Defendants' conduct with respect to the labeling, advertising, and sale

12    of the Products was and is unfair because the consumer injury was substantial, not

13    outweighed by benefits to consumers or competition, and not one consumer

14    themselves could reasonably have avoided.

15        68.    <u>Fraudulent</u>: A statement or practice is "fraudulent" under the UCL if it

16    is likely to mislead or deceive the public, applying an objective reasonable consumer

17    test. As set forth in detail above, Defendants have fraudulently labeled its Products

18    as they have made false and misleading statements that are likely to mislead

19    reasonable consumers.

20        69.    Defendants profited from its sale of the falsely, deceptively, and

21    unlawfully advertised and packaged Products to unwary consumers.

22        70.    Plaintiffs seek an order enjoining Defendant from continuing to

23    conduct business through fraudulent or unlawful acts and practices and to commence

24    a corrective advertising campaign.

25        71.    Defendant's conduct is ongoing and continuing, such that prospective

26    injunctive relief is necessary, especially given Plaintiffs' desire to purchase the

27    Products in the future if they can be assured that the Products are properly labeled

28    and actually contain a virologist developed elderberry extract.

COMPLAINT

Exhibit B
00262

72.    Additionally, Plaintiffs seek restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and the Class. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

73.    On behalf of themselves and the Class, Plaintiffs also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

**COUNT II**
**California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500 ("FAL")**
**(On Behalf of the National Class and California Subclass)**

74.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

75.    Plaintiffs bring this claim individually and on behalf of all members of the National Class and Plaintiff Binder brings this claim individually and on behalf of California Subclass against Defendants.

76.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

77.    As alleged in detail above, the advertisements, labeling, policies, acts, and practices of Defendants relating to the Elderberry Products misled consumers acting reasonably regarding the ingredients within said Products.

- 18 -

Exhibit B
00263

78.     Plaintiffs and the Class Members suffered injury in fact as a result of Defendants' actions as set forth herein because they purchased the Products in reliance on Defendants' labeling claims, when such claims were false.

79.     Defendants' business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants have advertised the Products in a manner that is untrue and misleading, which Defendants knew or reasonably should have known, and omitted material information from its advertising.  For example, Defendants advertised that its Elderberry Products contained a virologist developed extract, when it did not.

80.     Defendants profited from its sale of the falsely and deceptively advertised Products to unwary consumers.

81.     Plaintiffs seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.

82.     Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiffs' desire to purchase the Products in the future if they can be assured that the Products are properly laberled and actually contain a virologist developed elderberry extract.

83.     Additionally, Plaintiffs seek restitution if monetary damages are not available. Indeed, restitution under the FAL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and the Subclass. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

84.     On behalf of themselves and the Class, Plaintiffs also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

COMPLAINT

Exhibit B
00264

## COUNT III
### California's Consumer Legal Remedies Act
### Cal. Civ. Code § 1750 et seq. ("CLRA")
### (On Behalf of the California Subclass)

85.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

86.    Plaintiff Binder brings this claim individually and on behalf of the members of the California Subclass against Defendants.

87.    Defendants are a "person" under the CLRA, Cal. Civ. Code § 1761(c).

88.    Plaintiff Binder and California Subclass members are "consumers" under the CLRA, Cal. Civ. Code § 1761(d).

89.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

90.    Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiff Binder and California Subclass Members, and violated and continue to violate the following sections of the CLRA:

a.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

91.    Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

92.    Defendants' wrongful business practices constituted, and constitute, a

- 20 -

Exhibit B
00265

1    continuing course of conduct in violation of the CLRA.

2        93.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), concurrently

3    with the filing of this Complaint, Plaintiff Binder, through counsel, mailed

4    Defendants a letter by certified mail addressed to its headquarters (with a copy sent

5    to Defendants' counsel as well), providing notice of Defendants' alleged violations

6    of the CLRA, demanding that Defendants correct such violations, and providing

7    Defendants with the opportunity to correct its business practices.  Plaintiff Binder

8    specifically identified which provisions of Cal. Civ. Code § 1770 Defendants had

9    violated.

10        94.    Pursuant to California Civil Code § 1780, Plaintiff Binder seeks

11    injunctive relief, his reasonable attorneys' fees and costs, and any other relief that

12    the Court deems proper.  Should Defendant not respond to Plaintiff Binder's CLRA

13    Demand Letter, Plaintiff will amend his complaint to seek additional monetary

14    relief, which may include statutory damages.

15                                    **COUNT IV**
16                **Violation of New York Deceptive Acts and Practices Law**
17                    **(New York General Business Law §§ 349 and 350)**
                **(On Behalf of Plaintiff Sunderland and the New York Subclass)**

18        95.    Plaintiff Sunderland reallege and repeat the allegations set forth in the

19    preceding paragraphs as if fully set forth herein.

20        96.    By the acts and conduct alleged herein, Defendants committed

21    deceptive acts and practices in the State of New York by making the above alleged

22    misrepresentations directed to consumers in New York

23        97.    Plaintiffs and other members of the New York Class are "consumers"

24    in accordance with New York General Business Law ("GBL") § 349.

25        98.    Defendants' statements concerning the nature of the Elderberry Extract

26    in the Elderberry Products, alleged above, were advertisements in accordance with

27    GBL § 350.

28
                                        - 21 -

COMPLAINT

Exhibit B
00266

99.   Defendants' statements concerning the nature of the Elderberry Extract in the Elderberry Products, alleged above, were misleading in violation of GBL §§ 349 and 350.

100.   At all relevant times, Defendants conducted trade and commerce in New York and elsewhere within the meaning of GBL § 349, and profited from the sale of the Elderberry Products within New York.

101.   Section 349 allows a plaintiff to recover "actual damages or fifty dollars, whichever is greater." N.Y. Gen. Bus. L. §349(h). Section 350 allows a plaintiff to recover "actual damages or five hundred dollars, whichever is greater." Id. §350-e.

102.   As a direct and proximate result of Defendants' conduct, Plaintiffs and other members of the Class have suffered damages.

103.   Accordingly, Plaintiffs and the New York Subclass seek to enjoin the unlawful acts and practices described herein, to recover actual damages or statutory damages of fifty dollars and five hundred dollars under GBL §§ 349 and 350, respectively, whichever is greater, as well punitive damages and reasonable attorneys' fees and costs.

**COUNT VI**
**Breach of Express Warranties**
**(On Behalf of the National Classes and Subclasses)**

104.   Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

105.   Plaintiffs bring this claim individually and on behalf of the members of the National Class and the California and New York Subclasses against Defendants.

106.   Through the Products' labels and advertising, Defendants made affirmations of fact or promises, or description of goods, described above, which were "part of the basis of the bargain," in that Plaintiffs and the Class Members purchased the Products in reasonable reliance on those statements.

107.   Plaintiffs and the Class Members have privity of contract with

- 22 -

COMPLAINT

Defendants through their purchase of the Elderberry Products, and through the express warranties that Defendants issued to its customers. Defendants' warranties accompanied the Elderberry Products and were intended to benefit end-users of the Elderberry Products. To the extent that Plaintiffs and/or the Class Members purchased the Elderberry Products from third-party retailers, privity is not required because Plaintiffs and the Class Members are intended third-party beneficiaries of the contracts between Defendants and third-party retailers, and because the express warranty is intended to benefit purchasers or owners subsequent to the third-party retailers. In other words, the contracts are intended to benefit the ultimate consumer or user of the Elderberry Products.

108. Defendants breached the express warranties by selling Elderberry Products that contain a "unique" and "propriety" Elderberry Extract, developed by a virologist.

109. Plaintiffs and the Class Members would not have purchased the Elderberry Products had they known that the Products are falsely labeled. Plaintiffs and the Class Members relied on Defendants' misrepresentations and misstatements.

110. That breach actually and proximately caused injury in the form of a portion of the purchase price that Plaintiffs and Class members paid for the Elderberry Products.

111. Furthermore, Defendants had actual knowledge that the Elderberry Products were falsely labeled because it has actual knowledge of the formulation of the Elderberry Products.

112. Plaintiffs provided Defendants with notice of the alleged breach within a reasonable time after they discovered the breach or should have discovered it.

113. As a result of Defendants' breach of warranty, Plaintiffs and the Class Members have been damaged in the amount of the purchase price of the Products and any consequential damages resulting from the purchases.

COMPLAINT

Exhibit B
00268

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action and for judgment to be entered against Defendants as follows:

A.   Enter an order certifying the proposed Class (and subclasses, if applicable), designating Plaintiffs as the class representatives, and designating the undersigned as class counsel;

B.   Enter an order awarding Plaintiffs and the class members their actual damages, treble damages, and/or any other form of monetary relief provided by law;

C.   Declare that Defendants arefinancially responsible for notifying all Class members of the mislabeling and misbranding of the Products;

D.   Declare that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Products, or order Defendants to make full restitution to Plaintiffs and the members of the Class;

E.   Defendants shall audit and reassess all prior customer claims regarding the Products, including claims previously denied in whole or in part;

F.   An order awarding Plaintiffs and the Classes pre-judgment and post-judgment interest as allowed under the law;

G.   Grant reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action, including expert witness fees; and

H.   Grant such other and further relief as this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

- 24 -

Exhibit B
00269

Dated: July 18, 2023                          Respectfully Submitted,

By:  */s/ Trenton Kashima*
Trenton R. Kashima (SBN 291405)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

Alex Straus (SBN 321366)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 s. Beverly Drive, Ste. PH
Beverly Hills, CA 902126
Tel: 865-247-0080
astraus@milberg.com.com

Rachel Soffin*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel: 865-247-0080
rsoffin@ milberg.com

Martha A. Geer*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 West Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: 919-600-5035
mgeer@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

- 25 -

COMPLAINT

Exhibit B
00270

1    6905 Telegraph Rd., Suite 115
2    Bloomfield Hills, MI 48301
     Tel: 313-303-3472
3    nsuciu@milberg.com

4    *Pro Hac Vice pending*

5    **Counsel for Plaintiffs and the Class**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 26 -

## DECLARATION OF TRENTON KASHIMA

I, Trenton R. Kashima, declare as follows:

1.     I am an attorney duly licensed and entitled to practice law in the state of California. I am an attorney of the law firm Milberg Coleman Bryson Phillips Grossman PLLC, attorneys for Plaintiffs in above-captioned action. I have personal knowledge of the facts stated herein, and if called to do so, could and would competently testify thereto.

2.     Based on information from the Elderberry Products' labels and other public sources (including Defendant's linkedin profile), Defendant PharmaCare U.S., Inc. has its principal place of business, is registered to do business and/or is in-fact doing business at 5030 Camino De La Siesta, Ste 200, San Diego, CA 92108, located within the County of San Diego.

3.     Accordingly, pursuant to California Code of Civil Procedure, section 1780, the Southern District of California is the proper venue for Plaintiffs' California Consumer Legal Remedies Act claims.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 18, 2023 in San Diego, California

_____
Trenton R. Kashima

- 27 -

COMPLAINT

1   Trenton R. Kashima (SBN No. 291405)
    **MILBERG COLEMAN BRYSON**
2   **PHILLIPS GROSSMAN PLLC**
    402 W. Broadway., Suite 1760
3   San Diego, CA 92101
    Tel: (619) 810-7047
4   tkashima@milberg.com

5   *Attorneys for Plaintiffs*
    *and the Proposed Classes*
6
    *Additional attorneys on signature page*
7

8

9                 UNITED STATES DISTRICT COURT

10              SOUTHERN DISTRICT OF CALIFORNIA

11

12   LINDA SUNDERLAND and BENJAMIN        Case No. 3:23-cv-01318-JES-AHG
     BINDER individually and on behalf of all
13   others similarly situated,             **PLAINTIFF LINDA**
                                            **SUNDERLAND'S RESPONSES AND**
14                  Plaintiffs,             **OBJECTIONS TO DEFENDANT**
                                            **PHARMACARE U.S., INC.'S**
15          v.                              **INTERROGATORIES TO LINDA**
                                            **SUNDERLAND, SET ONE**
16   PHARMACARE U.S., INC., a Delaware
     Corporation, and PHARMACARE
17   LABORATORIES PTY LTD., an
     Australian company,
18
                    Defendants.
19

20

21

22

23

24

25

26          EXHIBIT
27            7
         2-27-24/m
28

_____
PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Plaintiff Linda Sunderland (hereinafter "Sunderland") by and through her undersigned counsel, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby provides the following first set of responses to the First Set of Interrogatories of Pharmacare U.S., Inc. (hereinafter "Pharmacare").

## PRELIMINARY STATEMENT

The following responses are made solely for purposes of this action. By making these responses, Plaintiff does not concede that the Interrogatories sought are relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's responses are made without in any way intending to waive or waiving, but, on the contrary, intending to preserve and preserving:

(a)    The right to object, on any grounds, to the use of these responses in any subsequent proceedings in, or at trial of, this or any action;

(b)    The right to object to the introduction of these responses into evidence in any subsequent proceedings in, or at the trial of, this or any action; and

(c)    The right to object, on any grounds at any time, to other Interrogatories or other discovery demands involving these responses or the subject matter thereof.

The responses and objections are made on the basis of information presently available to and located by Plaintiff upon reasonable investigation. Plaintiff expressly reserves the right to produce further information in response to these Interrogatories. Further, Plaintiff reserves the right to modify, revise, supplement, or amend her responses as she deems appropriate.

## GENERAL OBJECTIONS

The following general objections are made to each Interrogatory and are incorporated by this reference into each specific response as if set forth in full therein, and is in addition to any specific objections stated within those responses.

1.    Plaintiff objects to these Requests to the extent that they impose burdens or obligations inconsistent with, or in excess of, those imposed by the Federal Rules of Civil

1

PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00274

1  Procedure, the Local Rules of Civil Practice and Procedure of The United States District

2  Court for the Northern District of California ("Local Rules"), or any other applicable rules

3  and statutes.    Plaintiff will respond to each of the Requests in accordance with the

4  requirements of the Federal and Local Rules.

5      2.    Plaintiff bases her responses on the assumption that Defendant, in

6  propounding these Interrogatories, did not intend to seek information protected against

7  discovery by the attorney-client privilege, the attorney work-product doctrine, or any other

8  applicable right, privilege, protection or doctrine.    To the extent that Defendant's

9  Interrogatories, or any part thereof, are intended to elicit such information, Plaintiff objects

10  and asserts the privileges and protections contained in the foregoing rules to the fullest

11  extent permitted by law.

12      3.    Nothing contained in these responses is intended as, nor shall it in any way be

13  deemed as, a waiver of the attorney-client privilege, the attorney work-product doctrine, or

14  any other applicable right, privilege, protection or doctrine.    In responding to each

15  Interrogatory, Plaintiff will not undertake to provide privileged or otherwise protected

16  information, and inadvertent disclosure of such information shall not be deemed a waiver

17  of any applicable privilege or doctrine.

18      These Interrogatories could possibly be construed as seeking information from

19  entities or individuals other than Plaintiff.  In responding to these interrogatories, Plaintiff

20  is obligated, if at all, to provide only information that is within her knowledge; Plaintiff

21  expressly objects to these interrogatories to the extent they seek to require a response on

22  behalf of any individual other than Plaintiff.

23  **RESPONSES TO INTERROGATORIES**

24  **INTERROGATORY NO. 1:**

25      DESCRIBE the circumstances surrounding YOUR purchase and use of the

26  PRODUCTS, including the DATE of each purchase, the retail price paid, the method of

27

28

PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00275

1  payment, the specific PRODUCTS purchased, the store name and location from which

2  YOU purchased the PRODUCTS, and frequency of use.

3  **RESPONSE TO INTERROGATORY NO. 1:**

4        Subject to the preliminary statement and general objections, Plaintiff purchased two

5  bottles of Sambucol Black Elderberry Chewables every other month and Sambucol Black

6  Elderberry Lozenges beginning in 2020 through 2022 from the following locations:

7  - Walgreens #10678

8  - Walgreens #14128

9  - Walgreens #180305

10 - Mrytle Pharmacy, Brooklyn, New York

11       Plaintiff purchased the Product due to the language on the packaging, specifically

12 "Virologist Developed" on the label.

13       Plaintiff does not know the exact purchase information for the Walgreens and Mrytle

14 Pharmacy transactions.

15 **INTERROGATORY NO. 2:**

16       DESCRIBE ANY COUPON or DISCOUNT applied to YOUR purchases of the

17 PRODUCTS.

18 **RESPONSE TO INTERROGATORY NO. 2:**

19       Subject to the preliminary statement and general objections, Plaintiff is unaware of

20 any discounts applied to her purchases.

21 **INTERROGATORY NO. 3:**

22       DESCRIBE the circumstances surrounding YOUR purchase and use of OTHER

23 ELDERBERRY PRODUCTS, including the DATE of each purchase, the retail price paid,

24 the method of payment, the specific products purchased, the store name and location from

25 which YOU purchased the products, and frequency of use.

26 **RESPONSE TO INTERROGATORY NO. 3:**

27

28

PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00276

1    Began purchasing Goli Immune Vitamin Gummies with Elderberry Extract,

2    Airborne Immune Support Elderberry Gummies, and Emergen-C Elderberry Daily

3    Immune Support and Botanicals Gummies as of January 2023 from Walmart #3520 and

4    the locations listed in Response to Interrogatory No. 1.

5    **INTERROGATORY NO. 4:**

6    IDENTIFY all PERSONS with knowledge of the facts YOU contend support each

7    allegation contained in YOUR COMPLAINT.

8    **RESPONSE TO INTERROGATORY NO. 4:**

9    Subject to the preliminary statement and general objections, Plaintiff objects to the

10   Interrogatory as seeking identification and production of information and documents that

11   are not, and never were in Plaintiff's possession, custody or control.  Plaintiff further

12   objects to the Interrogatory's definition of "YOU" as improper third-party discovery

13   because it seeks identification of information and documents that, to the extent they exist,

14   are not known to Plaintiff, and do not relate to this action.

15   Defendant's Interrogatory is facially overbroad, and therefore unduly burdensome.

16   Defendant may not seek all information related to a general topic, otherwise known as

17   "contention" interrogatories.  *See e.g., Gopher Media, LLC v. Spain*, 2020 WL 6741675,

18   at *3 (S.D. Cal., Nov. 17, 2020) ("As a rule, requests for 'any and all' documents or

19   communications (or testimony about those materials) are facially overbroad"); *Sonnino

20   v. Univ. of Kan. Hosp. Auth.*, 2004 WL 764085, at *5 (D. Kan. Apr. 8, 2004) (a request

21   for production seeking "all documents that relate to or concern" a particular topic is

22   "overly broad on its face"); *Malik v. Amini's Billiard & Bar Stools, Inc.*, 2005 WL 8160879,

23   at *8 ("courts generally find contention interrogatories or requests to be overly broad on

24   their face to the extent they ask for "every fact" or "any and all" documents that support an

25   allegation or defense"); *High 5 Games, LLC v. IGT*, 2015 WL 9685094 at *1 (N.D. Ill.,

26   Nov. 25, 2015) (interrogatories containing "all documents" and "all individuals with

27   knowledge" pertaining to the subject matter specified in the interrogatory held to be

28

4

Exhibit B
00277

1    overbroad on their face).    Accordingly, Plaintiff will identify persons with material

2    information regarding the allegations in her complaint.

3        Plaintiff objects to the phrase "all PERSONS" as vague and overbroad, and further

4    objects to the extent the definition includes defense witnesses and experts.  Plaintiff will

5    not identify any persons associated or employed by Defendant or any expert witnesses.

6        Plaintiff also objects to this interrogatory to the extent that it requires the premature

7    disclosure of Plaintiffs' expert opinions, and information protected by the attorney-client

8    privilege, work product doctrine or other privilege, including marital /spousal testimonial

9    privilege.

10        Subject to and without waiving these objections, Plaintiff identifies only herself.

11    **INTERROGATORY NO. 5:**

12        For each PERSON identified in response to Interrogatory No. 4, DESCRIBE the

13    facts known by the PERSON that YOU claim support the allegations contained in YOUR

14    COMPLAINT.

15    **RESPONSE TO INTEROGATORY NO. 5:**

16        Subject to the preliminary statement and general objections, Plaintiff objects to the

17    Interrogatory as seeking identification and production of information and documents that

18    are not, and never were in Plaintiff's possession, custody or control.  Plaintiff further

19    objects to the Interrogatory's definition of "YOU" as improper third-party discovery

20    because it seeks identification of information and documents that, to the extent they exist,

21    are not known to Plaintiff, and do not relate to this action.

22        Plaintiff objects to the phrase "PERSONS" as vague and overbroad, and further

23    objects to the extent the definition includes defense witnesses and experts.  Plaintiff will

24    not identify any persons associated or employed by Defendant or any expert witnesses.

25        Plaintiff also objects to this interrogatory to the extent that it requires the premature

26    disclosure of Plaintiffs' expert opinions, and information protected by the attorney-client

27    privilege, work product doctrine or other privilege.

28

PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00278

1  Subject to and without waiving these objections, Plaintiff identifies that she has

2  knowledge regarding her own purchases.

3  **INTERROGATORY NO. 6:**

4  IDENTIFY any PERSON other than YOU that YOU believe purchased the

5  PRODUCTS for their personal use in the past four years.

6  **RESPONSE TO INTERROGATORY NO. 6:**

7  Subject to the preliminary statement and general objections, Plaintiff objects to the

8  Interrogatory as seeking identification and production of information and documents that

9  are not, and never were in Plaintiff's possession, custody or control.  Plaintiff further

10  objects to the Interrogatory's definition of "YOU" as improper third-party discovery

11  because it seeks identification of information and documents that, to the extent they exist,

12  are not known to Plaintiff, and do not relate to this action.

13  Plaintiff objects to the phrase "PERSONS" as vague and overbroad, and further

14  objects to the extent the definition includes defense witnesses and experts.  Plaintiff will

15  not identify any persons associated or employed by Defendant or any expert witnesses.

16  Plaintiff also objects to this interrogatory to the extent that it requires the premature

17  disclosure of Plaintiffs' expert opinions, and information protected by the attorney-client

18  privilege, work product doctrine or other privilege.

19  Subject to and without waiving these objections, Plaintiff identifies that she has

20  knowledge regarding her own purchases. Plaintiff also understands that other absent class

21  members purchased the PRODUCTS for their personal use in the past four years.

22  **INTERROGATORY NO. 7:**

23  IDENTIFY ANY DOCUMENTS that support the allegations in YOUR

24  COMPLAINT.

25  **RESPONSE TO INTERROGATORY NO. 7:**

26  Subject to the preliminary statement and general objections, Plaintiff objects to the

27  Interrogatory as seeking identification and production of information and documents that

28

PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00279

1    are not, and never were in Plaintiff's possession, custody or control.  Plaintiff further

2    objects to the Interrogatory's definition of "YOU" as improper third-party discovery

3    because it seeks identification of information and documents that, to the extent they exist,

4    are not known to Plaintiff, and do not relate to this action.

5         Defendant's Interrogatory is facially overbroad, and therefore unduly burdensome.

6    Defendant may not seek all information related to a general topic, otherwise known as

7    "contention" interrogatories.  *See e.g., Gopher Media, LLC v. Spain*, 2020 WL 6741675,

8    at *3 (S.D. Cal., Nov. 17, 2020) ("As a rule, requests for 'any and all'  documents  or

9    communications (or testimony about those materials) are facially overbroad"); *Sonnino*

10   *v. Univ. of Kan. Hosp. Auth.*, 2004 WL 764085, at *5 (D. Kan. Apr. 8, 2004) (a request

11   for production seeking "all documents that relate to or concern" a particular topic is

12   "overly broad on its face"); *Malik v. Amini's Billiard & Bar Stools, Inc.*, 2005 WL 8160879,

13   at *8 ("courts generally find contention interrogatories or requests to be overly broad on

14   their face to the extent they ask for "every fact" or "any and all" documents that support an

15   allegation or defense"); *High 5 Games, LLC v. IGT*, 2015 WL 9685094 at *1 (N.D. Ill.,

16   Nov. 25, 2015) (interrogatories containing "all documents" and  "all  individuals  with

17   knowledge" pertaining to the subject matter specified in the interrogatory held to be

18   overbroad on their face).  Accordingly, Plaintiff will identify persons with material

19   information regarding the allegations in her complaint.

20        Plaintiff also objects to this interrogatory to the extent that it requires the premature

21   disclosure of Plaintiffs' expert opinions, and information protected by the attorney-client

22   privilege, work product doctrine or other privilege, including marital /spousal testimonial

23   privilege.

24        Subject to and without waiving these objections, Plaintiff identifies all documents

25   referenced in Plaintiffs' Class Action Complaint (including product labels) and documents

26   that may be produced in response to Plaintiff's discovery requests, as well as documents

27   produced in the *Corbett v. Pharmacare U.S., Inc.* matter.

28

PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00280

**INTERROGATORY NO. 8:**

IDENTIFY all PERSONS with whom YOU have had ANY COMMUNICATION RELATED TO the allegations contained in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 8:**

Subject to the preliminary statement and general objections, Plaintiff objects to the Interrogatory as seeking identification and production of information and documents that are not, and never were in Plaintiff's possession, custody or control. Plaintiff further objects to the Interrogatory's definition of "YOU" as improper third-party discovery because it seeks identification of information and documents that, to the extent they exist, are not known to Plaintiff, and do not relate to this action.

Defendant's Interrogatory is facially overbroad, and therefore unduly burdensome. Defendant may not seek all information related to a general topic, otherwise known as "contention" interrogatories. *See e.g., Gopher Media, LLC v. Spain*, 2020 WL 6741675, at *3 (S.D. Cal., Nov. 17, 2020) ("As a rule, requests for 'any and all' documents or communications (or testimony about those materials) are facially overbroad"); *Sonnino v. Univ. of Kan. Hosp. Auth.*, 2004 WL 764085, at *5 (D. Kan. Apr. 8, 2004) (a request for production seeking "all documents that relate to or concern" a particular topic is "overly broad on its face"); *Malik v. Amini's Billiard & Bar Stools, Inc.*, 2005 WL 8160879, at *8 ("courts generally find contention interrogatories or requests to be overly broad on their face to the extent they ask for "every fact" or "any and all" documents that support an allegation or defense"); *High 5 Games, LLC v. IGT*, 2015 WL 9685094 at *1 (N.D. Ill., Nov. 25, 2015) (interrogatories containing "all documents" and "all individuals with knowledge" pertaining to the subject matter specified in the interrogatory held to be overbroad on their face). Accordingly, Plaintiff will identify persons with material information regarding the allegations in her complaint.

Plaintiff further objects to this Interrogatory because it is vague, overbroad, and seeks information irrelevant and not proportional to the needs of the pending case.

Exhibit B
00281

1   Plaintiff's communications with third parties are irrelevant to this case. Moreover, based

2   on the definitions of YOU, ANY, COMMUNICATIONS, and PERSON, Defendant seeks

3   any incidental communications between Plaintiff and her agents and any other person or

4   entity regarding the lawsuit, regardless of how inconsequential such communication is to

5   this case. Accordingly, Plaintiff will only respond to this Request to the extent that Plaintiff

6   has any communication with another individual which expressly references the claims at

7   issue in this dispute.

8        Plaintiff objects to this Request as vague and ambiguous to the extent that it calls for

9   Plaintiff to determine the identities of unknown parties and their communications with

10  other unknown parties. Plaintiff lacks the requisite personal knowledge to determine any

11  person that has "act on [her] behalf" has had any written communications regarding the

12  Products at issue.

13       Plaintiff also objects to this interrogatory to the extent that it requires the premature

14  disclosure of Plaintiffs' expert opinions, and information protected by the attorney-client

15  privilege, work product doctrine or other privilege, including marital /spousal testimonial

16  privilege.

17       Subject to and without waiving these objections, Plaintiff has communicated with

18  her attorneys and law firm staff and agents. Additionally, Plaintiff received an email

19  newsletter and viewed a website regarding the claims in this case. Plaintiff directs

20  Defendant to the Response to Interrogatory No. 9 for more information.

21  **INTERROGATORY NO. 9:**

22       DESCRIBE ANY COMMUNICATIONS between YOU and ClassAction.org.

23  **RESPONSE TO INTERROGATORY NO. 9:**

24       Subject to the preliminary statement and general objections, Plaintiff objects to the

25  Interrogatory as seeking identification and production of information and documents that

26  are not, and never were in Plaintiff's possession, custody or control. Plaintiff further

27  objects to the Interrogatory's definition of "YOU" as improper third-party discovery

28

PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00282

1  because it seeks identification of information and documents that, to the extent they exist,

2  are not known to Plaintiff, and do not relate to this action.

3       Defendant's Interrogatory is facially overbroad, and therefore unduly burdensome.

4  Defendant may not seek all information related to a general topic, otherwise known as

5  "contention" interrogatories. *See e.g., Gopher Media, LLC v. Spain*, 2020 WL 6741675,

6  at *3 (S.D. Cal., Nov. 17, 2020) ("As a rule, requests for 'any and all' documents or

7  communications (or testimony about those materials) are facially overbroad"); *Sonnino*

8  *v. Univ. of Kan. Hosp. Auth.*, 2004 WL 764085, at *5 (D. Kan. Apr. 8, 2004) (a request

9  for production seeking "all documents that relate to or concern" a particular topic is

10  "overly broad on its face"); *Malik v. Amini's Billiard & Bar Stools, Inc.*, 2005 WL 8160879,

11  at *8 ("courts generally find contention interrogatories or requests to be overly broad on

12  their face to the extent they ask for "every fact" or "any and all" documents that support an

13  allegation or defense"); *High 5 Games, LLC v. IGT*, 2015 WL 9685094 at *1 (N.D. Ill.,

14  Nov. 25, 2015) (interrogatories containing "all documents" and "all individuals with

15  knowledge" pertaining to the subject matter specified in the interrogatory held to be

16  overbroad on their face). Accordingly, Plaintiff will identify material information

17  regarding the allegations in his complaint.

18       Plaintiff further objects to this Interrogatory because it is vague, overbroad, and

19  seeks information irrelevant and not proportional to the needs of the pending case.

20  Plaintiff's communications with third parties are irrelevant to this case. Moreover, based

21  on the definitions of YOU, ANY, and COMMUNICATIONS, Defendant seeks any

22  incidental communications between Plaintiff and his agents and any other person or entity

23  regarding the lawsuit, regardless of how inconsequential such communication is to this

24  case. Accordingly, Plaintiff will only respond to this Request to the extent that Plaintiff

25  has any communication with another individual which expressly references the claims at

26  issue in this dispute.

27       Plaintiff objects to this Request as vague and ambiguous to the extent that it calls for

28

10

PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00283

Plaintiff to determine the identities of unknown parties and their communications with other unknown parties. Plaintiff lacks the requisite personal knowledge to determine any person that has "act on [his] behalf" has had any written communications regarding the Products at issue.

Plaintiff also objects to this interrogatory to the extent that it requires the premature disclosure of Plaintiffs' expert opinions, and information protected by the attorney-client privilege, work product doctrine or other privilege.

Subject to and without waiving these objections, on or about June 29, 2023, Plaintiff viewed a website (https://www.classaction.org/elderberry-supplement-lawsuit) on classaction.org regarding this case and provided her contained information on the form provided. Plaintiff also received an email newsletter regarding several cases, including the involving Sambucol, from newsletter@classaction.org, on the same date.

**INTERROGATORY NO. 10:**

DESCRIBE all TESTS of the PRODUCTS performed by YOU or on YOUR behalf.

**RESPONSE TO INTERROGATORY NO. 10:**

Subject to the preliminary statement and general objections, Plaintiff objects to this Request as vague and ambiguous to the extent that it calls for Plaintiff to determine the identities of unknown parties and their communications with other unknown parties. Plaintiff lacks the requisite personal knowledge to determine any person that has "act on [her] behalf" has had any written communications regarding the Products at issue.

Plaintiff Sunderland objects to this interrogatory on the grounds that it is vague and seeks information not relevant or proportional to the needs of this case, which alleges that: (1) there are no published studies which test the Elderberry Products; (2) that the Elderberry Products have not been "scientifically tested" as labeled.

Plaintiff also objects to this interrogatory to the extent that it requires the premature disclosure of Plaintiff's expert opinions, and information protected by the attorney-client privilege, work product doctrine or other privilege.

11

Exhibit B
00284

1    Subject to and without waiving her objections, Plaintiff has completed the lectin

2    testing referenced in the complaint.

3    **INTERROGATORY NO. 11:**

4    IDENTIFY ANY DOCUMENTS RELATING TO or CONCERNING the TESTS

5    identified in YOUR response to Interrogatory No. 10.

6    **RESPONSE TO INTERROGATORY NO. 11:**

7    Subject to the preliminary statement and general objections, Plaintiff objects to this

8    Request as vague and ambiguous to the extent that it calls for Plaintiff to determine the

9    identities of unknown parties and their communications with other unknown parties.

10   Plaintiff lacks the requisite personal knowledge to determine any person that has "act on

11   [her] behalf" has had any written communications regarding the Products at issue.

12   Plaintiff objects to this interrogatory on the grounds that it is vague and seeks

13   information not relevant or proportional to the needs of this case, which alleges that: (1)

14   there are no published studies which test the Elderberry Products; (2) that the Elderberry

15   Products have not been "scientifically tested" as labeled.

16   Plaintiff also objects to this interrogatory to the extent that it requires the premature

17   disclosure of Plaintiff's expert opinions, and information protected by the attorney-client

18   privilege, work product doctrine or other privilege.

19   Subject to and without waiving her objections, Plaintiff directs Defendant to the NIS

20   Lab Testing Report and documentation, produced in the *Corbett v. Pharmacare U.S., Inc.*

21   matter.

22   DATED: January 5, 2024                    Respectfully submitted,

23

24   By: /s/ Trenton R. Kashima

25   Trenton R. Kashima (SBN 291405)
     **MILBERG COLEMAN BRYSON**
26   **PHILLIPS GROSSMAN PLLC**
     402 West Broadway St., Suite 1760
27   San Diego, CA 92101

28
                                        12
PLAINTIFF LINDA SUNDERLAND'S RESPONSES AND OBJECTIONS TO DEFENDANT'S
INTERROGATORIES, SET ONE; CASE NO.: 3:23-CV-01318-JES-AHG

Exhibit B
00285

Tel: (619) 810-7047
tkashima@milberg.com

Alex Straus (SBN 321366)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 s. Beverly Drive, Ste. PH
Beverly Hills, CA 902126
Tel: 865-247-0080
astraus@milberg.com.com

Rachel Soffin*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel: 865-247-0080
rsoffin@milberg.com

Martha A. Geer*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 West Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: 919-600-5035
mgeer@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: 313-303-3472
nsuciu@milberg.com

*Attorneys for Plaintiffs
and the Proposed Classes*

13

Exhibit B
00286

1   Trenton R. Kashima (SBN No. 291405)
2   **MILBERG COLEMAN BRYSON
    PHILLIPS GROSSMAN PLLC**
3   402 W. Broadway., Suite 1760
    San Diego, CA 92101
4   Tel: (619) 810-7047
    tkashima@milberg.com
5   *Attorneys for Plaintiffs
    and the Proposed Classes*
6

7

8                  UNITED STATES DISTRICT COURT
9                SOUTHERN DISTRICT OF CALIFORNIA
10
11  LINDA SUNDERLAND and          Case No. 3:23-cv-01318-JES-AHG
    BENJAMIN BINDER individually and
    on behalf of all others similarly situated,
12
                                  **PLAINTIFF LINDA
13           Plaintiffs,          SUNDERLAND'S VERIFICATION
                                  OF RESPONSES AND
14      v.                        OBJECTIONS TO DEFENDANT
                                  PHARMACARE U.S., INC.'S
15  PHARMACARE U.S., INC., a Delaware  INTERROGATORIES TO LINDA
    Corporation, and PHARMACARE  SUNDERLAND, SET ONE**
16  LABORATORIES PTY LTD., an
    Australian company,
17
             Defendants.
18

19      I, Linda Sunderland, am Plaintiff in the above captioned matter, and believe,

20  based on reasonable inquiry, that the responses and objections to Defendant

21  Pharmacare U.S., Inc.'s Interrogatories to Linda Sunderland, Set One are true and
22
23  correct to the best of my knowledge, information, and belief.

24      I verify under penalty that the foregoing is true and correct.
25
    Executed on the <u>5th</u> day of <u>January</u>, 2024.
26
27                              _____
                                Linda Sunderland (Jan 5, 2024 15:51 EST)
28                              Linda Sunderland

    _____
    VERIFICATION OF PLAINTIFF'S RESPONSES TO          Case No. 3:23-cv-01318-JES-AHG
    INTERROGATORIES, SET ONE

                                                      Exhibit B
                                                      00287





SUNDERLAND_000001

Exhibit B
00288





Exhibit B
00290